IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JACOB BAREFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFERSON S. DUNN, GRANTT | ) | Case No. 2:20-cv-00917-WKW-SRW |
| CULLIVER, JEFFERY A. WILLIAMS, | ) | |
| DENNIS STAMPER, RUTH NAGLICH, | ) | **JURY TRIAL DEMANDED** |
| JENNIFER S. ABBOTT, ARNALDO | ) | |
| MERCADO, MATTHEW C. BRAND, | ) | |
| CHRISTY VINCENT, MICHAEL | ) | |
| STRICKLAND, KARLA JONES, PATRICIA | ) | |
| MYERS, BRIAN S. GORDON, JACOB R. | ) | |
| PETERS, JOSIAH C. HAGGINS, ANNE | ) | |
| HILL, CHRISTINA S. GLENN, LIZZIE | ) | |
| RUMPH, D'ANTHONY V. BYRD, ROBERT | ) | |
| E. LEWIS, III, UNKNOWN ADOC | ) | |
| ADMINISTRATORS, UNKNOWN | ) | |
| WARDENS, UNKNOWN ASSISTANT | ) | |
| WARDENS, UNKNOWN COMMANDERS, | ) | |
| UNKNOWN OFFICERS, UNKNOWN I&I | ) | |
| OFFICERS, and GOVERNOR KAY IVEY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## <u>AMENDED COMPLAINT</u>

Plaintiff Jacob Barefield, by and through his attorneys, Crowell & Moring LLP, files this

Complaint against Defendants Jefferson S. Dunn, Grantt Culliver, Jeffery A. Williams, Ruth

Naglich, Dennis Stamper, Jennifer Abbott, Arnaldo Mercado, Matthew C. Brand, Christy Vincent,

Michael Strickland, Karla Jones, Patricia Myers, Brian S. Gordon, Jacob R. Peters, Josiah C.

Haggins, Anne Hill, Christina S. Glenn, Lizzie Rumph, D'Anthony V. Byrd, Robert E. Lewis III,

Governor Kay Ivey, Unknown ADOC Administrators, Unknown Wardens, Unknown Assistant

Wardens, Unknown Commanders, Unknown Officers, and Unknown I&I Officers, and states as follows:

**INTRODUCTION**

1.      Plaintiff Jacob Barefield was brutally raped at knifepoint on the morning of November 11, 2018, while under the custody of the Alabama Department of Corrections ("ADOC") at Ventress Correctional Facility ("Ventress") in Clayton, Alabama (Barbour County). Defendants' policies, procedures, and conduct allowed Plaintiff to be taken under threat of a contraband knife to a dormitory supposedly monitored by Ventress Defendants[1] where he should not have been permitted access.  Once there, he was raped—by another inmate known by at least Defendants Culliver, Mercado, Vincent, Strickland, Myers, Gordon, Peters, Haggins, and Lewis to be a violent sexual offender—in a makeshift tent of sheets hung from a bunk under a blaring television turned up in an obvious attempt to drown out calls for help or other sounds of distress.

2.      Larry Lowe, the inmate who raped Plaintiff, was serving a 25-year prison sentence for murder, and had a history of violent behavior towards other inmates during his incarceration including, upon information and belief, homicide and sexual assault.  Nonetheless Defendant Administrative Supervisors,[2] particularly Defendants Culliver or Williams, allowed Lowe to be transferred from St. Clair, a prison for Alabama's most violent inmates, to Ventress, a medium-

---

[1] Defendant Strickland, Defendant Jones, Defendant Unknown Wardens, Defendant Unknown Assistant Wardens, Defendant Myers, Defendant Gordon, Defendant Peters, Defendant Haggins, Defendant Glenn, Defendant Rumph, Defendant Byrd, Defendant Lewis, Defendant Unknown Commanders, and Defendant Unknown Officers are collectively referred to as the "Ventress Defendants."  The Ventress Defendants were all employed by ADOC as a Ventress official, officer, or staff during the time frame relevant to the allegations in this Complaint.

[2] Collectively, Defendants Dunn, Culliver, Williams, Stamper, Naglich, Abbott, Mercado, Brand, Hill, Vincent, Ivey, and Unknown ADOC Administrators are referred to as "Defendant Administrative Supervisors."

security prison. Lowe described himself to Plaintiff as a leader of a well-known gang at Ventress, and at least Defendants Culliver, Mercado, Vincent, Strickland, Myers, Gordon, Peters, Haggins, and Lewis also knew or should have known about Lowe's gang affiliation and history of violence against other inmates.

3.     After Plaintiff was viciously raped at knifepoint, Defendant Administrative Supervisors and Ventress Defendants allowed him to be held hostage by Lowe and other gang members for more than five hours, thereby preventing him from obtaining immediate medical attention. During this time Lowe told Plaintiff he would be killed if he told anyone what happened. Lowe also told Plaintiff that it would become easier over time and he would "get used to it." Plaintiff understood this to mean that Lowe would rape him repeatedly while under Defendants' custody.

4.     When Plaintiff was finally permitted to leave Lowe's dormitory, Plaintiff went straight to Defendant Haggins, the Ventress Shift Commander on duty, and reported to Defendant Haggins that he had just been raped. Defendant Haggins took none of the steps required by the Prison Rape Elimination Act ("PREA"), 34 U.S.C. §§ 30301-02, or ADOC's own administrative regulations when an inmate reports a sexual assault (AR 454).[3] He did not file a report of the incident; he did not take Plaintiff to the infirmary at Ventress or any other medical facility; he did not provide Plaintiff with access to a medical examination or a rape kit; he did not notify the PREA coordinator; he did not notify ADOC's Intelligence and Investigation ("I&I") Division; he did nothing to preserve the crime scene where the rape occurred or collect evidence that would have allowed Lowe to be held accountable; and he did not provide access to mental health care or

---

[3] ADOC Administrative Regulation No. 454, *Inmate Sexual Abuse and Harrassment (Prison Rape Elimination Act [PREA]),* January 4, 2016 (available at http://www.doc.state.al.us/docs/AdminRegs/AR454.pdf) ("AR 454").

counseling for the rape.  He did not even ask Plaintiff which inmate committed the rape or allow him to seek medical treatment.  Instead, Defendant Haggins ordered Plaintiff to go immediately to his dormitory.

5. Because neither Defendant Haggins nor any other Defendant had taken any steps to respond to his assault, Plaintiff asked a friend outside the prison to report the rape, which she did that same evening through ADOC's website.  On information and belief, pursuant to ADOC policy, including AR 302 governing *Incident Reporting*, Defendants Gordon, Lewis, Peters, and Strickland received this report when it was submitted but like Defendant Haggins took none of the steps required by PREA or ADOC's regulations to provide medical treatment, preserve the crime scene or collect evidence of the rape.

6. Instead, shortly after Plaintiff's friend reported the incident, and in retaliation against Plaintiff for reporting the rape as well as in blatant disregard of their obligation to protect Plaintiff from retaliation, Ventress Supervisory Defendants[4] and Defendant Lewis transferred Lowe from his assigned dormitory, F Dorm, to a cell near Plaintiff's bunk in Plaintiff's assigned dormitory, C Dorm.  From that location and in the presence of Ventress Defendants, Lowe was able to harass and threaten Plaintiff on an ongoing basis, day and night, including, specifically, threatening to harm Plaintiff if he did not withdraw his report of the rape.  Other prisoners, who Plaintiff believed were affiliated with the same gang, joined in threatening Plaintiff with violent retaliation if he did not recant his report.

7. As a result of the rape, Plaintiff contracted Hepatitis B and Hepatitis C. His Hepatitis C remains active but Defendants, including Defendant Naglich, Ventress Defendants,

---

[4] Collectively, individual Defendants Strickland, Jones, Unknown Wardens, Unknown Assistant Wardens, Myers, Gordon, Peters, Haggins, and Unknown Commanders are referred to as "Ventress Supervisory Defendants."

and Defendant Vincent, failed to provide Plaintiff with proper treatment for it at the time of the incident and up until his release from ADOC's custody. In addition, Plaintiff was not tested or treated for HIV or other sexually transmitted infections during the weeks and months after he reported his rape, although Defendant Administrative Supervisors, Ventress Supervisory Defendants, I&I Defendants, Defendant Glenn, and Defendant Haggins knew or should have known that the risk of transmission of such diseases under the circumstances was high.  The administration of HIV prophylaxis within 72 hours of contraction of the disease can eliminate any HIV infection.  Defendants' failure to provide proper medical care when Plaintiff reported the assault, including access to a rape kit and to emergency HIV prophylaxis, cost Plaintiff the opportunity to eliminate any HIV infection he may have contracted from the rape. Plaintiff also suffered severe trauma, depression, and mental and emotional distress after the rape.

8.      The violent rape of Plaintiff, and each and every Defendant's deliberate indifference to the substantial and known risks of serious danger resulting from deplorable conditions (including severe overcrowding, understaffing, and a lack of adequate monitoring) were not isolated occurrences: indeed, inmate-on-inmate rape and other severe assaults were then (and still are) routine at Ventress.  Between January 2016 and January 2019, Ventress's own incident reports list an average of 39 inmate-on-inmate assaults every month.  In November 2018, the month Plaintiff was raped, the report identifies at least 47 incidents of inmate-on-inmate assaults. This number of assaults is far above the national average for a medium-security prison.  Even so, these data still understate the actual numbers of assaults because many go unreported by inmates and ADOC staff, including Ventress Defendants.

9.      This endemic violence is the direct and predictable result of Defendant Administrative Supervisors' decisions, which permit chronic understaffing and overcrowding to

persist at Ventress and throughout ADOC facilities; each and every Defendant's pattern and practice of suppressing reports of rape and ignoring or punishing individuals who report such incidents; and Defendant Administrative Supervisors and Ventress Supervisory Defendants' failure to properly supervise prison officials and correctional officers and hold them accountable for gross negligence and malfeasance in performing their required job functions, despite their knowledge of the substantial risks of serious harm at Ventress.

10.   Indeed, at the time Plaintiff was raped, Defendant Administrative Supervisors and Ventress Supervisor Defendants had filled only 30 percent of the correctional officer positions at Ventress.  Yet the inmate population at Ventress was nearly double that which the facility was designed to house. Defendant Administrative Supervisors and Ventress Defendants all had knowledge of the severe understaffing and overcrowding at Ventress, and the substantial risk of serious harm that it created, for years prior to the rape of Plaintiff.  Before Plaintiff was raped, Commissioner Dunn had testified that ADOC was "wrestling with a 'two-headed monster': overcrowding and understaffing." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1184 (M.D. Ala. 2017) (internal citations omitted).

11.   Despite Defendant Administrative Supervisors and Ventress Supervisory Defendants' knowledge, they allowed this situation to continue unabated for many years leading up to the rape of Plaintiff, demonstrating deliberate indifference to the known risk.  Indeed, just two months after Plaintiff's rape, on January 30, 2019, Defendant Dunn testified before the Alabama state legislature that "we still are down to 50 percent or lower staffing levels in many of our major facilities," and "there is a direct correlation between the shortage of officers in our

prisons and the increase in violence." Defendant Dunn also testified that the level of violence in ADOC's prisons remains "unacceptably high."[5]

12.     Three months after the rape, Defendant Ivey admitted to these long-standing deficiencies, stating, "In order to correct a problem, you must first admit there is a problem. In Alabama, we have a problem. Our problem is our state's corrections system. Like many other states, issues of violence, poor living conditions and mental illness persist within our system. These issues, and others, are exacerbated by a crowded inmate population, correctional and health care staffing challenges, and aging prison infrastructure – each piece compounding the others. We have a problem in Alabama, and *we have waited far too long to address it*." Governor Ivey, *Gov. Ivey: Rebuilding the Alabama Corrections System*, AL.com (Feb. 12, 2019), https://www.al.com/opinion/2019/02/gov-ivey-rebuilding-the-alabama-corrections-system.html. Moreover, she further admitted that despite this dangerous understaffing problem that had been going on unaddressed for years, it was not until December 2018, one month *after* the rape, that ADOC saw its "*first increase* in the number of correctional officers *in years*." *Id.* (emphasis added). This happened even, as Governor Kay reported, as "Alabama currently sits under a federal court order requiring the state to roughly double the number of correctional officers in the next two years. Although I disagree with many aspects of the lawsuit that led to this order, the fact of the matter is that it compels us to make staffing levels a necessary and vital part of the solution to our problem." *See id.*

13.     Nearly a year after this lawsuit was filed, Defendant Ivey wrote to the Alabama Legislature, asking:

---

[5] "Alabama prisons seek 500 more officers; 20 percent raises" at Alabama.com (Jan. 30, 2019) (last accessed on November 4, 2020 at https://www.al.com/news/2019/01/alabama-prisons-seek-500-more-officers-20-percent-raises.html).

It is my understanding that your respective caucuses will be meeting this week to discuss the merits of legislation currently being drafted to address Alabama's longstanding, yet urgent, prison infrastructure challenges. I do not use the word "urgent" lightly. We are already under a variety of federal court orders that impose certain mandates, which take critical funds away from hardworking Alabamians and families. And if our prison infrastructure issues are not resolved in a timely manner and the state is unsuccessful in court, our budgets will be even more significantly impacted. As Alabama did in past years, we could once again be subject to government by federal court order rather than government by our own elected officials.

*See* Erin Davis, *Ivey Asks Lawmakers to Develop Plan to Fix "Urgent" Prison Problems*, WBRC.com, https://www.wbrc.com/2021/09/09/ivey-asks-lawmakers-develop-plan-fix-urgent-prison-problems/ ("I do not use the word 'urgent' lightly.").

14.     Defendant Ivey added that "the state of [ADOC's] prison infrastructure is untenable," and that "many of our facilities have long surpassed their anticipated lifespans, resulting in . . . unsustainable living and working conditions for both inmates and correctional staff," recognizing that new legislation is necessary "to address Alabama's longstanding, yet urgent, prison infrastructure challenges." *Id*. In an official statement to the State Legislature, Defendant Ivey went on to explain that "[t]hese challenges did not arise overnight – or even during the past decade. . . . Instead, these challenges we face today are the result of decades of neglect." *Id*.

15.     Defendant Administrative Supervisors and Ventress Supervisory Defendants' decisions and actions in permitting these and other conditions to persist at Ventress caused Plaintiff's injuries.

16.     Defendants also knowingly failed to perform basic security functions, including those expressly mandated by PREA as well as ADOC and Ventress's own procedures and administrative regulations that would have prevented the rape. Among other failures, Ventress Defendants routinely failed to enforce safety rules that prevent inmates from accessing housing

areas to which they were not assigned, including performing even the most basic safety requirements, such as locking doors and having guards at their stations. Ventress Defendants did not monitor or patrol inmate activities in housing areas as required by ADOC and Ventress policies or procedures, nor did they install cameras to facilitate monitoring despite chronic severe staffing shortages. Ventress Defendants did not take reasonable steps to find and confiscate contraband weapons, which were ubiquitous at Ventress. Ventress Defendants allowed inmates to erect and maintain sheet and blanket "tents" on bunkbeds, known as "humps," which helped to conceal rape and other illicit activity. Ventress Defendants and I&I Defendants often failed to investigate or report violent incidents, concealed reports of such incidents, and took actions to discourage victims from reporting crimes. Ventress Defendants and I&I Defendants also failed to take necessary measures to prevent inmates from retaliating against other inmates who report crimes. In short, Ventress Defendants failed adequately to supervise hundreds of men, who were free to roam throughout the prison in violation of prison policies and who were left unmonitored for extended periods in open-bay dormitories.

17.     Conditions at Ventress and other ADOC facilities have been so dangerous for so long that the U.S. Department of Justice ("DOJ") concluded that ADOC "has violated and is continuing to violate the Eighth Amendment rights of prisoners housed in men's prisons by failing to protect them from inmate-on-inmate violence, inmate-on-inmate sexual abuse, and by failing to provide safe conditions, and that such violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights secured by the Eighth Amendment." U.S. Dep't of Just., Civ. Rts. Div., Investigation of Alabama's State Prisons for Men (2019), at 1 ("DOJ 2019 Report"). DOJ described these violations as "severe, systemic, and exacerbated by serious deficiencies in staffing and supervision; overcrowding; ineffective housing and classification protocols; inadequate

incident reporting; inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons; ineffective prison management and training; insufficient maintenance and cleaning of facilities; the use of segregation and solitary confinement to both punish and protect victims of violence and/or sexual abuse; and a high level of violence that is too common, cruel, of an unusual nature, and pervasive." *Id.* at 1-2.

18.     DOJ found that these Eighth Amendment violations are rampant throughout ADOC facilities, specifically including Ventress.  The Justice Department found "a strong pattern of evidence of deficient supervision" based on records of "hundreds of grave injuries to prisoners that were inflicted out of the sight of ADOC correctional officers." *Id.* at 18.  Furthermore, DOJ identified multiple incidents of violence at Ventress in just one week, and noted that "based on what we learned from our investigation and statements made by ADOC's head of operations [Defendant Culliver, on information and belief], it is likely that many other incidents also occurred this week but were not reported by prisoners or staff." *Id.* at 3.

19.     The rape of Plaintiff (as well as the numerous other inmate-on-inmate rapes and assaults) resulted from each and every Defendant's deliberate indifference to the dangerous conditions at Ventress that Defendants knew about and permitted to persist and worsen over a number of years.  At least Defendants Culliver, Mercado, Vincent, Strickland, Myers, Gordon, Peters, Haggins, and Lewis   also knew Lowe posed a specific risk of sexual and other violence, and they nonetheless failed to take necessary steps, including those required by ADOC regulations and Ventress's own policies, to protect other inmates, including Plaintiff, from him.  As a result, Lowe was able to force Plaintiff by threatening him with a contraband knife, which he should not have had, into a dormitory room that Plaintiff should not have been allowed to enter, and onto a lower bunk concealed by a "sheet tent" that should not have been allowed to exist; located under

a television playing at a volume that should not have been permitted; where Lowe was able to brutally rape Plaintiff and hold him hostage for approximately five hours without intervention from or protection provided by Ventress Defendants.

20.     As the Supreme Court has explained, "[h]aving incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citation omitted). Thus, it has long been recognized that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Id*. (quotation and alteration omitted).

21.     Plaintiff brings this action to redress his own injuries, physical, mental, and otherwise that were caused by the unlawful actions of each and every Defendant.

<u>**PARTIES**</u>

22.     Plaintiff Jacob Barefield is a 28-year-old resident of Alabama who entered ADOC custody on September 26, 2017.  He had never been incarcerated before.  Plaintiff initially was processed for intake at ADOC's Kilby Correctional Facility beginning on September 26, 2017. On December 27, 2017, he was transferred to Ventress, a medium-custody facility, where he was violently raped at knifepoint by another inmate on November 11, 2018.  Plaintiff was released from Ventress on August 28, 2021.

23.     Defendant Jefferson S. Dunn is over 19 years of age and is a resident of the State of Alabama.  Defendant Dunn was appointed the Commissioner of ADOC in April 2015, and held that position at the time of the rape.  Upon information and belief, Defendant Dunn resigned as ADOC Commissioner on or about December 31, 2021.  As Commissioner, Defendant Dunn was ADOC's highest ranking official, responsible for ADOC's direction, supervision, and control.

Defendant Dunn was responsible for exercising the authority, functions, and duties of the Commissioner of ADOC, including the appointment of personnel and employees within ADOC required to meet ADOC's responsibilities to the individuals it incarcerates. Those duties included operating a prison system that protects the constitutional and human rights of persons within ADOC custody. Pursuant to AR 454, the "Commissioner [Defendant Dunn] [is] responsible for ADOC's compliance with federal and state laws relating to PREA."

24.     Defendant Grantt Culliver is over 19 years of age and is a resident of the State of Alabama. At the time of the rape and at the time of Lowe's transfer from St. Clair to Ventress, Defendant Culliver was employed by ADOC as Associate Commissioner for Operations. As Associate Commissioner, Defendant Culliver was responsible for ensuring the effective and safe daily operations of all prison facilities, including overseeing institutional security, staffing, Institutional Coordinators, Correctional Emergency Response Teams, the Classification Review Board, the Training Division, and the Transfer Division. Upon information and belief, Defendant Culliver retired from ADOC at the end of November 2018.

25.     Defendant Jeffery A. Williams is over 19 years of age and is a resident of the State of Alabama. Defendant Williams was employed by ADOC as the interim Associate Commissioner for Operations following Defendant Culliver and preceding Charles Daniels, who assumed the position in January 2019. As Associate Commissioner, Defendant Williams was responsible for ensuring the effective and safe daily operations of all prison facilities, including overseeing institutional security, staffing, Institutional Coordinators, Correctional Emergency Response Teams, the Classification Review Board, the Training Division, and the Transfer Division. Defendant Williams left the position of Associate Commission for Operations in January 2019 and currently holds the position of Deputy Commissioner of Governmental Relations.

26.     Defendant Dennis W. Stamper is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of the rape and currently, Defendant Stamper was and is employed by ADOC as Deputy Commissioner, Special Assistant.  As Deputy Commissioner, Special Assistant, Defendant Stamper is responsible for helping with departmental projects that required prioritized attention, such as construction of new prisons and renovation of existing facilities.  Upon information and belief, Defendant Stamper also has been performing the functions of Associate Commissioner for Operations since Charles Daniels left ADOC at the end of 2019.

27.     Defendant Ruth Naglich is over 19 years of age and is a resident of the State of Alabama.  At the time of the rape and currently, Defendant Naglich was employed by ADOC as Associate Commissioner of Health Services.  As Associate Commissioner of Health Services, Defendant Naglich was responsible for the administration of medical and mental health services to inmates throughout ADOC's correctional institutions, including inmates housed at Ventress.

28.     Defendant Jennifer S. Abbott is over 19 years of age and is a resident of the State of Alabama.  At the time of the rape and currently, Defendant Abbott was and is employed by ADOC as Director of Facilities Management.  As Director of Facilities Management, Defendant Abbott is responsible for maintenance operations within ADOC's correctional institutions.

29.     Defendant Arnaldo Mercado is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of the rape, Defendant Mercado was the Director of ADOC's Intelligence and Investigation Division ("I&I") responsible for the supervision of all I&I investigations.  Pursuant to AR 454, as the I&I Director, Defendant Mercado was responsible, among other things, for ensuring that all allegations of sexual abuse and harassment are thoroughly

investigated, referring violations of the law to the district attorney for prosecution, and reporting statistical data for PREA-related incidents.

30.     Defendant Matthew C. Brand is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of the rape and currently, Defendant Brand was and is ADOC's Associate Commissioner of Administrative Services responsible for the training, development, and education of ADOC's workforce, including training necessary for PREA compliance.  He also has been responsible for implementing supervisory training courses, executive and basic leadership training, and developing the basic correctional officer position.

31.     Defendant Anne Hill is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of the rape and currently, Defendant Hill was and is employed by ADOC as Chief of Staff.  As Chief of Staff, Defendant Hill is responsible for coordinating all staff activities and overseeing the day-to-day management of ADOC operations. Defendant Vincent, the Agency-Wide PREA Coordinator, reported to Defendant Hill, according to the 2018 Ventress PREA audit. Defendant Hill had knowledge of the *Braggs* decisions, the monitoring reports in response to the Tutwiler case and consent decree, and the investigation by the U.S. Department of Justice from 2016-18, including, on information and belief, her participation in ADOC's document collection in response to DOJ's repeated requests and subpoena.

32.     Defendant Christy Vincent is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of the rape and currently, Defendant Vincent was and is employed as Director, ADOC PREA Division.  As Director, PREA Division, Defendant Vincent is responsible for coordinating and developing procedures to identify, monitor, and track

sexual abuse, rape, and sexual harassment in ADOC facilities; maintaining statistics; and conducting practice audits to ensure compliance with ADOC and PREA policies and standards.

33.     Defendant Kay Ivey is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of the rape and currently, Defendant Ivey was and is the Governor of the State of Alabama.  As Governor of Alabama, Defendant Ivey is responsible for overseeing ADOC and is responsible for implementing policies and procedures to protect inmates such as Plaintiff.

34.     Defendant Unknown ADOC Administrators are each over 19 years of age and, upon information and belief, are residents of the State of Alabama.  During the time relevant to the allegations in this Complaint and currently, Defendant Unknown ADOC Administrators were and are employed by ADOC as executive-level administrators.  Defendant Unknown ADOC Administrators are responsible for the day-to-day operations of ADOC, including ensuring the effective and safe daily operations of all prison facilities, overseeing institutional security, staffing, the safety of all prisoners, the training and supervision of all subordinate employees, and the appointment of personnel and employees within ADOC required to meet ADOC's responsibilities to the individuals it incarcerates.  Those duties also include operating a prison system that protects the constitutional and human rights of persons within ADOC's care and custody.

35.     Collectively, Defendants Dunn, Culliver, Williams, Stamper, Naglich, Abbott, Mercado, Brand, Hill, Vincent, Ivey, and Unknown ADOC Administrators are referred to as "Defendant Administrative Supervisors."

36.     Defendant Michael Strickland is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of the rape, Defendant Strickland was employed by ADOC as the Warden of Ventress.  Defendant Strickland was the Warden of Ventress

beginning around May 2018 to approximately 2019. As Warden of Ventress, Defendant Strickland was responsible for the day-to-day operations of the prison including staffing and maintenance, the placement, housing, movement, and ultimately the safety, health, and well-being of all prisoners within ADOC custody at Ventress, and the training and supervision of all subordinate employees at the prison. Defendant Strickland also was responsible for, among other things, developing Standard Operating Procedures to implement AR 454; ensuring that intermediate or higher-level supervisors (defined as Correctional Sergeants through Wardens) conduct and document unannounced rounds, on each shift, to deter sexual assaults; ensure compliance with AR 302, *Incident Reporting*, as it applies to PREA; and ensuring that an allegation received from an inmate of sexual abuse or harassment at the facility is appropriately handled, that I&I is notified, and that the inmate receives all necessary follow up care according to the requirements of ADOC's PREA policy.

37. Defendant Karla Jones is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. Defendant Jones was the Warden of Ventress from 2015 to 2018. As Warden of Ventress, Defendant Jones was responsible for the day-to-day operations of the prison, the safety of all prisoners, and the training and supervision of all subordinate employees. In 2015, local media in Alabama reported that ADOC "announced this week they will be shuffling key leadership positions in response to the continued criticism of overcrowding and reported violence [in Alabama's prisons]." As part of that reshuffling, Defendant Jones moved from Easterling Correctional Facility to Ventress Correctional Facility. Previously she had been the deputy warden at Tutwiler Prison for Women at a time when rampant abuse and sexual violence against inmates was documented by the Department of Justice, resulting in a consent agreement in federal court. For example, the 2014 DOJ report identified the extensive sexual violence at

Tutwiler and leadership's failures to address it, noting among other things, that "[d]espite Warden II Jones' attendance at the training, Tutwiler officials have yet to embrace gender-responsive strategies to manage the institution, or incorporate the strategies into their operational policies, practices, and procedures. Had Tutwiler adopted these strategies, a number of the harms identified in our investigation could have been avoided." A substantial risk of sexual violence against inmates continued undeterred under Defendant Jones's leadership during her tenure at Ventress as well.

38.     Defendant Unknown Wardens are each over 19 years of age and, upon information and belief, are residents of the State of Alabama. During the time relevant to the allegations in this Complaint, Defendant Unknown Wardens were employed by ADOC as Wardens at Ventress. Wardens at Ventress were responsible for the day-to-day operations of the prison, the safety of all prisoners, and the training and supervision of all subordinate employees.

39.     Defendant Unknown Assistant Wardens are each over 19 years of age and, upon information and belief, are residents of the State of Alabama. During the time relevant to the allegations in this Complaint, Defendant Unknown Assistant Wardens were employed by ADOC as Assistant Wardens at Ventress. Assistant Wardens at Ventress were responsible for staff planning, discipline, and security.

40.     Defendant Patricia Myers is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of the rape, Defendant Myers was employed by ADOC as an Administrative Captain at Ventress.  As an Administrative Captain, Defendant Myers was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.   Defendant Myers was also responsible for supervising institutional activities during shifts, including the corrections officers and other subordinates who supervised locations such as the prison canteen, C Dorm, and F Dorm.

41.     Defendant Brian S. Gordon is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of the rape, Defendant Gordon was employed by ADOC as a Lieutenant at Ventress, and was the Ventress Institutional PREA Compliance Manager ("IPCM").  As a Lieutenant, Defendant Gordon was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.  As the Ventress IPCM, Defendant Gordon also was responsible for, among other things, monitoring inmates identified as sexual aggressors, potential sexual aggressors, victims of sexual abuse, and potential victims of sexual abuse; reviewing, monitoring, and maintaining records of all PREA-related incidents, forms and documents to ensure compliance with AR 454 and federal PREA standards; recommending placement and/or transfer of inmates involved in PREA-related incidents; taking immediate action when an inmate is subject to a substantial risk of imminent abuse; conducting after-hours institutional visits; ensuring inmates and employees in PREA-related incidents receive all services required and submitting appropriate reports.

42.     Defendant Jacob R. Peters is over the age of 19, and, upon information and belief, is a resident of the State of Alabama. At the time of the rape, Defendant Peters was employed by ADOC as a Sergeant at Ventress, and was the Ventress back-up IPCM.  As a Sergeant, Defendant Peters was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.  As the Ventress back-up IPCM, Defendant Peters also was responsible for, among other things, monitoring inmates identified as sexual aggressors, potential sexual aggressors, victims of sexual abuse, and potential victims of sexual abuse; reviewing, monitoring, and maintaining records of all PREA-related incidents, forms and documents to ensure compliance with AR 454 and federal PREA standards; recommending placement and/or transfer of inmates involved in PREA-related incidents; taking immediate action

when an inmate is subject to a substantial risk of imminent abuse; conducting after-hours institutional visits; ensuring inmates and employees in PREA-related incidents receive all services required and submitting appropriate reports.

43.     Defendant Josiah C. Haggins is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of the rape, Defendant Haggins was employed by ADOC as a Sergeant at Ventress.  As a Sergeant, Defendant Haggins was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.  Defendant Haggins was on duty as the shift supervisor on November 11, 2018, the date Plaintiff was raped.

44.     Defendant Unknown Commanders are each over 19 years of age and, upon information and belief, are residents of the State of Alabama.  During the time relevant to the allegations in this Complaint, Defendant Unknown Commanders, including individuals employed by ADOC as Captains, Lieutenants, and Sergeants, were responsible for supervising institutional activities during shifts, as well as the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees, including the corrections officers and other subordinates who supervised locations such as the canteen, C Dorm, and F Dorm.

45.     Collectively, individual Defendants Strickland, Jones, Unknown Wardens, Unknown Assistant Wardens, Myers, Gordon, Peters, Haggins, and Unknown Commanders are referred to as "Ventress Supervisory Defendants."

46.     Defendant Glenn (whose first name, on information and belief, is Christina) is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of the rape, Defendant Glenn was employed by ADOC as a Corrections Officer at Ventress.  As a

Corrections Officer, Defendant Glenn was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.

47.     Defendant Rumph (whose first name, on information and belief, is Lizzie) is over the age of 19 and, upon information and belief, is a resident of the State of Alabama.  At the time of the rape, Defendant Rumph was employed by ADOC as a Corrections Officer at Ventress.  As a Corrections Officer, Defendant Rumph was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.

48.     Defendant D'Anthony V. Byrd is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of the rape, Defendant Byrd was employed by ADOC as a Corrections Officer at Ventress.  As a Corrections Officer, Defendant Byrd was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.

49.     Defendant Robert E. Lewis, III is over the age of 19 and, upon information and belief, is a resident of the State of Alabama. At the time of the rape, Defendant Lewis was employed by ADOC as an I&I Officer at Ventress.  As a Ventress I&I Officer, Defendant Lewis was responsible for "promptly, thoroughly, and objectively" investigating reports of sexual assault.

50.     Defendants Unknown Officers are each over the age of 19 and, upon information and belief, are residents of the State of Alabama. At the time of the rape, Defendant Unknown Officers were employed by ADOC as officers at Ventress. Defendant Unknown Officers include the officers on duty in the C Dorm, F Dorm, and the canteen on November 11, 2018, and thereafter, who failed to protect Plaintiff from the abduction and rape, ignored Plaintiff's reports of the rape and requests for investigation and medical attention, and/or failed to provide adequate medical care for Plaintiff's resulting injuries.

51.     Defendant Strickland, Defendant Jones, Defendant Unknown Wardens, Defendant Unknown Assistant Wardens, Defendant Myers, Defendant Gordon, Defendant Peters, Defendant Haggins, Defendant Glenn, Defendant Rumph, Defendant Byrd, Defendant Lewis, Defendant Unknown Commanders, and Defendant Unknown Officers are collectively referred to as the "Ventress Defendants."  The Ventress Defendants were all employed by ADOC as a Ventress official, officer, or staff during the time frame relevant to the allegations in this Complaint.

52.     Defendant Unknown I&I Officers are each over the age of 19, and upon information and belief, are residents of the State of Alabama.  At the time of Plaintiff's rape, Defendant Unknown I&I Officers were employed by ADOC in the I&I Division.  Defendant Unknown I&I Officers are additional officers who conducted or supervised the investigation relating to Plaintiff's rape.

53.     Defendant Mercado, Defendant Lewis, and Defendant Unknown I&I Officers are collectively referred to as the "I&I Defendants."  In addition to the responsibilities identified for Defendant Mercado, Defendant Lewis, and Defendant Unknown I&I Officers, I&I Defendants were responsible generally for investigating reports of inmate and ADOC personnel wrongdoing and misconduct.

54.     Collectively, all of the individual Defendants are referred to as the "Defendants."

55.     Unless otherwise noted, Plaintiff sues each of the Defendants in his or her individual capacity.

56.     Each of the Defendants acted under color of law and within the scope of his or her employment by ADOC when engaging in the conduct described in this Complaint.

## JURISDICTION AND VENUE

57.     This Court has original jurisdiction over Plaintiff's federal claims herein pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  Several claims herein arise under the Constitution, laws, or treaties of the United States.

58.     This Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a).

59.     Venue is proper, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims presented in this case occurred within this judicial district.

## FACTUAL ALLEGATIONS

### I.     THE RAPE AND AFTERMATH

**A.     Larry Lowe, a known, violent sexual offender, abducted and raped Plaintiff at knifepoint.**

60.     At approximately 9:30 a.m. on November 11, 2018, Plaintiff was in the snack line at the Ventress canteen when Larry Lowe approached him, showed him a knife next to his waist, and forced Plaintiff to go with him to the "F Dorm" where Lowe and other inmates with a high risk of committing violence against other inmates were assigned.  As was known to at least Defendants Culliver, Mercado, Vincent, Strickland, Myers, Gordon, Peters, Haggins, and Lewis , Lowe has a history of murder and sexual assault against other inmates, and he identified himself to Plaintiff as a leader of a well-known gang.  Upon information and belief, residents of F Dorm should not have been permitted by Ventress Defendants to leave the dorm at the time, and thus Lowe should not have been allowed to exit the dorm and enter the canteen area.  Ventress Defendants, however, failed to supervise inmate movements in accordance with their own policies, and that failure enabled Lowe to confront Plaintiff at the canteen.

61.     Despite the fact that there were dozens of inmates from various housing units in the canteen area at that time, there were no guards or officials supervising the area.  The nearest guard was in the "chow hall" next to the canteen.  Although the chow hall is next to the canteen, there is no line of sight from the chow hall to the canteen.  Likely due to the fact that there were no officers or guards overseeing the area, Lowe was able to abduct Plaintiff with a contraband knife without any intervention.

62.     To get from the canteen to F Dorm, Plaintiff and Lowe had to leave the canteen and walk across the yard past a number of other buildings.  On information and belief, Ventress policies require that there should have been guards stationed between the canteen and F Dorm—however, Lowe and Plaintiff did not pass a single officer during the walk.  Once at F Dorm, Lowe was able to force Plaintiff to enter the dormitory with ease.  Ventress policies require the door to F Dorm to be locked and secured at all times, but the door was unsecured and Lowe was able to push the door open.  Further, an officer was supposed to check wristbands at the door to ensure that entering inmates were assigned to F Dorm, but the officer on duty failed to do so.  Had an officer been properly monitoring and supervising entry into F Dorm, the officer would have determined by virtue of Plaintiff's yellow wristband, which identified Plaintiff as assigned to C Dorm, that Plaintiff was not authorized to enter F Dorm, where assigned inmates wear teal wristbands, and prevented Lowe from taking Plaintiff into F Dorm.

63.     When they arrived inside F Dorm, which houses approximately 100 inmates in one open-room dormitory environment, Lowe forced Plaintiff to a lower bunkbed at the back corner of the unit.  Sheets and blankets were hung from the upper bunk to create a "tent" covering the lower bunk, preventing anyone from seeing what was happening inside.  These so-called "sheet tents," or "humps," are intentionally put up by inmates to hide illicit conduct from prison officers,

even though they are an obvious security risk and a violation of Ventress rules.   Ventress Defendants, however, routinely allowed these sheet tents to remain in place for extended periods of time and they made no meaningful effort to prevent their use.   The bed was located under a television with the volume turned to the loudest possible level to drown out sounds of distress or calls for help.   Inside F Dorm, Lowe told another inmate known as "DJ," believed to be a member of Lowe's gang, that he was going to show him how to take control of another inmate.

64.     After forcing Plaintiff to that corner bed in F Dorm hidden by bedding, in the middle of the day under what should have been active supervision of the prison officers, Lowe forced his penis into Plaintiff's mouth and attempted to make him perform oral sex.   When Plaintiff did not cooperate, Lowe pulled out his knife and held it to Plaintiff's side, instructing Plaintiff to lie on his stomach while Lowe pulled Plaintiff's pants down to his knees.   Holding the knife at Plaintiff's side, Lowe put shaving cream into Plaintiff's rectum and violently raped him.

65.     After the rape, and while Plaintiff was experiencing extreme emotional and physical distress, Lowe held Plaintiff hostage and refused to allow him to leave F Dorm for approximately five hours.   During this time, Lowe warned Plaintiff that he would kill him if he told anyone about what happened.   Lowe also told Plaintiff that "it would get easier," and that he "would get used to it."   Plaintiff understood that Lowe was informing him that Lowe would repeatedly rape him during his time in ADOC custody at Ventress.

66.     On information and belief, Ventress procedures require that there be two "cubicle operators" and two correctional officers supervising each dorm at all times.   At the time of the rape, there was only one officer in the cubicle at F Dorm, and that officer was sitting in a position that made it impossible for him to keep watch over the area properly.   No other correctional officers were supervising the dorm.

67.     Further, on information and belief, Ventress procedures require prison officers to patrol each dorm every 30 minutes by doing a walk-through inspection.  During the five-plus hours in which Plaintiff was raped and then held hostage in F Dorm, no such patrols took place.  The only time a prison official entered the dorm during the entire ordeal was to perform an inmate "count."  During the count, Lowe directed Plaintiff to sit on another inmate's assigned bed.  Although Plaintiff was not assigned to F Dorm (as was evident to all based on the yellow wristband he wore), and was sitting on another inmate's assigned bed, the officer performing the count ignored Plaintiff's unauthorized presence there.

**B.      Ventress Defendants ignored Plaintiff's reports of the rape,  conducted only a superficial investigation after it was too late to secure evidence, and  subjected Plaintiff to retaliation.**

68.     Finally, when the inmates in F Dorm were instructed to leave for dinner following the inmate count, Lowe allowed Plaintiff to leave the area.  Plaintiff immediately sought out help and found Defendant Haggins, the shift supervisor on duty, outside in the prison yard.  Plaintiff told Defendant Haggins that he had just been raped.  Instead of following the procedures required by ADOC's administrative regulations implementing PREA, however, Defendant Haggins was dismissive, told him the yard was closed, and ordered him to return to his assigned dorm.  Plaintiff tried to reiterate that he had been raped, but Defendant Haggins again ignored what Plaintiff was saying and just repeated that the yard was closed.  Plaintiff had no choice but to return to his dorm as instructed.

69.     Defendant Haggins, as the first prison official told of the crime within hours of it having occurred (the "first responder"), failed to take any of the required actions in response to Plaintiff's report that he had just been raped.  Contrary to PREA and AR 454, Defendant Haggins did not take Plaintiff to the infirmary or anywhere else for medical treatment or the collection of

evidence.[6]  He took no steps whatsoever to secure the crime scene for investigation, or to ensure that Lowe did not clean himself or take any other action that might destroy evidence of the rape.[7] He did not order Plaintiff to preserve physical evidence, or at least to not take any action that might destroy physical evidence.[8]  Nor did he notify the prison's PREA Coordinator or contact the I&I Division to ensure that an investigation and other appropriate steps would be taken.[9]  He did not ask who perpetrated the rape.  And, on information and belief, Defendant Haggins failed to report the rape to anyone, either formally or informally.[10]

70.    Later that evening, Plaintiff called a friend outside the prison, told her what had happened, and asked her to report the rape to ADOC, which she did that evening.  Upon information and belief, Defendants Gordon, Lewis, Peters, and Strickland received this report when it was submitted, pursuant to ADOC policy (including AR 302 governing *Incident Reporting*) but each failed to take any of the steps required by PREA or ADOC's regulations to provide medical treatment, preserve the crime scene, or collect evidence of the rape, and each failed to ensure that anyone else was following those requirements.

---

[6] ADOC AR 454 § V.G.2.d. (Jan. 4, 2016) (requiring, among other things, that the Shift Commander, upon learning of an allegation of a PREA-related incident, take the alleged victim to the medical unit for a medical evaluation, ensure that the first responder – in this case Defendant Haggins himself – has secured the crime scene, ensure that the IPCM and I&I have been notified, and ensure that collection of evidence is accomplished by trained staff in accordance with ADOC AR 306).

[7] AR454 § V.G.1. (requiring first responder staff upon learning of a PREA-related incident, among other things, to: protect and preserve the crime scene until appropriate steps can be taken to collect evidence; ensure that the alleged aggressor not bathe, wash, urinate or defecate).

[8] *Id.* (requiring first responder staff to request that the victim not bathe, wash, urinate or defecate, or take any actions that would destroy evidence).

[9] *Id.* at V.G.2.

[10] *Id.* at V.G.1. (requiring first responder staff as soon as possible to draft an ADOC Form 302-A, *Incident Report*).

71.     Two days after the rape, on November 13, 2018, presumably in response to Plaintiff's friend's formal report, Defendant Lewis with Ventress I&I took Plaintiff's statement. Defendant Lewis did not attempt to collect any physical evidence.  He did not refer or take Plaintiff to the infirmary for administration of a rape kit or emergency medical treatment.   Instead Defendant Lewis simply told Plaintiff that he and Lowe would be separated, and that Defendant Lewis would send a report of the assault to Warden Strickland.

72.     Instead of separating Plaintiff and his rapist as required by AR 454,[11] however, the day after Defendant Lewis first interviewed Plaintiff, Ventress Defendants, including, upon information and belief, Defendants Strickland and Lewis, moved Lowe from F Dorm to Plaintiff's dorm (C Dorm) and placed him in a one-man segregation cell on the same side of the housing unit to which Plaintiff was assigned. Given his proximity to Plaintiff in C Dorm, Lowe persistently harassed Plaintiff with verbal abuse and threats, alternately threatening and attempting to bribe Plaintiff to get him to retract the rape allegation.  Lowe also issued threats to Plaintiff on a daily basis by using other prisoners as messengers.  The constant threats and intimidation and the proximity of his assailant compounded the emotional distress Plaintiff was experiencing as a result of the rape and his fear of further assaults.

73.     Upon hearing the torrent of threats and harassment coming from Lowe, Defendant Glenn asked Plaintiff what was going on, and he told her that he had been raped by Lowe and he was being harassed by him.  He gave her a note describing the assault and identifying Lowe as the rapist.  Defendant Glenn made no effort to address the harassment and threats coming from Lowe. Upon information and belief, Defendant Glenn did not file a report as required by AR 454 and PREA.

---

[11] AR 454 § V.G.

74.     Later that night, Plaintiff met with Sergeant Lindsey and confirmed that he had been raped by Lowe.  Plaintiff also told Sergeant Lindsey that he had reported the rape to other officers.  When Sergeant Lindsey searched for a report of the incident on his computer, however, he found that no PREA report had been filed as a result of Plaintiff's report to either Defendant Haggins or Defendant Glenn.  Sergeant Lindsey told Plaintiff he would speak with Defendant Gordon about why a report was not filed.

75.     Approximately three days after the rape, on November 14, 2018, Defendant Mercado signed a declaration stating that he had personally reviewed the list of requested open or pending investigative files at issue in the Department of Justice's subpoena request, which presumably should have included the I&I investigation into the rape of Plaintiff based on its status as an open or pending investigation.  He asserted that ADOC should not have to turn over these files to DOJ because "law enforcement privilege applie[d] and that confidentiality must be maintained in order to protect the integrity of these investigations and to avoid comprising any potential criminal prosecutions that may stem from those investigations."

76.     In a second meeting with Defendant Lewis a few weeks later, Lewis told Plaintiff that Lewis had talked with Lowe and DJ, and what they reported did not match up with Plaintiff's account.  Defendant Lewis communicated that Lowe and DJ had told Lewis that Plaintiff was high on drugs at the time and was not being truthful about what had happened.  Following this meeting, Plaintiff was asked to take a drug test, a tactic frequently used by Ventress Defendants and I&I Defendants, to deflect blame from the perpetrators of assaults to the inmates who are victims of assaults. Plaintiff had not taken any illegal drugs, and on information and belief, the results of those tests confirmed that Plaintiff did not have illegal drugs in his system.

77.     Defendants' "investigation" of this violent crime appears to have consisted solely of one interview with Plaintiff, one interview with Lowe and DJ, and a drug test of Plaintiff with negative results.  There was no medical examination of Plaintiff or review of other evidence.  That "investigation" resulted in a letter from Defendant Lewis to Plaintiff on December 19, 2018, stating that the "case in which you were the victim of sexual assault … was found to be unsubstantiated and closed."  The letter advised Plaintiff that "[i]f you have any questions, feel free to contact your institutional IPCM, or myself . . . ."  Defendant Gordon, the Ventress IPCM , and Defendant Strickland were copied on the letter.  Even though Defendant Gordon was now aware of the rape and of the various reports, including the report made by Plaintiffs' friend, Defendant Gordon still did not take any of the steps required by PREA or ensure that others had followed PREA requirements.

78.     Following the rape, and for several weeks thereafter, Plaintiff repeatedly attempted to speak with Defendant Gordon about the rape.  To get to Defendant Gordon, however, Plaintiff had to go through other officers at the Ventress Administrative Office, including Defendant Byrd, Defendant Rumph, Defendant Myers, and others, who routinely sent Plaintiff away by saying Defendant Gordon was not available to meet with him.  For example, two days after the rape, Plaintiff went to the Administrative Office and stood in front of the door until Defendant Byrd opened the door.  Plaintiff informed Defendant Byrd that Plaintiff wanted to speak with Defendant Gordon, but Defendant Byrd said Defendant Gordon was busy.  Plaintiff attempted to speak with Defendant Gordon more than six times over the few weeks following the rape.  It was not until Plaintiff ran into Defendant Gordon outside in the prison yard one day that he was able to set up a meeting with him.

79. During Plaintiff's meeting with Defendant Gordon, Defendant Gordon was accusatory, making Plaintiff feel as though he thought the rape was Plaintiff's fault. Defendant Gordon suggested to Plaintiff that the incident may have been his fault and that Plaintiff's report of the rape was unsubstantiated. At one point during the meeting, Defendant Strickland walked in, lectured Plaintiff about the hair growth on his chin, and was dismissive of Plaintiff's reports about the rape, implying that Plaintiff's reports were a burden to Defendant Strickland and asking Plaintiff about his "intentions." During that meeting, Defendant Gordan handed Plaintiff the December 19, 2018 letter stating that Plaintiff's report was determined to be unsubstantiated.

80. On January 24, 2019, using the confidential information provided by Plaintiff, Defendant Glenn loudly, and in violation of AR 454,[12] told Plaintiff in front of other inmates and staff, "the next time those black boys sexually assault or sexually harass you, don't come running my way or ask me for help," laughing as she said it.

81. Defendants rarely punish the perpetrators of sexual assault at Ventress, a policy that obviously leaves assailants like Lowe emboldened to repeatedly assault their victims or others, and sends a message that other would-be assailants can act with impunity.

C. **Defendants failed to provide medical care immediately following the rape and later after diagnosing sexually transmitted diseases.**

82. Plaintiff did not have Hepatitis B or C at the time of his ADOC intake process in late 2017. In addition, during his prison intake medical exam he tested negative for HIV and other sexually transmitted diseases. The rape was the only time Mr. Barefield had a sexual encounter in

---

[12] AR 454.V.H.1.c prohibits prison staff from revealing any information related to a sexual abuse report to anyone, unless necessary to make treatment, investigations, or other security and management decisions.

prison, and he had not engaged in other behavior while incarcerated that would have put him at risk of contracting Hepatitis C.

83.    In physical examinations subsequent to the rape, Plaintiff's liver function tests became elevated.  Further testing revealed that he had been exposed to both Hepatitis B and C. His Hepatitis C remains an active infection.  Although the sudden onset of Hepatitis B and C signify risk that Plaintiff might also have acquired other sexually transmitted diseases, including HIV, he was not tested for HIV until 2021, after he filed his complaint in this case and submitted a medical grievance form for failure to conduct the testing.

84.    Hepatitis C is a serious disease that affects the liver.  A Hepatitis C infection can lead to inflammation of the liver and can cause the immune system to attack healthy liver cells.  It also can lead to cirrhosis of the liver and/or liver cancer.  Hepatitis C can be curable with appropriate treatment.  Plaintiff specifically requested treatment for his Hepatitis C infection in October 2019.  Despite this request, and despite the fact that the standard of care would require that Plaintiff be treated for his active Hepatitis C infection, Defendants have not provided treatment, thus leaving him vulnerable to the severe effects of this disease.

> **D.    At the time of the rape, and in the preceding years, violence at Ventress was endemic.**

85.    Defendants were well aware that the violent rape of inmates under their care and custody, such as Plaintiff, were not isolated occurrences.  Rather, in the preceding years and at the time of the assault, violence, including sexual violence, was endemic at Ventress and other ADOC facilities.  Defendants were aware of the culture of violence, including the culture of rape, at Ventress and were deliberately indifferent to the specific risk these dangerous conditions posed to Plaintiff and other inmates.

86.     In the three years prior to the rape of Plaintiff in November 2018, inmate-on-inmate assaults at Ventress were common and increasing occurrences. The average number of reported inmate-on-inmate assaults *per month* from January 2016 through January 2019 was 39, with the number of assaults per month increasing from the teens to thirties between January 2016 and June 2017 (average of 24 assaults per month) and to the forties and seventies from July 2017 to January 2019 (average of 54 assaults per month). Alabama Dep't of Corr., Statistical Reports (Jan. 2016 – Jan. 2019). The inmate-on-inmate assault total hit a high during this period with 74 assaults reported in March 2018.[13]

87.     Because of the violent conditions in ADOC facilities, DOJ initiated an investigation in 2016 into the conditions of confinement in Alabama's State Prisons for Men under the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. Defendants were well aware of the investigation beginning in 2016 at the latest. DOJ conducted its investigation primarily in 2017 and 2018, the years leading up to the rape of Plaintiff in November 2018, conducting site visits, interviewing hundreds of inmates and dozens of ADOC employees, and reviewing hundreds of thousands of pages of documents, including letters from inmates, ADOC data and incident reports, medical records, and emails from prisoners and family members. On April 2, 2019, the DOJ issued a report of its investigation, concluding that "there is reasonable cause to believe, based on the totality of the conditions, practices, and incidents discovered that: (1) the conditions in Alabama's prisons for men . . . violate the Eighth Amendment of the U.S. Constitution; and (2) these violations are pursuant to a pattern or practice of resistance to the full enjoyment of rights protected by the Eighth Amendment." DOJ 2019 Report at 1.

---

[13] Alabama Dep't of Corr., Statistical Reports (Mar. 2018).

88.     Indeed, the violence was so pervasive at Ventress that in just one week in September 2017, when Plaintiff entered the ADOC prison system for the first time, at least three Ventress prisoners were assaulted so severely that they needed to be sent to an outside hospital.

89.     The pervasive violence at Ventress continues to this day.  On information and belief, earlier this year, Curtis Williams, an inmate at Ventress, was assaulted in a Ventress dormitory and sustained serious injuries.  He was evacuated to a hospital, where he was taken off of life support and died on April 19, 2020.  Mr. Williams became the fifth person in less than a year known to have been killed at "medium-security" Ventress, a homicide rate that is extraordinary, even in a prison system that federal investigators have described as one of the most violent in the country.

90.     In 2019, there were 70 reported assaults for every 1000 inmates in Alabama prisons. That is more than four times the most recently reported national average for that year of 16.25 assaults per 1,000 inmates. The assault rate at Ventress was approximately 165 per 1,000—more than twice the Alabama average and more than 10 times the national average.

91.     The assault rate at Ventress in 2019 was almost four times the rate at Mississippi's three state-run prisons.  To put that in context, earlier this year the DOJ launched an investigation into Mississippi's Department of Corrections to determine whether it is adequately protecting prisoners from harm given its high rate of assaults and homicides.

92.     In 2018, the year Plaintiff was raped while at Ventress, Ventress had the highest number of reported inmate-on-inmate assaults in all the men's prisons in Alabama.

93.     Furthermore, for the period of time from 2015 through 2018 (and beyond), Ventress had the most inmate-on-inmate assaults of any men's prison in Alabama.



*See* Second Amended Complaint at 12 (Chart 3), *United States v. State of Alabama and Alabama Dep't of Corr.*, Civil No. 2:20-cv-01971-RDP (N.D. Ala. Nov. 19, 2021) (ECF No. 71) ("SAC, *United States v. State of Alabama and ADOC*").

94.    From October 2018 to September 2019 (FY2019 and inclusive of the period in which Plaintiff was raped), approximately 278 prisoners in ADOC's men's prisons suffered serious injuries, defined as requiring transport to outside hospitals, as the result of inmate-on-inmate assaults as detailed below. Again, Ventress had the highest total of this type of assault-related category.



Chart 2: Inmate-on-Inmate Assaults with Serious Injury (FY 2019)

*See id.* at 13 (Chart 4).

95.     Even in a state where the reported number of inmate assults is more than four times the national average, Ventress stands out as the facility with the highest number of inmate-on-inmate homicides in Alabama as publicly reported by the ADOC.



*Chart 3: Facility-by-Facility Homicides Reported for Fiscal Years 2015-2021*

*See id.* at 7 (Chart 1).

96.     In 2018, the homicide rate in ADOC's men's prisons was more than seven times the national average.

97.     Despite the Alabama men's prison homicide rate being substantially higher than the national average, homicides were not accurately classified nor was the cause of death accurately identified. By way of example, in February 2018, a prisoner at Kilby died from multiple stab wounds to his head, abdomen, back, and arm s. ADOC classified the prisoner's death as "Natural" rather than "Homicide." Similarly, in November 2017, an autopsy revealed a prisoner died from blunt force trauma to the head sustained at Elmore. ADOC classified the death as "Natural."

98.     Despite the extraordinary levels of violence, including sexual violence, at Ventress prior to Plaintiff's rape, and Defendants' knowledge of these dangerous conditions, Defendants failed to implement corrective action to reduce the risk of harm to individuals at Ventress, exhibiting deliberate indifference to Plaintiff's safety in violation of his constitutional rights.

## II.     DEFENDANTS ACTED WITH DELIBERATE INDIFFERENCE TO THE SUBSTANTIAL RISK OF SERIOUS HARM TO PLAINTIFF.

### A.     Defendants failed to take required measures to prevent and adequately respond to the sexual assault on Plaintiff.

99.     Congress passed the Prison Rape Elimination Act ("PREA") in 2003 with a goal of eradicating prisoner rape in all types of correctional facilities in the United States.  Congress's purpose in enacting the law was to "protect the Eighth Amendment rights of Federal, State, and local prisoners" after finding that "[t]he high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution."  Prison Rape Elimination Act, 34 U.S.C. §§ 30301-02.  As Congress warned at the time it enacted PREA, "States that do not take basic steps to abate prison rape" demonstrate deliberate indifference to prisoners' constitutional rights.  42 U.S.C. § 15601(13).

- 36 -

100.    To achieve its purpose, PREA established minimum requirements federal and state prison authorities must take to protect prisoners from rape and sexual assault.

101.    Pursuant to PREA requirements, in January 2016, ADOC published administrative regulations purporting to establish standards for "the responsibilities, policies and procedures to implement a zero-tolerance policy for prohibiting, preventing, detecting, responding to and investigating the sexual abuse and harassment of inmates under ADOC care and control." ADOC AR 454 § I.

102.    But Defendants' actions speak much louder than their words. Defendants' actual practice was to either ignore or fail to comply with PREA requirements and ADOC's regulations with respect to protecting Plaintiff from sexual assault, responding after Plaintiff reported the rape, and providing appropriate medical care. Defendants' deliberate indifference to these requirements to ensure the protection of Alabama inmates' Eighth Amendment rights has resulted in inmate-on-inmate rape and other forms of assault being notoriously commonplace at Ventress, as well as other ADOC facilities. *See, e.g.,* DOJ 2019 Report at 34-45 (documenting the "pattern of undeterred systemic sexual abuse in Alabama's prisons" throughout 2017 and 2018).

### 1.    Defendants were deliberately indifferent to Plaintiff's status as a high-risk victim and Lowe's status as a high-risk offender.

103.    Defendant Administrative Supervisors, Ventress Supervisory Defendants, and I&I Defendants knew from their own statistics that their conduct and their pattern and practice of failing to properly and fully implement PREA and AR 454 and other ADOC policies and procedures -- including but not limited to the dangerous housing assignments reflecting a failure to properly apply classification and risk assessments at Ventress; the failure to control the proliferation of weapons; the failure to properly respond to reports of violence; the failure to control inmate movements; the failure to prevent inmates from maintaining "sheet tents;" the

existence of a pervasive rape culture at Ventress; and overcrowding, understaffing, and inadequate supervision and monitoring -- created an unnecessary and serious risk of sexual abuse to Plaintiff and other vulnerable individuals in ADOC's care and custody.

104.   Defendants' deliberate indifference to the substantial risk of serious harm to Plaintiff began with Defendant Administrative Supervisors and Ventress Supervisory Defendants' inadequate measures to separate Plaintiff, whom ADOC personnel recognized as being at high-risk of being sexually assaulted, from Lowe, who was known to be a violent inmate at high-risk of being sexually predatory, and never should have been assigned to a medium-security facility like Ventress in the first place.  ADOC regulations require that each inmate, during intake, "shall be screened within 72 hours . . . for potential risk of sexual vulnerability." AR 454 § V.F.1. Information obtained during the intake process should be used to "assist in the initial classification and institutional assignment of the inmate . . . with the goal of keeping separate those inmates at high-risk of being sexually victimized from those at high-risk of being sexually abusive." AR 454 § V.F.9.a.

105.   Plaintiff was 24 years old when he entered ADOC custody on September 26, 2017, and had never been incarcerated before.  During his PREA intake process in November 2017, Plaintiff was described as follows: "Classification made a referral for this inmate as a victim.  This is his first incarceration and he is currently serving a sentence for a sexual offense.  He also admits to a history of sexual abuse.  These factors may make the inmate more vulnerable to victimization." Notes from a January 2018 follow-up assessment confirm this conclusion, again noting the presence of factors that "make the inmate more vulnerable to victimization based on the PREA Risk Factors."

106.   Yet despite concluding that Plaintiff was at risk of being sexually assaulted, Defendant Administrative Supervisors and Ventress Supervisory Defendants did not take appropriate steps to keep him separated from those at high-risk of being sexually abusive.

107.   ADOC regulations also provide that incoming inmates be screened for the potential to *perpetrate* sexual assaults on fellow inmates.

108.   Lowe had a long history of extreme violence, including murder and sexual assault while incarcerated under the most restrictive custody level.  Lowe is currently in prison following a guilty plea for committing a murder on September 30, 1997, for which he received a 25-year sentence.  While incarcerated in "close custody" facilities, Lowe committed multiple serious violent offenses.  For example, in 2010, while incarcerated at St. Clair Correction Facility, Lowe and six other inmates attacked Corey Henley and brutally beat him as retaliation for testifying against Lowe's cousin.  In another incident, ADOC concluded that, in 2013, Lowe used a knife to murder fellow inmate Jammy Bell at St. Clair.  Lowe had a reputation among both inmates and corrections officials for sexual assault of fellow inmates and a gang affiliation.

109.   Yet despite his violent history, Lowe was transferred from a "close custody" facility, which ADOC defines as appropriate for inmates that "may be prone to violent behavior . . . or refuse to follow the rules and regulations," to Ventress, a less secure "medium custody" facility, which ADOC defines as appropriate for inmates who are "suitable for dormitory living," which he plainly was not.  Due to Defendants' actions and omissions, at Ventress, Lowe was able to obtain a knife, leave his dorm at will to roam the prison corridors, and accost, abduct, and violently rape Plaintiff with impunity.

**2.      Ventress Defendants ignored Plaintiff's report that he had been raped and failed to properly document and escalate his report.**

110.     As described above, immediately after leaving F Dorm after the rape, Plaintiff sought out Defendant Haggins, the Shift Commander, and told him what had happened.  Defendant Haggins was therefore the "first responder" and the Shift Commander and, pursuant to ADOC regulations, was required "as soon as possible" to provide immediate health and mental care, draft an incident report, ensure that I&I was contacted, and ensure that the Ventress IPCM was notified of the incident.  Defendant Haggins did none of those things.  Instead, his sole response was to order Plaintiff to go back to his dorm.

111.     ADOC regulations provide that employees "who receive any information, including verbal, written, third-party reports and anonymous complaints, concerning inmate sexual abuse . . . shall immediately report the incident through their chain of command" in addition to notifying the IPCM, PREA Director, and the I&I Investigator immediately. AR 454 § V.H.1.a. Contrary to his obligation to report the rape to supervising officers, upon information and belief, Defendants Haggins failed to submit any such report.

112.     This was no anomaly.  To the contrary, Ventress Defendants and I&I Defendants had – and continue to have – a pattern and practice of ignoring and failing to submit reports of violence and rape at Ventress.  One effect of that failure is to conceal the number of such incidents that are publicly reported and, on information and belief, that is a motivation for it.  Numerous such failures exist in the months preceding Plaintiff's rape in November 2018.

113.     For example, in February 2018, a prisoner died from wounds he sustained four days earlier in a knife fight at Ventress. The autopsy details multiple stab wounds to the prisoner's head, abdomen, back, and arm. One stab wound extended "through the scalp and impact[ed] the skull and [was] associated with a depressed skull fracture 1/4 inch in diameter."  Ventress Defendants

and I&I Defendants tried to cover up the homicide at Ventress by listing the prisoner's death as "Natural," despite the original incident report narrative describing an altercation with a weapon. Though Ventress Defendants and I&I Defendants reported the death as "Natural," the autopsy report definitively states that the manner of death was a "homicide."

114.    In February or March 2018, an inmate was held hostage and raped in a Ventress dorm.  The victim was suicidal following the incident and repeatedly called the PREA hotline and left messages.  No one contacted him or followed up.

115.    On August 18, 2018, an inmate was stabbed in the back in the Ventress infirmary, requiring 31 stitches.  His assailant, whom he did not previously know, was able to enter the infirmary because the gate was not secure, and told the victim that there was a "hit" out on him. After the attack, the victim was not permitted to speak with anyone from I&I and his assailant remained housed in a cell near the infirmary and continued using the infirmary showers.

116.    In addition, there are multiple instances of Defendant Glenn ignoring reports of violence at Ventress in 2018 alone.  For example, on September 29, 2018, an inmate was near the back of F Dorm when another inmate ran up and stabbed him in the chest five times.  As with Plaintiff, there was no officer present in F Dorm when the incident occurred.  The victim tried to report the incident to Defendant Glenn, but she ignored him, and as a result, he had to get medical attention from other inmates rather than in the infirmary.

117.    Such conduct by Ventress Defendants and I&I Defendants continues to this day. Ventress Defendants ignored reports of rape at Ventress and engaged in shocking victim blaming. For example, in 2019 an inmate was being extorted and forced into sex by gang-affiliated men at Ventress.  The victim's family called the Warden for help.  But rather than addressing the reports of rape and following PREA and ADOC regulations, the Warden asked the inmate's family if he

was gay and tried to explain away the sexual violence he had been experiencing as somehow related to consensual "homosexual activity."

118.    On March 27, 2018, while working in the kitchen, an inmate was hit in the head with a metal pitcher by another inmate, knocking him unconscious and leaving him lying in a pool of his own blood. The victim was hospitalized and remained in the prison healthcare unit for two months following the incident. The victim's previous reports of ongoing threats had been consistently ignored by Ventress Defendants and I&I Defendants.

119.    In April 2018, a prisoner at Ventress reported that he had been forced at knifepoint to perform oral sex on another prisoner.  The report regarding this incident notes that a previous PREA-related allegation had been made against the same assailant.

### 3.    Defendants failed to conduct appropriate investigations into Plaintiff's rape.

#### (i)    First Responders

120.    ADOC regulations require that upon being notified of a sexual assault, the first responder and Shift Commander must take several critical steps to ensure the victim's safety and lay the groundwork for an investigation of the incident.  Defendant Haggins, who was both the first person to whom Plaintiff reported the rape and the Shift Commander, failed to take any of these steps.

121.    The first responder is required to immediately ensure the preservation of evidence, including "protect[ing] and preserv[ing] the crime scene," and "request[ing] that the victim not bathe, brush his teeth, eat, drink, smoke, urinate or defecate."  AR 454 § V.G.1.b-c.  Defendant Haggins failed to follow any of these procedures and instead squandered the opportunity to preserve evidence that would have corroborated Plaintiff's report and permitted prosecution of the perpetrator.

122.    Ventress Defendants also failed to follow ADOC regulations with respect to securing evidence from Lowe following the reported rape.  The first responder is required to "ensure that the alleged aggressor not bathe, wash, brush his teeth, eat, drink, smoke, urinate or defecate." AR 454 § V.G.1.d.  Upon information and belief, neither Defendant Haggins nor any other Defendant attempted to secure evidence of the rape from Lowe following Plaintiff's report.

123.    In addition to the requirements regarding the collection of evidence described above, as the Shift Commander, Defendant Haggins was required to immediately "take alleged victim to the medical unit for a medical evaluation."  AR 454 § V.G.2.  This would allow the medical staff to determine whether a rape kit should be administered for the collection of evidence, as well as to provide critical physical and mental health care to Plaintiff.  As the ADOC regulations require, "[v]ictims of sexual abuse . . . shall be referred immediately to Medical . . . [and] receive timely, unimpeded access to emergency medical treatment and crisis intervention services." AR 454 § V.G.3.a.  Such early intervention by medical professionals would have helped to mitigate some of the resulting injuries to Plaintiff, for example, by allowing for the administration of emergency sexually transmitted infections prophylaxis or reducing some of Plaintiff's ongoing mental trauma.  But Defendant Haggins failed to take any of these actions, instead ordering Plaintiff to return to his dorm.

124.    Had Plaintiff been taken to the infirmary or other medical unit for a medical evaluation, Plaintiff could have been given anti-viral medicines that are often effective in preventing an HIV infection after possible exposure to HIV.  Such medications must be administered as soon as possible after exposure, up to 72 hours.  Ventress Defendants' failure to take Plaintiff to the medical unit for a medical evaluation after he reported the rape, prevented him from having access to the only available treatment that can eliminate HIV infection from the body.

125.    Ventress Defendants' failure to take the proper action to secure the crime scene and physical evidence on both Plaintiff and his assailant, and to bring Plaintiff to the medical unit for evaluation is consistent with Defendants' pattern and practice of ignoring the requirements of PREA and AR 454.  This has fostered the rape culture and rampant violence endemic at Ventress and throughout the Alabama corrections system, as documented in the DOJ 2019 Report.  It further confirms the DOJ's finding of Defendants' deliberate indifference to the substantial risk of sexual violence and serious harm to Plaintiff and others as well as Defendants' concerted effort to suppress sexual assault reports by victims at Ventress.

### *(ii)    I&I and Subsequent Responses*

126.    Per ADOC regulations, "I&I is responsible for conducting a *prompt, thorough and objective* investigation, whether administrative or criminal, in all such cases" of reported inmate-on-inmate sexual abuse.  AR 454 § V.I.1.b (emphasis added).

127.    On November 13, 2018, two days after Plaintiff's friend submitted a report to ADOC regarding the rape, Defendant Lewis initiated an investigation of the report by interviewing Plaintiff.  Defendant Lewis did not attempt to collect any physical evidence, at that time; he did not take or refer Plaintiff for a medical exam or rape kit, and he never took Plaintiff to the infirmary or a SAFE center (Lighthouse).  Instead, Defendant Lewis simply told Plaintiff that he and Lowe would be separated, and that Defendant Lewis would send a report of the assault to Warden Strickland.  But, rather than separating Plaintiff from Lowe as required, Ventress Defendants and I&I Defendants moved Lowe to Plaintiff's dorm, where Lowe through repeated harassment and threats of violent retaliation sought to terrorize Plaintiff into dropping his allegations against Lowe.

128.    Several weeks later, Defendant Lewis had a second meeting with Plaintiff, at which time Defendant Lewis conveyed that he had interviewed Lowe and DJ, who told him that Plaintiff was high on drugs at the time of the assault and was making up the story.  Defendant Lewis

suggested that he believed Lowe and DJ and not Plaintiff, and Plaintiff was subsequently asked to take a test for illegal drugs, which upon information and belief he passed. Instead of conducting a "prompt, thorough and objective" investigation, Defendant Lewis issued a letter stating that Plaintiff's claim was "unsubstantiated" without the benefit of such investigation.

129.   Ventress Defendants, including Defendants Rumph, Meyers, and Byrd, also repeatedly thwarted Plaintiff's attempts to speak with the Ventress PREA Compliance Manager (IPCM), Defendant Gordon.  Instead, they repeatedly rebuffed his efforts to speak with Defendant Gordon, telling Plaintiff that Defendant Gordon was unavailable.  This obstruction is contrary to ADOC regulations permitting victims to report sexual abuse by telling the IPCM.  AR 454 § V.H.2.a.

130.   I&I Defendants' cursory investigations fall far short of PREA and ADOC requirements, and contribute to the pervasive Ventress rape culture which discourages reporting and encourages criminal conduct.

### 4.    Defendants' retaliation against Plaintiff and allowing his rapist to continue to traumatize him is part of a pattern at Ventress that reflects Defendants' indifference.

131.   ADOC's regulations require prison staff to ensure that "inmates and staff who report sexual abuse, sexual harassment, or cooperate with a sexual abuse investigation are protected from retaliation by other inmates or staff." AR 454 § V.K.2.  Far from protecting Plaintiff from retaliation by his assailant, however, after the rape, Ventress Defendants deliberately placed Plaintiff in harm's way by moving Lowe to a cell so close to Plaintiff's assigned bed that Lowe was permitted to taunt, harass, and threaten Plaintiff on an ongoing basis, verbally and through written notes delivered by fellow members of his gang.

132.   Ventress Defendants thereby not only failed to protect Plaintiff from retaliation by other inmates; they punished him for reporting a sexual assault by facilitating retaliation by his

assailant.   Even after Defendant Glenn and other Ventress Defendants became aware of and witness to the ongoing harassment and threats of retaliation faced by Plaintiff, they allowed the situation to continue for weeks.

133.    Defendant Administrative Supervisors, Ventress Defendants, and I&I Defendants knew that such forms of retaliation for reporting sexual assault were commonplace at Ventress. They also knew that, faced with a threat of retaliation, victims of assault are less likely to report the assault or to stand by their report for fear of severe repercussions.  Defendants' failure to follow their own regulations and protect victims of assault from retaliation is one of the reasons for the perpetuation of a rape culture at Ventress.

134.    In the months leading up to Plaintiff's rape, there were several reports of rape at Ventress allegedly in retaliation for the victim's prior report of rape.  For example, in March 2018, a prisoner at Ventress reported that "he had been sexually assaulted on the gym porch by a prisoner whose cousin had previously sexually assaulted the victim at a different ADOC facility.   The victim reported that his assailant told him he was going to get him back for telling on his cousin. A week later, the victim reported another attack by the same assailant, which required an outside Sexual Assault Nurse Examiner assessment."  DOJ 2019 Report at 39.   Defendants did not even link the second assault to the first assault as the report on the second assault makes no mention of the first report.  *Id*.

135.    "Also in March 2018, a correctional lieutenant 'received information' that a prisoner was 'being tortured' in a dormitory at Ventress. The lieutenant located the prisoner and escorted him to the Health Care Unit. The prisoner reported that he was 'tied up, burned, and tortured for two days and that a broom handle was stuck up his rectum.' The prisoner stated that

the torture was in retaliation for his documented report of a prior sexual assault in February 2018." *Id.*

136.    Another Ventress inmate was sexually assaulted twice in 2018.  After reporting the second assault, a Ventress sergeant instructed the victim to return to his same assigned bed, even though the victim was afraid that his assailant could easily attack him again if he returned to that bed.  Ventress staff initially refused to make any accommodations despite the victim's grave fear of being assaulted yet again.  When the victim was eventually promised a new bed, however, the new bed did not actually ensure separation between the victim and his rapist and the victim was forced to continually encounter his attacker throughout the facility even after the bed reassignment. In addition, like Plaintiff's subsequent situation later the same year, Ventress Defendants and I&I Defendants did not conduct any retaliation monitoring, and allowed multiple other prisoners to threaten the victim for reporting the assault.

**5.      Defendants' conduct in denying medical attention to victims also allows the rape culture to continue to flourish at Ventress.**

137.    As described above, Defendants failed to provide Plaintiff with adequate medical care immediately following the rape, and with longer-term testing and treatment when Plaintiff later tested positive for sexually-transmitted diseases, Hepatitis B and C, as a result of the rape. As Congress noted when PREA was enacted, "[i]nfection rates for . . . sexually transmitted diseases, tuberculosis, and hepatitis B and C are … far greater for prisoners than for the American population as a whole.  Prison rape undermines the public health by contributing to the spread of these diseases, often giving a potential death sentence to its victims."  34 U.S.C. § 30301. Furthermore, Congress found that "[v]ictims of prison rape suffer severe physical and psychological effects that hinder their ability to integrate into the community and maintain stable

employment upon their release from prison. They are thus more likely to become homeless and/or require government assistance." *Id.*

138.    ADOC regulations require not only immediate medical treatment for victims of sexual assault, but also appropriate "follow-up services [and] treatment plans," including a mental health evaluation and a PREA Risk Reassessment.  AR 454 § V.G.3.e.  The regulation is very clear that "medical and mental health evaluations and treatment shall be offered to all inmates who have been victimized by sexual abuse."   AR 454 § V.G.3.d.   As set forth above, Defendant Administrative Supervisors, Ventress Defendants, and I&I Defendants acted in flagrant violation of these requirements.

139.    Defendant Administrative Supervisors, Ventress Defendants, and I&I Defendants' failure to provide Plaintiff with an immediate medical examination as well as follow-up medical treatment for his resulting injuries, including Hepatitis C, has caused and threatens to continue to cause serious health consequences. Ventress Defendants, Defendant Naglich, and Defendant Vincent all failed to ensure that Plaintiff was provided with testing emergency sexually transmitted infections prophylaxis or antivirals, despite the specific corrective action required by Ventress's 2018 PREA Audit just months earlier.  Indeed, the 2018 PREA Audit performed in September 2018 noted that Defendant Vincent allegedly provided the PREA auditor with draft edits to AR 454 in an attempt to make the noncompliant AR 454 policy PREA-compliant with respect to emergency prophylaxis treatment.  To date, nearly four years later, however, Defendant Vincent still has not incorporated those edits to make AR 454 PREA-compliant, and the 2016 version of AR 454 remains on ADOC's website currently. Moreover, the case of Hepatitis C that Plaintiff contracted as a result of his rape remained untreated through the date of Plaintiff's release from

Ventress.  Defendants acted with knowledge of, and deliberate indifference to, the culture of rape at Ventress.

140.    Prior to Plaintiff's rape, Defendant Administrative Supervisors and Ventress Supervisors were on notice of the widespread sexual abuse at Ventress and failed to properly address it.  Instead, Defendants engaged in numerous activities designed to suppress *reports* of rape at Ventress, rather than rape itself, and Defendants' customs and practices discouraged victims of rape from reporting it.

141.    Among other things, (1) Defendant Administrative Supervisors and Ventress Supervisory Defendants failed to provide adequate supervision and to properly implement practices or customs that encouraged correctional officers or other staff members to intervene to stop a sexual assault and also to report sexual assault; (2) Defendant Administrative Supervisors, Ventress Defendants, and I&I Defendants permitted a culture to persist where rape was accepted "as a normal course of business, including acquiescence to the idea that prisoners will be subjected to sexual abuse as a way to pay debts accrued to other prisoners" (DOJ 2019 Report at 36), and (3) Defendants discouraged victims of sexual violence from coming forward and reporting rape, including by drug testing *victims* and subjecting them to disciplinary action in connection with their reports of rape.

142.    Lack of Supervision and Failure to Intervene or Report:  Reviewing over 600 ADOC-classified "Sexual Assault – Inmate-on-Inmate" incident reports from an eighteen-month period between late 2016 and early 2018 before Plaintiff was raped, DOJ found that those reports "did not identify a *single incident* in which a correctional officer or other staff member observed or intervened to stop a sexual assault."  DOJ 2019 Report at 34.  Either ADOC staff responsible for monitoring the dormitories failed to observe every single one of these hundreds of incidents,

or they observed an incident but did not report it.  Defendant Administrative Supervisors had access to these reports, and thus knowledge of the failure to supervise and report, yet failed to correct it.

143.    Defendant Mercado described a typical I&I investigative file as follows:

> Many documents come from the facilities at which the incidents occur. Such documents include, but are not limited to, incident reports, duty officer reports, body charts, living agreements, and written witness statements. These are documents that are not generated by the assigned agent. Other documents in the files include documents that are generated by the assigned agent. Such agent-created documents include the investigative report, statements obtained by the agent, photographs, audio/video interviews conducted by the agent, and the assigned agents notes. In nearly every investigation, assigned agents review the actions taken by involved ADOC personnel.

In addition, a March 20, 2018, letter from ADOC counsel to DOJ indicated that Defendant Mercado provided weekly reports to ADOC Administrative Supervisors, containing a summary of open investigations by I&I.

144.    <u>Deliberate Indifference to Culture of Rape</u>:  As in Plaintiff's case, Defendants, including I&I investigators, regularly drug tested rape *victims*, or inquired into rape *victims'* drug habits and "drug debts," or other debts.  If I&I Defendants found that the victim owed a so-called debt to the rapist, for example, then Ventress Defendants and I&I Defendants would find that the rape was a form of *payment* and deem the rape report to be "unsubstantiated."  On information and belief, Defendants Stickland, Lewis, Gordon, Peters, Haggins, Glenn, Rumph, Byrd, Myers, and Lewis viewed Plaintiff's rape under the same false narrative lens.  Their investigation focused entirely on whether Plaintiff was somehow at fault, either because of drug use or a debt to another inmate, but failed to include any inquiry into physical or other evidence that would have confirmed the rape had actually occurred.

145.    This inordinate focus on the activities of the victims of sexual violence, as opposed to the perpetrators of it, reflects a bias towards blaming sexual assaults on the victims of it and dismissing their allegations accordingly.  ADOC's PREA Pamphlet for inmates includes tips on "[h]ow to avoid rape . . ."  It advises "[d]o not accept canteen items, contraband or other gifts from other inmates.  Placing yourself in debt to another inmate can lead to the expectation of repaying the debt with sexual favors."  AR 454 at 44 (Attachment A to AR 454).  Having thus warned inmates of the risks of gifts and debts, Defendants take a "hands off" attitude to sexual violence resulting from them.  Defendants recognize that gifts and debt are common at Ventress and they accept sexual violence as an inevitability.  Worse, they assume that sexual violence is somehow the fault of the victim, whether a gift or debt was involved or not and routinely dismiss sexual violence claims without investigation.  Defendants, including at least Defendants Dunn, Culliver, Mercado, Vincent, Strickland, Myers, Gordon, Peters, Haggins, Glenn, Rumph, Byrd, and Lewis thereby perpetuate the pervasive rape culture at Ventress.

146.    The DOJ Report highlights this phenomenon.  During their investigation, DOJ found that, in February and March of 2018, separate prisoners at Ventress reported sexual assaults.  "The incident reports each note that a review of the victim's incident history 'revealed that he has not made any previous PREA related allegations,' but does reflect a history of drug use and debt.  Interviews with ADOC staff revealed an understanding that debt, particularly drug debt, can result in sexual abuse. This was a common point raised by the prisoners we interviewed on site.  Submission to sexual abuse under the threat of violence resulting from the drug trade does not indicate consent."  DOJ 2019 Report at 37.

147.    "In January 2018, the mother of a prisoner at Ventress called [DOJ's] toll-free number to report that she and her son were being extorted for money to pay off an alleged $600

debt to another prisoner. Because of his failure to pay, the victim was beaten and threatened with rape. His mother later called to report that she was being extorted by a prisoner at Ventress who texted her photos of a prisoner's genitals from a cell phone. Through texts, he threatened to chop her son into pieces and rape him if she did not send him $800." DOJ 2019 Report at 23-24.

148.    In another incident, a Ventress inmate was assaulted by two inmates in early 2018. The victim reported that sheets hung over the beds in the dorm create blind spots and shield inmates from the view of officers, like the "humps" used by Plaintiff's rapist. After the victim reported his assault, which occurred many months before Plaintiff's rape, he too was forced to stay in the same dorm as his attackers, and no retaliation monitoring was conducted. The victim was beaten by his assaulters in retaliation for reporting the rape. In addition, I&I Defendants did not speak to the victim about his case until a month after the rape, at which time they focused, not on the rape but rather on the victim's alleged drug debts.

149.    Illustrating the deliberate indifference to the culture of rape, throughout the three years leading up to the rape of Plaintiff, inmate-on-inmate sexual assaults only increased each year at Ventress and led to Ventress having the most reported inmate-on-inmate rapes during the span of 2015-2017.



Chart 4: Number of Reported Sexual Assaults by Facility (2015-2017)

*See* SAC, *United States v. State of Alabama and ADOC* at 25 (Chart 9).

150.    The 2018 ADOC PREA Report identified 227 reports of inmate-on-inmate sexual victimization in 2018 with only 10 substantiated cases.  Defendant Vincent failed to investigate or determine why only 4% of the 227 inmate-on-inmate sexual victimization reports were substantiated by I&I or other investigators.

151.    Moreover, far from preventing a culture of rape at Ventress, local media outlets have reported that Defendant Culliver, over several years, used his position at ADOC to "coerce women under his command into sexual liaisons in return for promotions or other considerations" and also retaliated against women who rebuffed his advances. The report further states that Defendant Culliver had been demoted by interim ADOC Commissioner William Sharpe due to allegations of sexual misconduct by Defendant Culliver, but that subsequently, on June 1, 2015, Defendant Dunn promoted Culliver to Associate Commissioner again, despite his awareness of

the allegations against Defendant Culliver. *See* "Sexual misconduct allegations at Department of Corrections kept from public by bureaucracy," Alabama Political Reporter, Jan. 7, 2019.

152.    <u>Drug Testing and Disciplinary Action for Rape Victims</u>:  In addition to treating rape as an expected consequence of drug debt rather than appropriately addressing it as sexual violence against an individual they are obligated to protect, Defendants also demonstrated deliberate indifference to the risk of serious harm by engaging in additional behaviors and implementing policies aimed at suppressing victim reports, such as subjecting victims to disciplinary action for facts a victim discloses as part of the investigative process or drug testing victims, such as Plaintiff.   And Ventress officers engage in sexual assault against inmates themselves, further evidencing their indifference to controlling sexual assaults by inmates.

153.    For example, on July 28, 2016, a Ventress inmate was beaten and stabbed in F Dorm. Officers were present but did not intervene as the victim lost consciousness in a pool of his own blood. When he awoke, he asked the officers present for assistance getting to the infirmary, but they forced him to walk there himself, unaccompanied. After spending several nights in an outside hospital, the victim was returned to Ventress, where he received disciplinary action for disorderly conduct. Neither of his assailants faced any disciplinary action.

154.    In July 2018, an officer sexually assaulted a Ventress inmate. When the inmate reported the assault, he was sent to lockup. Another officer attempted to take the inmate to a closet to perform sexual acts. When he refused, the officer sprayed the inmate's genitals and rear with mace.

155.    In addition, DOJ reported that in February 2017, after a victim reported a sexual assault at an ADOC facility two days earlier, the PREA Compliance Manager at another ADOC facility met with him and he "stated that he was in debt to the prisoner who had raped him and

- 54 -

several other prisoners, but 'was adamant' that he had been sexually assaulted."  DOJ 2019 Report at 43.  But the PREA compliance manager responded with a disciplinary action against the *victim* "for 'Intentionally Creating a Safety, Security and/or Health Hazard' for admitting that he had accrued debt to other prisoners."  *Id.*

156.    Defendants' failure to follow PREA and ADOC regulations at every step following Plaintiff's and other inmates' reports of rape is indicative of the entrenched rape culture at Ventress.   Defendants have long been aware of and shown deliberate indifference to this substantial risk of serious harm at not just Ventress, but also other ADOC facilities.[14]

**B.    Defendants knew about and failed to address unsafe conditions that created a substantial risk of serious harm.**

**1.    Ventress was dangerously overcrowded.**

157.    As Defendant Administrative Supervisors and Ventress Defendants were well aware, Ventress was both dangerously overcrowded and dangerously understaffed at the time Plaintiff was raped.  These conditions placed Plaintiff at a higher risk of being violently assaulted.

158.    Ventress has been chronically overcrowded for years.  For example, from January 2016 through January 2019, Ventress was occupied at nearly 200 percent capacity.  Alabama Dep't of Corr., Statistical Reports (Jan. 2016 – Jan. 2019).  The designed capacity of Ventress consists of 650 beds.  Alabama Dep't of Corr., Statistical Reports (Oct. 2018).  Specifically, in November 2018, when Plaintiff was raped, the occupancy rate at Ventress was 194.6 percent, with 1,265 beds occupied – housing 615 more inmates than the facility was designed to house.  Alabama Dep't of Corr., Statistical Reports (Nov. 2018).

---

[14] Defendant Jones served as Warden not only at Ventress, but also St. Clair Correctional Facility and Tutwiler Prison.  All three of these facilities are well documented as having a pervasive rape culture during Warden Jones' tenure.

159.    In comparison, when California's occupancy rate approached 170 percent of the number of inmates that California's prison facilities were designed to hold, a three-judge court found the conditions to be unconstitutional and subsequently ordered the State to lower the occupancy rate to 137.5 percent, which the Supreme Court affirmed in *Brown v. Plata*, 563 U.S. 493, 539-42 (2011).

160.    Here, Ventress had an occupancy rate that far surpassed the 170% at issue in California, and yet Defendants have not taken adequate steps to address this dangerous overcrowding, knowingly leaving vulnerable inmates like Plaintiff at a substantial risk of serious harm as a result.

161.    In addition to such rampant overcrowding, even if the facilities were kept under their designed occupancy rate, Ventress was in such poor condition that overcrowding is made that much worse. By at least 2016, two years before the rape, the Governor's office had direct knowledge of the overcrowding and poor facility issues, and therefore the substantial risk of serious harm to Ventress inmates due to such unalleviated conditions.

### 2.    Ventress was dangerously understaffed.

162.    The risks from severe overcrowding at Ventress have been greatly exacerbated by persistent, egregious levels of understaffing. Available data from the Monthly Statistical Reports produced by the Alabama Department of Corrections reveal that from 2016 through 2019, the Correctional Officer ("CO") staffing level varied from 29.4 to 35.7 percent of authorized levels. Alabama Dep't of Corr., Statistical Reports (Jan. 2016 – Jan. 2019).

163.    In September 2016, media outlets reported that correctional officers were striking due to complaints about the administration's failures to address the extreme overcrowding, understaffing, and filthy conditions, including disease, plaguing Alabama men's prisons, and wrote that Defendant Culliver had to be dispatched to one of Alabama's men's prisons, Holman, as a

result and had to order supervisors from another prison, Atmore CF, to report there just to be able to serve meals to inmates.  At the time Plaintiff was assaulted in November 2018, the CO staffing rate at Ventress was a mere 30 percent.  Alabama Dep't of Corr., Statistical Reports (Nov. 2018). *See also* DOJ 2019 Report at 9-10 (describing ADOC prisons with "dangerous" staffing levels, including Ventress, which had 30 percent of the authorized correctional officers).

164.    As ADOC's own report noted in 2018, this severe overcrowding and understaffing at Ventress equated to an occupancy rate that was over 192% of the prison's capacity and a staffing level that was only 31.2% of the recommended staffing level for Ventress, resulting in a 18.1 to 1 inmate to CO ratio as of December 2017, just eleven months before Plaintiff was brutally raped at Ventress.

165.    The United States Department of Justice also quoted one former ADOC warden as stating that "with this level of understaffing, 'the convicts are in extreme danger.'"  DOJ 2019 Report at 10.

166.    Further straining the staffing levels at Ventress and all the ADOC men's prisons, are the low salaries. According to a 2015 report by the Vera Institute, Alabama spends less per prisoner than *any other state*. For comparison, the 2015 study demonstrates that Alabama spent $14,780 per inmate (ranking lowest out of the 45 states reporting) while some states spent upwards of $60,000 per inmate (with one state spending just shy of $70,000 per inmate). A state ranked twenty-fifth in spending per inmate, West Virginia, spends almost double ($27,458) per inmate when compared to Alabama. The next closest state in spending per inmate ($16,251) still spends almost $1,500 more per inmate than Alabama. Being that most prison systems devote the bulk of their budget to personnel costs, the fact that Alabama spends less per inmate means it is difficult

to employ the necessary numbers of COs, and that ADOC cannot pay those COs competitive wages.

167.     At the time of Plaintiff's rape, an analysis of ADOC's pay scale for correctional officer trainees compared with the pay scale for comparable public sector jobs in Alabama demonstrated that ADOC paid its correctional officer trainees 19% below the market average in Alabama.

168.     Indeed, correctional officer salaries were even low when compared to the salaries of other law enforcement officials in Alabama: "CO salaries in Alabama are not high enough to compete with other law enforcement jobs. The mean salary for correctional officers and jailers in Alabama is $35,370, while the mean salary for police and sheriff's patrol officers is $44,490."

169.     In addition to the lower salary, prior to and at the time of the rape, working conditions at Ventress were poor, as identified by ADOC's own experts in the *Braggs* litigation, which also caused turnover and further understaffing. Some correctional officerss interviewed by ADOC's expert said they lacked proper break rooms, and that ADOC did not provide basic care, such as water, to combat the physical working conditions. Correctional officers also indicated that they do not always have the necessary equipment to carry out their duties, such as pepper spray, working radios, or batons. According to ADOC's expert report, cell phones, weapons, and other contraband were thrown over the fence, or smuggled in by friends or family of the inmates.

170.     Additionally, due to the severe understaffing at Ventress, COs have to routinely work overtime. ADOC frequently tops the list of Alabama government departments for overtime spending. In 2017, ADOC ranked first among state departments with $31.6 million in overtime wages, up $5 million from the year prior. Overtime pay is not only an inefficient use of resources, but studies have also shown that frequent and extended overtime has negative effects on cognition

and reaction time, which are extremely important in high stress jobs like law enforcement. Furthermore, exhaustion caused by mandatory overtime, often in the form of 16-hour shifts, results in burnout which leads to higher turnover.

171.    Similarly, DOJ also concluded in its Report that the "combination of ADOC's overcrowding and understaffing results in prisons that are inadequately supervised, with inappropriate and unsafe housing designations, creating an environment rife with violence, extortion, drugs, and weapons," where "[p]risoner-on-prisoner homicide and sexual abuse is common." DOJ 2019 Report at 5. These problems were, and still are, severe at Ventress.

172.    As a result of this overcrowding and understaffing, supervision of Ventress inmates was woefully insufficient. In fact, inmates at Ventress were frequently unsupervised for nearly the entirety of the day. At least two officers were supposed to be assigned during the day to patrol each dorm, which typically houses 100 inmates, but generally only one correctional officer, *if any*, was present. When in the dorms, officers generally sit in an enclosed cubicle between two sides of the dorm and have limited visibility. No officers are present in the dorms overnight, and staffing is often reduced on weekends. The lack of security staff means that the officers who do show up are unable to maintain basic security functions such as conducting contraband searches and assuring men are in their assigned locations.

173.    Severe overcrowding and understaffing at Ventress directly contributes to increased violence and risk of substantial harm to prisoners. Defendant Administrative Supervisors and Ventress Supervisory Defendants have had direct knowledge of this link for years and have failed to address it. As a result, violence has run rampant at Ventress. In 2017, Judge Thompson concluded, "Considering the institution's historical deliberate indifference to the problem of overcrowding . . . the court finds that ADOC has disregarded the harm and risk of harm caused by

overcrowding and understaffing." *Braggs*, 257 F. Supp. 3d at 1256 n.81. In that decision, Judge Thompson also explained effects of overcrowding and understaffing on ADOC's ability to provide adequate medical care to its prisoners, noting that "persistent and severe shortages of mental-health staff and correctional staff, combined with chronic and significant overcrowding, are the overarching issues that permeate" ADOC's "horrendously inadequate" mental-health care system. *Id.* at 1267-68.

174.    Other violent incidents underscore the link between overcrowding and understaffing, on the one hand, and violence on the other.  In October 2016, a Ventress inmate was sitting in the TV room of his dorm when another man, who was known by inmates and officers to suffer from mental illness, approached him from behind and cut his throat severely.  The victim's injuries required 28 stitches.  The sole officer in the dorm at the time of the assault pretended not to see anything until the victim fled while bleeding heavily and other men in the dorm grabbed the assailant.  The officer later told the victim that he had been forced to choose between taking him to get medical attention or stopping the men who had begun beating his assailant.

175.    As another example, in May 2017, three months after he was first stabbed and hospitalized, a Ventress inmate was attacked again by a group of different men.  He was stabbed in the neck and back and received stitches in the infirmary.  No officers were in the block at the time of the stabbing and it took the victim thirty minutes to find an officer to whom he could report the incident.

176.    Defendant Administrative Supervisors and Ventress Supervisory Defendants were well aware that the chronic overcrowding and understaffing at Ventress posed a serious risk of inmate-on-inmate sexual assault and harassment, and contributed to the rape culture at that facility. On September 5, 2018, two months before Plaintiff was raped, the PREA Auditors of America,

LLC, released an audit report regarding Ventress Correctional Facility's compliance with PREA.[15]

The report concluded that, while Ventress had a staffing plan that nominally complied with PREA,

"th[e] auditor would be remiss in not addressing the lack of sufficient staff to protect inmates from

sexual abuse/harassment. Further consequences are, of course, overall safety of staff, inmates and

the public.  It is highly recommended ADOC and Ventress develop and implement a plan to

provide adequate staffing for the facility.  The lack of camera coverage and video recording (while

not a fix-all) of crucial areas, including blind spots, further exacerbates the issue."[16]  Defendant

Administrative Supervisors and Ventress Supervisory Defendants, of course, were well aware that

Ventress was chronically and severely overpopulated and understaffed. This PREA audit

underscored these deficiencies, while further pointing out that Defendants had not even attempted

to remediate the effects of them with camera coverage – particularly of blind spots like the location

where Plaintiff was raped.  Defendant's deliberate indifference to these conditions not only

contributed to the pervasive rape and violent culture at Ventress, but led inevitably to Lowe's rape

of Plaintiff.

### 3. Defendants failed to control or check for inmates' possession of dangerous contraband weapons.

177.    One of the most significant risks to inmate safety at Ventress was, and still is,

widespread access to contraband weapons.  DOJ concluded that "ADOC does not effectively

control the introduction, manufacture, and use of weapons," which "leads to a substantial risk of

violence."  DOJ 2019 Report at 25.  Many, if not most, inmates possess makeshift knives,

boxcutters, and other deadly weapons.  Within Ventress, homemade or smuggled knives are so

---

[15] Dave Cotton, *Prison Rape Elimination Act Audit Report, Ventress Correctional Facility*, PREA Auditors of America, LLC (Sept. 5, 2018) ("Ventress PREA Audit"), available at http://www.doc.alabama.gov/PREA (last checked Oct. 30, 2020).

[16] *Id.* at 13.

plentiful that they can be purchased by one inmate from another for the price of a pack of cigarettes. DOJ's "investigation revealed that an alarming number of prisoners are killed by other prisoners using homemade knives." *Id.* at 13.

178.    Defendants knew about the widespread proliferation of contraband weapons at Ventress but failed to control the endemic problem. Instead, Defendants displayed deliberate indifference to the substantial risk of serious harm that these weapons created to inmates, including Plaintiff, under the custody and care of ADOC.

179.    In contravention of ADOC policies and Defendants' obligation to protect inmates within their custody, Ventress Defendants did not regularly conduct facility-wide searches and other standard prison search protocols and procedures to locate and eliminate weapons.   The widespread presence of contraband weapons has contributed to frequent instances of homicide, rape, and near-fatal stabbings at Ventress.

180.    Moreover, even though many of the assaults at Ventress happen at knifepoint, Ventress Defendants failed to regularly conduct comprehensive, dorm-wide or facility-wide weapons searches even following reports of assaults at knifepoints or after stabbings. Defendant Administrative Supervisors allowed such failures to occur and continue unabated.

181.    In July 2017, four men were stabbed in a single night at Ventress.  Three men were taken to outside hospitals by ambulance, while one had to be airlifted.

182.    In April 2018, one inmate was attacked at Ventress "with a homemade hatchet." "The victim was taken to an outside hospital with excessive blood loss and a possible punctured lung.  ADOC described the 'hatchet like weapon' as having a foot-long broom handle with a 'lawn edging blade' attached to the top."  DOJ 2019 Report at 21.

183.    Also in April 2018, another Ventress inmate was attacked by inmates armed with knives who were attempting to extort him.

184.    On or around July 24, 2018, another inmate was stabbed to death in a Ventress housing unit. "The autopsy noted that 'another prisoner with a prison-made 'shank' reportedly stabbed him.' And the autopsy further noted that '[t]he cause of death was a stab wound of the chest. A sharp force injury of the left chest injured the left lung and the heart, causing massive bleeding into the left chest cavity.'" DOJ 2019 Report at 13.

185.    On September 17, 2018, an inmate was stabbed by another inmate in the Ventress housing unit when he woke up to use the bathroom. Two officers were present in the dorm during the assault but did not respond. The victim sought help but the officers made him walk on his own to the infirmary.

186.    Less than two weeks later on September 29, 2018, an inmate was near the back of F Dorm when another inmate ran up and stabbed him in the chest five times. There was no officer present in the dorm when the incident occurred. The victim tried to report the incident to Defendant Glenn, but she brushed him off, and as a result, he had to get medical attention from other inmates rather than in the infirmary.

187.    Significantly, this stabbing occurred just six weeks before Plaintiff was raped in the same Ventress housing unit, F Dorm, at knifepoint, after which Defendant Glenn similarly brushed off Plaintiff's report of the rape.

188.    In the three years leading up to the rape of Plaintiff, the contraband-related incidents as reported by ADOC increased each year, illustrating both the seriousness of the problem and indifference to solving such problem.



Chart 5: Contraband-Related Incidents (2015-2017)

*See* SAC, *United States v. State of Alabama and ADOC* at 17 (Chart 7).

189.    In the years leading up to the rape of Plaintiff, more than half of Alabama inmate homicides involved stabbings with contraband knives, while hundreds more individuals under ADOC's care and custody had been hospitalized with life-threatening stab wounds and countless others had been raped at knifepoint.

190.    In sum, as DOJ found in its 2019 Report, "ADOC does not effectively control the introduction, manufacture, and use of weapons," which "leads to a substantial risk of violence," DOJ 2019 Report at 25—like the rape of Plaintiff at the point of such a weapon.

**4.      Defendants failed to properly supervise inmate movements and housing units.**

191.    According to ADOC regulations, "[e]ach facility shall implement a practice of having intermediate and higher-level staff conduct and document unannounced rounds to identify and deter sexual abuse and harassment."  AR 454 § V.C.  Ventress staff failed to conduct such rounds before, during and after the assault on Plaintiff.  Inmates were left unsupervised and

unmonitored for hours at a time.  Inmates were permitted to create bed tents or "humps" using sheets and blankets to obstruct oversight by guards, and Plaintiff was left suffering and without medical intervention out of sight of the guards for more than five hours following the assault.

192.    Although Defendants purportedly have adopted policies, procedures, and practices to protect vulnerable inmates from sexual assault and harassment by potential abusers, their failure to enforce them has contributed to the rape culture at Ventress and led directly to Plaintiff's rape by Lowe.  According to the 2018 Ventress PREA Audit, inmates are assigned to different dorms based on whether they are at risk of being victimized or pose a risk of abusing others, and are provided different colored wristbands to enable Ventress staff to identify the dorms to which inmates are assigned.[17] Inmates purportedly are prohibited from going into dorms to which they are not assigned.[18] Ventress Defendants routinely failed to enforce these requirements, however. As a consequence, Ventress Defendants permitted inmates to enter dormitory units without verifying whether they were authorized to be there.  That is precisely what happened in this case. Although Plaintiff was wearing a yellow wristband clearly indicating that he was assigned to C Dorm, and thus was not permitted in F Dorm, the guard on duty made no attempt to check Plaintiff's wrist, allowing Lowe to move Plaintiff, under threat of a knife, to F Dorm and then rape Plaintiff in an illicit "hump" or sheet tent.  Ventress Defendants would have known Plaintiff did not belong in F Dorm, as F Dorm inmates wear teal green wristbands.

193.    Defendants, through their acts and omissions, fail to provide adequate programming, education, or work opportunities. The majority of ADOC prisoners receive no programming or employment.  This idle time combined with lack of adequate supervision of

---

[17] Ventress PREA Audit at 43.

[18] *Id.*

prisoners results in increased opportunities to perpetuate misconduct and correspondingly increasing violence.

194.    The continuing failure of Defendant Administrative Supervisors and Ventress Defendants to enforce safety policies controlling the movement of prisoners within Ventress further undermines the security of incarcerated persons and increases the risk and frequency of physical and sexual assaults.  These conditions existed at Ventress at the time of Plaintiff's rape.

195.    At the time of Plaintiff's rape, there was no correctional officer supervising F Dorm. According to Ventress policy, there were supposed to be two "cubicle operators" and two correctional officers supervising each dorm.  But for the several years leading up to Plaintiff's rape, there had only been one cubicle operator and one correctional operator supervising the dorm. At the time of Plaintiff's rape, there was only one officer in the cubicle and that officer was sitting down in a position that made it impossible for him to keep watch over the area properly.

196.    Basic security measures at Ventress were missing or inoperable.  The lock on the door to F Dorm, which was to remain locked, was broken and could be easily opened whenever inmates wanted.  Cameras were also not present in any of the dorms at the time of the attack on Plaintiff even though Ventress officials acknowledged to the PREA auditor in July 2018 that cameras would be a useful tool.  Ventress PREA Audit at 23-24.

197.    Defendant Administrative Supervisors and Ventress Defendants were aware of the dangerous conditions resulting from their failure to properly supervise inmate movements.

198.    For instance, in July 2016, a Ventress inmate was stabbed in E4 Dorm by another inmate.  The assailant was assigned to a different dorm but was able to enter E4 because no officers were present to control the inmates' movement.  No officers responded to the stabbing, and the

victim was forced to walk to the infirmary himself following the assault in order to receive medical treatment, which required a four-day outside hospital stay.

199.    On August 18, 2018, another Ventress inmate was stabbed in the back in the infirmary, requiring 31 stitches.  His assailant was able to enter the infirmary because the gate was not secure.  His assailant, whom he did not previously know, told him that there was a hit out on him.  The victim was not permitted to speak with anyone from I&I, and his assailant remained housed in a cell near the infirmary and continued using the infirmary showers.

>    5.    **Defendants failed to address blind spots and sheet tents that were a common occurrence at Ventress.**

200.    As recounted by the Department of Justice, "ADOC's incident reports document sexual abuse occurring in the dormitories, cells, recreation areas, the infirmary, bathrooms, and showers at all hours of the day and night. . . . Our experts found that the physical plant designs and layout of ADOC's housing units make visibility difficult, which, when coupled with deficient staffing levels, results in inadequate supervision.  Large open living units with multiple bunks or stacked bunks contain many blind spots that make it impossible for the limited staff to provide adequate safety and security. . . . Prisoners interviewed and incident reports frequently reference sexual assaults occurring in bunks that have sheets or towels hung up to conceal activity, often referred to as 'the hump.'  The 'Sexual Assault' incident reports do not document correctional officers making any effort to remove these sight barriers." DOJ 2019 Report 35-36.  These conditions prevailed at Ventress, and within F Dorm, when Plaintiff was raped.

201.    Defendants, including at least Defendants Culliver, Williams, Stamper, Abbott, Mercado, Hill, Vincent, Strickland, Myers, Gordon, Peters, and Haggins, were required to implement a staffing plan to provide for "adequate levels of staffing" and, where applicable, video monitoring to protect inmates against sexual abuse. The staffing plan should have provided

adequate security to ensure that the all of Ventress – including any of its "blind spots" – was monitored via video surveillance or by guards, including through unannounced rounds of inspection.  On information and belief, Defendants, including at least Culliver, Williams, Stamper, Abbott, Mercado, Hill, Vincent, Strickland, Myers, Gordon, Peters, and Haggins, were aware of the deficiencies with respect to the Ventress blind spots but did nothing to address them.

202.   Similarly, Defendants' acts and omissions allowed inmates to maintain "sheet tents" or "humps" on bunkbeds, which allowed inmates to conduct illicit activities including sexual assaults without being seen.

203.   Furthermore, Defendants, including at least Dunn, Abbott, Culliver, and Williams, allowed the lighting at Ventress to be out of order for extended periods, including at the time of Plaintiff's rape.  There should have been night lights on to keep the dormitories illuminated throughout the night, however those lights were either disabled by inmates or no longer working. Defendants Dunn, Abbott, Culliver, and Williams made no effort to repair the lights or ensure they were in working order.

204.   Prior to Plaintiff's rape, Defendants were aware that these failures created serious risk of harm.

205.   For example, in early 2018, one Ventress inmate reported that he was sexually assaulted by a man who was involved in the extortion of the victim's family.  One evening, after spending time with two friends, the victim fell asleep on the bed of a man who had previously acted like a friend and insinuated that he would help address the extortion the victim was experiencing.  The assailant had a sheet hanging over his bed to create a blind spot.  The victim subsequently woke up to the man on top of him, holding him down and sexually assaulting him

out of view of anyone else due to the blind spot created by the sheet tents that Defendants permitted to be used in Ventress.

## PLAINTIFF'S INJURY AND DAMAGES

206.    As a result of Defendants' wrongful actions, Plaintiff has suffered severe physical and emotional trauma.

207.    As a result of Defendants' wrongful actions, Plaintiff contracted Hepatitis B, Hepatitis C, and possibly other sexually transmitted diseases from the rape and which remain untreated to this day.

208.    Plaintiff has incurred and will continue to incur medical expenses as a result of Defendants' actions.

209.    As a result of Defendants' wrongful actions, Plaintiff has suffered extensive trauma, retaliation, extreme stress, worry, and lack of sleep after the rape and subsequent harassment from Lowe and Ventress Defendants.  Plaintiff suffered severe mental and emotional injuries as a direct result of the rape, and those injuries were compounded by Defendants' failure to provide mental health resources to specifically address the harm Plaintiff suffered.  Defendants did not refer Plaintiff for mental health care for the assault and failed to assess Plaintiff's mental trauma from the assault that requires specific, tailored, and ongoing mental health care and counseling that is necessary for a rape victim.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

210.    There are no administrative remedies within the Alabama Department of Corrections for Plaintiff to exhaust before bringing his claims.

## CLAIMS

### COUNT I(A) - 42 U.S.C. SECTION 1983
**Eighth and Fourteenth Amendment Failure to Protect (Against Defendant Dunn)**

211.    Plaintiff incorporates paragraphs 1-23, 54-200, 203-210 of this Complaint as if fully restated here.

212.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

213.    Defendant Dunn, who was Commissioner of ADOC at the time of the rape, failed to protect Plaintiff.  (*See, e.g.,* ¶ 23.)

214.    Defendant Dunn knew of and recklessly disregarded the substantial risk of sexual assault at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41.)

215.    In addition to the facts alleged above, for years Defendant Dunn was acutely aware of the widespread abuse fostering a culture of rape at Ventress, and therefore on notice of the need to correct the substantial risk of harm to inmates, and he failed to do so.  (*See, e.g.,* ¶¶ 103-106, 140-42, 144-51, 157-76.)  In an act that was antithetical to discouraging and stopping a culture of rape, Defendant Dunn even went so far as to promote Defendant Culliver while Defendant Culliver was facing sexual misconduct allegations.  (*See, e.g.,* ¶ 151.)

216.    Furthermore, as the Commissioner of ADOC, Defendant Dunn created, shaped, or allowed certain customs or policies that resulted in deliberate indifference to Plaintiff's constitutional rights.  (*See, e.g.,* ¶¶ 23, 133, 152-56, 178, 192-94.)  For example, Defendant Dunn allowed practices perpetuating the systematic blaming of rape victims for sexual assaults.  (*See, e.g.,* ¶¶ 144-45.)  These customs included the practice of drug testing of rape victims and inquiring

into whether the rape victims had any so-called "debts" that might have led to the expectation that the victim was to reciprocate with sexual favors. (*See, e.g., id.*) This culture of blaming the victim led to sexual violence claims routinely being dismissed without investigation, thereby failing to deter future sexual assaults. (*See, e.g., id.*)

217.   Additionally, based on the numerous ongoing failures, understaffing, and overcrowding, Defendant Dunn knew that his subordinates would act unlawfully and failed to stop them from doing so. (*See, e.g.,* ¶¶ 10-11, 157-58, 194-97, 203.)

218.   For instance, over a year prior to Plaintiff's rape, Defendant Dunn testified that ADOC was "wrestling with a 'two-headed monster': overcrowding and understaffing." *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1184 (M.D. Ala. 2017). (*See, e.g.,* ¶¶ 10-11.) Defendant Dunn had specific knowledge of these issues based, *inter alia*, on the *Braggs* case, the Tutwiler DOJ report, and numerous other ongoing investigations and cases into the prison conditions and culture of violence at ADOC's men's prisons during the relevant timeframe. In 2018, as described in paragraph 176 above, an audit of PREA compliance at Ventress issued two months before Plaintiff was raped included the statement that "th[e] auditor would be remiss in not addressing the lack of sufficient staff to protect inmates from sexual abuse/harassment." (*See, e.g.,* ¶ 176.)

219.   Despite knowing that inmates at Ventress faced a substantial risk of serious harm, Defendant Dunn disregarded that risk by failing to take reasonable measures to abate that risk prior to Plaintiff's rape. (*See, e.g.,* ¶¶ 11, 178-79.) For example, in testimony given approximately two months after Plaintiff's rape, Defendant Dunn recognized that ADOC was "still [] down to 50 percent or lower staffing levels in many of our major facilities" and that "there is a direct correlation between the shortage of offices in our prisons and the increase in violence." (*See, e.g.,*

¶ 11.)  In that same testimony, Defendant Dunn testified that the level of violence in ADOC prisons remained "unacceptably high."  (*See, e.g.,* ¶ 11.)

220.    Defendant Dunn also knew that Ventress was in a state of disrepair that was causing security failures—for example, Defendant Dunn knew that there were no functioning night lights in Ventress.  (*See, e.g.,* ¶ 203.)  Defendant Dunn knew that this issue caused a serious risk of harm, but took no effort to fix it.  (*See, e.g.,* ¶¶ 203-04.)

221.    Defendant Dunn's conduct was objectively unreasonable, and was undertaken with deliberate indifference to Plaintiff's and other inmates' health and safety.

222.    Defendant Dunn acted with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

223.    Defendant Dunn's action and inaction directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including medical expenses, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

### COUNT I(B) - 42 U.S.C. SECTION 1983
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Culliver**

224.    Plaintiff incorporates paragraphs 1-22, 24, 34, 54-210 of this Complaint as if fully restated here.

225.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

226.     Defendant Culliver, who was Associate Commissioner for Operations of ADOC at the time of the rape and was responsible for ensuring the effective and safe daily operations of all ADOC men's prison facilities, failed to protect Plaintiff.  (*See, e.g.,* ¶ 24.)

227.     Defendant Culliver knew of and recklessly disregarded the substantial risk of sexual assault at Ventress, as well as the specific risk that Lowe posed to other inmates, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 1, 2, 19, 103-06, 131-33.)

228.     In addition to the facts alleged above, for years Defendant Culliver was acutely aware of the widespread abuse fostering a culture of rape at Ventress, and therefore on notice of the need to correct the deprivation, and he failed to do so.  (*See, e.g.,* ¶¶ 103-106, 140-42, 144-51, 157-76.)  Furthermore, as the Associate Commissioner for Operations of ADOC, he created, shaped, or allowed certain customs or policies that resulted in deliberate indifference to constitutional rights. (*See, e.g.,* ¶¶ 24, 151, 201-204.)  For example, he failed to address the overcrowding, understaffing, and numerous failures of Ventress staff to protect Ventress inmates from the endemic violence. Defendant Culliver also encouraged or allowed the systematic blaming of rape victims for sexual assaults. (*See, e.g.,* ¶¶ 144-45.)  Under his watch, rape victims were subjected to drug tests, asked about so-called drug "debts", or written up for violations during investigations after reporting sexual assaults at Ventress. (*See, e.g., id*.)  This culture of blaming the victim led to sexual violence claims routinely being dismissed without investigation and discouraged victims from reporting assaults as well.  (*See, e.g., id*.)

229.     Based on this and the numerous ongoing failures, understaffing, and overcrowding, Defendant Culliver knew that his subordinates would act unlawfully and failed to stop them from doing so.  (*See, e.g.,* ¶¶ 24, 157-58, 163, 201-204.)

230.    Moreover, far from preventing a culture of rape at Ventress, local media outlets have reported that Defendant Culliver, over several years, used his position at ADOC to "coerce women under his command into sexual liaisons in return for promotions or other considerations" and also retaliated against women who rebuffed his advances. The report further states that Defendant Culliver had been demoted by interim ADOC Commissioner William Sharpe due to allegations of sexual misconduct by Defendant Culliver, but that subsequently, on June 1, 2015, Defendant Dunn promoted Culliver to Associate Commissioner again, despite his awareness of the allegations against Defendant Culliver. *See* "Sexual misconduct allegations at Department of Corrections kept from public by bureaucracy," Alabama Political Reporter, Jan. 7, 2019. (*See* ¶ 151.)

231.    Like Defendant Dunn, Defendant Culliver knew about the widespread violence at Ventress, including the underreporting of violent incidents by prisoners and ADOC staff, the overcrowding of inmates at Ventress, understaffing of COs at Ventress, and the other failures and policies that contributed to the substantial risk of serious harm to Plaintiff and other inmates like him, yet he disregarded that risk by failing to take reasonable measures to abate it. (*See, e.g.,* ¶¶ 18, 201-203.)   For example, Defendant Culliver was one of the individuals responsible for implementing a staffing plan to provide adequate levels of staffing and video monitoring to protect inmates against sexual abuse. (*See, e.g.,* ¶ 201.)  The staffing plan was supposed to cover any "blind spots" in the facility. (*Id.*)  However, Defendant Culliver did not implement the staffing plan. (*See, e.g.,* ¶¶ 201-09.)  Additionally, in September 2016, media outlets reported that correctional officers were striking due to complaints about the administration's failures to address the extreme overcrowding, understaffing, and filthy conditions, including disease, plaguing Alabama men's prisons, and wrote that Defendant Culliver had to be dispatched to one of

Alabama's men's prisons, Holman, and ordered supervisors from another prison, Atmore CF, to report to Holman prison just to be able to serve inmate meals there.  (*See, e.g.,* ¶ 163.)  Defendant Culliver was aware of these conditions well in advance of Plaintiff's rape in 2018.

232.    Defendant Culliver also knew that Ventress was in a state of disrepair that was causing security failures—for example, Defendant Culliver knew that there were no functioning night lights in Ventress.  (*See, e.g.,* ¶ 203.)  Defendant Culliver knew that this issue caused a serious risk of harm, but took no effort to fix it.  (*See, e.g.,* ¶¶ 203-04.)

233.    Defendant Culliver's conduct was objectively unreasonable, and was undertaken with deliberate indifference to Plaintiff's and other inmates' health and safety.

234.    Defendant Culliver acted with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

235.    Defendant Culliver's action and inaction directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including medical expenses, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

**COUNT I(C) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Williams**

236.    Plaintiff incorporates paragraphs 1-22, 25, 34, 54-210 of this Complaint as if fully restated here.

237.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

238.    Defendant Williams, who was interim Associate Commissioner for Operations of ADOC at the time of the rape and was responsible for ensuring the effective and safe daily operations of all ADOC men's prison facilities, failed to protect Plaintiff.  (*See, e.g.,* ¶ 25.)

239.    Defendant Williams knew of and recklessly disregarded the substantial risk of sexual assault at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41.)

240.    In addition to the facts alleged above, Defendant Williams was acutely aware of the widespread abuse fostering a culture of rape at Ventress, and therefore on notice of the need to correct the deprivation, and he failed to do so. (*See, e.g.,* ¶¶ 103-106, 140-42, 144-51, 157-76.) Furthermore, as the interim Associate Commissioner for Operations of ADOC, he created, shaped, or allowed certain customs or policies that resulted in deliberate indifference to constitutional rights. (*See, e.g.,* ¶¶ 23, 133, 152-56, 178, 192-94.) Additionally, based on the numerous ongoing failures, understaffing, and overcrowding, Defendant Williams knew that his subordinates would act unlawfully and failed to stop them from doing so.  (*See, e.g.,* ¶¶ 10-11, 157-58, 194-97, 203.)

241.    Defendant Williams knew about the widespread violence at Ventress, including the underreporting of violent incidents by prisoners and ADOC staff, the overcrowding of inmates at Ventress, understaffing of COs at Ventress, and the other failures and policies that contributed to the substantial risk of serious harm to Plaintiff and other inmates like him, yet he disregarded that risk by failing to take reasonable measures to abate it.  (*See, e.g.,* ¶¶ 157-58, 172-76, 201-203.) For example, Defendant Williams was one of the individuals responsible for implementing a staffing plan to provide adequate levels of staffing and video monitoring to protect inmates against sexual abuse.  (*See, e.g.,* ¶ 201.)  The staffing plan was supposed to cover any "blind spots" in the

facility.  (*See, e.g.,* ¶ 201.)  However, Defendant Williams did not implement the staffing plan. (*See, e.g.,* ¶¶ 201-09.)

242.    Defendant Williams also knew that Ventress was in a state of disrepair that was causing security failures—for example, Defendant Williams knew that there were no functioning night lights in Ventress.  (*See, e.g.,* ¶ 203.)  Defendant Williams knew that this issue caused a serious risk of harm, but took no effort to fix it.  (*See, e.g.,* ¶¶ 203-04.)

243.    Defendant Williams acted with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

244.    Defendant Williams's action and inaction directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including medical expenses, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

**COUNT I(D) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Stamper**

245.    Plaintiff incorporates paragraphs 2, 3, 8-11, 15-17, 19, 21, 26, 35, 55-56, 81, 85, 98, 102-106, 109, 125, 133, 140-42, 152, 156-57, 160, 173, 176, 178, 192-94, 197, 201, 206-209 of this Complaint as if fully restated here.

246.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

247.    Defendant Stamper, who at the time of the rape was employed by ADOC as Deputy Commissioner, Special Assistant, and was responsible for helping with departmental projects that

required prioritized attention, such as construction of new prisons and renovation of existing facilities, failed to protect Plaintiff.  (*See, e.g.,* ¶ 26.)

248.    Defendant Stamper knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41.)

249.    In addition to the facts alleged above, Defendant Stamper was responsible for helping with departmental projects that required prioritized attention, such as construction of new prisons and renovation of existing facilities.  (*See, e.g.,* ¶ 26.)  Defendant Stamper was aware that ADOC facilities, including Ventress, were exceptionally overcrowded, had poor or broken security systems such as night lights and working door locks, and were otherwise not secure.  (*See* ¶¶ 16, 176, 191-92, 196-97.)  Defendant Stamper was further aware that the overcrowding and poor state of the facilities, including Ventress, would and was leading to increased assaults and sexual assaults.  (*See, e.g., id.*)

250.    Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Stamper did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  For example, Defendant Stamper did not address the overcrowding, did not authorize measure to fix Ventress's security issues, failed to supervise maintenance and repair efforts, and did not establish or enforce procedures that would have provided reasonable protection to prevent violent inmate-on-inmate attacks at Ventress.  (*See id.*)  Additionally, Defendant Stamper was one of the individuals responsible for implementing a staffing plan to provide adequate levels of staffing and video monitoring to protect inmates against sexual abuse.  (*See* ¶ 201.)  The staffing plan was supposed to cover any "blind spots" in the

facility.  (*Id.*)  Defendant Stamper did not implement the staffing plan, however.  (*See, e.g.,* ¶¶ 201-09.)

251.    Defendant Stamper's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

252.    Defendant Stamper's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

## COUNT I(E) - 42 U.S.C. SECTION 1983
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Naglich**

253.    Plaintiff incorporates paragraphs 1-22, 27, 34, 54-102, 120-25, 137-141, 206-210 of this Complaint as if fully restated here.

254.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

255.    Defendant Naglich, who was Associate Commissioner of Health Services at ADOC from 2014 through the present, failed to protect Plaintiff.  (*See, e.g.,* ¶ 27.)

256.    Defendant Naglich knew of and recklessly disregarded the substantial risk of sexual assault at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 139, 140-41.)

257.    In addition to the facts alleged above, Defendant Naglich was acutely aware of the widespread abuse fostering a culture of rape at Ventress, and therefore on notice of the need to correct the deprivation, and she failed to do so. (*See, e.g.,* ¶¶ 144-49.)  Furthermore, as the

Associate Commissioner of Health Services at ADOC, she created, shaped, or allowed certain customs or policies that resulted in deliberate indifference to constitutional rights. (*See, e.g.,* ¶ 27.) For instance, she failed to ensure that all victims of sexual assault and alleged perpetrators in ADOC's men's prisons were promptly tested for sexually transmitted diseases, including for Hepatitis C and HIV, and to timely treat with anti-virals after the rape, if testing returned positive. (*See, e.g.,* ¶¶ 7, 82-84, 137, 141.) In addition, she permitted the culture of rape at Ventress to go unchecked by failing to promptly provide medical attention to victims, including rape kits or referrals for rape kits, as well as mental health services for both victim and perpetrator. (*See, e.g., id.*)

258.   Defendant Naglich knew about the widespread violence at Ventress, the overcrowding of inmates at Ventress, understaffing of medical employees at Ventress, and the other testing failures and lack of adequate medical care practices, which contributed to the substantial risk of serious harm to Plaintiff and other inmates like him, yet she disregarded that risk of harm and failed to take reasonable measures to abate it for years. (*See id.*)

259.   In doing so, Defendant Naglich acted with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

260.   Defendant Naglich's action and inaction directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including medical expenses, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

**COUNT I(G) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Abbott**

261.     Plaintiff incorporates paragraphs 2, 3, 8-11, 15-17, 19, 21, 28, 35, 55-56, 81, 85, 98, 102-106, 109, 125, 133, 140-42, 152, 156-57, 160, 173, 176, 178, 192-94, 197, 201-203, 206-209 of this Complaint as if fully restated here.

262.     Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

263.     Defendant Abbott, who was ADOC's Director of Facilities Management and responsible for maintenance operations within ADOC's correctional institutions, failed to protect Plaintiff.  (*See, e.g.,* ¶ 28.)

264.     Defendant Abbott knew of and recklessly disregarded the substantial risk of sexual assault at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 103-06, 131-33, 201-03.)

265.     In addition to the facts alleged above, Defendant Abbott was acutely aware of the widespread abuse fostering a culture of rape at Ventress, and therefore on notice of the need to correct the deprivation, and she failed to do so. (*See, e.g.,* ¶¶ 16, 140-41.)  Furthermore, as the ADOC's Director of Facilities Management, she created, shaped, or allowed certain customs or policies that resulted in deliberate indifference to constitutional rights. (*See, e.g.,* ¶¶ 16, 176, 191-92, 196-97, 201-203.)  Additionally, based on the numerous ongoing failures, understaffing, and overcrowding, Defendant Abbott knew that her subordinates would act unlawfully and failed to stop them from doing so.  (*See id.*)

266.     Defendant Abbott knew about the widespread violence at Ventress, including the underreporting of violent incidents by prisoners and ADOC staff, the overcrowding of inmates at

Ventress, understaffing of COs at Ventress, and the other failures and policies that contributed to the substantial risk of serious harm to Plaintiff and other inmates like him, yet she disregarded that risk by failing to take reasonable measures to abate it. (*See id.*)

267.     Defendant Abbott also knew that Ventress was in a state of disrepair that was causing security failures—for example, Defendant Abbott knew that there were no functioning night lights in Ventress. (*See, e.g.,* ¶ 203.) Defendant Abott knew that this issue caused a serious risk of harm, but took no effort to fix it. (*See, e.g.,* ¶¶ 203-04.)

268.     Defendant Abbott acted and failed to act with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

269.     Defendant Abbott's action and inaction directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including medical expenses, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

## COUNT I(H) - 42 U.S.C. SECTION 1983
### Eighth and Fourteenth Amendment Failure to Protect Against Defendant Mercado

270.     Plaintiff incorporates paragraphs 1-22, 29, 34, 53-210 of this Complaint as if fully restated here.

271.     Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

272.     Defendant Mercado, who at the time of the rape was and is employed by ADOC as Director of ADOC's I&I Division, failed to protect Plaintiff. (*See, e.g.,* ¶ 29.)

273.    Defendant Mercado knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 1, 2, 19, 28, 60, 143, 145.)

274.    Approximately three days after the rape, on November 14, 2018, Defendant Mercado signed a declaration stating that he had personally reviewed the list of requested open or pending investigative files at issue in the Department of Justice's subpoena request, which presumably should have included the I&I investigation into the rape of Plaintiff based on its status as an open or pending investigation.  He asserted that ADOC should not have to turn over these files to DOJ because "law enforcement privilege applie[d] and that confidentiality must be maintained in order to protect the integrity of these investigations and to avoid comprising any potential criminal prosecutions that may stem from those investigations." (*See, e.g.,* ¶ 75.)

275.    In addition to the facts alleged above, Defendant Mercado was responsible for the supervision of all I&I Investigations.   Pursuant to AR 454, Defendant Mercado was further responsible, among other things, for ensuring that all allegations of sexual abuse and harassment were thoroughly investigated, referring violations of the law to the district attorney for prosecution, and reporting statistical data for PREA-related incidents.  (*See, e.g.,* ¶ 29.)

276.    Mercado also allowed practices to continue that discouraged victims of sexual violence from coming forward and reporting rape, including by drug testing *victims* who report rape and allowing them to be subjected to retaliation and disciplinary action in connection with their reports of assaults.  (*See, e.g.,* ¶¶ 133, 140-41, 143-45.)

277.    Defendant Mercado was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other inmate-on-inmate violence and did not protect inmates.  (*See, e.g.,* ¶¶ 133, 140-41, 143-45.)

278.    Defendant Mercado was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates.  (*See, e.g.,* ¶¶ 29, 102-03, 111, 125, 130, 139, 155-56, 176.)

279.    Defendant Mercado was also aware that I&I investigators, including those who worked at Ventress, were insufficiently trained and supervised in responding to reports of sexual assault.  (*See, e.g.,* ¶¶ 16, 75, 76, 112, 117, 127, 130, 133, 136, 141-44.)

280.    Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Mercado did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  For example, Defendant Mercado did not adequately train I&I investigators in investigating sexual assaults, did not implement appropriate procedures that would have led to effective investigation of sexual assaults, and did not implement appropriate procedures that would have led to the effective prosecution and monitoring of sexual assault perpetrators. (*See id.*) Had Defendant Mercado taken reasonable steps to train investigators, to investigate assaults, and to prosecute assaults, Lowe and other sexual assault perpetrators would have been properly supervised or deterred from committing assaults.  (*See id.*)

281.    Defendant Mercado's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

282.     Defendant Mercado's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

**COUNT I(I) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Brand**

283.     Plaintiff incorporates paragraphs 2, 3, 8-11, 15-17, 19, 21, 30, 35, 55-56, 81, 85, 98, 102-106, 109, 125, 133, 140-42, 152, 156-57, 160, 173, 176, 178, 192-94, 197, 206-209 of this Complaint as if fully restated here.

284.     Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

285.     Defendant Brand, who at the time of the rape was and is employed by ADOC as Associate Commissioner of Administrative Services, failed to protect Plaintiff.  (*See, e.g.,* ¶ 30.)

286.     Defendant Brand knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41.)

287.     In addition to the facts alleged above, Defendant Brand was responsible for the training, development, and education of ADOC's workforce, including training necessary for PREA compliance. (*See, e.g.,* ¶ 30.)  He has also been responsible for implementing supervisory training courses, executive and basic leadership training, and developing the basic correctional officer position.   (*See, e.g.,* ¶ 30.)

288.    Defendant Brand was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other inmate-on-inmate violence and did not protect inmates.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41.)

289.    Defendant Brand was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates.  (*See, e.g.,* ¶¶ 102-03, 139, 156, 176.)

290.    Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Brand did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  For example, Defendant Brand failed to train and supervise officers in complying with PREA requirements, failed to train and supervise officers in basic security measures such as checking for contraband, failed to train and supervise officers in performing their duties with regard to PREA reporting, and failed to train and supervise officers on how to supervise and control likely sexual assault perpetrators, including Larry Lowe. Defendant Brand further failed to implement policies that would have led to the hiring and training of enough officers to staff ADOC facilities, including Ventress.  (*See, e.g.,* ¶¶ 102-03, 139, 156, 176.)

291.    Defendant Brand's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

292.    Defendant Brand's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

## COUNT I(J) - 42 U.S.C. SECTION 1983
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Hill**

293.    Plaintiff incorporates paragraphs 1-22, 31, 34, 54-210 of this Complaint as if fully restated here.

294.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

295.    Defendant Hill, who at the time of the rape was and is employed by ADOC as Chief of Staff, failed to protect Plaintiff.  (*See, e.g.,* ¶ 31.)

296.    Defendant Hill knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 87, 103-06, 131-33, 140-41, 201.)

297.    In addition to the facts alleged above, Defendant Hill was responsible for coordinating all staff activities and overseeing the day-to-day management of ADOC operations. Defendant Vincent, the Agency-Wide PREA Coordinator, reported to Defendant Hill, according to the 2018 Ventress PREA audit.  (*See, e.g.,* ¶ 31.)

298.    Defendant Hill was aware of the allegations in the *Braggs* case and was responsible for pulling together many of the records requested by DOJ from 2016 through 2018 as part of its investigation.  (*See, e.g.,* ¶ 87.)

299.    Defendant Hill was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other inmate-on-inmate violence and did not protect inmates.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41.)

300.    Defendant Hill was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates.  (*See, e.g.,* ¶¶ 102-03, 139, 156, 176.)

301.    Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Hill did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  For example, Defendant Hill failed to train and supervise officers in complying with PREA requirements, failed to train and supervise officers in basic security measures such as checking for contraband, failed to train and supervise officers in performing their duties with regard to PREA reporting, and failed to train and supervise officers on how to supervise and control likely sexual assault perpetrators, including Larry Lowe.

302.    Defendant Hill further failed to implement policies that would have led to the hiring and training of enough officers to staff ADOC facilities, including Ventress.  (*See, e.g.,* ¶¶ 102-03, 139, 156, 176.)   For example, Defendant Hill was one of the individuals responsible for implementing a staffing plan to provide adequate levels of staffing and video monitoring to protect inmates against sexual abuse.  *See, e.g.,* ¶ 201.  The staffing plan was supposed to cover any "blind spots" in the facility.  *Id.*  However, Defendant Hill did not implement the staffing plan.  (*See, e.g.,* ¶¶ 201-09.)

303.    Defendant Hill's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

304.    Defendant Hill's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights,

and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

<u>COUNT I(K) - 42 U.S.C. SECTION 1983</u><br>
<strong>Eighth and Fourteenth Amendment Failure to Protect Against Defendant Vincent</strong>

305.    Plaintiff incorporates paragraphs 1-22, 32, 34, 54-210 of this Complaint as if fully restated here.

306.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

307.    Defendant Vincent, who was Director of ADOC's PREA Division at the time of the rape and was responsible for, *inter alia*, coordinating and developing procedures to identify, monitor, and track sexual abuse, rape, and sexual harassment in ADOC facilities, maintaining statistics, and conducting practice audits to ensure compliance with ADOC and PREA policies and standards, failed to protect Plaintiff.  (*See, e.g.,* ¶ 32.)

308.    Defendant Vincent knew of and recklessly disregarded the substantial risk of sexual assault at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 1, 2, 19, 60, 87, 103-06, 131-33, 140-41, 145, 150, 201.)

309.    In addition to the facts alleged above, for years Defendant Vincent was acutely aware of the widespread abuse fostering a culture of rape at Ventress, and therefore on notice of the need to correct the deprivation, and she failed to do so.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41, 201.)

310.    Furthermore, as the Director of the PREA Division, she created, shaped, or allowed certain customs or policies that resulted in deliberate indifference to constitutional rights. (*See,*

- 89 -

*e.g.,* ¶¶ 102-03, 139, 156, 176.)  For instance, Defendant Vincent allegedly provided the Ventress PREA auditor with draft edits to AR 454 in an attempt to make the currently noncompliant policy appear compliant by adding draft language to the policy regarding the provision of prophylaxis treatment. Nearly four years later, AR 454 still has not been updated since 2016, and it does not include any draft or final language regarding prophylaxis treatment. (*See, e.g.,* ¶ 139.) Additionally, based on the numerous ongoing failures, understaffing, and overcrowding, Defendant Vincent knew that her subordinates would act unlawfully and failed to stop them from doing so. (*See, e.g.,* ¶¶ 102-03, 139, 156, 176.)  For example, *inter alia,* she failed to ensure that every inmate victim who reported a sexual assault or PREA violation received a timely rape kit test to collect evidence and medical examination to test for any sexually transmitted diseases, and if not, why not; she failed to ensure that inmates all had regular access to the IPCM; and she failed to investigate or determine why only 4% of the 227 inmate-on-inmate sexual assaults reported in 2018, which appeared in the 2018 ADOC PREA Report, were substantiated.  (*See, e.g.,* ¶¶ 102-03, 139, 150, 156, 176.)

311.   Despite ADOC's regulations purporting to implement a zero-tolerance policy for the sexual abuse and harassment of inmates under ADOC care and control, in reality, Vincent failed to provide adequate supervision and to properly implement practices or customs that encouraged correctional officers or other staff members to intervene to stop a sexual assault and also to report sexual assault; permitted a culture to persist where rape was accepted 'as a normal course of business, including acquiescence to the idea that prisoners will be subjected to sexual abuse as a way to pay debts accrued to other prisoners'; and discouraged victims of sexual violence from coming forward and reporting rape, including by permitting the drug testing *victims* and

subjecting them to disciplinary action in connection with their reports of rape. (*See, e.g.,* ¶¶ 133, 140-41, 143-45.)

312.    Additionally, rather than use the PREA audit reports to decrease incidents of sexual assault at Ventress, upon information and belief, Defendant Vincent shared or allowed the PREA audit information to be shared to help a facility pass a PREA audit, rather than address the underlying issues at the facility and check up to confirm actual compliance on a regular basis. (*See, e.g.,* ¶ 139.)

313.    As noted, Defendant Vincent knew about the widespread violence at Ventress, including the underreporting of violent incidents by prisoners and ADOC staff, the overcrowding of inmates at Ventress, understaffing of COs at Ventress, and the other failures and policies that contributed to the substantial risk of serious harm to Plaintiff and other inmates like him, yet she disregarded that risk by failing to take reasonable measures to abate it.  (*See, e.g.,* ¶¶ 16, 176, 191-92, 196-97, 201.)

314.    Defendant Vincent acted with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

315.    Defendant Vincent's action and inaction directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including medical expenses, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

### COUNT I(L) - 42 U.S.C. SECTION 1983
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Ivey**

316.    Plaintiff incorporates paragraphs 1-22, 33-34, 54-210 of this Complaint as if fully restated here.

317.     Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

318.     Defendant Ivey, who was the Governor of Alabama at the time of the rape and responsible for overseeing ADOC as well as implementing policies and procedures to protect ADOC inmates, failed to protect Plaintiff.  (*See, e.g.,* ¶ 33.)

319.     Defendant Ivey knew of and recklessly disregarded the substantial risk of sexual assault at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 12-14, 103-06, 131-33, 140-41, 201.)

320.     In addition to the facts alleged above, for years Defendant Ivey was acutely aware of the widespread abuse fostering a culture of rape at Ventress, and therefore on notice of the need to correct the deprivation, and she failed to do so.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41.) Furthermore, as the Governor of Alabama, she created, shaped, or allowed certain customs or policies that resulted in deliberate indifference to constitutional rights. (*See id.*)  Additionally, based on the numerous ongoing failures, understaffing, and overcrowding, Defendant Ivey knew that her subordinates would act unlawfully and failed to stop them from doing so.  (*See, e.g., id.*)

321.     Governor Ivey failed to correct major security failures, overcrowding, and understaffing at Ventress that directly caused Plaintiff's injuries. (*See, e.g.,* ¶¶ 10-13, 103-06, 131-33, 140-41.) Moreover, there can be no question that Ivey was aware of the persistently dangerous conditions at Ventress and other Alabama prisons prior to Plaintiff's assault, and by her own admission "waited far too long to address" those conditions.  (*See, e.g.,* ¶¶ 10-13.)  For example, shortly after the rape occurred, Governor Ivey issued a statement admitting that "[o]ur problem is our state's corrections system. . . . [I]ssues of violence, poor living conditions and mental illness

persist within our system.   These issues, and others, are exacerbated by a crowded inmate population, correctional and health care staffing challenges, and aging prison infrastructure . . ." (*See, e.g.,* ¶ 12.)

322.   As noted, Defendant Ivey knew about the widespread violence at Ventress, including the underreporting of violent incidents by prisoners and ADOC staff, the overcrowding of inmates at Ventress, understaffing of COs at Ventress, and the other failures and policies that contributed to the substantial risk of serious harm to Plaintiff and other inmates like him, yet she disregarded that risk by failing to take reasonable measures to abate it.  (*See, e.g.,* ¶¶ 10-13.)  Even years after the rape, Governor Ivey admitted that Alabama still had "longstanding, yet urgent, prison infrastructure challeneges" and that the "living and working conditions for both inmates and correction staff" was "unsustainable."  (*See, e.g.,* ¶¶ 13-14.)

323.   Defendant Ivey acted with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

324.   Defendant Ivey's action and inaction directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including medical expenses, pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

### COUNT I(M) - 42 U.S.C. SECTION 1983
### Eighth and Fourteenth Amendment Failure to Protect Against Defendant Strickland

325.   Plaintiff incorporates paragraphs 1-22, 36, 45, 51, 54-210 of this Complaint as if fully restated here.

326.     Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

327.     Defendant Strickland, who at the time of the rape was the Warden at Ventress and responsible for day-to-day operations, failed to protect Plaintiff.  (*See, e.g.,* ¶ 36.)

328.     Defendant Strickland knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress, knew of and disregarded the specific risk that Lowe posed to Plaintiff and other inmates, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 1, 2, 19, 60, 103-06, 131-33, 140-41, 145, 201.)

329.     In addition to the facts alleged above, Defendant Strickland also was responsible for developing Standard Operating Procedures to implement AR 454; ensuring that intermediate or higher-level supervisors conduct and document unannounced rounds, on each shift, to deter sexual assaults; ensure compliance with AR 302, Incident Reporting, as it applies to PREA; and ensuring that an allegation received from an inmate of any sexual abuse or harassment at the facility is appropriately handled, that I&I is notified, and that the inmate receives all necessary follow-up care according to the requirements of ADOC's PREA policy.  (*See, e.g.,* ¶¶ 36.) Defendant Strickland failed to adequately fulfill these responsibilities.

330.     Defendant Strickland received the report of the rape filed by Plaintiff's friend the evening of the rape and failed to take the steps required by PREA or to ensure that others took those steps.  (*See, e.g.,* ¶¶ 5, 79.)

331.     More generally, Defendant Strickland promoted and permitted a culture of rape at Ventress that permitted high rates of inmate-on-inmate rape and other inmate-on-inmate violence

to occur, and thereby, failed to protect inmates.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41.)  For example, Defendant Strickland allowed the systematic blaming of rape victims for sexual assaults. (*See, e.g.,* ¶¶ 144-45.)  The practice was to drug test rape victims and inquire into whether the rape victims had any debts that might have led to the expectation that the victim was to reciprocate with sexual favors.  (*See id*.)  This culture of blaming the victim led to sexual violence claims routinely being dismissed without investigation.  (*See id*.)

332.    Defendant Strickland was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates.  (*See, e.g.,* ¶¶ 102-03, 111, 125, 130, 139, 155-56, 176.)

333.    Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Strickland did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  For example, Defendant Strickland did not address the overcrowding and understaffing; he neither trained nor disciplined staff in an adequate manner to address the violence at Ventress; and he did not establish or enforce procedures that would have provided reasonable protection to prevent violent inmate-on-inmate attacks at Ventress. *(See, e.g.,* ¶¶ 103-06, 131-33, 140-41, 176.)

334.    Defendant Strickland also knew that given the violent history of some of the inmates at Ventress, including Larry Lowe, and the lack of adequate protections, there was a substantial risk of serious harm including rape to inmates at Ventress, including to Plaintiff.  (*See, e.g.,* ¶¶ 1, 2, 19, 60, 103-06, 131-33, 140-41, 145, 201.)

335.    Defendant Strickland was also one of the individuals responsible for implementing a staffing plan to provide adequate levels of staffing and video monitoring to protect inmates

against sexual abuse. (*See, e.g.,* ¶ 201.)  The staffing plan was supposed to cover any "blind spots" in the facility. (*Id.*)  However, Defendant Strickland did not implement the staffing plan. (*See, e.g.,* ¶¶ 201-09.)

336.   Defendant Strickland's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

337.   Defendant Strickland's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

## COUNT I(N) - 42 U.S.C. SECTION 1983
## Eighth and Fourteenth Amendment Failure to Protect Against Defendant Jones

338.   Plaintiff incorporates paragraphs 1-22, 37, 45, 51, 54-210 of this Complaint as if fully restated here.

339.   Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

340.   Defendant Jones, who was the Warden at Ventress from 2015-18 and responsible for day-to-day operations, failed to protect Plaintiff. (*See, e.g.,* ¶ 37.)

341.   In 2015, local media in Alabama reported that the ADOC "announced this week they will be shuffling key leadership positions in response to the continued criticism of overcrowding and reported violence [in Alabama's prisons]."  As part of that reshuffling, Defendant Jones moved from Easterling Correctional Facility to Ventress Correctional Facility. Previously she had been the deputy warden at Tutwiler Prison for Women at a time when rampant

abuse and sexual violence against inmates was documented by the United States Department of Justice, resulting in a consent agreement in federal court. A 2014 DOJ Report documented the extensive violence and abuse that occurred under Defendant Jones's leadership at Tutwiler, and ultimately a substantial risk of sexual violence against inmates continued undeterred under Defendant Jones's leadership during her tenure at Ventress as well.  For example, the 2014 report identified the sexual violence culture at Tutwiler and leadership's failures to address it, noting among other things, that "[d]espite Warden II Jones' attendance at the training, Tutwiler officials have yet to embrace gender-responsive strategies to manage the institution, or incorporate the strategies into their operational policies, practices, and procedures. Had Tutwiler adopted these strategies, a number of the harms identified in our investigation could have been avoided." Unfortunately Defendant Jones's knowledge and disregard of the substantial risk of sexual violence against prisoners continued during her tenure at Ventress.  (*See id*.)

342.    Similarly, as Warden of Ventress, Defendant Jones failed to ensure inmates at Ventress were properly classified upon arrival, and when they were, to enforce classification and housing assignments.  Thus, inmates were able to move from unit to unit without intervention, defeating the purpose of the classification and housing assignments separating categories of inmates and resulting in sexual assaults, such as the rape of Plaintiff.  (*See, e.g.,* ¶¶ 103-06.)

343.    Defendant Jones knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41, 201.)

344.    In addition to the facts alleged above, Defendant Jones was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other

inmate-on-inmate violence and did not protect inmates. (*See, e.g.,* ¶¶ 103-106, 140-42, 144-51, 157-76.)

345.    Defendant Jones was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates. (*See, e.g.,* ¶¶ 102-03, 139, 156, 176.)

346.    Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Jones did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  For example, Defendant Jones did not address the overcrowding and understaffing, she neither trained nor disciplined staff in an adequate manner to address the violence at Ventress, and she did not establish or enforce procedures that would have provided reasonable protection to prevent violent inmate-on-inmate attacks at Ventress. *(See, e.g.,* ¶¶ 103-06, 131-33, 140-41, 176.)

347.    Defendant Jones also knew that given the violent history of some of the inmates at Ventress and the lack of adequate protections, there was a substantial risk of serious harm including rape to inmates at Ventress, including to Plaintiff.  (*See id.*)

348.    Defendant Jones allowed the culture of rape to continue and take hold at Ventress during the years leading up to the rape, and her actions and inactions described above continued to affect prisoners' safety at Ventress until after the date of Plaintiff's rape.  (*See id.*)

349.    Defendant Jones's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

350.    Defendant Jones's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights,

and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

<u>**COUNT I(P) - 42 U.S.C. SECTION 1983**</u>
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Myers**

351.    Plaintiff incorporates paragraphs 1-3, 6, 8-11, 15-16, 19, 21, 40, 45, 51, 55-56, 60, 78, 81, 85, 98, 102-106, 111-112, 117, 125, 131-33, 140-145, 152, 156-57, 160, 173, 176, 178-180, 192-94, 197, 201, 206-209 of this Complaint as if fully restated here.

352.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

353.    Defendant Myers, who at the time of the rape was an Administrative Captain at Ventress responsible for the safety of all inmates and the supervision of all institutional security activities, failed to protect Plaintiff.  (*See, e.g.,* ¶ 40.)

354.    Defendant Myers knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress as well as the specific risk that Lowe posed to Plaintiff and others, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 1, 2, 19, 60, 87, 103-06, 131-33, 140-41, 145, 150, 201.)

355.    In addition to the facts alleged above, Defendant Myers was responsible for supervising institutional activities during shifts, including the corrections officers and other subordinates who supervised locations such as the canteen, C Dorm, and F Dorm.  (*See, e.g.,* ¶ 40.)

356.    In addition to the facts alleged above Defendant Myers was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other

inmate-on-inmate violence and did not protect inmates.  (*See, e.g.,* ¶¶ 103-106, 140-42, 144-51, 157-76.)

357.   Defendant Myers was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates.  (*See, e.g.,* ¶¶ 102-03, 139, 156, 176.)

358.   Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Myers did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  For example, Defendant Myers did not adequately supervise security activities and did not adequately repair and maintain the security infrastructure at Ventress. (*See, e.g.,* ¶¶ 103-106, 144-51, 157-76, 194.)  Defendant Myers was also one of the individuals responsible for implementing a staffing plan to provide adequate levels of staffing and video monitoring to protect inmates against sexual abuse.  (*See, e.g.,* ¶ 201.)  The staffing plan was supposed to cover any "blind spots" in the facility.  (*Id*.)  However, Defendant Myers did not implement the staffing plan.  (*See, e.g.,* ¶¶ 201-09.)

359.   Defendant Myers also knew that given the violent history of some of the inmates at Ventress, including Larry Lowe, and the lack of adequate protections, there was a substantial risk of serious harm including rape to inmates at Ventress, including to Plaintiff.  (*See, e.g.,* ¶¶ 1, 2, 19, 60, 87, 103-06, 131-33, 140-41, 145, 150, 201.)

360.   Defendant Myers's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

361.   Defendant Myers's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights,

and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

## COUNT I(Q) - 42 U.S.C. SECTION 1983
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Gordon**

362.    Plaintiff incorporates paragraphs 1-3, 5-6, 8-11, 15-16, 19, 21, 41, 45, 51, 55-56, 60, 74, 77-79, 81, 85, 98, 102-106, 111-112, 117, 125, 129, 131-33, 140-145, 152, 156-57, 160, 173, 176, 178-180, 192-94, 197, 201, 206-209 of this Complaint as if fully restated here.

363.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

364.    Defendant Gordon, who at the time of the rape was a Lieutenant at Ventress and the Ventress Institutional PREA Compliance Manager, failed to protect Plaintiff.  (*See, e.g.,* ¶ 40.)

365.    Defendant Gordon knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 1, 2, 19, 60, 87, 103-06, 131-33, 140-41, 145, 150, 201.)

366.    In addition to the facts alleged above, Defendant Gordon was responsible for the safety of all inmates at Ventress and the supervision of all institutional security activities and subordinate employees, including the corrections officers and other subordinates who supervised locations such as the canteen, C Dorm, and F Dorm. (*See, e.g.,* ¶ 40.) As the Ventress IPCM, Defendant Gordon also was responsible for, among other things, monitoring inmates identified as sexual aggressors, potential sexual aggressors, victims of sexual abuse, and potential victims of sexual abuse; reviewing, monitoring, and maintaining records of all PREA-related incidents, forms

and documents to ensure compliance with AR 454 and federal PREA standards; recommending placement and/or transfer of inmates involved in PREA-related incidents; taking immediate action when an inmate is subject to a substantial risk of imminent abuse; conducting after-hours institutional visits; ensuring inmates and employees in PREA-related incidents receive all services required and submitting appropriate reports.  (*See, e.g.,* ¶ 40.)  Defendant Gordon failed to adequately fulfill these responsibilities.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41, 201.)

367.    Defendant Gordon received the report of the rape filed by Plaintiff's friend the evening of the rape and failed to take the steps required by PREA or to ensure that others took those steps.  (*See, e.g.,* ¶¶ 5, 79.)

368.    More generally, Defendant Gordon was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other inmate-on-inmate violence and did not protect inmates.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41.)  For example, one key practice that Defendant Gordon implemented or allowed was a systematic blaming of rape victims for sexual assaults.  (*See, e.g.,* ¶¶ 144-45.)  The practice was to drug test rape victims and inquire into whether the rape victims had any debts that might have led to the expectation that the victim was to reciprocate with sexual favors.  (*See id*.)  This culture of blaming the victim led to sexual violence claims routinely being dismissed without investigation, thereby failing to deter future sexual assaults.  (*See id*.)

369.    Defendant Gordon was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates.  (*See, e.g.,* ¶¶ 102-03, 111, 125, 130, 139, 155-56, 176.)

370. Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Gordon did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety. For example, Defendant Gordon, despite being the Ventress Institutional PREA Compliance Manager, often did not follow PREA requirements. *(See, e.g.,* ¶¶ 103-06, 131-33, 140-41, 176.)

371. Defendant Gordon also knew that given the violent history of some of the inmates at Ventress, including Larry Lowe, and the lack of adequate protections, there was a substantial risk of serious harm including rape to inmates at Ventress, including to Plaintiff. *(See, e.g.,* ¶¶ 103-06, 131-33, 140-41, 176.)

372. Defendant Gordon was also one of the individuals responsible for implementing a staffing plan to provide adequate levels of staffing and video monitoring to protect inmates against sexual abuse. (*See, e.g.,* ¶ 201.) The staffing plan was supposed to cover any "blind spots" in the facility. (*Id.*) However, Defendant Gordon did not implement the staffing plan. (*See, e.g.,* ¶¶ 201-09.)

373. Defendant Gordon's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

374. Defendant Gordon's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

**COUNT I(R) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Peters**

375.   Plaintiff incorporates paragraphs 1-22, 42, 45, 51, 54-210 of this Complaint as if fully restated here.

376.   Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

377.   Defendant Peters, who at the time of the rape was a Sergeant at Ventress and the Ventress Back-up Institutional PREA Compliance Manager, failed to protect Plaintiff.  (*See, e.g.,* ¶ 42.)

378.   Defendant Peters knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress and the specific risk that Lowe posed to Plaintiff and others, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 1, 2, 19, 60, 87, 103-06, 131-33, 140-41, 145, 150, 201.)

379.   In addition to the facts alleged above, Defendant Peters was responsible for the safety of all inmates at Ventress and the supervision of all institutional security activities and subordinate employees, including the corrections officers and other subordinates who supervised locations such as the canteen, C Dorm, and F Dorm.  (*See, e.g.,* ¶ 42.)  As the Ventress Back-up IPCM, Defendant Peters also was responsible for, among other things, monitoring inmates identified as sexual aggressors, potential sexual aggressors, victims of sexual abuse, and potential victims of sexual abuse; reviewing, monitoring, and maintaining records of all PREA-related incidents, forms and documents to ensure compliance with AR 454 and federal PREA standards; recommending placement and/or transfer of inmates involved in PREA-related incidents; taking

immediate action when an inmate is subject to a substantial risk of imminent abuse; conducting after-hours institutional visits; ensuring inmates and employees in PREA-related incidents receive all services required and submitting appropriate reports.  (*See id.*)  Defendant Peters failed to adequately fulfill these responsibilities.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41, 201.)

380.   Defendant Peters received the report of the rape filed by Plaintiff's friend the evening of the rape and failed to take the steps required by PREA or to ensure that others took those steps.  (*See, e.g.,* ¶¶ 5, 70.)

381.   In addition to the facts alleged above, Defendant Peters was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other inmate-on-inmate violence and did not protect inmates.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41.) For example, one key practice that Defendant Peters implemented or allowed was a systematic blaming of rape victims for sexual assaults.  (*See, e.g.,* ¶¶ 144-45.)  The practice was to drug test rape victims and inquire into whether the rape victims had any debts that might have led to the expectation that the victim was to reciprocate with sexual favors.  (*See id.*)  This culture of blaming the victim led to sexual violence claims routinely being dismissed without investigation, thereby failing to deter future sexual assaults.  (*See id.*)

382.   Defendant Peters was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates.  (*See, e.g.,* ¶¶ 102-03, 111, 125, 130, 139, 155-56, 176.)

383.   Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Peters did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  For example, Defendant Peters, despite being the

Ventress Institutional PREA Compliance Manager, often did not follow PREA requirements. (*See, e.g.,* ¶ 70.)

384.    Defendant Peters also knew that given the violent history of some of the inmates at Ventress, including Larry Lowe, and the lack of adequate protections, there was a substantial risk of serious harm including rape to inmates at Ventress, including to Plaintiff.  *(See, e.g.,* ¶¶ 103-06, 131-33, 140-41, 176.)

385.    For example, Defendant Peters was one of the individuals responsible for implementing a staffing plan to provide adequate levels of staffing and video monitoring to protect inmates against sexual abuse.  (*See, e.g.,* ¶ 201.)  The staffing plan was supposed to cover any "blind spots" in the facility.  (*Id.*)  Defendant Peters did not implement the staffing plan.  (*See, e.g.,* ¶¶ 201-09.)

386.    Defendant Peters's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

387.    Defendant Peters's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

**COUNT I(S) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Haggins**

388.    Plaintiff incorporates paragraphs 1-22, 43, 45, 51, 54-210 of this Complaint as if fully restated here.

389.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

390.    Defendant Haggins, who at the time of the rape was a Sergeant at Ventress, responsible for the safety of all inmates and the supervision of all institutional security activities, failed to protect Plaintiff.  *(See, e.g.,* ¶ 43.)

391.    Defendant Haggins knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress and the specific risk that Lowe posed to Plaintiff and others, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety. (*See, e.g.,* ¶¶ 1, 2, 19, 60, 87, 103-06, 131-33, 140-41, 145, 150, 201.)

392.    In addition to the facts alleged above, Defendant Haggins was on duty as the shift supervisor when Plaintiff was raped and was the first Ventress official Plaintiff spoke to after the rape.  (*See, e.g.,* ¶¶ 4, 68.)  Although Plaintiff reported the rape to Defendant Haggins as soon as he escaped from F Dorm, where Larry Lowe and others were confining him, Defendant Haggins ignored Plaintiff's report and did none of the steps he was required to take after receiving a rape report. (*See, e.g.,* ¶¶ 4, 68-69, 110-11, 120-23.)  As alleged more fully above, he did not take Plaintiff to the infirmary or elsewhere for medical treatment or the collection of evidence; he did not take any steps to secure the crime scene or to preserve evidence; he did not notify the Ventress PREA Coordinator or the I&I Division to investigate; and, on information and belief, he did not tell anyone at Ventress about the rape.  (*See id.*)

393.    More generally, Defendant Haggins was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other inmate-on-inmate

violence and did not protect inmates.  (*See, e.g.,* ¶¶ 103-06, 131-33, 140-41.)  For example, one key practice that Defendant Haggins implemented and engaged in was a systematic blaming of rape victims for sexual assaults.  (*See, e.g.,* ¶¶ 144-45.)  The practice was to drug test rape victims and inquire into whether the rape victims had any debts that might have led to the expectation that the victim was to reciprocate with sexual favors.  (*See id*.)  This culture of blaming the victim led to sexual violence claims routinely being dismissed without investigation, thereby failing to deter future sexual assaults.  (*See id*.)

394.    Defendant Haggins was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates.  (*See, e.g.,* ¶¶ 102-03, 111, 125, 130, 139, 155-56, 176.)   For example, Defendant Haggins was one of the individuals responsible for implementing a staffing plan to provide adequate levels of staffing and video monitoring to protect inmates against sexual abuse.  (*See, e.g.,* ¶ 201.)  The staffing plan was supposed to cover any "blind spots" in the facility.  (*Id.*)  Defendant Haggins did not implement the staffing plan, however.  (*See, e.g.,* ¶¶ 201-09.)

395.    Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Haggins did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  (*See, e.g.,* ¶¶ 1, 2, 19, 60, 87, 103-06, 131-33, 140-41, 145, 150, 201.)

396.    Defendant Haggins also knew that given the violent history of some of the inmates at Ventress, including Larry Lowe, and the lack of adequate protections, there was a substantial risk of serious harm including rape to inmates at Ventress, including to Plaintiff.  (*See id*.)

397.    Defendant Haggins's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

398.    Defendant Haggins's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

<u>**COUNT I(T) - 42 U.S.C. SECTION 1983**</u>
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Glenn**

399.    Plaintiff incorporates paragraphs 3, 6, 7-10, 16, 19, 21, 46, 51, 55-56, 73, 80-81, 85, 98, 112, 116-17, 125, 131-33, 140-144, 152, 156-57, 178-180, 186-87, 192, 206-209 of this Complaint as if fully restated here.

400.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

401.    Defendant Glenn, who at the time of the rape was employed as a Corrections Officer at Venturess, failed to protect Plaintiff.  (*See, e.g.,* ¶ 43.)

402.    Defendant Glenn knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 10,  16, 116, 145, 186, 187.)

- 109 -

403.   In addition to the facts alleged above, Defendant Glenn was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.  (*See, e.g.,* ¶ 43.)

404.   Defendant Glenn was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other inmate-on-inmate violence and did not protect inmates.  (*See, e.g.,* ¶¶ 116, 144-45, 186, 187.)   For example, one key practice that Defendant Glenn engaged in was a systematic blaming of rape victims for sexual assaults.  (*See* ¶¶ 144-45.)  The practice was to drug test rape victims and inquire into whether the rape victims had any debts that might have led to the expectation that the victim was to reciprocate with sexual favors.  (*See id.*)  This culture of blaming the victim led to sexual violence claims routinely being dismissed without investigation, thereby failing to deter future sexual assaults.  (*See id.*)

405.   Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Glenn did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  (*See, e.g.,* ¶¶ 116, 145, 186, 187.)  For example, Defendant Glenn did not properly supervise or control the movements of dangerous inmates, including Lowe.  (*See, e.g.,* ¶¶ 1-3, 16, 60-61, 63.)  Further, after the rape took place, Defendant Glenn heard and saw Lowe harassing Plaintiff in an effort to intimidate Plaintiff.  (*See, e.g.,* ¶ 73.)  Plaintiff then informed Defendant Glenn that he had been raped by Lowe and gave her a note describing the assault and identifying Lowe as the rapist.  (*See id.*)  However, Defendant Glenn made no effort to report the rape and made no effort to reduce the harassment and threats coming from Lowe.  (*See id.*)

406.   Defendant Glenn further incited harassment and increased the danger to Plaintiff after the rape by loudly telling Plaintiff in front of other inmates and staff that "the next time those

black boys sexually assault or sexually harass you, don't come running my way or ask me for help." (*See, e.g.*, ¶ 80.)

407.    Defendant Glenn's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

408.    Defendant Glenn's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

**COUNT I(U) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Rumph**

409.    Plaintiff incorporates paragraphs 3, 6, 8-10, 16, 19, 21, 47, 51, 55-56, 78, 81, 85, 98, 112, 117, 125, 129, 132-33, 140-145, 152, 156-57, 178-180, 192, 206-209 of this Complaint as if fully restated here.

410.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

411.    Defendant Rumph, who at the time of the rape was employed as a Corrections Officer at Venturess, failed to protect Plaintiff. (*See, e.g.*, ¶ 47.)

412.    Defendant Rumph knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety. (*See, e.g.*, ¶¶ 10,  16, 78, 129, 144-45.)

413.     In addition to the facts alleged above, Defendant Rumph was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.  (*See, e.g.,* ¶ 47.)

414.     Defendant Rumph was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other inmate-on-inmate violence and did not protect inmates. (*See, e.g.,* ¶¶ 129, 144-45.)  For example, one key practice that Defendant Rumph engaged in was a systematic blaming of rape victims for sexual assaults.  (*See, e.g.,* ¶¶ 144-45.) The practice was to drug test rape victims and inquire into whether the rape victims had any debts that might have led to the expectation that the victim was to reciprocate with sexual favors.  (*See id.*)  This culture of blaming the victim led to sexual violence claims routinely being dismissed without investigation, thereby failing to deter future sexual assaults.  (*See id.*)

415.     Defendant Rumph was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates.  (*See id.*)

416.     Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Rumph did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  For example, Defendant Rumph did not properly supervise or control the movements of dangerous inmates, including Lowe.  (*See, e.g.,* ¶¶ 1-3, 16, 60-61, 63.)  Further, after the rape took place, Defendant Rumph prevented Plaintiff from speaking with Defendant Gordon to report the rape.  (*See, e.g.,* ¶¶ 78, 129.)

417.     Defendant Rumph's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

418.    Defendant Rumph's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

<u>**COUNT I(V) - 42 U.S.C. SECTION 1983**</u>
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Byrd**

419.    Plaintiff incorporates paragraphs 3, 6, 8-10, 16, 19, 21, 48, 51, 55-56, 78, 81, 85, 98, 112, 117, 125, 129, 132-33, 140-144, 152, 156-57, 178-180, 192, 206-209 of this Complaint as if fully restated here.

420.    Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

421.    Defendant Byrd, who at the time of the rape was employed as a Corrections Officer at Ventress, failed to protect Plaintiff.  (*See, e.g.,* ¶ 48.)

422.    Defendant Byrd knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 10,  16, 78, 129, 144-45.)

423.    In addition to the facts alleged above, Defendant Byrd was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.  (*See, e.g.,* ¶ 48.)

424.    Defendant Byrd was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other inmate-on-inmate violence and did not protect inmates.  (*See, e.g.,* ¶¶ 129, 144-45.)  For example, one key practice that Defendant Byrd

engaged in was a systematic blaming of rape victims for sexual assaults. (*See, e.g.,* ¶¶ 144-45.) The practice was to drug test rape victims and inquire into whether the rape victims had any debts that might have led to the expectation that the victim was to reciprocate with sexual favors. (*See id*.) This culture of blaming the victim led to sexual violence claims routinely being dismissed without investigation, thereby failing to deter future sexual assaults. (*See id*.)

425.   Defendant Byrd was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates. (*See id.*)

426.   Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress, Defendant Byrd did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety. For example, Defendant Byrd did not properly supervise or control the movements of dangerous inmates, including Lowe. (*See* ¶¶ 1-3, 16, 60-61, 63.) Further, after the rape took place, Defendant Byrd prevented Plaintiff from speaking with Defendant Gordon to report the rape. (*See, e.g.,* ¶¶ 78, 129.) In one incident, two days after the rape, Plaintiff went to the Administrative Office and stood in front of the door until Defendant Byrd opened the door. (*See, e.g.,* ¶ 78.) Plaintiff informed Defendant Byrd that Plaintiff wanted to speak with Defendant Gordon, but Defendant Byrd said Defendant Gordon was busy. (*See id.*)

427.   Defendant Byrd's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

428.   Defendant Byrd's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights,

and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

**COUNT I(W) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Failure to Protect Against Defendant Lewis**

429.  Plaintiff incorporates paragraphs 1-22, 49, 51, 53-210 of this Complaint as if fully restated here.

430.  Pursuant to the Eighth and Fourteenth Amendments of the United States Constitution, Plaintiff is entitled to be free from a known and unreasonable risk of serious harm while in the custody of the State.

431.  Defendant Lewis, who at the time of the rape was employed as an I&I Officer at Ventress, failed to protect Plaintiff.  (*See, e.g.,* ¶ 49.)

432.  Defendant Lewis knew of and recklessly disregarded the substantial risk that a known or likely perpetrator of sexual assault would harm Plaintiff and inmates like him while in custody at Ventress, and failed to take action reasonably necessary to respond to this risk to Plaintiff's and other inmates' health and safety.  (*See, e.g.,* ¶¶ 10,  16, 78, 129, 144-45.)

433.  In addition to the facts alleged above, Defendant Lewis was responsible for "promptly, thoroughly, and objectively" investigating reports of sexual assault.  (*See, e.g.,* ¶ 49.)

434.  Defendant Lewis was acutely aware of and tolerated a longstanding culture at Ventress that permitted inmate-on-inmate rape and other inmate-on-inmate violence and did not protect inmates.  (*See, e.g.,* ¶¶ 144-45.)  For example, one key practice that Defendant Lewis implemented, allowed, and engaged in was a systematic blaming of rape victims for sexual assaults.  (*See, e.g.,* ¶¶ 144-45.)  The practice was to drug test rape victims and inquire into whether the rape victims had any debts that might have led to the expectation that the victim was to reciprocate with sexual favors.  (*See id.*)  This culture of blaming the victim led to sexual violence

claims routinely being dismissed without investigation, thereby failing to deter future sexual assaults.  (*See id*.)

435.    Defendant Lewis was also aware that the requirements of PREA were routinely ignored at Ventress and that there was severe understaffing at Ventress, which led to significantly increased likelihood of sexual attacks against inmates.  (*See id.*)

436.    Despite knowing of the substantial risk of serious rape of and other violent attacks on inmates at Ventress and the specific risk that Lowe posed to Plaintiff and others, Defendant Lewis did not take reasonable steps to attempt to ensure the inmates' safety, including Plaintiff's safety.  (*See, e.g.,* ¶¶ 1, 19, 60.)  For example, two days after the rape, Defendant Lewis took Plaintiff's statement about the rape.  (*See, e.g.,* ¶ 71.)  Defendant Lewis did not attempt to collect any physical evidence.  He did not refer or take Plaintiff to the infirmary for administration of a rape kit or emergency medical treatment.  (*See id*.)  Instead Defendant Lewis simply told Plaintiff that he and Lowe would be separated, and that Defendant Lewis would send a report of the assault to Warden Strickland.  (*See id*.)

437.    Rather than separate Lowe from Plaintiff, Defendant Lewis then instead moved Lowe to Plaintiff's dorm in a one-man segregation cell on the same side as Plaintiff's unit.  (*See, e.g.,* ¶ 72.)  From that cell, Lowe was able to persistently harassed Plaintiff with verbal abuse and threats, alternately threatening and attempting to bribe Plaintiff to get him to retract the rape allegation.  (*See id*.)  Lowe was also able to issue threats to Plaintiff on a daily basis by using other prisoners as messengers.  (*See id*.)

438.    Then, in a second meeting with Plaintiff, Defendant Lewis claimed that he had spoken to Lowe and DJ, and that they had denied Plaintiff's account.  (*See, e.g.,* ¶ 76.)  Defendant Lewis accused Plaintiff of being on drugs at the time of the rape and not being truthful about the

rape. (*See id.*) Defendant Lewis concluded the investigation by issuing a letter to Plaintiff stating that the "case in which you were the victim of sexual assault … was found to be unsubstantiated and closed." (*See, e.g.,* ¶ 77.)

439.    Defendant Lewis's misconduct was objectively unreasonable, and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.

440.    Defendant Lewis's misconduct directly and proximately caused Plaintiff to be subjected to a known and unreasonable risk of serious harm in violation of his constitutional rights, and caused him to suffer damages, including pain, suffering, fear, anxiety, rage, and other harmful physical and psychological harms, both from the brutal rape and its devastating aftermath.

## COUNT II(A) - 42 U.S.C. SECTION 1983
### Eighth and Fourteenth Amendment Deprivation of Health Care Against Defendant Haggins

441.    Plaintiff incorporates paragraphs 1, 3-7, 43, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

442.    At the time of the rape, Defendant Haggins was employed by ADOC as a Sergeant at Ventress, and he was the Ventress Shift Commander on duty. (*See* ¶¶ 4, 43, 68.)  In that role, Defendant Haggins was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees. (*See* ¶ 43.) Defendant Haggins was also aware of and required to comply with PREA and ADOC standards, policies and procedures concerning reporting and responding to sexual assault, including the need and requirement for prompt emergency and preventative medical treatment and intervention. (*See* ¶¶ 4, 43, 66-69, 99-103, 110-125, 138, 191.)

443.   After being raped, Plaintiff had an objectively serious need for health care, including emergency medical care for injury from the rape, testing and preventative treatment for sexually transmitted infections, and medical and mental health crisis intervention.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-123, 137-138.)

444.   Defendant Haggins was the first prison official to receive notice of Plaintiff's serious need for medical care when Plaintiff personally reported to Haggins, the Ventress Shift Commander then on duty, that he had just been raped, thereby rendering Haggins the "first responder" under AR 454.  (*See* ¶¶ 4, 43, 68-69, 110-111, 120, 123.)

445.   Despite his immediate knowledge of the rape and the fact that he was the responsible Shift Commander and first responder, Defendant Haggins failed to respond to Plaintiff's report by providing access to timely medical treatment as required by law or filing a report, and he instead ordered Plaintiff to immediately return to his dormitory without such treatment.  (*See* ¶¶ 4, 43, 74, 68-69, 110-111, 120-123.)

446.   Defendant Haggins' misconduct named in this Count II(A) was objectively unreasonable and was undertaken with deliberate indifference, malice, willfullness, or reckless disregard to Plaintiff's health and safety.  (*See* ¶¶ 4, 68-69, 110-111, 120-123.)

447.   As a proximate result of Defendant Haggins' actions named in this Count II(A), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

### COUNT II(B) - 42 U.S.C. SECTION 1983
**Eighth and Fourteenth Amendment Deprivation of Health Care Against Defendant Glenn**

448.   Plaintiff incorporates paragraphs 1, 3-7, 46, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

449.    At the time of the rape, Defendant Glenn was employed by ADOC as a Corrections

Officer as Ventress, and in that role she was responsible for the safety of inmates at the facility

and the implementation of institutional security activities.  (See ¶ 46.)  Defendant Glenn was also

aware of and required to comply with PREA and ADOC standards, policies and procedures

concerning reporting and responding to sexual assault, including the need and requirement for

prompt emergency and preventative medical treatment and intervention.  (See ¶¶ 4, 46, 99-102,

110-112, 120-123.)

450.    After being raped, Plaintiff had an objectively serious need for health care,

including emergency medical care for injury from the rape, testing and preventative treatment for

sexually transmitted infections, and medical and mental health crisis intervention.  (See ¶¶ 3-4, 7,

65, 82-84, 120-123, 137-138.)

451.    Just days after the rape, Plaintiff told Defendant Glenn that he was raped by Lowe

and gave her a note describing the assault, making her aware of Plaintiff's serious need for medical

care and the fact this need had not yet been addressed.  (See ¶ 73.)  When Plaintiff reported the

rape to Glenn, Plaintiff had still not been provided medical treatment or intervention, effectively

rendering Glenn a "first responder" with respect to the assault.  (See ¶ 69, 121-22.)

452.    Despite her knowledge of the rape, Defendant Glenn failed to respond by providing

access to timely medical treatment, make any effort to reduce the harassment or threats coming

from Lowe, or file a report as required by law, and she instead verbally harassed Plaintiff using

the confidential information he provided when he reported the rape to her.  (See ¶¶ 7, 73-74, 80,

100-102, 111, 131-133, 120-122, 129, 137-39.)

453.    Defendant Glenn's misconduct named in this Count II(B) was objectively

unreasonable and was undertaken with deliberate indifference, malice, willfullness, or reckless

disregard to Plaintiff's health and safety.  (*See* ¶¶ 7, 73-74, 111-114, 116, 120-122, 131-133, 186-187.)

454.    As a proximate result of Defendant Glenn's actions named in this Count II(B), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

**COUNT II(C) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Deprivation of Health Care**
**Against Defendant Strickland**

455.    Plaintiff incorporates paragraphs 1, 3-15, 17-18, 36, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

456.    At the time of and leading up to the rape, Defendant Strickland was employed by ADOC as the Warden of Ventress, and in that role, he was responsible for the safety of all prisoners; staffing and maintenance of the prison; the training and supervision of all subordinate employees (including without limitation Defendants Haggins, Glenn, Gordon, Lewis, and Peters); housing and placement of inmates within the prison; development of Standard Operating Procedures to implement AR 454; ensuring that Correctional Sergeants, assistant wardens, and other officers conduct unannounced rounds on each shift to deter sexual assault and ensure prisoner safety; ensuring compliance with AR 302, as it applies to PREA and reporting of sexual assault; ensuring that any allegation received from any inmate of sexual assault is appropriately reported and handled; and ensuring that all necessary medical care is provided to any inmate that is a victim of sexual assault.   (*See* ¶ 36.)

457.    After being raped, Plaintiff had an objectively serious need for health care, including emergency medical care for injury from the rape, testing and preventative treatment for

sexually transmitted infections, and medical and mental health crisis intervention. (*See* ¶¶ 3-4, 7, 65, 82-84, 120-123, 137-138.)

458.   Despite Plaintiff's objectively serious need for medical care in the wake of the assault, that need went unaddressed by anyone at Ventress, including as Plaintiff was held against his will for hours during which no officer patrolled his rapist's dormitory, and thereafter as multiple Ventress officers and personnel became aware of the rape and Plaintiff's serious need for medical care, but failed to respond by providing Plaintiff with timely access to medical care. (*See* ¶¶ 3-5, 65-74, 191-195, Counts II(A)-(B) and Counts II(D)-(F).)

459.   When, at Plaintiff's request, Plaintiff's friend outside the prison reported his rape the evening of the assault through ADOC's website, Defendant Strickland received notice of the assault, pursuant to ADOC policy, and thereby was made aware of Plaintiff's serious need for medical attention and the fact that this need had not yet been addressed. (*See* ¶¶ 5, 36, 70-71.)

460.   Despite his knowledge of this unconstitutional deprivation of health care, and the facts that he was the Warden with overall responsibility for Ventress and effectively a first responder by virtue of his receipt of the initial online report of the rape, Defendant Strickland failed to respond to Plaintiff's report by providing Plaintiff with access to timely medical treatment as required by law. (*See* ¶¶ 5, 36, 110-112, 121-22.) Instead, Plaintiff was promptly retaliated against and subjected to further mental and emotional trauma when Lowe was transferred to a nearby cell in Plaintiff's dorm, a transfer that on information and belief would have required Defendant Strickland's knowledge and approval (*see* ¶¶ 6, 72), and Defendant Strickland was dismissive of Plaintiffs' report about the rape. (*See* ¶ 79.)

461.   Before Plaintiff's assault, Defendant Strickland was also aware of or deliberately indifferent to the routine refusal to provide or to delay medical care for prisoners sexually assaulted

at Ventress, as demonstrated by the DOJ's 2019 Report regarding its investigation of ADOC's prisons, which documented numerous examples of ADOC prisoners being denied adequate medical care during the years leading up to Plaintiff's assault.  This failure to provide timely medical care for prisoners who had been sexually assaulted was widespread and pervasive at Ventress, and was further known to Defendant Strickland from performing his duties as warden of Ventress, reviewing internal ADOC and Ventress reports and records, as well as his awareness of the DOJ's then-ongoing investigation and the recent *Braggs* decision, which found that "persistent and severe shortages of mental-health staff and correctional staff, combined with chronic and significant overcrowding, are the overarching issues that permeate" ADOC's "horrendously inadequate" mental-health aspects of its health care system.  (*See* ¶¶ 8-15, 17-18, 36, 87, 100-102, 121-123, 146, 162-176.)

462.    Despite his knowledge of this unconstitutional deprivation of health care, Defendant Strickland failed to adequately supervise, discipline, or train Ventress correctional officers, adequately staff Ventress as necessary to promptly respond to sexual assault and provide access to needed medical treatment to victims, or take other reasonable measures to ensure prison officers provided timely medical care to prisoners like Plaintiff.  (*See* ¶¶ 4-15, 65-67, 102, 110-112, 123, 131-133, 136-141, 162-176.)

(a)    By failing to take any minimally adequate action to address the pervasive failure of correctional officers to provide timely medical care to prisoners at Ventress, despite being aware of rampant PREA violations and the associated risks, Defendant Strickland was deliberately indifferent to the problem, thereby effectively ratifying it.

(b)     Plaintiff's injuries were exacerbated by the conduct of employees at ADOC, who acted and failed to act pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system, described above, that were ratified and followed by Defendant Strickland, among others.

463.    Defendant Strickland's misconduct named in this Count II(C) was objectively unreasonable and was undertaken with deliberate indifference, malice, willfullness, or with reckless disregard to Plaintiff's health and safety.  (*See* ¶¶ 5-7, 71-79, 112, 124-149, 137-139.)

464.    As a proximate result of Defendant Strickland's actions named in this Count II(C), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

**COUNT II(D) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Deprivation of Health Care**
**Against Defendant Lewis**

465.    Plaintiff incorporates paragraphs 1, 3-7, 49, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

466.    At the time of the rape, Defendant Lewis was employed by ADOC as an I&I Officer at Ventress, and in that role, he was responsible for promptly, thoroughly, and objectively investigating reports of sexual assault as well as responding to those reports and ensuring that victims receive all necessary medical attention and treatment.  (*See* ¶ 49.)

467.    After being raped, Plaintiff had an objectively serious need for health care, including emergency medical care for injury from the rape, testing and preventative treatment for sexually transmitted infections, and medical and mental health crisis intervention.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-123, 137-138.)

468.    When, at Plaintiff's request, Plaintiff's friend outside the prison reported his rape the evening of the assault through ADOC's website, Defendant Lewis received notice of the

assault, pursuant to ADOC policy, and thereby was made aware of Plaintiff's serious need for medical attention and the fact that this need had not yet been addressed.  (*See* ¶¶ 5, 49, 70.)   In addition, two days after the rape Lewis personally took Plaintiff's statement about the rape.  (*See* ¶ 71.)

469.   Despite his knowledge of the rape, and the fact that he was effectively a "first responder" by virtue of receiving the online report of the rape and personally taking Plaintiff's statement about it, Defendant Lewis did not refer or take Plaintiff to the infirmary for medical treatment or examination.  (*See* ¶¶ 7, 70-71.)  Upon learning of the rape, he failed to take many of the necessary actions required by law and instead attempted to blame Plaintiff for the assault and to deny that it happened at all.  (*See* ¶¶ 5-7, 70-72, 76-77, 127-128.)  Defendant Lewis made no efforts to separate Plaintiff and Lowe, and in fact moved Lowe to Plaintiff's dorm the following day.  (*See* ¶¶ 6, 72.)  Instead of providing access to medical care and conducting a thorough investigation of the reported rape, Defendant Lewis ordered a drug test of Plaintiff, then dismissed Plaintiff's complaint as "unsubstantiated."  (*See* ¶¶ 76-77, 127-128.)  He also did not take any further action to ensure that Plaintiff received adequate and immediate care as required by law. (*See* ¶¶ 82-84, 95-102, 110-11, 121-22, 127-129.)

470.   Defendant Lewis's misconduct named in this Count II(D) was objectively unreasonable and was undertaken with deliberate indifference, malice, willfullness, or reckless disregard to Plaintiff's and other inmates' health and safety.  (*See* ¶¶ 5-7, 70-79, 112-125.)

471.   As a proximate result of Defendant Lewis's actions named in this Count II(D), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

**COUNT II(E) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Deprivation of Health Care**
**Against Defendant Gordon**

472.    Plaintiff incorporates paragraphs 1, 3-15, 17-18, 41, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

473.    At the time of the rape, Defendant Gordon was employed by ADOC as a Lieutenant at Ventress and was Ventress's Institutional PREA Compliance Manager ("IPCM").  In that role, Defendant Gordon was responsible for the safety of all inmates at the facility and the supervision of all institutional security activities and subordinate employees.  (*See* ¶ 41.)  As the Ventress IPCM, he also was responsible for, among other things, monitoring victims of sexual abuse, taking immediate action when an inmate is subject to a substantial risk of imminent abuse, and ensuring that inmates in PREA-related incidents receive all necessary services.  (*See* ¶ 41.)

474.    After being raped, Plaintiff had an objectively serious need for health care, including emergency medical care for injury from the rape, testing and preventative treatment for sexually transmitted infections, and medical and mental health crisis intervention.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-123, 137-138.)

475.    Despite Plaintiff's objectively serious need for medical care in the wake of the assault, that need went unaddressed by anyone at Ventress, including as Plaintiff was held against his will for hours during which no officer patrolled his rapist's dormitory, and thereafter as multiple Ventress officers and personnel became aware of the rape and Plaintiff's serious need for medical care, but failed to respond by providing Plaintiff with timely access to medical care.  (*See* ¶¶ 3-5, 65-74, 191-195, Counts II(A)-(D) and Count II(F).)

476.    When, at Plaintiff's request, Plaintiff's friend outside the prison reported his rape the evening of the assault through ADOC's website, Defendant Gordon received notice of the

assault, pursuant to ADOC policy, and thereby was made aware of Plaintiff's serious need for medical attention and the fact that this need had not yet been addressed.  (*See* ¶¶ 5, 41, 70.)

477.    Despite his knowledge of the rape and the ongoing unconstitutional deprivation of health care and his role as Ventress IPCM and as an effective "first responder" by virtue of receiving the online report of the rape, Defendant Gordon failed to adequately respond to Plaintiff's report by providing Plaintiff with access to timely medical treatment as required by law. (*See* ¶ 5, 41, 70, 79, 121-122.)

478.    Before Plaintiff's assault, Defendant Gordon was also aware of or deliberately indifferent to the routine refusal to provide or to delay medical care for prisoners sexually assaulted at Ventress, as demonstrated by the DOJ's 2019 report regarding its investigation of ADOC's prisons, which documented numerous examples of ADOC prisoners being denied adequate medical care during the years leading up to Plaintiff's assault.  This failure to provide timely medical care for prisoners who had been sexually assaulted was widespread and pervasive at Ventress, and further known to Defendant Gordon from performing his duties as Ventress' IPCM, reviewing internal ADOC and Ventress reports and records, as well as his awareness of DOJ's then-ongoing investigation and the recent *Braggs* decision.  (*See* ¶¶ 8-11, 17-18, 41, 75-76, 80, 99-106, 145-46, 154-169.)

479.    Despite his knowledge of this unconstitutional deprivation of health care, Defendant Gordon failed to adequately supervise, discipline, or train Ventress correctional officers, or take any other reasonable measures to prevent officers from failing to provide timely medical care to prisoners like Plaintiff.  (*See* ¶¶ 4-5, 10-13, 66-80, 110-123, 127-130, 137-141.)

(a)    By failing to take any minimally adequate action to respond to Plaintiff's report or to address the pervasive failure of correctional officers to provide

timely medical care to prisoners at Ventress, despite being aware of rampant PREA violations and the associated risks, Defendant Gordon was deliberately indifferent to the problem, thereby effectively ratifying it.

(b)     Plaintiff's injuries were exacerbated by the conduct of employees at ADOC, who acted and failed to act pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system, described above, that were ratified and followed by Defendant Gordon, among others.

480.     Defendant Gordon's misconduct named in this Count II(E) was objectively unreasonable and was undertaken with deliberate indifference, malice, willfullness, or reckless disregard to Plaintiff's and other inmates' health and safety. (*See* ¶¶ 5-7, 79, 121-125.)

481.     As a proximate result of Defendant Gordon's actions named in this Count II(E), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

### COUNT II(F) - 42 U.S.C. SECTION 1983
**Eighth and Fourteenth Amendment Deprivation of Health Care
Against Defendant Peters**

482.     Plaintiff incorporates paragraphs 1, 3-7, 42, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

483.     At the time of the rape, Defendant Peters was employed by ADOC as a Sergeant and back-up Institutional PREA Compliance Manager at Ventress, and in that role, he was responsible for the safety of all inmates at the facility and the training and supervision of all subordinate institutional security activities and employees, including activities related to PREA compliance and the provision of health care and other necessary services to inmates who report being sexual assaulted.  (*See* ¶¶ 5, 42.)

484.    After being raped, Plaintiff had an objectively serious need for health care, including emergency medical care for injury from the rape, testing and preventative treatment for sexually transmitted infections, and medical and mental health crisis intervention.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-123, 137-138.)

485.    In addition, despite Plaintiff's objectively serious need for medical care in the wake of the assault, that need went unaddressed by anyone at Ventress, including as Plaintiff was held against his will for hours during which no officer patrolled his rapist's dormitory, and thereafter as multiple Ventress officers and personnel became aware of the rape and Plaintiff's serious need for medical care, but failed to respond by providing Plaintiff with timely access to medical care.  (*See* ¶¶ 3-5, 65-74, 191-195, and Counts II(A)-(E).)

486.    When, at Plaintiff's request, Plaintiff's friend outside the prison reported his rape the evening of the assault through ADOC's website, Defendant Peters received notice of the assault, pursuant to ADOC policy, and thereby was made aware of Plaintiff's serious need for medical attention and the fact that this need had not yet been addressed.  (*See* ¶¶ 5, 42, 70-71.)

487.    Despite his knowledge of the rape and the ongoing unconstitutional deprivation of health care, his role as backup IPCM at Ventress and as an effective "first responder" by virtue of receiving the online report of the rape, Defendant Peters failed to adequately respond to Plaintiff's report by providing Plaintiff with access to timely medical treatment as required by law.  (*See* ¶ 5, 42, 70, 111, 121-122.)

488.    Despite his knowledge of the ongoing unconstitutional deprivation of health care, Defendant Peters failed to adequately supervise, discipline, or train Ventress correctional officers, or take any other reasonable measures to prevent officers from failing to provide timely medical care to prisoners like Plaintiff.  (*See* ¶¶ 4-5, 65, 71-80, 82-84, 102-109, 131-139.)

(a)     By failing to take any minimally adequate action to respond to Plaintiff's report or to address the pervasive failure of correctional officers to provide timely medical care to prisoners at Ventress, despite being aware of rampant PREA violations and the associated risks, Defendant Peters was deliberately indifferent to the problem, thereby effectively ratifying it.

(b)     Plaintiff's injuries were exacerbated by the conduct of employees at ADOC, who acted and failed to act pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system, described above, that were ratified and followed by Defendant Peters, among others.

489.     Defendant Peters' misconduct named in this Count II(F) was objectively unreasonable and was undertaken with deliberate indifference, malice, willfullness, or reckless disregard to Plaintiff's and other inmates' health and safety.  (*See* ¶¶ 5-7, 70, 111, 121-125.)

490.     As a proximate result of Defendant Peters' actions named in this Count II(F), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

## COUNT II(G) - 42 U.S.C. SECTION 1983
### Eighth and Fourteenth Amendment Deprivation of Health Care
### Against Defendant Vincent

491.     Plaintiff incorporates paragraphs Plaintiff incorporates paragraphs 1, 3-15, 17-18, 32, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

492.     At the time of the rape, Defendant Vincent was the Director of ADOC's PREA Division, and in that role, she was responsible for coordinating and developing procedures to identify, monitor, and track sexual abuse, rape, and sexual harassment in ADOC facilities to ensure

compliance with ADOC and PREA policies and standards, including regulations requiring victims of sexual abuse to be given immediate access to medical treatment.  (*See* ¶ 32.)

493.    After being raped, Plaintiff had an objectively serious need for health care, including emergency medical care for injury from the rape, testing and preventative treatment for sexually transmitted infections, and medical and mental health crisis intervention.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-123, 137-138.)

494.    Despite Plaintiff's objectively serious need for medical care in the wake of the assault, that need went unaddressed by anyone at Ventress, including as Plaintiff was held against his will for hours during which no officer patrolled his rapist's dormitory, and thereafter as multiple Ventress officers and personnel became aware of the rape and Plaintiff's serious need for medical care, but failed to respond by providing Plaintiff with timely access to medical care.  (*See* ¶¶ 3-5, 65-74, 191-195, and Counts II(A)-(F).)

495.    Before Plaintiff's assault, Defendant Vincent was aware of or deliberately indifferent to the routine refusal to provide or to delay medical care for prisoners sexually assaulted at Ventress, as demonstrated by the DOJ's 2019 report regarding its investigation of ADOC's prisons, which documented numerous examples of ADOC prisoners being denied adequate medical care during the years leading up to Plaintiff's assault.  This failure to provide timely medical care for prisoners who had been sexually assaulted was widespread and pervasive at Ventress, and was further known to Defendant Vincent from performing her duties as Director of ADOC's PREA Division, reviewing internal ADOC and Ventress reports and records, as well as her awareness of DOJ's then-ongoing investigation and the recent *Braggs* decision.  (*See* ¶¶ 8-15, 17-18, 32, 87, 99-107, 146, 154-173.)

496.    Despite her knowledge of this unconstitutional deprivation of health care, Defendant Vincent failed to adequately supervise, discipline, or train Ventress correctional officers, or take any other reasonable measures to prevent officers from failing to provide timely medical care to prisoners like Plaintiff.  *See* ¶¶ 4-7, 65-80, 102-103, 120-125.)

> (a)    By failing to take any minimally adequate action to address the pervasive failure of correctional officers to provide timely medical care to prisoners at Ventress, despite being aware of rampant PREA violations and the associated risks, Defendant Vincent was deliberately indifferent to the problem, thereby effectively ratifying it.

> (b)    Plaintiff's injuries were exacerbated by the conduct of employees at ADOC, who acted and failed to act pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system, described above, that were ratified and followed by Defendant Vincent, among others.

497.    Defendant Vincent's misconduct named in this Count II(G) was objectively unreasonable and was undertaken with deliberate indifference, malice, willfulness, and/or reckless disregard to Plaintiff's and other inmates' health and safety.  (*See* ¶¶ 5-7, 65-77, 120-125, 137-139, 145.)

498.    As a proximate result of Defendant Vincent's actions named in this Count II(G), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

**COUNT II (H) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Deprivation of Health Care**
**Against Defendant Naglich**

499.     Plaintiff incorporates paragraphs 1, 3-7, 10, 17-18, 27, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

500.     At the time of the rape, Defendant Naglich was employed by ADOC as the Associate Commissioner of Health Services, and in that role, she was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures regarding the provision of medical care to ADOC prisoners, including inmates housed at Ventress who report being sexual assaulted.  (*See* ¶ 27.)

501.     After being raped, Plaintiff had an objectively serious need for health care, including emergency medical care for injury from the rape, testing and preventative treatment for sexually transmitted infections, and medical and mental health crisis intervention.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-123, 137-138.)

502.     Despite Plaintiff's objectively serious need for medical care in the wake of the assault, that need went unaddressed by anyone at Ventress, including as Plaintiff was held against his will for hours during which no officer patrolled his rapist's dormitory, and thereafter as multiple Ventress officers and personnel became aware of the rape and Plaintiff's serious need for medical care, but failed to respond by providing Plaintiff with timely access to medical care.  (*See* ¶¶ 3-5, 65-74, 191-195, and Counts II(A)-(F).)

503.     Before Plaintiff's assault, Defendant Naglich was aware of or deliberately indifferent to the routine refusal to provide or to delay medical care for prisoners sexually assaulted at ADOC facilities, including at Ventress, as demonstrated by the DOJ's 2019 report regarding its investigation of ADOC's prisons, which documented numerous examples of ADOC prisoners being denied adequate medical care during the years leading up to Plaintiff's assault.  This failure to provide timely medical care for prisoners who had been sexually assaulted was widespread and

pervasive at Ventress, and was further known to Defendant Naglich from performing her duties as ADOC's Associate Commissioner of Health Services, reviewing internal ADOC and Ventress reports and records, as well as her awareness of DOJ's then-ongoing investigation and the recent *Braggs* decision, which explicitly found that Defendant Naglich, in her official capacity, had violated the Eighth Amendment rights of the plaintiff class by failing to provide adequate healthcare. *See Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. 2017). (*See* ¶¶ 8-11, 17-18, 24, 99-106, 146, 154-169.)

504.    Despite her knowledge of this unconstitutional deprivation of health care, Defendant Naglich failed to adequately supervise, discipline, or train Ventress correctional officers, or take any other reasonable measures to prevent officers from failing to provide timely medical care to prisoners like Plaintiff. (*See* ¶¶ 4-7, 71-80, 102-103, 120-125, 137-139.)

(a)    By failing to take any minimally adequate action to address the pervasive failure of correctional officers to provide timely medical care to prisoners at Ventress, despite being aware of the associated risks, Defendant Naglich was deliberately indifferent to the problem, thereby effectively ratifying it.

(b)    Plaintiff's injuries were exacerbated by the conduct of employees at ADOC, who acted and failed to act pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system, described above, that were ratified and followed by Defendant Naglich, among others.

505.    Defendant Naglich's misconduct named in this Count II(H) was objectively unreasonable and was undertaken with deliberate indifference, malice, willfullness, and/or reckless disregard to Plaintiff's and other inmates' health and safety. (*See* ¶¶ 4-7, 10, 71-80, 111, 120-125, 137-139.)

506.    As a proximate result of Defendant Naglich's actions named in this Count II(H), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

### COUNT II (I) - 42 U.S.C. SECTION 1983
### Eighth and Fourteenth Amendment Deprivation of Health Care
### Against Defendant Culliver

507.    Plaintiff incorporates paragraphs 1, 3-15, 17-18, 24, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

508.    At the time of the rape, Defendant Culliver was the Associate Commissioner for Operations at ADOC, and in that role, he was responsible for the creation, implementation, oversight, and supervision of policies, practices, and procedures related to the health and safety of inmates at Ventress, including including ensuring adequate staffing of ADOC facilities, and overseeing institutional security, Correctional Emergency Response Teams, the Classification Review Board, the Training Division, and the Transfer Division.  (*See* ¶ 24.)

509.    After being raped, Plaintiff had an objectively serious need for health care, including emergency medical care for injury from the rape, testing and preventative treatment for sexually transmitted infections, and medical and mental health crisis intervention.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-123, 137-138.)

510.    Despite Plaintiff's objectively serious need for medical care in the wake of the assault, that need went unaddressed by anyone at Ventress, including as Plaintiff was held against his will for hours during which no officer patrolled his rapist's dormitory, and thereafter as multiple Ventress officers and personnel became aware of the rape and Plaintiff's serious need for medical care, but failed to respond by providing Plaintiff with timely access to medical care.  (*See* ¶¶ 3-5, 65-74, 191-195, and Counts II(A)-(F).)

511.   Before Plaintiff's assault, Defendant Culliver was aware of or deliberately indifferent to the routine refusal to provide or to delay medical care for prisoners sexually assaulted at Ventress, as demonstrated by the DOJ's 2019 report regarding its investigation of ADOC's prisons, which documented numerous examples of ADOC prisoners being denied adequate medical care during the years leading up to Plaintiff's assault.  This failure to provide timely medical care for prisoners who had been sexually assaulted was widespread and pervasive at Ventress, and further known to Defendant Culliver from performing his duties as ADOC's Associate Commissioner for Operations, reviewing internal ADOC and Ventress reports and records, as well as his awareness of DOJ's then-ongoing investigation and the recent *Braggs* decision, which repeatedly cited Defendant Culliver's own testimony regarding ADOC's inadequate staffing levels.  *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1198 (M.D. Ala. 2017).  (*See* ¶¶ 8-15, 17-18, 24, 81, 87, 100-107, 146, 157-173.)

512.   Despite his knowledge of this unconstitutional deprivation of health care, Defendant Culliver failed to adequately staff ADOC's facilities, supervise, discipline, or train Ventress correctional officers, or take any other reasonable measures to ensure that prisoners like Plaintiff receive timely medical attention.  (*See* ¶¶ 4-15, 65-74, 102-103, 120-125.)

(a)   By failing to take any minimally adequate action to address the pervasive failure of correctional officers to monitor, supervise, and provide timely medical care to prisoners at Ventress, despite being aware of the associated risks, Defendant Culliver was deliberately indifferent to the problem, thereby effectively ratifying it.

(b)   Plaintiff's injuries were exacerbated by the conduct of employees at ADOC, who acted and failed to act pursuant to the de facto policies, practices, and

customs at Ventress and throughout the ADOC system, described above, that were ratified and followed by Defendant Culliver, among others.

513.    Defendant Culliver's misconduct named in this Count II(I) was objectively unreasonable and was undertaken with deliberate indifference, willfullness, or reckless disregard to Plaintiff's and other inmates' health and safety.  (*See* ¶¶ 5-7, 65-80, 111, 120-125, 137-139.)

514.    As a proximate result of Defendant Culliver's actions named in this Count II(I), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

**COUNT II(J) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Deprivation of Health Care**
**Against Defendant Hill**

515.    Plaintiff incorporates paragraphs 1, 3-15, 31, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

516.    At the time of the rape, Defendant Hill was ADOC's Chief of Staff, and in that role, she was responsible for coordinating all staff activities and overseeing the day-to-day management of ADOC operations, including ensuring adequate staffing at ADOC facilities, including Ventress, and supervising ADOC's PREA Division, which is responsible for implementing policies to ensure that reports of sexual assault are fully invested and that victims receive adequate medical treatment. (*See* ¶ 31.)

517.    After being raped, Plaintiff had an objectively serious need for health care, including emergency medical care for injury from the rape, testing and preventative treatment for sexually transmitted infections, and medical and mental health crisis intervention.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-123, 137-138.)

518.   Despite Plaintiff's objectively serious need for medical care in the wake of the assault, that need went unaddressed by anyone at Ventress, including as Plaintiff was held against his will for hours during which no officer patrolled his rapist's dormitory, and thereafter as multiple Ventress officers and personnel became aware of the rape and Plaintiff's serious need for medical care, but failed to respond by providing Plaintiff with timely access to medical care.  (*See* ¶¶ 3-5, 65-74, 191-195, and Counts II(A)-(F).)

519.   Before Plaintiff's assault, Defendant Hill was aware of or deliberately indifferent to the routine refusal to provide or to delay medical care for prisoners sexually assaulted at Ventress, as demonstrated by the DOJ's 2019 Report regarding the conditions of ADOC's prisons during the time period leading up to the assault.  This failure to provide timely medical care for prisoners who had been sexually assaulted was widespread and pervasive at Ventress, and known to Defendant Hill from performing her duties as ADOC's Chief of Staff, reviewing internal ADOC and Ventress reports and records, as well as her awareness of DOJ's then-ongoing investigation and the recent *Braggs* decision, which identified "persistent and severe [staff] shortages" as a key factor, which contributed to ADOC's failure to provide adequate medical care.  *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1268 (M.D. Ala. 2017).  (*See* ¶¶ 8-15, 17-18, 31, 81, 87, 100-107, 146, 157-173.)

520.   Despite her knowledge of this unconstitutional deprivation of health care, Defendant Hill failed to adequately staff Ventress, supervise, discipline, or train Ventress correctional officers, or take any other reasonable measures to prevent officers from failing to provide timely medical care to prisoners like Plaintiff.  (*See* ¶¶ 4-15, 65-74, 102-103, 120-125, 137-139, 162-176.)

- 137 -

(a)    By failing to take any minimally adequate action to address the pervasive failure of correctional officers to provide timely medical care to prisoners at Ventress, despite being aware of rampant PREA violations and the associated risks, Defendant Hill was deliberately indifferent to the problem, thereby effectively ratifying it.

(b)    Plaintiff's injuries were exacerbated by the conduct of employees at ADOC, who acted and failed to act pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system, described above, that were ratified by Defendant Hill, among others.

521.    Defendant Hill's misconduct named in this Count II(J) was objectively unreasonable and was undertaken with deliberate, malice, willfullness, or reckless disregard to Plaintiff's and other inmates' health and safety.  (*See* ¶¶ 5-15, 65-74, 120-125, 137-139, 162-76.)

522.    As a proximate result of Defendant Hill's actions named in this Count II(J), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

## COUNT II(K) - 42 U.S.C. SECTION 1983
### Eighth and Fourteenth Amendment Deprivation of Health Care
### Against Defendant Dunn

523.    Plaintiff incorporates paragraphs 1, 3-15, 17-18, 23, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

524.    At the time of the rape, Defendant Dunn was the Commissioner of ADOC, ADOC's highest ranking official, and in that role, he was responsible for the creation, implementation, and

oversight of policies, practices, and procedures related to the provision of medical care to prisoners, ensuring ADOC prisons, including Ventress, were adequately staffed,  the training of correctional staff on the provision of medical care, and, more generally, the supervision of ADOC facilities, including Ventress, to ensure compliance with all applicable laws and regulations.  (*See* ¶ 23.)

525.   After being raped, Plaintiff had an objectively serious need for health care, including emergency medical care for injury from the rape, testing and preventative treatment for sexually transmitted infections, and medical and mental health crisis intervention.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-123, 137-138.)

526.   Despite Plaintiff's objectively serious need for medical care in the wake of the assault, that need went unaddressed by anyone at Ventress, including as Plaintiff was held against his will for hours during which no officer patrolled his rapist's dormitory, and thereafter as multiple Ventress officers and personnel became aware of the rape and Plaintiff's serious need for medical care, but failed to respond by providing Plaintiff with timely access to medical care.  (*See* ¶¶ 3-5, 65-74, 191-195, and Counts II(A)-(F).)

527.   Before Plaintiff's assault, Defendant Dunn was aware of or deliberately indifferent to the routine refusal to provide or to delay medical care for prisoners sexually assaulted at Ventress, as demonstrated by the DOJ's 2019 report regarding its investigation of ADOC's prisons as well as Defendant Dunn's own statements regarding the "unacceptably high" level of violence in ADOC's prisons during the years leading up to the assault.  This failure to provide timely medical care for prisoners who had been sexually assaulted was widespread and pervasive at Ventress, and further known to Defendant Dunn from performing his duties as Commissioner of ADOC, reviewing internal ADOC and Ventress reports and records, as well as his awareness of

DOJ's then-ongoing investigation and the recent *Braggs* decision, which explicitly found that Defendant Dunn, in his official capacity, had violated the Eighth Amendment rights of the plaintiff class by failing to provide adequate health care. *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. 2017). (*See* ¶¶ 8-15, 17-18, 23, 81, 87, 100-107, 146, 157-173.)

528. Despite his knowledge of this unconstitutional deprivation of health care, Defendant Dunn failed to adequately staff Ventress, supervise, discipline, or train Ventress correctional officers, or take any other reasonable measures to ensure that prisoners like Plaintiff are provided timely medical care. (*See* ¶¶ 4-15, 65-74, 102-103, 120-125, 137-139, 162-176.)

(a) By failing to take any minimally adequate action to address the pervasive failure of correctional officers to provide timely medical care to prisoners at Ventress, despite being aware of the associated risks, Defendant Dunn was deliberately indifferent to the problem, thereby effectively ratifying it.

(b) Plaintiff's injuries were exacerbated by the conduct of employees at ADOC, who acted and failed to act pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system, described above, that were ratified and followed by Defendant Dunn, among others.

529. Defendant Dunn's misconduct named in this Count II(K) was objectively unreasonable and was undertaken with deliberate indifference, malice, willfullness, or reckless disregard to Plaintiff's and other inmates' health and safety. (*See* ¶¶ 5-15, 65-74, 120-125, 137-139, 162-176.)

530. As a proximate result of Defendant Dunn's actions named in this Count II(K), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering. (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

**COUNT II(L) - 42 U.S.C. SECTION 1983**
**Eighth and Fourteenth Amendment Deprivation of Health Care**
**Against Defendant Ivey**

531.     Plaintiff incorporates paragraphs 1, 3-15, 33, 60-61, 64-106, 110-130, 137-176, 185-187, 191-195, and 200-201 as if fully restated here.

532.     At the time of the rape, Defendant Ivey was the Governor of Alabama, and in that role, she was responsible for overseeing ADOC and implementing policies to protect inmates such as Plaintiff by ensuring, among other things, that ADOC prisons, including Ventress, are adequately staffed and capable of providing immediate medical attention to inmates who report being sexually assaulted.  (*See* ¶ 33.)

533.     After being raped, Plaintiff had an objectively serious need for health care, including emergency medical care for injury from the rape, testing and preventative treatment for sexually transmitted infections, and medical and mental health crisis intervention.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-123, 137-138.)

534.     Despite Plaintiff's objectively serious need for medical care in the wake of the assault, that need went unaddressed by anyone at Ventress, including as Plaintiff was held against his will for hours during which no officer patrolled his rapist's dormitory, and thereafter as multiple Ventress officers and personnel became aware of the rape and Plaintiff's serious need for medical care, but failed to respond by providing Plaintiff with timely access to medical care.  (*See* ¶¶ 3-5, 65-74, 191-195, and Counts II(A)-(F).)

535.     Before Plaintiff's assault, Defendant Ivey was aware of or deliberately indifferent to the routine refusal to provide or to delay medical care for prisoners sexually assaulted at Ventress, as demonstrated by the DOJ's 2019 report regarding its investigation of ADOC's prisons, which was directly addressed to Governor Ivey, as well as Defendant Ivey's own

- 141 -

statements regarding the "untenable" and "unstainable" conditions in ADOC's prisons, which "are the result of decades of neglect." This failure to provide timely medical care for prisoners who had been sexually assaulted was widespread and pervasive at Ventress, and known to Defendant Ivey from performing her duties as Governor of Alabama, reviewing internal ADOC reports and records, including with respect to Ventress, as well as her awareness of DOJ's then-ongoing investigation and the recent *Braggs* decision. (*See* ¶¶ 8-14, 17-18, 33, 87, 146, 162-174.)

536. Despite her knowledge of this unconstitutional deprivation of health care, Defendant Ivey failed to provide adequate staffing, funding, or training for Ventress correctional officers, or take any other reasonable measures to prevent ADOC officials and officers from failing to provide timely medical care to prisoners like Plaintiff. (*See* ¶¶ 5-15, 71-74, 102-103, 162-176.)

(a) By failing to take any minimally adequate action to address the pervasive failure of correctional officers to provide timely medical care to prisoners at Ventress, despite being aware of the associated risks, Defendant Ivey was deliberately indifferent to the problem, thereby effectively ratifying it.

(b) Plaintiff's injuries were exacerbated by the conduct of employees at ADOC, who acted and failed to act pursuant to the de facto policies, practices, and customs at Ventress and throughout the ADOC system, described above, that were ratified and followed by Defendant Ivey, among others.

537. Defendant Ivey's misconduct named in this Count II(L) was objectively unreasonable and was undertaken with deliberate indifference, willfullness, or reckless disregard to Plaintiff's and other inmates' health and safety. (*See* ¶¶ 5-15, 65-74, 162-176.)

538.    As a proximate result of Defendant Ivey's actions named in this Count II(L), Plaintiff was deprived of health care after his assault, exacerbating his injuries and suffering.  (*See* ¶¶ 3-4, 7, 65, 82-84, 120-124, 137-139.)

**COUNT III(A) – STATE LAW**
**Intentional Infliction of Emotional Distress (Defendant Strickland)**

539.    Plaintiff incorporates paragraphs 7, 36, and 79 as if fully restated here.

540.    Defendant Strickland intended to cause, or acted in reckless regard to the probability that he would cause, severe emotional distress to Plaintiff.

541.    The acts of Defendant Strickland as set forth above and again below were both extreme and outrageous.

542.    Defendant Strickland's conduct described above and again below has cause emotional distress so severe that no person could be expected to endure it.

543.    Just days after the rape, after Defendant Lewis told Plaintiff that he and Lowe would be separated, as required by AR 454 § V.G., Defendants Strickland and Lewis, on information and belief, instead transferred Lowe into Plaintiff's dorm to a cell near to Plaintiff's bunk, allowing Lowe to terrorize Plaintiff using constant harassment and threats of violent retaliation, so that Plaintiff would drop his allegations against Lowe. (*See* ¶¶ 6, 71-72, 127).   Lowe's improper proximity to Plaintiff also allowed him to issue repeated threats by using Lowe's fellow gang members as messengers. (*See* ¶ 72.)

544.    Then, during Plaintiff's meeting with Defendant Gordon, Defendant Strickland walked in and began lecturing Plaintiff, with complete disregard that Plaintiff was trying to discuss his rape with Defendant Gordon.  (*See* ¶ 79).  Defendant Strickland then blamed Plaintiff, the victim of a violent crime, for burdening Defendant Strickland—the warden at Ventress who was responsible for all aspects of Plaintiff's health and safety while in the state's custody there—with

- 143 -

Plaintiff's rape report and demanded that Plaintiff explain what his "intentions" were by reporting this crime (*see id.*).

545.     Defendant Strickland's conduct caused Plaintiff to experience severe trauma, retaliation, extreme stress, and lack of sleep.

## COUNT III(B) – STATE LAW (DEFENDANT HAGGINS)
### Intentional Infliction of Emotional Distress

546.     Plaintiff incorporates paragraphs 4, 5, 7, 43, 68, 110, and 120 as if fully restated here.

547.     Defendant Haggins intended to cause, or acted in reckless regard to the probability that Defendant would cause, severe emotional distress to Plaintiff.

548.     The acts of Defendant Haggins as set forth above and again below were both extreme and outrageous.

549.     Defendant Haggins' conduct described above and again below has caused emotional distress so severe that no person could be expected to endure it.

550.     Defendant Haggins was the shift supervisor on duty and the first prison official Plaintiff told of the rape (the "first responder").  (*See* ¶¶ 4, 43, 68, 97).  In response to Plaintiff's report that he had just been brutally raped by another inmate, Defendant Haggins failed to take any actions required of a first responder or a Shift Commander and instead ordered Plaintiff to immediately return to his dormitory.  (*See* ¶¶ 2, 4, 68, 97, 110, 120).

551.     Defendant Haggins' conduct caused Plaintiff to experience severe trauma, retaliation, extreme stress, and lack of sleep.

## COUNT III(C) – STATE LAW (DEFENDANT GLENN)
### Intentional Infliction of Emotional Distress

552.     Plaintiff incorporates paragraphs 7, 46, 73, and 80 as if fully restated here.

553.    Defendant Glenn intended to cause, or acted in reckless regard to the probability that Defendant would cause, severe emotional distress to Plaintiff.

554.    The acts of Defendant Glenn as set forth above and again below were both extreme and outrageous.

555.    Defendant's conduct described above and again below has caused emotional distress so severe that no person could be expected to endure it.

556.    Upon hearing Lowe's threats and harassment towards Plaintiff, Defendant Glenn asked Plaintiff why Lowe was threatening him.  (*See* ¶ 73).  Plaintiff told Defendant Glenn that he was raped by Lowe, and that Lowe was continuing to harass him.  (*Id.*).  Plaintiff also gave Defendant Glenn a note which again described the assault and identified Lowe as the rapist.  (*Id.*)  Defendant Glenn not only ignored Plaintiff's request for help, but later, used the information Plaintiff provided her in confidence to loudly tell Plaintiff in front of other inmates and staff, "the next time those black boys sexually assault or sexually harass you, don't come running my way or ask me for help," laughing as she said it.  (*See* ¶¶ 73, 80).

557.    Defendant Glenn's conduct, which identified him as a victim of sexual assault and as an inmate who reported on another prisoner to Ventress officials and thereby subjected him to risk of further retataliation and violence, was extreme and outrageous.  Defendant Glenn's conduct caused Plaintiff to experience severe trauma, retaliation, extreme stress, and lack of sleep.

## COUNT III(D) – STATE LAW (DEFENDANT LEWIS)
### Intentional Infliction of Emotional Distress

558.    Plaintiff incorporates paragraphs 6, 49, 71, 72, 76, 77, 127, and 128 as if fully restated here.

559.    Defendant Lewis intended to cause, or acted in reckless regard to the probability that Defendant would cause, severe emotional distress to Plaintiff.

560.   The acts of Defendant Lewis as set forth above and again below were both extreme and outrageous.

561.   Defendant Lewis's conduct described above and again below has caused emotional distress so severe that no person could be expected to endure it.

562.   In his first meeting with Plaintiff, two days after the rape, Defendant Lewis told Plaintiff that he and Lowe would be separated, as required by AR 454 § V.G. (*See* ¶¶ 6, 71, 127). Instead, the next day, Lowe was transferred into Plaintiff's dorm to a cell near Plaintiff's bunk, at the direction, on information and belief, of Defendants Lewis and Strickland.  (*See* ¶¶ 6, 72, 127). Moving Lowe near his rape victim allowed Lowe terrorize Plaintiff using constant harassment and threats of violent retaliation so that he would drop his allegations against Lowe (*See* ¶¶ 72, 127). Lowe's proximity to Plaintiff also allowed him to issue threats on a daily basis by using Lowe's fellow gang members as messengers (*See* ¶ 72).

563.   Several weeks later, Defendant Lewis had a second meeting with Plaintiff, at which time Defendant Lewis conveyed that he had interviewed Lowe and DJ, who told him that Plaintiff was high on drugs at the time of the assault and was making up the story.  (*See* ¶¶ 76, 128). Defendant Lewis suggested that he believed Lowe and DJ and not Plaintiff, and Plaintiff was subsequently asked to take a test for illegal drugs, which upon information and belief he passed. (*See* ¶¶ 76, 128).  Instead of conducting a "prompt, thorough and objective" investigation, Defendant Lewis issued a letter stating that Plaintiff's claim was "unsubstantiated" without the benefit of such investigation.  (*See* ¶ 77).

564.   After hearing Plaintiff's report of being raped by Lowe, Defendant Lewis and other Defendants acted with reckless regard by moving  Lowe into the same dorm and on the same side of the housing unit as Plaintiff.  Defendant Lewis's conduct was extreme and outrageous, designed

to thwart a real investigation into Plaintiff's rape and subject Plaintiff to a barrage of threats of

further violence by his rapist so that Plaintiff would withdraw his rape allegation.  Further, rather

than investigating Plaintiff's rapist, Defendant Lewis effectively dismissed Plaintiff's rape,

accused Plaintiff of being high on drugs and fabricating the assault, and subjected Plaintiff to an

unjustified drug test.

565.   Defendant Lewis's conduct caused Plaintiff to experience severe trauma,

retaliation, extreme stress, and lack of sleep.

## COUNT IV – STATE LAW
### Civil Conspiracy (Ventress Defendants Byrd, Glenn, Gordon, Haggins, Lewis, Myers, Peters, Rumph, and Strickland)

566.   A civil conspiracy is a combination of two or more persons to accomplish an

unlawful end (by civil law standards) or to accomplish a lawful end by unlawful means.

567.   Ventress Defendants conspired to suppress reports of sexual assault at Ventress

utilizing numerous tactics that they applied to Plaintiff:  Defendants refused to acknowledge

Plaintiff's reports of rape and subsequent harassment by Lowe; Defendants refused to conduct a

timely and thorough investigation of Plaintiff's rape allegation, thus ensuring that evidence would

not be preserved and that Defendants could close the report as "unsubstantiated"; Defendants

refused to provide medical treatment to Plaintiff, including treatment for Hepatitis C, which

Plaintiff contracted as a result of the rape, an HIV test, and mental health care and counseling; and

Defendants moved Plaintiff's assailant near Plaintiff's cell so that Lowe could threaten Plaintiff

with violence so that he would withdraw his report of rape.

568.   Defendants Haggins, Gordon, Lewis, Peters, and Strickland worked together to

refuse to acknowledge Plaintiff's report of rape and/or to do so in a timely manner.  These

Defendants' actions caused evidence of the rape not to be obtained or preserved and by refusing

to interview inmates other than the assailant and his accomplice, Defendants failed to perform a

- 147 -

legitimate investigation that would have substantiated Plaintiff's rape allegation against Lowe and that should have supported a referral of Lowe to the district attorney for prosecution. Furthermore, Defendants Gordon, Myers, Byrd, and Rumph worked together to deny Plaintiff timely access to Defendant Gordon, the Ventress Institutional PREA Compliance Manager in order to delay Plaintiff's report of his rape (¶ 73).

569.    Defendants Haggins, Lewis, Gordon, Peters, and Strickland  worked together to deny Plaintiff medical treatment necessary for a rape victim, including an HIV test and emergency HIV prophylaxis; treatment for Hepatitis C, which Plaintiff contracted as a result of the rape; and mental health care and counseling. Defendants' failure to provide medical treatment was in furtherance of their conspiracy to suppress reports of sexual assault and the underlying dangerous conditions present at Ventress.

570.    Defendants Gordon, Lewis, Peters, Strickland and Glenn worked together to retaliate against Plaintiff by moving and keeping his assailant, Lowe, near Plaintiff.   On information and belief, Defendants Gordon, Lewis, Peters, and Strickland received the report of Plaintiff's rape when it was submitted by his friend the evening of the rape, November 11, 2018 (¶ 5). Two days after the rape, on November 13, 2018, Defendant Lewis took Plaintiff's statement and told Plaintiff that he and Lowe would be separated, as required by AR 454, and that Defendant Lewis would send a report of the rape to Defendant Strickland (¶ 67).  The next day, on November 14, 2018, Lowe is moved from "F" Dorm, where Ventress's most violent prisoners are kept (¶ 56), to Plaintiff's "C" Dorm and on the same side of the housing unit as Plaintiff (¶ 68).  Lowe's proximity to Plaintiff allowed Lowe to harass and threaten Plaintiff day and night with continued violence unless Plaintiff withdrew his report of rape (¶ 68).  Lowe also enlisted other prisoners to threaten Plaintiff on a daily basis (¶ 68).  These Defendants conspired to move Plaintiff's rapist

near him so that Lowe and his fellow gang members could threaten Plaintiff with continued violence unless Plaintiff withdrew his rape allegation against Lowe.  Lowe's and his fellow gang members' threats to Plaintiff were overheard by Defendant Glenn, who inquired why Plaintiff was being threatened.  Plaintiff informed Defendant Glenn verbally and in writing that he was raped by Lowe and reported the rape to other Defendants (¶ 69).  Defendants Glenn, Gordon, Peters, Lewis, and Strickland conspired to keep Lowe near Plaintiff's cell after learning of Lowe's threats so that Plaintiff would be terrorized into dropping his allegations against Lowe in furtherance of Defendants' objective of suppressing reports of sexual assaults at Ventress.

### **PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court:

(a)    declare that the acts and omissions of the Defendants violated the Eighth and Fourteenth Amendments of the United States Constitution;

(b)    enter a judgment in Plaintiff's favor and against all Defendants;

(c)    award Plaintiff compensatory damages against Defendants, jointly and severally, in an amount to be determined;

(d)    award Plaintiff punitive damages against Defendants, jointly and severally;

(e)    award Plaintiff reasonable attorneys' fees and costs; and

(f)    order such additional relief as the Court may deem just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated:  March 22, 2022

Respectfully submitted,

*/s/ Shannon L. Holliday*
Shannon L. Holliday (ASB-5440-Y77S)
COPELAND FRANCO SCREWS & GILL, P.A.
444 South Perry Street
Montgomery, AL 36104
Telephone: (334) 440-2943
holliday@copelandfranco.com

Jeane A. Thomas (*pro hac vice* pending)
Luke van Houwelingen (admitted *pro hac vice*)
Charlotte Gillingham (admitted *pro hac vice*)
Alexis DeBernardis (admitted *pro hac vice*)
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: (202) 624-2500
jthomas@crowell.com
lvanhouwelingen@crowell.com
cgillingham@crowell.com
adebernardis@crowell.com

Eric Fanchiang (admitted *pro hac vice*)
CROWELL & MORING, LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Telephone: (949) 263-8400
efanchiang@crowell.com

*Counsel for Plaintiff Jacob Barefield*

## <u>CERTIFICATE OF SERVICE</u>

I, Shannon Holliday, do hereby certify that a true and correct copy of the foregoing has been filed this 22nd day of March, 2022, via the Court's CM/ECF NextGen system, which will provide service to all counsel of record.

<u>/s/ *Shannon L. Holliday*    </u>
Of counsel