IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JACOB BAREFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-CV-917-WKW |
| | ) | [WO] |
| JEFFERSON S. DUNN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case arises from the daylight abduction and knifepoint rape of Jacob Barefield while he was held hostage by another inmate in an overcrowded, unsupervised dormitory room at an Alabama state prison. If true, the allegations in this case tell a horrific story about excessively dangerous conditions in another Alabama state prison—and the failures of authorities to fix them.[1] In 2003,

---

[1] This case does not come to the court in isolation. In the past year, several courts have found viable allegations of unconstitutionally violent conditions of confinement throughout the Alabama prison system. *See McKee v. Dunn,* 2023 WL 5103102, at *3 (M.D. Ala. Aug. 9, 2023); *Wilson v. Dunn,* 618 F. Supp. 3d 1253, 1269 (N.D. Ala. 2022); *D.S. v. Dunn,* 2022 WL 1785262, at *8 (N.D. Ala. June 1, 2022), *opinion clarified,* 2022 WL 3570330 (N.D. Ala. Aug. 18, 2022); *Williams v. Dunn,* 2022 WL 831423, at *11 (S.D. Ala. Feb. 16, 2022), *report and recommendation adopted,* 2022 WL 830611 (S.D. Ala. Mar. 18, 2022). The common themes in these cases are easily detected: understaffing, overcrowding, proliferation of contraband weapons, and abject failures to monitor and supervise inmates—all of which have allegedly led to the highest rates of inmate-on-inmate violence in the country. And those failures, especially concerning egregious understaffing, are not new. Over five years ago, the Commissioner of the Alabama Department of Corrections (ADOC) was ordered to staff Alabama prisons at a constitutionally adequate level. *See Braggs v. Dunn,* 562 F. Supp. 3d 1178, 1259 (M.D. Ala. 2021). He has not yet done so.

Congress passed the "Prison Rape Elimination Act" (PREA).  The PREA reiterates what the Constitution mandates:   Officials who "do not take basic steps to abate prison rape" may violate the "Cruel and Unusual Punishments Clause of the Eighth Amendment."  34 U.S.C. § 30301.  Barefield alleges that he was brutally raped because Alabama officials did not take such basic steps to alleviate an excessive risk of inmate-on-inmate violence at Ventress Correctional Facility (Ventress).

On the morning of November 11, 2018, Plaintiff Jacob Barefield, an inmate at Ventress, was abducted at knifepoint from the prison canteen by a fellow inmate who was known to be violent.  Barefield's captor forced him to walk through the prison yard, past many buildings, and into a high-risk inmate dormitory that Barefield—a non-violent inmate—was not authorized to enter.  The dormitory door was supposed to be locked, but it was not.  A guard was supposed to check Barefield's identification and prohibit Barefield from entering, but he did not. Consequently, Barefield was easily forced by knifepoint into the dormitory— which was a large, open room with many rows of bunkbeds for over one hundred high-risk inmates.  There, Barefield was orally and anally raped at knifepoint in a makeshift tent made from sheets hanging off the top of one of the bunkbeds.  After the rape, Barefield was held hostage by the rapist and his gangmate for over five hours.  During this time, the rapist told Barefield he would be killed if he told anybody what happened.  The rapist also told Barefield to "get used to" being

raped.  For hours, no guards were on patrol or monitoring the hundred-inmate dormitory.

When Barefield was finally let go he went straight to a prison guard in the yard and reported the rape and abduction.  The guard ignored Barefield's report and told Barefield to go back to his assigned dormitory.  That evening, Barefield contacted a friend outside of the prison and told her that he had been raped.  His friend immediately filed a report of the rape.

But for weeks thereafter nobody at Ventress filed a proper report in accordance with the Prison Rape Elimination Act (PREA).  Rather, Barefield's rapist was moved to a cell in Barefield's dormitory, which allowed the rapist to verbally harass and threaten Barefield.  When Barefield was eventually given medical treatment and tested for sexually transmitted infections, he tested positive for Hepatitis C.  Two months after the rape, one of the prisons guards told Barefield, "the next time those black boys sexually assault or sexually harass you, don't come running my way or ask me for help."  She laughed as she said it. Thereafter, Barefield filed this lawsuit alleging violations of the United States Constitution and Alabama law.

In his Amended Complaint, (Doc. # 74), Barefield asserts, under 42 U.S.C. § 1983, Eighth Amendment deliberate indifference to excessive risk of inmate-on-inmate violence and failure-to-protect claims against all Defendants

based on the injuries he sustained during and following the rape on November 11, 2018.  (Doc. # 74 at 70–117.)  Barefield also asserts an Eighth Amendment deliberate indifference to serious-medical-needs claim against most of the Defendants.  (Doc. # 74 at 117–42.)  Finally, he alleges two Alabama-law counts for intentional infliction of emotional distress and civil conspiracy against several of the Ventress Defendants.  (Doc. # 74 at 143–47.)

Defendants have moved to dismiss Barefield's Amended Complaint. (Docs. # 88, 90.)  Defendants' attack the sufficiency of all Barefield's claims, and Defendants argue that they are entitled to immunity under several doctrines, including sovereign and qualified immunity.  Barefield filed a consolidated response (Doc. # 95), and Defendants replied (Docs. # 102, 103, 105).

For the reasons explained below, Defendants' motions to dismiss will be granted in part and denied in part:

1.    Count I's Eighth Amendment Excessive Risk of Inmate-on-Inmate Violence Claims will be dismissed as to all Defendants except Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, Vincent, Strickland, and Myers.

2.    Count I's Eighth Amendment Failure-to-Protect Claims will be dismissed as to all Defendants.

3.    Count II's Eighth Amendment Deliberate Indifference to

Serious-Medical-Needs Claims will be dismissed as to all Defendants except Strickland, Lewis, Gordon, Peters, and Haggins.

**4.** Count III's Outrage Claim will proceed against Strickland, Haggins, Glenn, and Lewis.

**5.** Count IV's Civil Conspiracy claim will proceed against Byrd, Glenn, Gordon, Haggins, Lewis, Myers, Peters, Rumph, and Strickland.

**6.** All fictitious defendants will be dismissed.

# TABLE OF CONTENTS

I.    JURISDICTION AND VENUE ..................................................................... 8

II.   STANDARD OF REVIEW .......................................................................... 8

III.  THE CLAIMS AND PARTIES .................................................................... 9

IV.  BACKGROUND ........................................................................................ 12

    A.    The Abduction and Rape ................................................................. 12

        1.    *November 11, 2018* .............................................................. 12

        2.    *Aftermath & Investigation* .................................................... 17

    B.    Conditions at Ventress ................................................................... 21

    C.    Defendants' Knowledge and Authority Over Ventress's Conditions ........... 27

V.   DISCUSSION ............................................................................................ 33

    A.    Defendants are Not Entitled to Eleventh Amendment Immunity ................. 33

    B.    Qualified Immunity Framework ..................................................... 38

    C.    Excessive Risk of Inmate Violence and Failure-to-Protect Frameworks ........ 40

        1.    *Two Distinct Theories and Terminology* ................................. 40

        2.    *Excessive-Inmate-Violence Claims for Personal Liability are Governed by Individualized Deliberate Indifference and Supervisory Liability Causation* ...... 43

    D.    Eighth Amendment Excessive Risk of Inmate Violence Claims .................. 47

        1.    *Constitutional Violation* ...................................................... 50

            a.   Substantial Risk of Serious Harm ...................................... 50

            b.   Deliberate Indifference ................................................... 63

            c.   Causation .................................................................... 84

        2.    *Clearly Established Law* ....................................................... 103

            a.   Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, Vincent, Strickland,

and Myers................................................................................. 103

      b.  Governor Ivey.......................................................... 113

  3.  *Summary of Excessive-Inmate-Violence Analysis* ................................ 115

E.  Failure to Protect from Specific Risk Posed By Lowe.......................... 119

  1.  *ADOC Defendants* ................................................................ 120

  2.  *Ventress Defendants* ............................................................ 121

F.  Eighth Amendment Deliberate Indifference to a Serious Medical Need.................... 127

  1.  *Constitutional Violation* ...................................................... 128

  2.  *Clearly Established Law*........................................................ 135

  3.  *Supervisory Liability as to ADOC Officials* .................................. 138

G.  State-Law Claims ................................................................ 142

  1.  *State-Agent Immunity* .......................................................... 143

  2.  *Intentional Infliction of Emotional Distress (i.e., Outrage)* ................ 145

  3.  *Civil Conspiracy Against Ventress Defendants* ................................ 148

H.  Fictitious Defendants............................................................ 154

VI.  CONCLUSION.......................................................................... 159

# I.   JURISDICTION AND VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal-question jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction). Defendants do not contest venue or personal jurisdiction.

# II.   STANDARD OF REVIEW

When evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court "accept[s] as true the facts alleged in the complaint, drawing all reasonable inferences in [the] plaintiff's favor." *Est. of Cummings v. Davenport*, 906 F.3d 934, 937 (11th Cir. 2018) (second alteration in original) (quoting *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016)).  To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).  The well-pleaded factual allegations in the complaint, but not its legal conclusions, are presumed true. *Id.*

### III.   THE CLAIMS AND PARTIES

In his operative complaint (Doc. # 74), Barefield brings five types of claims, three based on federal law and two based on state law: (1) Eighth Amendment deliberate indifference to excessive inmate-on-inmate violence claims under 42 U.S.C. § 1983; (2) Eighth Amendment individualized failure-to-protect claims under 42 U.S.C. § 1983; (3) Eighth Amendment deliberate indifference to serious-medical-needs claims under 42 U.S.C. § 1983; (4) intentional infliction of emotional distress claims under Alabama state law; and (5) a civil conspiracy claim under Alabama state law.

Barefield's complaint names twenty-one Defendants, ranging from Ventress guards to the Governor of Alabama.   All Defendants are sued only in their individual capacity.   (Doc. # 74 at 21.)   Some of his claims are against all twenty-one Defendants, and some are against only a few of the Defendants. However, Defendants can roughly be sorted into three groups: (1) the Ventress officers, (2) the Ventress supervisors, and (3) the ADOC officials and Governor Kay Ivey.

The Ventress officer Defendants are Officer Christina Glenn, Officer Lizzie Rumph, Officer D'Anthony V. Byrd, and Officer Robert E. Lewis III. (Doc. # 74 at 19–20.)

The Ventress supervisor Defendants are Warden Michael Strickland,

Warden Karla Jones, Captain Patricia Myers, Lieutenant Brian Gordon, Sergeant Jacob Peters, and Sergeant Josiah Haggins. (Doc. # 74 at 19.)

The ADOC officials are Governor Kay Ivey, former-ADOC Commissioner Jefferson Dunn, Associate Commissioner for Operations Grantt Culliver, interim Associate Commissioner of Operations Jeffrey A. Williams, Deputy Commissioner Dennis Stamper, Associate Commissioner of Health Services Ruth Naglich, Director of Facilities Management Jennifer Abbott, Intelligence and Investigation Division (I&I) Director Arnaldo Mercado, Associate Commissioner of Administrative Services Matthew Brand, Chief of Staff Anne Hill, and PREA Director Christy Vincent. (Doc. # 74 at 15.)[2]

The Ventress officers and supervisors filed a joint motion to dismiss, (Doc. # 90), and the ADOC officials and Governor Ivey filed a joint motion to dismiss, (Doc. # 88).

In his amended complaint, Barefield raises four counts. In Count I (A–W), Barefield brings, under 42 U.S.C. § 1983, Eighth Amendment failure to protect claims against all Defendants, in their individual capacities. (Doc. # 74 at 70–117.)[3] This count contains claims for both deliberate indifference to a specific

---

[2] Barefield also brings claims against Unknown ADOC officials (Doc. # 74 at 15), Unknown Wardens (Doc. # 74 at 17), Unknown Assistant Wardens (Doc. # 74 at 17), Unknown Ventress Commanders (Doc. # 74 at 19), and Unknown Ventress Officers (Doc. # 74 at 20). As explained in Section V.H, these fictitious parties will be dismissed without prejudice.

[3] For each letter under Count I (*e.g.*, Count I(A)), Barefield alleges the same causes of

failure to protect and deliberate indifference to a general threat of excessive inmate violence.  The difference is explained in Section V.C of this opinion.

In Count II (A–L), Barefield brings, under 42 U.S.C. § 1983, Eighth Amendment deprivation of health care claims against Defendants Haggins, Glenn, Strickland, Lewis, Gordon, Peters, Vincent, Naglich, Culliver, Hill, Dunn, and Ivey, in their individual capacities.  (Doc. # 74 at 117–43.)

In Count III (A–D), Barefield brings Intentional Infliction of Emotional Distress claims under Alabama law against Defendants Strickland, Haggins, Glenn, and Lewis.  (Doc. # 74 at 143–47.)

In Count IV, Barefield brings Civil Conspiracy claims under Alabama law against Defendants Byrd, Glenn, Gordon, Haggins, Lewis, Myers, Peters, Rumph, and Strickland.  (Doc. # 74 at 147–49.)

For these claims, Barefield does not seek injunctive relief.  Rather, he seeks declaratory relief, compensatory damages, punitive damages, and attorneys' fees and costs against all Defendants in their individual capacities.  (Doc. # 74 at 149.)

---

action against a separate Defendant.  (*See generally* Doc. # 74.)  This is the same wherever a Count is followed by a letter throughout this opinion.

## IV.   BACKGROUND[4]

This case arises from the brutally violent abduction and knifepoint rape of Jacob Barefield while he was in the custody of ADOC at Ventress in Barbour County, Alabama.  Barefield alleges that this attack, and his resulting Hepatitis-C diagnosis, could have been prevented by Defendants had they not been deliberately indifferent to their constitutional duties to remedy the excessively dangerous conditions at Ventress in November of 2018, and to provide adequate healthcare.

Barefield's complaint is over 150-pages long, naming twenty-one Defendants and bringing over 40 distinct claims.  (*See* Doc. # 74.)  In this section, the court will summarize the complaint's factual allegations.  This background will be relayed in three parts: (1) the abduction and rape of Barefield on November 11, 2018, and the following events; (2) the conditions of Ventress leading up to the rape; and (3) Defendants' knowledge of, and authority to address, these conditions prior to the rape.

### A.   <u>The Abduction and Rape</u>

#### 1.   *November 11, 2018*

On the morning of November 11, 2018, twenty-five-year-old Jacob Barefield was in the prison canteen with fellow inmates from the "C Dorm."

---

[4] The court accepts Barefield's allegations as true for purposes of the Rule 12(b)(6) motion.  *See Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (citing *GSW, Inc. v. Long Cty.*, 999 F.2d 1508, 1510 (11th Cir. 1993)).  Labels and conclusions unsupported by factual allegations, however, do not receive the benefit of this presumption.  *Iqbal*, 556 U.S. at 662.

(Doc. # 74 at 22.)  Barefield was wearing a yellow wristband designating him to C Dorm.  (Doc. # 74 at 23.)  Barefield was standing in the canteen's snack-line when another inmate, Larry Lowe, approached him.   (Doc. # 74 at 22.)   Lowe was wearing a teal wristband designating him to the "F Dorm" where high-risk of violence inmates are assigned.  (Doc. # 74 at 22.)  F Dorm residents, like Lowe, should not have been allowed in the canteen with C Dorm residents.  (Doc. # 74 at 22.)  But Lowe was there.

Lowe approached Barefield in the snack line, showed Barefield a knife that he held at his waist, and forced Barefield to follow him.  (Doc. # 74 at 22.)  No guards witnessed this abduction because no guards were in the canteen at the time, despite dozens of inmates from various housing units being present. (Doc. # 74 at 23.)

Unsupervised, Lowe forced Barefield out of the canteen and into the prison yard.  (Doc. # 74 at 23.)  Lowe forced Barefield through the prison yard, past many buildings, and toward the entrance of the F Dorm.  (Doc. # 74 at 23.)  Despite Ventress policies requiring guards to be stationed between the canteen and F Dorm, Lowe and Barefield did not pass a single guard during the walk.  (Doc. # 74 at 23.)

Once at the F Dorm entryway, Lowe opened the door and forced Barefield into the dormitory.  (Doc. # 74 at 23.)  The door was supposed to be locked, but it

13

was not.  (Doc. # 74 at 23.)   A guard was supposed to be at the door checking wristband colors and stopping non-F Dorm residents from entering, but the officer did not.  (Doc. # 74 at 23.)  Instead, Lowe was able to simply open the front door and force Barefield—who was not authorized to enter F Dorm—inside.

The F Dorm houses approximately 100 high-risk inmates in a single open-room environment.  (Doc. # 74 at 23.)  Once inside the open-bay dorm, Lowe forced Barefield to a lower bunkbed at the back of the unit.  (Doc. # 74 at 23.) Sheets and blankets hung from the upper bunk to create a "tent" that covered the lower bunk and prevented anyone from seeing what happened inside.  (Doc. # 74 at 23–24.)  These makeshift tents are against Ventress policy.  (Doc. # 74 at 24.) But Barefield was forced into one at knifepoint.

A nearby TV's volume was turned all the way up.  (Doc. # 74 at 24.) Outside the tent, Lowe told another inmate that he was "going to show him how to take control of another inmate."  (Doc. # 74 at 24.)  Lowe then got into the tent. There, in the middle of the morning, in a violent offender's dorm that Barefield should never have been allowed to enter, in a crowded area that should have been supervised by a guard, in a makeshift tent that should have been immediately taken down, using a knife that should have been confiscated, Larry Lowe raped Jacob Barefield.  (Doc. # 74 at 24.)

Lowe pulled down his pants and forced his penis into Barefield's mouth.

14

(Doc. # 74 at 24.)   When Barefield did not cooperate to Lowe's liking, Lowe pressed his knife to Barefield's side.  (Doc. # 74 at 24.)  Lowe forced Barefield to lie down.   (Doc. # 74 at 24.)   Lowe then pulled Barefield's pants down, put shaving cream in Barefield's rectum, and anally raped him.  (Doc. # 74 at 24.)  All the while, Lowe kept the knife pressed to Barefield's side.  (Doc. # 74 at 24.)  The TV drowned out any cries.  (Doc. # 74 at 24.)  Lowe's gangmate waited outside the tent.

Eventually, the rape was over; but the ordeal had just begun.  After the rape, Lowe held Barefield hostage for over *five* hours.  (Doc. # 74 at 24.)  During this time, Lowe warned Barefield that he would kill him if he told anyone what happened.   Lowe also informed Barefield to "get used" to being raped. (Doc. # 74 at 24.)

For over five hours, no officers surveilled Lowe's bunk area.  (Doc. # 74 at 24–25.)  Ventress procedures require there to be two "cubicle operators" and two correctional officers always supervising each dorm.  (Doc. # 74 at 24.)  Ventress procedure also requires an officer to patrol F Dorm every 30 minutes by doing a walk-through inspection.  (Doc. # 74 at 25.)  When Barefield was abducted, raped, and held hostage, there were no correctional officers supervising the dorm. (Doc. # 74 at 24.)  There were no 30-minute patrols.  (Doc. # 74 at 25.)  And there was only one cubicle operator, who sat in a position that made it impossible to

effectively watch the dorm.  (Doc. # 74 at 24.)  From beginning to end, only one prison official entered F Dorm (which, again, houses over a hundred high-risk inmates).  (Doc. # 74 at 25.)  The official performed an inmate count but ignored Barefield's unauthorized presence in F Dorm.  (Doc. # 74 at 25.)

Following the inmate count, the F Dorm inmates were instructed to leave for dinner.  (Doc. # 74 at 25.)  Only then, five hours after he originally abducted Barefield, did Lowe allow Barefield to leave.  (Doc. # 74 at 25.)  Barefield exited F Dorm and immediately sought help.  He found a guard, Defendant Haggins, outside in the prison yard.  (Doc. # 74 at 25.)  Haggins was the Ventress Shift Commander on duty.  Barefield told Haggins about the rape multiple times, repeatedly asking for help.  (Doc. # 74 at 25.)  But Haggins ignored him each time.  (Doc. # 74 at 25.)  Contrary to PREA requirements, Haggins did not take Barefield to the infirmary or facilitate a rape kit; he did not take a statement or make a report.  Indeed, he did not even ask Barefield who raped him.  (Doc. # 74 at 3.)  Instead, Haggins ordered Barefield to immediately go to his assigned dorm.  (Doc. # 74 at 25.)  And, once Barefield realized his complaint to Haggins was futile, Barefield did go back to C Dorm.  Haggins took no action in response to Barefield's report.  (Doc. # 74 at 25–26.)

That evening, Barefield called a friend outside the prison and told her to report the rape, which she promptly did.  (Doc. # 74 at 26.)  The Defendants who

16

received the report that night were Warden Strickland, Lieutenant Gordon, Sergeant Peters, and Officer Lewis.  (Doc. # 74 at 26.)  But none of them took any action for two days.  (Doc. # 74 at 26–27.)  They did not give Barefield medical attention, they did not refer him for medical treatment, they did not administer a rape kit, they did not secure the crime scene for investigation, they did not stop Lowe from cleaning himself or destroying other evidence of the rape, they did not collect evidence from Barefield, they did not interview Barefield, they did not ask who perpetrated the rape, and they did not check to see if anyone else was doing any of these things.  (Doc. # 74 at 26.)

### 2.   *Aftermath & Investigation*

Two days after the rape, on November 13, 2018, Defendant Lewis took Barefield's statement.  (Doc. # 74 at 26.)  Lewis was an Intelligence and Investigation (I&I) Officer who was responsible for "promptly, thoroughly, and objectively" investigating reports of sexual assault.  (Doc. # 74 at 20.)  But Lewis did not collect any physical evidence, and he did not take Barefield to be medically examined or to be administered a rape kit.  (Doc. # 74 at 27.)  Rather, after receiving Barefield's statement, Lewis said he would separate Barefield from Lowe and that he would send an assault report to Warden Strickland. (Doc. # 74 at 27.)

But instead of ensuring Lowe was kept from Barefield, the Ventress

supervisors decided to move Lowe closer to Barefield—to a one-man cell in C Dorm, where Barefield resided.  (Doc. # 74 at 27.)  From this cell, Lowe was able to harass Barefield with verbal abuse and threats.  (Doc. # 74 at 27.)

Eventually, Defendant Glenn overheard Lowe's threats and asked Barefield what was going on.  (Doc. # 74 at 27.)  Barefield privately told her he had been raped by Lowe and was now being harassed by him.  (Doc. # 74 at 27.)  Glenn did nothing in response.  (Doc. # 74 at 27.)  Sometime during that day, November 13, Barefield also sought out Defendant Gordon, Ventress's Institutional PREA Compliance Manager (IPCM).  (Doc. # 74 at 18, 29.)  But when he tried to report the rape to Gordon, Defendant Byrd turned Barefield away outside of Gordon's office door.  (Doc. # 74 at 29.)

Later that night, Barefield reported the rape to yet another official—Sergeant Lindsey.  (Doc. # 74 at 28.)  Barefield told Lindsey that he had reported the rape to several officials.  But when Lindsey searched for an official PREA report of the rape, he found nothing.  (Doc. # 74 at 28.)  Lindsey told Barefield that he would speak with Gordon about why a report had not been filed despite Barefield's multiple reports and the fact that Lewis had interviewed Barefield earlier that day. (Doc. # 74 at 28.)

Weeks passed. (Doc. # 74 at 28.)  During this time, Barefield attempted to report the rape to Gordon over six times, but each time was turned away by

Defendants Byrd, Rumph, and/or Myers.  (Doc. # 74 at 29.)  Eventually—weeks after initially taking Barefield's statement—Lewis met with Barefield again. (Doc. # 74 at 28.)  This time, Lewis told Barefield that Lowe denied the rape accusations and that Lowe accused Barefield of being high on drugs.  (Doc. # 74 at 28.)  Barefield was then given a drug test and he tested negative. (Doc. # 74 at 28.)  Other than the drug test, there was no medical examination of Barefield.  The investigation of the rape also did not include the collection of any physical evidence, review of camera footage, or interviews of other inmates or personnel in F Dorm.  (Doc. # 74 at 29.)

Following the drug test, Barefield continued to seek an audience with Gordon.  But despite his concerted efforts, Barefield was prevented from seeing Gordon in his office even though Gordon was responsible for receiving rape reports and Barefield was supposed to "feel free to contact" Gordon.  (Doc. # 74 at 29.)  One day, however, over a month after the rape, Barefield ran into Gordon in the prison yard.  (Doc. # 74 at 29.)  Barefield reported the rape again and asked for a meeting with Gordon.

During that meeting, Gordon suggested the rape was Barefield's fault. (Doc. # 74 at 30.)  At one point, Warden Strickland came in and told Barefield something along the lines of "grow some hair on your chin."  (Doc. # 74 at 30.) Strickland suggested that Barefield's rape reports were a burden to Strickland and

wanted to know what Barefield's intentions were by filing the reports. (Doc. # 74 at 30.) Eventually, Gordon gave Barefield a letter dated December 19, 2018. The letter was from the investigator, Defendant Lewis. (Doc. # 74 at 29–30.) It stated that the "case in which you were the victim of sexual assault . . . was found to be unsubstantiated and closed." (Doc. # 74 at 29.)

One month later, Defendant Glenn (one of the many officers to whom Barefield had confidentially reported the rape) told Barefield in front of other inmates and staff, "the next time those black boys sexually assault or sexually harass you, don't come running my way or ask me for help," laughing as she said it. (Doc. # 74 at 30.)

Barefield was not only emotionally damaged by the rape; its physical consequences also affect him to this day. (Doc. # 74 at 31.) At some point after the rape, Barefield tested positive for Hepatitis C. (Doc. # 74 at 31.) Barefield alleges that the only sexual encounter he had while in prison was the rape and that he tested negative for sexually transmitted infections when he entered ADOC's custody. (Doc. # 74 at 30.) Hepatitis C can be curable with appropriate treatment. (Doc. # 74 at 31.) Barefield alleges that he never received treatment for his Hepatitis C infection while at Ventress, despite requesting it in October 2019. (Doc. # 74 at 31.) And even though he was raped, Barefield was not tested for HIV until he filed the first complaint in this case—over a year after the attack.

(Doc. # 74 at 31.)    Barefield was released from Ventress on August 28, 2021.

(Doc. # 74 at 11.)

## B.    <u>Conditions at Ventress</u>

Ventress is a medium-custody men's prison in Alabama housing roughly 1,200 inmates.  (Doc. # 74 at 5.)  Barefield alleges that inmate-on-inmate violence was endemic at Ventress in the years, months, and weeks leading up to his rape. (Doc. # 74 at 5.)

 In 2018, the year Barefield was raped, Ventress had the most reported inmate-on-inmate assaults of men's prisons in Alabama.  (Doc. # 74 at 33.)  The inmate-on-inmate assault rate at Ventress was more than 10 times the national average and more than twice the Alabama average.  (Doc. # 74 at 33–34.)  From 2017 to 2019, Ventress had an average of 54 inmate-on-inmate assault reports *per month* and 74 violent assaults reported in March 2018 alone. (Doc. # 74 at 32.) Inmate-on-inmate assaults at Ventress became more frequent every year from 2016 to 2018.  (Doc. # 74 at 34.)  In 2018, the year Barefield was brutally attacked, Ventress had nearly double the number of reported assaults from the year prior. (Doc. # 74 at 34.)

Similarly, Ventress also had the most reported inmate-on-inmate sexual assaults of prisons in Alabama in the years leading up to the rape.  (Doc. # 74 at 53.)  From 2015 to 2017, the reported sexual assaults at Ventress *doubled* with

21

each passing year.  (Doc. # 74 at 53.)  And yet, from 2016 to 2018, somehow not one Ventress correctional officer observed or intervened to stop a *single* sexual assault.  (Doc. # 74 at 49.)  Barefield alleges that "[e]ither ADOC staff [members] responsible for monitoring dormitories [like the one Barefield was raped in] failed to observe every single one of these hundreds of incidents, or they observed an incident but did not report it."  (Doc. # 74 at 49–50.)  Additionally, across the ADOC, prison officials incredibly determined that 96% of the hundreds of reported sexual assaults in 2018 were unsubstantiated.  (Doc. # 74 at 53.)  However, ADOC declined to investigate why nearly every single report of sexual assault was determined to be unsubstantiated.  (Doc. # 74 at 53.)  Further, Barefield alleges that all the assault statistics underestimate the real number of assaults at Ventress due to underreporting from inmates and staff.  (Doc. # 74 at 93); (Doc. # 74 at 10 (noting that the DOJ determined that "it is likely that many other incidents [of violence] also occurred [at Ventress] . . . but were not reported by prisoners or staff.").)

Barefield supports these statistics by referencing several specific incidents of inmate violence in his complaint.  (Doc. # 74 at 60.)  The court will not rehash the details of each incident, but Barefield provides the factual accounts of several violent attacks in the months and years leading up to Barefield's rape that involved contraband weapons and abject failures to monitor, supervise, or intervene.

(Doc. # 74 at 60, 68.)   Barefield also references several other cases dealing with inmate violence at Ventress prior to November 11, 2018.  (Doc. # 74 at 71.)

Barefield alleges that the widespread violence in Ventress is the result of institutional failures to implement, enforce, and maintain basic security measures. Specifically, Barefield alleges that Defendants permitted this culture of violence to take root in Ventress by, among other things, chronically understaffing the prison and overcrowding it with inmates.  (Doc. # 74 at 59.)

Ventress is severely understaffed.   Around the time of the rape, Ventress employed 30% or less of its authorized correctional officer staffing levels. (Doc. # 74 at 57.)   In context, the United States Department of Justice (DOJ) has determined that even at 75% staffing capacity, a prison is "dangerously understaffed."[5]   (Doc. # 74 at 56–57.)   And a former ADOC warden stated that with this level of understaffing, "the convicts are in extreme danger and the correctional officers working are in extreme danger."  (Doc. # 74 at 57 (citing DOJ 2019 Report at 10).)   Additionally, two months before Barefield was raped, a PREA auditor stated that he would be "remiss in not addressing the lack of sufficient staff to protect inmates from sexual abuse/harassment," and recommended that Ventress implement a plan to adequately staff the prison to provide "overall safety of staff, inmates, and the public."  (Doc. # 74 at 61, 71.)

---

[5] *See* U.S. Dep't of Just., Civ. Rts.Div., Investigation of Alabama's State Prisons for Men (2019), at 9–10 (hereinafter, "DOJ 2019 Report").

Ventress is not only understaffed, but also severely overcrowded.  In the year Barefield was raped, Ventress had an occupancy rate that was over 192% of the prison's capacity—nearly double the number of inmates Ventress was designed to house, resulting in hundreds of inmates sharing dorm rooms on rows of stacked bunks without supervision.  (Doc. # 74 at 57.)  Ventress's designed capacity consists of 650 beds.  When Barefield was raped, 1,265 beds were occupied. (Doc. # 74 at 57.)  The combination of understaffing and overcrowding is what Defendant Dunn, the former-ADOC commissioner, described, in the year before Barefield was raped, as a "two-headed monster."  (Doc. # 74 at 71.)  The DOJ seemingly agreed, noting that the "combination of [] overcrowding and understaffing results in prisons that are inadequately supervised . . . creating an environment rife with violence, extortion, drugs, and weapons," where "sexual abuse is common."  (Doc. # 74 at 59.)    Barefield alleges that this dangerous combination was especially pernicious at Ventress in November 2018, reiterating that, "at the time [he] was raped, [Defendants] had filled only 30 percent of the correctional officer positions at Ventress. Yet the inmate population at Ventress was nearly double that which the facility was designed to house."  (Doc. # 74 at 6.)

Barefield alleges that the danger resulting from overcrowding and understaffing is exacerbated by other specific features and failures to implement and enforce policies, including:

24

- Uncontrolled, widespread inmate possession of contraband weapons, like knives and hatchets. (Doc. # 74 at ¶¶ 177–90.)

- Lack of inmate monitoring and supervision for hours at a time, both because of understaffing and failures to implement security measures like video surveillance and routine guard patrols. (Doc. # 74 at ¶¶ 191–99.)

- Unrestricted inmate movement through unauthorized parts of the prison due to lack of supervision, monitoring, camera surveillance, and broken locks. (Doc. # 74 at ¶ 191–199.)

- Tolerance for blind spots and make-shift sheet tents in housing units that allow inmates to engage in violent activity out of sight. (Doc. # 74 at ¶¶ 200–05.)[6]

- Failures to enforce policies segregating known violent inmates from vulnerable inmates. (Doc. # 74 at ¶ 192.)

- Failures to seriously investigate reports of sexual assault (Doc. # 74 at 49–54) and actions taken to intentionally suppress reports of sexual

---

[6] "As recounted by the Department of Justice, 'ADOC's incident reports document sexual abuse occurring in the dormitories, cells, recreation areas, the infirmary, bathrooms, and showers at all hours of the day and night. . . . Our experts found that the physical plant designs and layout of ADOC's housing units make visibility difficult, which, when coupled with deficient staffing levels, results in inadequate supervision. Large open living units with multiple bunks or stacked bunks contain many blind spots that make it impossible for the limited staff to provide adequate safety and security. . . . Prisoners interviewed and incident reports frequently reference sexual assaults occurring in bunks that have sheets or towels hung up to conceal activity, often referred to as "the hump." The "Sexual Assault" incident reports do not document correctional officers making any effort to remove these sight barriers.' DOJ 2019 Report 35-36." (Doc. # 74 at 67.)

assault (Doc. # 74 at 49).[7]

- No functioning night lights at Ventress.  (Doc. # 74 at ¶ 203.)

- Lack of camera coverage and video recording of crucial areas, including blind spots.  (Doc. # 74 at ¶ 176.)

In addition, Barefield alleges that many of the specific failures listed above are a known, collateral consequence of Ventress's severe understaffing and overcrowding.  (Doc. # 74 at 59.)  For example, Barefield alleges that "woefully insufficient" monitoring and supervision at Ventress was the natural result of understaffing and overcrowding:

> [I]nmates at Ventress were frequently unsupervised for the entirety of the day.  At least two officers were supposed to be assigned during the day to patrol each dorm, which typically houses 100 inmates, but generally only one correctional officer, *if any*, was present.  When in the dorms, officers generally sit in an enclosed cubicle between two sides of the dorm and have limited visibility.  No officers are present in the dorms overnight, and staffing is often reduced on weekends.  The lack of security staff means that the officers who do show up are unable to maintain basic security functions such as conducting contraband searches and assuring men are in their assigned locations.

(Doc. # 74 at 59.)

---

[7] (*See* Doc. # 74 at 49 ("Among other things, (1) Defendant Administrative Supervisors and Ventress Supervisory Defendants failed to provide adequate supervision and to properly implement practices or customs that encouraged correctional officers or other staff members to intervene to stop a sexual assault and also to report sexual assault; (2) Defendant Administrative Supervisors, Ventress Defendants, and I&I Defendants permitted a culture to persist where rape was accepted 'as a normal course of business, including acquiescence to the idea that prisoners will be subjected to sexual abuse as a way to pay debts accrued to other prisoners' (DOJ 2019 Report at 36), and (3) Defendants discouraged victims of sexual violence from coming forward and reporting rape, including by drug testing *victims* and subjecting them to disciplinary action in connection with their reports of rape.").)

In short, Barefield alleges that "violence has run rampant at Ventress" because of "[s]evere overcrowding and understaffing," which exacerbates and causes failures to supervise and control inmates, and because of myriad other specific features, like the lack of camera surveillance, night lights, and functioning locks; the proliferation of contraband weapons and makeshift tents; and systemic disregard for reports of assault and sexual assault.  (Doc. # 74 at 59–60.)

## C.   <u>Defendants' Knowledge and Authority Over Ventress's Conditions</u>[8]

Barefield alleges that Defendants had knowledge of the alleged conditions at Ventress.   In support, Barefield references the Defendants' on-the-ground experience and observations at Ventress, Ventress's and the ADOC's own statistics,[9] incident reports, prison reports, disciplinary records, observation, and internal communications, many of which are catalogued in the DOJ's 2019 report.[10]  Barefield also references the September 5, 2018 PREA Audit report, issued two months before Barefield was raped, which specifically referenced Ventress's understaffing, overcrowding, lack of camera coverage, and blind spots.

---

[8] Barefield alleges other reports and lawsuits that did not exist until *after* the attack on Barefield in November 2018, including the DOJ investigation discussed above.  But those matters do not show the Defendants' knowledge of Ventress's conditions at the time of the attack.  *See Wilson v. Dunn*, 2022 WL 3007599, at *4 n.3 (N.D. Ala. July 28, 2022).  They can, however, confer notice by detailing facts that are plausibly obvious to certain defendants.  *Id.*

[9] *See generally*, ALABAMA DEP'T OF CORR., Statistical Reports, http://www.doc.state.al.us/StatReports.

[10] *See* DOJ 2019 Report at 1.

That report said the following:

> The "auditor would be remiss in not addressing the lack of sufficient staff to protect inmates from sexual abuse/harassment.   Further consequences are, of course, overall safety of staff, inmates, and the public. It is highly recommended ADOC and Ventress develop and implement a plan to provide adequate staffing for the facility. The lack of camera coverage and video recording (while not a fix-all) of crucial areas, including blind spots, further exacerbates the issue."[11]

(Doc. # 74 at 60–61.)

Barefield also references other courts that have found, for example, that the "ADOC has been well aware of the magnitude and impact of overcrowding on every facet of its operations for years."[12]  (Doc. # 74 at 60–61.)  And Barefield references the fact that DOJ was investigating Alabama prisons, including Ventress, for unconstitutional conditions beginning in 2016, which at least put Defendants on notice that they too needed to be analyzing their system.

Further, Barefield alleges Defendants had varying degrees of responsibility and authority over the conditions of Ventress.  First, the ADOC officials allegedly had the following authority:[13]

- Defendant Kay Ivey was and is the Governor of the State of Alabama.

---

[11] Dave Cotton, *Prison Rape Elimination Act Audit Report, Ventress Correctional Facility*, PREA Auditors of America, LLC (Sept. 5, 2018) ("Ventress PREA Audit"), available at http://www.doc.alabama.gov/PREA.

[12] *Braggs*, 257 F. Supp. 3d at 1256 n.81.

[13] Again, the ADOC officials are Ivey, Dunn, Culliver, Williams, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent.

(Doc. # 74 at 15.)   She is "responsible for overseeing ADOC and is responsible for implementing policies and procedures to protect inmates such as [Barefield]."  (Doc. # 74 at 15.)

- Defendant Jefferson S. Dunn was the Commissioner of ADOC from April 2015 to December 2021.  (Doc. # 74 at 11.)  Dunn was ADOC's highest ranking official and ultimately responsible for the ADOC's direction, supervision and control.  (Doc. # 74 at 11.)  It was his duty to operate a "prison system that protects the constitutional and human rights of persons within ADOC custody."  (Doc. # 74 at 12.)  Pursuant to Administrative Regulation 454, Dunn was "responsible for ADOC's compliance with federal and state law relating to PREA."  (Doc. # 74 at 12.)

- Defendant Grantt Culliver was the ADOC's Associate Commissioner for Operations.  (Doc. # 74 at 12.)  He was responsible for "ensuring the effective and safe daily operations of all prison facilities, including overseeing institutional security, staffing," and more.  (Doc. # 74 at 12.) Culliver retired from the ADOC at the end of November 2018.  (Doc. # 74 at 12.)

- Defendant Jeffery A. Williams was the interim Associate Commissioner for Operations from late November 2018 to January 2019 during which

time he held the same responsibilities as Culliver. (Doc. # 74 at 12.) The complaint does not allege what position Williams held before he became interim Associate Commissioner for Operations.

- Defendant Dennis W. Stamper was and is employed by ADOC as Deputy Commissioner, Special Assistant. (Doc. # 74 at 13.) Stamper is responsible for "helping with departmental projects that required prioritized attention, such as construction of new prisons and renovation of existing facilities." (Doc. # 74 at 13.)

- Defendant Ruth Naglich was employed at the time of the rape as ADOC's Associate Commissioner of Health Services. (Doc. # 74 at 13.) Naglich was responsible for "the administration of medical and mental health services to inmates throughout ADOC's correctional institutions." (Doc. # 74 at 13.)

- Defendant Jennifer S. Abbott was and is ADOC's Director of Facilities Management. (Doc. # 74 at 13.) She is "responsible for maintenance operations within ADOC's correctional institutions." (Doc. # 74 at 13.)

- Defendant Arnaldo Mercado was ADOC's Director of I&I and was responsible for the supervision of all I&I investigations at the time of the rape. (Doc. # 74 at 13.) That responsibility includes, among other things, ensuring "that all allegations of sexual abuse and harassment are

thoroughly investigated, referring violations of the law to the district attorney for prosecution, and reporting statistical data for PREA-related incidents." (Doc. # 74 at 14.)

- Defendant Matthew C. Brand was and is the ADOC's Associate Commissioner for Administrative Services. (Doc. # 74 at 14.) He is responsible for the training, development, and education of ADOC's workforce. (Doc. # 74 at 14.)

- Defendant Anne Hill was and is ADOC's Chief of Staff. (Doc. # 74 at 14.) She is responsible for coordinating all staff activities and overseeing the day-to-day management of ADOC operations. (Doc. # 74 at 14.)

- Defendant Christy Vincent was and is the Director of ADOC's PREA Division. (Doc. # 74 at 14.) She is responsible for "coordinating and developing procedures to identify, monitor, and track sexual abuse, rape and sexual harassment in ADOC facilities" and for ensuring ADOC compliance with the PREA. (Doc. # 74 at 14.) She reports to Hill. (Doc. # 74 at 14.)

Second, Barefield alleges the Ventress supervisors had the following responsibilities and authority:[14]

- Defendant Michael Strickland was employed by ADOC as the Warden of

---

[14] Again, the Ventress supervisors are Strickland, Jones, Myers, Gordon, Peters, and Haggins.

Ventress from May 2018 to approximately 2019.  (Doc. # 74 at 15.)  As

Warden, he was responsible for the day-to-day operations of the prison,

including staffing and maintenance, inmate placement and housing, and

training and supervision of all Ventress employees.  (Doc. # 74 at 16.)

- Defendant Karla Jones was employed by ADOC as the Warden of
  Ventress from 2015 to 2018, when Strickland took over the role.  (Doc. #
  74 at 16.)  She had the same responsibilities as Warden Strickland during
  her tenure.  (Doc. # 74 at 16.)

- Defendant Patricia Myers was the Administrative Captain at Ventress.
  (Doc. # 74 at 17.)  She was responsible for "the safety of all inmates at
  the facility and the supervision of all institutional security activities and
  subordinate employees."  (Doc. # 74 at 17.)  She was also responsible for
  supervising institutional activities during shifts, including the corrections
  officers and other subordinates who supervise locations such as the
  prison canteen, C Dorm, and F Dorm.  (Doc. # 74 at 17.)

- Defendant Brian S. Gordon was a Lieutenant at Ventress and was the
  Ventress IPCM.  (Doc. # 74 at 18.)  As IPCM, Gordon was responsible
  for all PREA monitoring and compliance at Ventress.  (Doc. # 74 at 18.)

- Defendant Jacob R. Peters was a Sergeant at Ventress and was the back-
  up IPCM.  (Doc. # 74 at 18.)  He had much of the same responsibility as

Gordon.  (Doc. # 74 at 18.)

- Defendant Josiah C. Haggins was a Sergeant at Ventress and was responsible for the safety of all inmates at the facility and supervision of all institutional security activities and subordinate employees.  (Doc. # 74 at 19.)

## V.  DISCUSSION

The discussion is divided into eight parts: (A) an explanation of why Eleventh Amendment immunity does not apply, (B) an outline of the qualified immunity framework, (C) a clarification of the terminology used for Barefield's failure-to-protect/excessive-inmate-violence claims and an overview of the applicable standard, (D) an analysis of Barefield's excessive-inmate-violence claims, (E) an analysis of Barefield's specific failure-to-protect claims, (F) an analysis of Barefield's serious-medical-needs claims, (G) an analysis of Barefield's state-law claims, and (H) a section dismissing the fictitious defendants.

## A.    Defendants are Not Entitled to Eleventh Amendment Immunity

Before discussing the merits, there is a threshold issue that must be resolved: Whether Defendants are entitled to Eleventh Amendment sovereign immunity for Barefield's individual-capacity claims brought under 42 U.S.C § 1983.  They are not.

Defendants begin their sovereign immunity argument by asserting that the court need not worry about Barefield's constitutional rights because the "Alabama Board of Adjustment provides an adequate remedy for Plaintiff." (Doc. # 88 at 1.) Put differently, Defendants argue that the Eleventh Amendment bars Barefield's individual-capacity claims because Barefield can find relief at the Alabama Board of Adjustment "for claims against the state that are not justiciable in the courts because of [the Eleventh Amendment]." (Doc. # 89 at 6.) This circular argument is wrong. The Eleventh Amendment does not bar Barefield's individual-capacity claims in this case.

Despite its text only referencing diversity suits, the Eleventh Amendment provides sovereign immunity to states sued by their own citizens. *Melton v. Abston*, 841 F.3d 1207, 1233–34 (11th Cir. 2016). This sovereign immunity applies to state officials "acting in their official capacity," but it does not apply to officials "sued in their *individual* capacities under Section 1983." *Id.* (emphasis in original). Barefield brings his federal claims against Defendants only in their individual capacities, (Doc. # 74 at ¶ 55), therefore Eleventh Amendment immunity typically does not apply.

Nonetheless, Eleventh Amendment immunity may still shield defendants sued in their individual capacities "if the state is the real, substantial party in interest." *Jackson v. Ga. Dept. of Transp.*, 16 F.3d 1573, 1577 (11th Cir. 1994)

(quotation omitted). The Eleventh Circuit has stated that "[t]he general test for determining whether the state is the real party in interest . . . is whether the relief sought . . . would in fact operate against the state, especially by imposing liability damages that must be paid out of the public" funds. *Id.* That is, so long as Barefield does not "see[k] to impose a liability which *must* be paid from public funds in the state treasury," his claim is an individual-capacity suit that is not barred by the Eleventh Amendment. *Id.* (quotation omitted) (emphasis added).

Here, Barefield does not seek damages from Alabama's state treasury. He seeks compensatory and punitive damages from individual defendants. And "an award of damages against an official in his [individual] capacity can be executed only against the official's personal assets." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Accordingly, Barefield has brought individual capacity claims that are not barred by the Eleventh Amendment.

Despite Defendants' arguments to the contrary, this result does not change simply because Barefield could hypothetically also seek damages from the Alabama Board of Adjustment. After all, "the existence of an alternative mechanism for recovery . . . does not affect the key issue for Eleventh Amendment immunity—whether a judgment against the Defendants 'must be paid from public funds.'" *Wilson v. Dunn*, 618 F. Supp. 3d 1253, 1269 (N.D. Ala. 2022) (quoting *Jackson*, 16 F.3d at 1577). In any event, the jurisdiction of the Alabama Board of

Adjustment does not even cover Barefield's claims. The Board of Adjustment covers claims against the State of Alabama or its agencies, like the ADOC. *See* Ala. Code. § 41-9-62(a)(1), (2). Therefore, recourse to the Alabama Board of Adjustment constitutes a non-starter vis-à-vis the individual-capacity claims lodged by Barefield. However, even if it were a starter, relief at the Board of Adjustment would still not trigger Eleventh Amendment immunity because it has long been settled that the existence of a state-law remedy does not supplant Barefield's federal claims. *See Monroe v. Pape*, 365 U.S. 167, 183 (1961) ("It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.").

Nor does Alabama's decision to pay a portion of judgments against correctional officers confer Eleventh Amendment immunity to those officials. *See* Ala. Code § 41-9-74; *see Williams v. Bennett*, 689 F.2d 1370, 1378 (11th Cir. 1982). Similarly, Alabama's decision to insure correctional officials against individual capacity suits does not trigger Eleventh Amendment immunity. *See Jackson*, 16 F.3d at 1577–78. If either Alabama's indemnity statute or employer-provided insurance policies could cloak officials in sovereign immunity from personal suit, then there would be "no use" for these insurance protections, *id.*, and Alabama could discretionarily grant every public official sovereign

immunity from individual-capacity claims by passing a law that says the State will pay for all individual suits against public officials.  *Id.* (citing *Rubacha v. Coler*, 607 F. Supp. 477, 481 (N.D. Ill. 1985) ("To hold otherwise would give the State carte blanche to provide a meaningless kind of paper protection—granting an 'indemnification' that would, by its very existence, destroy the liability to which the indemnity purportedly extends.")).

In short, the Eleventh Amendment protects states, not individual actors (even if they work for the state), from being sued, unless state funds "*must*, under all circumstances," be used to pay the individual suit.  *Id.* at 1577.  And despite Defendants' protestations, states cannot circumvent that rule by discretionarily deciding whom to indemnify, like it has done for correctional officers.  *Id.*  If it could, § 1983 individual-capacity suits would cease to exist.  But that is not the law.

Accordingly, Defendants are not entitled to sovereign immunity under the Eleventh Amendment because Barefield has brought only individual-capacity claims under § 1983 seeking damages from individual defendants—damages that do not necessarily have to be paid from state funds, but which the state has volunteered to pay in part.  *See also Wilson*, 618 F. Supp. 3d at 1269 (addressing nearly identical arguments made by some of the same Defendants and reaching the

same conclusion).   Qualified immunity, not sovereign immunity, applies to Barefield's individual-capacity claims against Defendants.

**B.**   **Qualified Immunity Framework**

Defendants assert qualified immunity against Barefield's individual-capacity constitutional claims.   Qualified immunity protects government officials performing discretionary functions in their individual capacities from civil suit and liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir. 2015) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).   "When a court concludes [an official] was engaged in a discretionary function, 'the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity.'"   *Id.* (emphasis in original) (citation omitted).   A plaintiff carries this burden by establishing (1) that defendants violated a constitutional right, and (2) that the right was "clearly established" at the time of the alleged violation.   *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 845 (2022).

When determining whether the law clearly established relevant conduct as a constitutional violation, courts consider whether officers possessed "fair warning" that the conduct at issue violated a constitutional right.   *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).   The assessment of fair warning may proceed in

three methods.  Barefield must point to either (1) "case law with indistinguishable

facts," (2) "a broad statement of principle within the Constitution, statute, or case

law," or (3) "conduct so egregious that a constitutional right was clearly violated,

even in the total absence of case law."  *Crocker*, 995 F.3d at 1240.  The second and

third methods are known as the "obvious clarity" paths and are rarely trod because

clearly established law is not to be defined at a "high level of generality."  *Id.*; *see*

*also Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010) ("[I]f a plaintiff

relies on a general rule, it must be obvious that the general rule applies to the

specific situation in question.").

When the court relies upon factually similar case law to assess whether the

law was clearly established, it

> must look at the facts in the precedent and at the facts that confronted
> the government official in the case before the court. The two sets of
> facts must be materially similar. For qualified immunity purposes, a
> preexisting precedent is materially similar to the circumstances facing
> an official when the specific circumstances facing the official are
> enough like the facts in the precedent that no reasonable, similarly-
> situated official could believe that the factual differences between the
> precedent and the circumstances facing the official *might* make a
> difference to the conclusion about whether the official's conduct was
> lawful or unlawful, in the light of the precedent. Thus, every fact need
> not be identical.

*Marsh v. Butler Cnty.*, 268 F.3d 1014, 1032 (11th Cir. 2001) (en banc) (emphasis

in original), *abrogated on other grounds by Bell Atlantic Corp. v. Twombly*, 550

U.S. 544 (2007).  Furthermore, "[u]npublished cases . . . do not serve as binding

precedent and cannot be relied upon to define clearly established law," and cases published after the alleged violation cannot be relied upon to define clearly established law. *Crocker*, 995 F.3d at 1241 n.6 (alteration in original) (quoting *JW by & through Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1260 n.1 (11th Cir. 2018)).

## C.   <u>Excessive Risk of Inmate Violence and Failure-to-Protect Frameworks</u>

Additionally, before turning to the merits of Barefield's claims, there are two other threshold matters that warrant clarification.  First, Barefield advances two different types of claims in Count I (Doc. # 74 at 70), though they both bear the Eighth Amendment "failure-to protect" label in the operative complaint.  Second, liability against supervisors for excessive-inmate-violence claims can attach directly through that supervisor's own violation of the Constitution or through supervisory-liability causation based on a violation by a subordinate.

### 1.   *Two Distinct Theories and Terminology*

In Count I(A-W), Barefield advances two types of claims under the "failure-to-protect" deliberate-indifference theory.  (Doc. # 74 at 70.)  Indeed, the "parties agree that [Barefield's] Eighth Amendment failure-to-protect claim subdivides into a specific threat and a general threat claim."  (Doc. # 102 at 6.)

First, he brings claims alleging that Defendants unconstitutionally failed to protect him from Lowe, the inmate who attacked him on November 11, 2018.

(Doc. # 95 at 20.)  This is the more common type of Eighth Amendment failure-to-protect, deliberate indifference claim based on specific, or individualized, threats posed by certain inmates or groups of inmates to a specific plaintiff or class of inmates like plaintiff.  *See Marbury v. Warden*, 936 F.3d 1227, 1235–36 (11th Cir. 2019) (alleging a deliberate indifference claim based on a specific threat to plaintiff's safety).

Second, Barefield brings a more general deliberate indifference claim—a claim that alleges that the conditions of confinement at Ventress in 2018 posed a "generalized risk of inmate-on-inmate violence" to which Defendants were deliberately indifferent.  (Doc. # 95 at 10.)  This claim alleges that the conditions of confinement themselves generally posed a substantial risk of serious harm from inmate-on-inmate violence to all inmates forced to live under those conditions. Barefield denominates this claim as a generalized "failure-to-protect" claim.  Other courts have referred to the claim in this way too.  *See McKee v. Dunn,* 2023 WL 5103102, at *3 (M.D. Ala. Aug. 9, 2023); *Wilson*, 618 F. Supp. 3d at 1269–73; *D.S. v. Dunn*, 2022 WL 1785262, at *8 (N.D. Ala. June 1, 2022), *opinion clarified,* 2022 WL 3570330 (N.D. Ala. Aug. 18, 2022).  However, courts have also denominated these claims as "excessive risk of inmate-on-inmate violence" claims or "excessive inmate violence" claims.  *Purcell ex rel. Est. of Morgan v. Toombs Cnty.*, 400 F.3d 1313, 1320 (11th Cir. 2005); *Ogletree v. Colbert Cnty.*, 2021 WL

4477630, at *23 (N.D. Ala. Sept. 30, 2021) (rejecting the failure-to-protect terminology and using the excessive-inmate-violence label), *appeal dismissed sub nom. Hargrove v. Colbert Cnty.*, 2022 WL 16646712 (11th Cir. Aug. 10, 2022).

For purposes of concision and clarity, the court will refer to Barefield's claims in Count I that assert deliberate indifference to a generalized risk of inmate-on-inmate violence because of prison conditions as "excessive-inmate-violence" claims. Regardless, whether denominated as a generalized failure-to-protect claim or an excessive-inmate-violence claim, the test and relevant legal principles are identical.[15] Barefield must demonstrate: (1) a substantial risk of serious harm; (2) each defendants' deliberate indifference to that risk; and (3) causation. *Compare Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (using "excessive risk of violence"), *with Marsh v. Butler Cnty, Ala.*, 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc) (using "failure to maintain" conditions).

The standards for both types of claims brought in Count I—specific failure-to-protect claims and generalized excessive-inmate-violence claims—will be more thoroughly discussed in their respective sections: V.D and V.E.

---

[15] This generalized type of claim has also been referred to as an "environmental risk based on dangerous prison conditions" claim. *See Bugge v. Roberts*, 430 F. App'x 753, 759 (11th Cir. 2011). But even under this descriptive tag, the Eleventh Circuit employed the same analytical framework as in the other cases. *Id.*

## 2. *Excessive-Inmate-Violence Claims for Personal Liability are Governed by Individualized Deliberate Indifference and Supervisory Liability Causation*

There is one final threshold point of clarification. The parties in this case, as in other cases across the Eleventh Circuit dealing with excessive-inmate-violence claims, have framed their arguments, in part, around the causation standard used for § 1983 suits brought against public officials in their personal, supervisory capacities. However, after a review of the case law, this court, and others like it,[16] concludes that it should not cabin the analysis to the supervisory-causation framework.

Under § 1983, when a plaintiff sues officials in their supervisory capacities, the claim cannot rest upon the doctrine of respondeat superior or the officials' vicarious liability for their subordinates' actions. *Keith v. Dekalb Cnty.*, 749 F.3d 1034, 1047 (11th Cir. 2014). Rather, "supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v.*

---

[16] *See Ogletree*, 2021 WL 4477630, at *24 (finding that the *Farmer v. Brennan* test, not the supervisory liability causal connection standard, guides the analysis of excessive-inmate-violence claims, even for nominal supervisors).

*Scott*, 610 F.3d 701 (11th Cir. 2010). That is, a supervisor can be liable for (1) his own unconstitutional conduct, and (2) conduct that meets the supervisory liability causal connection framework. *Id.* Under the supervisory-causation framework, a supervisor may be liable "for the actions of a subordinate," *Braddy v. Fla. Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998), when: (1) there is a history of widespread abuse putting the supervisor on notice to take action but he fails to do so, (2) a supervisor's custom or policy results in a subordinate's deliberate indifference to constitutional rights, or (3) the supervisor knew that subordinates would act unlawfully and failed to stop them from doing so. *Vlades v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006) (citing *Cottone*, 326 F.3d at 1360). This causal framework (supervisory liability for actions of a subordinate) constitutes an "extremely rigorous" burden. *Braddy*, 133 F.3d at 802.

However, despite some confusion by the parties, this supervisory-causal-connection framework supplements (*not* supplants) the general rule that officials, whether or not they bear the title of supervisor, may be held liable for their *own* unconstitutional conduct. And here, according to *Farmer v. Brennan* and its progeny, officials—even if they bear the title of supervisor—*personally* violate the Eighth Amendment by the nature of their *own* conduct if they manifest deliberate indifference to a substantial risk of serious harm, which causes a plaintiff's injuries. 511 U.S. 825, 835–38 (1994). That is, under

excessive-inmate-violence claims, liability may attach to "supervisor" defendants so long as the *Farmer* standard is met as applied against them because they "personally participated in the unconstitutional conditions of confinement due to the responsibility wielded by such officials for control and maintenance of the facilities." *Ogletree*, 2021 WL 4477630, at *24.

Accordingly, the court need not restrict itself to the supervisory-causal-connection framework for subordinate action where Barefield alleges that a defendant's individualized deliberate indifference to an excessive risk of inmate violence caused his injuries. And Eleventh Circuit case law clearly confirms this approach. When analyzing excessive-inmate-violence claims, the Eleventh Circuit has repeatedly determined personal liability by asking whether a defendant, regardless of his supervisory status, demonstrated deliberate indifference to a substantial risk of serious harm, without analyzing the subordinate-action-causal-connection framework. *See Marbury v. Warden*, 936 F.3d 1227, 1231 (11th Cir. 2019) (discussing a warden's deliberate indifference to a substantial risk of serious harm, not the supervisory causal connection framework, even though the warden's liability arose from his responsibilities in a supervisory position); *Keith v. DeKalb Cnty.*, 749 F.3d 1034 (11th Cir. 2014), *Marsh v. Butler Cnty.*, 268 F.3d 1014 (11th Cir. 2001), *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579 (11th Cir. 1995) (explicitly discussing the causal links necessary for

excessive-inmate-violence claims while not mentioning supervisory causation); *Purcell*, 400 F.3d 1313; *Q.F.*, 768 F. App'x  at 935; *Ogletree*, 2021 WL 4477630, at *24–25 (collecting cases saying the same); *but see Wilson*, 618 F. Supp. 3d at 1276 (restricting the analysis to the three pathways outlined in supervisory-causation framework because the defendants were "supervisors").[17]

Based upon this authority, the court need not cabin its analysis to the Eleventh Circuit's supervisory liability causal connection framework that is employed when determining if a supervisor should also be liable for a subordinate's unconstitutional actions.  Rather, the focus will first be on whether an official—under the nominal title of supervisor or otherwise—personally caused

---

[17] If any confusion persists, imagine this hypothetical: A police chief in the field uses excessive force in violation of the Fourth Amendment.  No one would dispute that he could be personally liable for that conduct, regardless of whether there was a custom, policy, or history of widespread abuse, even though he, as police chief, is nominally a "supervisor."  After all, he personally committed the violation.  Similarly, as is alleged here, if a warden, or other official who bears a "supervisor," title does something or fails to do something himself that would meet every element of the *Farmer* test for an Eighth Amendment violation, he too can be personally liable for that violation regardless of custom, policy, widespread abuse, *etc.*, because he committed the violation.

However, there has been confusion on this front because the deliberate-indifference standard, when applied to excessive-inmate-violence conditions of confinement cases (as systemic deficiencies cases), inherently shares common ground with the supervisory liability for subordinate action causation framework.  For example, the supervisory liability standard assesses whether a supervisor failed to correct deprivations despite knowledge of a history of widespread abuse, which, if met, would likely mean that a supervisor acted with deliberate indifference to a substantial risk of serious harm from conditions of confinement that systematically create an excessive risk of inmate violence.  Likewise, an official can act with deliberate indifference by adopting policies or customs that disregard substantial risks of serious harm, which further overlaps with the supervisory liability test.  In short, there is a difference between personal liability for excessive-inmate-violence claims (whether the person has the title of supervisor or not) and supervisory liability; but the difference may not mean much in practice here because of the overlap between the tests in the excessive-inmate-violence context.  *See infra* n.38.

the plaintiff's injuries by acting with deliberate indifference to a substantial risk of serious harm, *i.e.*, an excessive risk of inmate-on-inmate violence. *Farmer*, 511 U.S. at 834; *Marbury*, 936 F.3d at 1231–34.  That is, the initial focus will be on whether each Defendant "participated directly in the unconstitutional conduct" as alleged by Barefield. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014).[18]  And under that analysis, the court may ultimately hold each Defendant liable only if his or her own actions or inactions demonstrated deliberate indifference to Barefield's safety which caused his injuries. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *Keith*, 749 F.3d at 1047.  Then, for the Defendant supervisors who did not plausibly violate the Eighth Amendment themselves, the court will analyze whether a "causal connection exists between the supervisor's action and the alleged constitutional violation" of their subordinates. *Harrison*, 746 F.3d at 1298.

## D.    Eighth Amendment Excessive Risk of Inmate Violence Claims

In Count I (A–W), Barefield claims that Defendants violated the Eighth Amendment by manifesting deliberate indifference to an excessive risk of inmate-on-inmate violence, which caused his injuries. That is, unlike a specific failure-to-protect claim, this claim asserts that Defendants failed to ensure

---

[18] The "unconstitutional conduct" in an excessive-inmate-violence conditions of confinement case is not the injury (in this case, the rape).  Rather, the unconstitutional conduct is the deliberate indifference to a substantial risk of serious harm. *Farmer*, 511 U.S. at 834; *see also LaMarca*, 995 F.2d at 1538 ("The wrong in Eighth Amendment cases is the deliberate indifference to a constitutionally infirm condition.").

Barefield's "protection from the general danger arising from a prison environment that both stimulated and condoned violence." *LaMarca*, 995 F.2d at 1535. Specifically, Barefield alleges that Defendants knew about the excessive risk of inmate-on-inmate violence at Ventress and failed to do anything about it. That failure allegedly led to Barefield being abducted, brutally raped, and held hostage for over five hours at knifepoint. In their motions to dismiss, Defendants argue that Barefield fails to plausibly allege Eighth Amendment excessive-inmate-violence claims and that qualified immunity shields them from Barefield's claims. (Doc. # 88; Doc. # 90.)

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend VIII. Under the Eighth Amendment, prison custodians are not the "guarantor[s] of a prisoner's safety." *Purcell v. Toombs Cnty.*, 400 F.3d 1313, 1320 (11th Cir. 2005). The Eighth Amendment does, however, require that "inmates be furnished with basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 33 (1993). It is an unavoidable constitutional conclusion that incarcerating people against their will in "life-threatening condition[s]" is an unnecessary and wanton infliction of pain that constitutes "cruel and unusual punishment." *Id.* Inmates are punished with the loss of their freedom; judges do not sentence them to be beaten, stabbed, raped, and murdered. Recognizing this, the Eighth Amendment provides an inmate with

the right "to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates," *i.e.*, a right to be reasonably protected from an "excessive risk of inmate-on-inmate violence." *Purcell*, 400 F.3d at 1320 (quoting *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973)).  A plaintiff sufficiently alleges an Eighth Amendment excessive-inmate-violence claim by stating facts showing "(1) a substantial risk of serious harm [from inmate-on-inmate violence]; (2) the defendants' deliberate indifference to that risk; *and* (3) causation." *Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (citation omitted).

And to receive the protection of qualified immunity, government officials must first show that they acted within their discretionary authority when the challenged conduct occurred.  *Bowen v. Warden*, 826 F.3d 1312, 1319 (11th Cir. 2016).  Once discretionary authority has been established, defendants are entitled to qualified immunity unless the plaintiff sufficiently alleges that defendants (1) violated his constitutional rights, and (2) that the constitutional right in question was clearly established at the time of the violative conduct. *Id.*

As explained in the sections below, the court finds (1) that Barefield has plausibly alleged, in violation of his Eighth Amendment rights, excessive-inmate-violence claims against Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, Vincent, Strickland, and Myers, and (2) that the alleged conduct violated a "clearly established" right.  Accordingly, those

49

Defendants are not entitled to qualified immunity and their motions to dismiss Barefield's excessive-inmate-violence claims will be denied.  However, for various reasons, the excessive-inmate-violence claims against all other Defendants will be dismissed.

### 1.     *Constitutional Violation*

An Eighth Amendment excessive-inmate-violence claim seeking personal liability has three elements: (1) the conditions of confinement posed a substantial risk of serious harm, (2) the defendant's deliberate indifference to that risk, and (3) causation.  *Hale*, 50 F.3d at 1582; *see Purcell*, 400 F.3d at 1320.

### a.     **Substantial Risk of Serious Harm**

The first element of an excessive-inmate-violence claim requires a showing of incarceration under conditions that objectively pose a "substantial risk of serious harm."  *Cox v. Nobles*, 15 F.4th 1350, 1357 (11th Cir. 2021).  All Defendants proffer nearly identical arguments regarding the sufficiency of Barefield's pleadings on this element, so the court will first address the risk-of-harm element as to Defendants collectively.

To satisfy this element, Barefield's complaint must state facts that plausibly show that the conditions at Ventress at the time of the officials' conduct "were extreme and posed an unreasonable risk of serious injury to his future health or safety." *Marbury*, 936 F.3d at 1233 (cleaned up).  In cases of inmate-on-inmate

violence, "occasional, isolated attacks by one prisoner on another may not constitute cruel and unusual punishment"; however, an "excessive risk of inmate-on-inmate violence at a [prison] creates a substantial risk of serious harm." *Purcell*, 400 F.3d at 1320–22 (recognizing that a risk of harm "to some degree always exists" because of the nature of jails and prisons).

Defendants argue that Barefield has failed to sufficiently allege facts that plausibly show that Barefield's conditions of confinement posed a substantial risk of serious harm, that is, an excessive risk of inmate-on-inmate violence. (Doc. # 91 at 14.) Specifically, Defendants argue that Barefield fails to plausibly allege "that he was in an environment so beset by violence that confinement, by its nature, threatened him with the substantial risk of serious harm." *Marbury*, 936 F.3d at 1234 (quotations omitted). Did they read the complaint? If they had then they would know that such a violent environment is exactly what Barefield alleges, and arguments to the contrary are disingenuous, if not bordering on outright dishonesty.

One theme animates Barefield's complaint: Rampant, life-threatening inmate-on-inmate violence at Ventress. Barefield's complaint does not simply include allegations of "occasional, isolated" attacks. *Purcell*, 400 F.3d at 1320. It includes factual allegations of "excessive" and out-of-control violence and sexual assault. *Id.* Indeed, Barefield commits over 200 paragraphs of factual allegations

51

in his complaint to plausibly establishing that, at the time he was raped, "violence at Ventress was endemic" and featured a "culture of rape" resulting from Defendants' actions, inaction, and the specific features of Ventress that heightened the risk of violence past constitutional toleration.  (*See* Doc. # 74.)  The factual allegations paint a dark picture of a lawless state at Ventress where armed, unsupervised, and violent inmates can go wherever they want, whenever they want, and do whatever they want.

These factual allegations include, among others:

- Rampant inmate-on-inmate violence at Ventress in the years preceding the rape (averaging 54 reported assaults *per month* from July 2017 to January 2019 at a prison with approximately 1,000 inmates).  (Doc. # 74 at ¶ 86.)

- Over 160 reported sexual assaults at Ventress from 2015 to 2017.  (Doc. # 74 at ¶ 149.)

- Extreme overcrowding (the inmate population was nearly double Ventress's capacity).  (Doc. # 74 at ¶ 158.)

- Extreme understaffing (Ventress employed less than *a third* of the authorized correctional staff).  (Doc. # 74 at ¶ 162.)

- Uncontrolled, widespread inmate possession of contraband weapons, like knifes.  (Doc. # 74 at ¶¶ 177–90.)

- Complete lack of inmate monitoring and supervision for whole days at a time, both because of understaffing and failures to implement security measures like video surveillance and routine guard rounds.  (Doc. # 74 at ¶¶ 172–99.)

- Unrestricted inmate movement through unauthorized parts of the prison due to lack of supervision, monitoring, surveillance, and broken locks. (Doc. # 74 at ¶¶ 191–99.)

- Tolerance for blind-spots and make-shift sheet tents in housing units that allow inmates to engage in violent activity out of sight.  (Doc. # 74 at ¶¶ 200–05.)

- Failure to enforce policies segregating known violent inmates from vulnerable inmates.  (Doc. # 74 at ¶ 192.)

- Lack of night lights in overcrowded dormitory blocks. (Doc. # 74 at ¶ 203.)

- Inadequate staff training for weapons searches, assault and sexual assault investigations, and inmate monitoring.  (Doc. # 74 at ¶¶ 172–79.)

These factual allegations are in line with, if not far more severe than, the factual allegations that courts across this circuit have found to plausibly allege an unconstitutionally excessive risk of inmate-on-inmate violence.[19]  *See Williams v.*

---

[19] All decisions of the former Fifth Circuit handed down prior to October 1, 1981,

*Edwards*, 547 F.2d 1206, 1211 (5th Cir. 1977); *LaMarca v. Turner*, 995 F.2d 1526, 1532–38 (11th Cir. 1993); *see also Dickinson v. Cochran*, 833 F. App'x 268, 272–73 (11th Cir. 2020); *Marsh*, 268 F.3d at 1029; *Hale*, 50 F.3d at 1583; *McKee v. Dunn,* 2023 WL 5103102, at *3 (M.D. Ala. Aug. 9, 2023) (Huffaker, J.); *Wilson*, 618 F. Supp. 3d at 1269–73 (Bowdre, J.); *D.S. v. Dunn*, 2022 WL 1785262, at *8 (N.D. Ala. June 1, 2022) (Proctor, J.); *Cohen v. Hill*, 2022 WL 1094658, at *10 (N.D. Ala. Apr. 12, 2022) (Kallon, J.); *Williams v. Dunn*, 2022 WL 831423, at *12 (S.D. Ala. Feb. 16, 2022), *report and recommendation adopted*, 2022 WL 830611 (S.D. Ala. Mar. 18, 2022) (denying summary judgment and ordering discovery for plaintiff's claims based on overcrowding, understaffing, and patterns of violent inmate-on-inmate attacks).  Barefield's allegations feature all the factual hallmarks of these cases, including: a widespread history of violence/appreciable rate of violence, overcrowding, understaffing, failures to supervise and monitor, failures to confiscate and control contraband weapons proliferation, failures to implement security measures like cameras and functioning locks, and failures to enforce segregation policies.  *See, e.g., id.*

To begin, a widespread history of violence (or, an appreciable rate of violence), shown through statistics and data, is a key consideration when determining whether there was plausibly a substantial risk of serious harm from

constitute binding precedent in this Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

inmate-on-inmate violence. *See Marbury*, 936 F.3d at 1235. And here, Barefield's empirical allegations fit the bill.[20] In 2018, the year Barefield was raped, Ventress had the most reported inmate-on-inmate assaults of any of the male prisons in Alabama. (Doc. # 74 at 32.) The inmate-on-inmate assault rate at Ventress was more than 10 times the national average. (Doc. # 74 at 33–34.) From 2017 to 2019, Ventress had an average of 54 inmate-on-inmate assault reports *per month* and 74 violent assaults reported in March 2018 alone. (Doc. # 74 at 32.) Inmate-on-inmate assaults at Ventress became more frequent every year from 2016 to 2018. (Doc. # 74 at 34.) In 2018, the year Barefield was brutally raped at knifepoint, Ventress had nearly double the number of reported assaults from the prior year. (Doc. # 74 at 34.) Moreover, Ventress also had the most reported inmate-on-inmate sexual assaults of prisons in Alabama in the years leading up to the rape. (Doc. # 74 at 53.) And from 2015 to 2017, the reported sexual assaults at Ventress *doubled* with each passing year. (Doc. # 74 at 53.) Despite the already horrifying nature of these statistics, Barefield also alleges that these figures are a

---

[20] Defendants argue that these statistics do not bear on this case's risk of harm analysis because the data is, for the most part, about violent assaults and not rapes. (Doc. # 91 at 19–20 ("[T]his data does not differentiate assaults from rapes.").) This argument is wordplay, not law. First, it goes without saying that a rape is necessarily an assault, as was the case here. Therefore, the assault statistics are facially relevant. Perhaps Defendants are attempting to argue that the assault statistics are not relevant because not all violent assaults are "serious" harms, unlike rape. If that is the case, the argument still fails because violent assaults are typically serious harms. And in any event, it has long been clearly established that evidence of a history of violence, while highly relevant, is not necessary to establishing the existence of a substantial risk of serious harm from inmate-on-inmate violence. *See Marsh,* 268 F.3d at 1034 (reiterating that "an Eighth Amendment violation can arise from unsafe conditions of confinement even if no assault or similar physical injury has yet occurred.").

dramatic underestimation of the real amount of inmate-on-inmate violence that occurred at Ventress because it is based on *reported* incidents, and there is a strong inference that many assaults and rapes at Ventress go unreported. (*See* Doc. # 74 at 10 (noting that the DOJ determined that "it is likely that many other incidents [of violence] also occurred [at Ventress] . . . but were not reported by prisoners or staff.").)   First, threats of future violence in retaliation for complaining (as Barefield was threatened by Lowe) likely prevents incidents from being reported. Second, ADOC incredibly determined that nearly every single sexual assault report in 2018 was unsubstantiated.   This determination plausibly signals to genuine victims that they will not find relief through their custodians even if they do report. Therefore, the reported statistics plausibly reflect a significant underestimation of the violence that did, in fact, permeate through Ventress.

Nonetheless, while sufficiently alleged in Barefield's complaint, a "history of violence" is not the *sine qua non* of adequately pleading an excessive-inmate-violence claim; it is also "possible to base [such a claim] in the absence of a history of [] violence," through other factual allegations that create a substantial risk of serious harm from inmate-on-inmate violence.[21]   *Purcell*, 400 F.3d at 1323; *see*

---

[21] When a plaintiff relies solely on history of violence evidence, then that evidence must establish that violence "was the norm or something close to it," but when a "plaintiff has pointed to specific features of a facility or its population rendering it particularly violent," then the plaintiff can establish a substantial risk of serious harm without showing that violence was the "norm" through statistical evidence.  *See Marbury v. Warden*, 936 F.3d 1227, 1235 (11th Cir.

*also Marsh*, 268 F.3d at 1029–1034 (finding a sufficient risk of harm from inmate-on-inmate violence even where there were no allegations of a history of violence).  For example, courts consider specific institutional features that, when "[t]aken as a whole . . . present an objectively serious risk of harm."  *See e.g., Marsh*, 268 F.3d at 1029.  The Eleventh Circuit has found these "specific features" to include extreme overcrowding, pervasive understaffing, proliferation of contraband weapons, routinely leaving inmates without supervision, unrestricted prison movement, ineffective locks, and failures to segregate violent inmates, among others.  *Id*.  Barefield's complaint fits this bill too.

Barefield alleges that Ventress was extremely overcrowded at the time of the rape—housing an inmate population that was nearly double its designed capacity. (Doc. # 74 at 6.)  Barefield also alleges that Ventress was staffed at *a third* of its authorized staffing levels, which a former ADOC warden described as a staffing level that poses an "extreme danger to inmates" and staff.  (Doc. # 74 at 57.)  Even at 75% percent staffing capacity, a prison is "dangerously understaffed" according to the DOJ.  *See* DOJ 2019 Report at 9–10.  These two factors—overcrowding and understaffing—are what the former-ADOC commissioner described as a "two-headed monster."  *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1184 (M.D. Ala. 2017)

---

2019).  At bottom though, the legal test is whether there was plausibly an "excessive risk of inmate-on-inmate violence."  *Purcell*, 400 F.3d at 1323.

(Thompson, J.).

Barefield's complaint easily satisfies his pleading requirement on the risk-of-harm element based solely on the allegations of a rampant history of violence, extreme overcrowding, and extreme understaffing (which can cause monitoring and supervision deficiencies amongst a host of other issues).  *See Williams v. Edwards*, 547 F.2d 1206, 1211 (5th Cir. 1977) (finding that the "deplorable condition" of widespread inmate-on-inmate violence was because of "overcrowding and [] lack of security").[22]  After all, the severe understaffing alone allegedly creates, per a former ADOC warden, "extreme[ly] danger[ous]" conditions at Ventress. (Doc. # 74 at 57.)   And an "extreme danger" is definitionally a danger that poses a substantial risk of serious harm.  *Purcell*, 400 F.3d at 1323 (noting that the risk need only be substantial).  Indeed, the alleged understaffing by itself plausibly "creates a substantial risk of serious harm regardless of any other [conditions]."[23] *Braggs v. Dunn*, 562 F. Supp. 3d 1178, 1227 n.10 (M.D. Ala. 2021).

---

[22] *See also Alberti v. Klevenhagen*, 790 F.2d 1220, 1227-28 (5th Cir. 1986) (upholding district court's finding that inadequate staffing and supervision, among other factors, led to a pattern of constitutional violations); *Ramos v. Lamm*, 639 F.2d 559, 573 (10th Cir. 1980) ("Violence and illegal activity between inmates . . . is further facilitated by the inadequacy of the staffing levels."); *Van Riper v. Wexford Health Sources, Inc.*, 67 F. App'x 501, 505 (10th Cir. 2003) ("When prison officials create policies that lead to dangerous levels of understaffing and, consequently, inmate-on-inmate violence, [there is a violation of the Eighth Amendment.]").

[23] The court finds that the allegations of unconscionable understaffing and overcrowding alone, if proven by evidence, "at the very least, [would be] sufficient to create a jury question on

But Barefield's complaint also contains many of the other recognized "specific features" that contribute to an excessive risk of inmate-on-inmate violence. *See Marbury*, 936 F.3d at 1235. Barefield alleges: That Defendants allow inmates to move about the prison accessing unauthorized spaces with little to no supervision, *id.* ( "pervasive staffing and logistical issues rendering prison officials unable to address near-constant violence"); that Defendants leave overcrowded dormitories "virtually unguarded" and unmonitored for hours on end, *Williams v. Bennett*, 689 F.2d 1370, 1385 (11th Cir. 1982) ("[c]onfining medium and maximum security risk prisoners in a dormitory without the presence of a guard inevitably exposes each inmate to violent injury at the hands of other inmates,"); that Defendants tolerate makeshift tents that allow inmates to engage in concealed criminal activity; that dorms are not monitored at all at night; that Defendants permit broken door locks, allowing inmates to roam freely throughout the prison, *Marsh*, 268 F.3d at 1029 ("locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day"); that Defendants fail to segregate violent inmates from vulnerable inmates; that Defendants do not have proper video surveillance throughout the prison; and that Defendants have permitted, and tolerated, the widespread proliferation of contraband weapons, *Marsh*, 268 F.3d at 1029 ("weapons were readily available"). All of which, in

---

whether a substantial risk of serious harm existed" at Ventress. *Bugge*, 430 F. App'x at 759.

conjunction with the history of violence, overcrowding, and understaffing, clearly illustrates an environment that is beset by an excessive risk of inmate violence.

Defendants ignore Barefield's allegations and supporting case law,[24] and instead cite three cases to bolster their argument that Barefield fails to plausibly allege a sufficient risk of inmate violence at Ventress: *Marbury*, 936 F.3d at 1235; *Purcell*, 400 F.3d at 1313; and *Harrison*, 746 F.3d at 1300.  But the facts in the cases cited by Defendants are not analogous to Barefield's factual pleadings.  First, there is a great disparity between the statistics of Defendants' cases and the data alleged here: fifteen stabbings over six years in *Marbury*, thirty-three incidents over four years in *Harrison*, and three brawls over nine months in *Purcell*.  In contrast, Barefield has alleged an average of fifty-four reported inmate-on-inmate assaults *per month* from 2017–2019 and a rate of inmate assaults that is more than twice the Alabama average and nearly ten times greater than the national average. (Doc. # 74 at 33.)  Second, none of Defendants' cited cases contain allegations close to the horrifically understaffed and extremely overcrowded conditions that

---

[24] Perhaps it is fairer to say that Defendants do not ignore Barefield's factual allegations at Ventress, but rather that Defendants disbelieve these allegations and label them as legal conclusions and "formulaic recitation of elements."  (Doc. # 89 at 5.)  But, as discussed, Barefield's allegations go well beyond "[t]hreadbare recitals of the elements."  *Iqbal*, 556 U.S. at 678.  At the motion to dismiss stage, the court must take Barefield's allegations as true, and with the benefit of discovery, these allegations may be tested for their veracity by both parties. Barefield need not, however, support every factual allegation in his pleadings based on the evidentiary burden employed at summary judgment.  *See Williams,* 2022 WL 831423, at *12 (ordering discovery to test factual allegations made about overcrowding, understaffing, and wide-spread inmate-on-inmate violence).

Barefield has alleged.   Third, numbers aside, *Marbury* and *Harrison* involved motions for summary judgment based on an evidentiary record, not the plausibility standard.   And fourth, critically, the Defendants' relied-upon cases, especially *Marbury*, are also factually distinguishable because they lack abundant facts relating to "specific features" of prisons that contribute to creating an unconstitutional risk of inmate violence, such as broken locks, lack of proper video surveillance and guard rounds, widespread  proliferation of contraband weapons (like the knife put to Barefield when he was raped), unrestricted prisoner movement, failures to segregate inmates, and a tolerance for make-shift tents (like the tent Barefield was raped in and held hostage in for over five hours) that allow prisoners to go unseen, unmonitored, and, most importantly, unprotected.   *See Dickinson v. Cochran*, 833 F. App'x 268, 274 (11th Cir. 2020).   All of which, as discussed, Barefield has factually alleged.   *Id.* (finding a plausible Eighth Amendment violation based on overcrowding, understaffing, failures to segregate violent and nonviolent prisoners, failures to adequately supervise inmates, and failures to confiscate weapons and contraband); *see also Wilson*, 618 F. Supp. 3d at 1269–73 (same).

In summary, Barefield alleges a history of rampant inmate violence, extreme overcrowding, extreme understaffing, uncontrolled proliferation of contraband weapons, unrestricted and unauthorized movement through the prison, and routine

failures to monitor and supervise overcrowded open-bay dormitories for hours at a time, among other systemic issues.  *Cf. Hale*, 50 F.3d at 1583 (holding that an excessive-inmate-violence claim was viable where the plaintiff only "produced evidence that inmate-on-inmate violence occurred regularly . . . [and] the evidence indicated that the violence was severe.").   Considering these robust and disconcerting factual allegations as a whole,[25] the court will not, and cannot, declare that Barefield has failed to satisfy his pleading burden.  Rather, the court finds it beyond debate that Barefield plausibly alleged conditions at Ventress that were extreme and posed an excessive risk of serious injury from inmate-on-inmate violence; in short, that he was forced to live "in an environment so best by violence that confinement, by its nature, threatened him with substantial risk of serious harm."[26]  *Marbury*, 936 F.3d at 1235.  Further fact development during discovery

---

[25] *See Marsh*, 268 F.3d at 1029 ("*Taken as a whole*, these alleged conditions, if true, present an objectively substantial risk of serious harm—including the risk of inmate-on-inmate attacks—to inmates." (emphasis added)); *Gates v. Collier*, 501 F.2d 1291, 1309 (5th Cir. 1974) ("Each factor separately . . . may not rise to constitutional dimensions; however, the effect of the *totality of these circumstances* is the infliction of punishment on inmates violative of the Eighth Amendment, as determined by the trial court." (emphasis added)); *Williams*, 547 F.2d at 1211 ("Thus the District Judge was fully justified in finding that the *totality of circumstances* as to conditions of confinement at Angola amounted to a violation of the [E]ighth [A]mendment." (emphasis added)).

[26] And this determination is beyond debate—both as a matter of binding case law and obvious clarity.  Ask any rational person if they would live in these alleged conditions for over a year, and the answer should invariably be, "*No, too dangerous*."  An inmate's punishment is the loss of his freedom—the sentences given do not account for lawless prison conditions where a person can foreseeably be held at knifepoint, forced across the prison, through the yard, through multiple unlocked doors, into unauthorized areas, into a makeshift tent, orally and anally raped, and then kept captive for five hours in an unmonitored, overcrowded open-bay dormitory.  Judges "do not sentence people to be stabbed and beaten. . . . *Lord of the Flies* is supposed to be

may, or may not, bear out Barefield's allegations.  But that debate is inappropriate at the motion-to-dismiss stage where the complaint's allegations are taken as true, and the "procedural life of this case" is young.  *Dickinson*, 833 F. App'x at 275; *see also Iqbal*, 556 U.S. at 678.

### b.  Deliberate Indifference

The second element of an excessive-inmate-violence claim asserting personal liability requires Barefield to plausibly allege that each Defendant acted with deliberate indifference to the substantial risk of serious harm from inmate-on-inmate violence. *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993).  The deliberate indifference standard has two components, one subjective and one objective.  *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014).   To satisfy the subjective component, plaintiffs must produce evidence that defendants subjectively knew that an inmate faced a substantial risk of serious harm.  *Id.*  "The defendant 'must both be aware of facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'"  *Id.* at 1099–1100 (quoting *Farmer*, 511 U.S. at 837).  "To satisfy the objective component, a plaintiff must produce evidence that the defendant 'disregard[ed] that known risk by failing to respond to it in an (objectively)

---

a work of fiction; it should not describe the environment in our prisons. Indeed, the Eighth Amendment strictly prohibits prison officials from allowing such treacherous environments to exist." *Marbury*, 936 F.3d at 1238–39 (Rosenbaum, J., dissenting).

reasonable manner.'"  *Id.* at 1099 (quoting *Rodriguez v. Sec'y for Dep't of Corrs.*, 508 F.3d 611, 617 (11th Cir. 2007)).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Hale*, 50 F.3d at 1583 (quoting *Farmer*, 511 U.S. at 842); *see also Lane*, 835 F.3d at 1308 ("Inferences from circumstantial evidence . . . can be used to show that a prison official possessed the necessary knowledge." (citing *Caldwell*, 748 F.3d at 1099)).  "Thus, 'a [court] may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Hale*, 50 F.3d at 1583 (quoting *Farmer*, 511 U.S. at 842); *see also LaMarca*, 995 F.2d at 1536–37.  In the context of claims regarding an excessive risk of inmate assaults, the plaintiff need not show that he notified an official that he feared an attack.  *Hale*, 50 F.3d at 1583 (first alteration in original).

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Farmer*, 511 U.S. at 842–43 (footnote, citation, and internal quotations omitted).

A plaintiff next must sufficiently allege that a defendant disregarded the known risk of harm by failing to respond to the risk in an objectively reasonable

manner.  *Hale*, 50 F.3d at 1583.   "[D]eliberate indifference describes a state of mind more blameworthy than negligence," and an ordinary lack of due care for a prisoner's interest or safety will not support the claim.  *Farmer*, 511 U.S. at 835. "Merely negligent failure to protect an inmate from attack does not justify liability under section 1983."  *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990); *see also Carter*, 352 F.3d at 1350.  Rather, a defendant must act (or fail to act) with "more than gross negligence."  *Wade v. McDade*, 67 F.4th 1363 (11th Cir. 2023) (clarifying applicable standard).[27] A plaintiff can demonstrate that a defendant displayed deliberate indifference to an excessive risk of inmate violence if the defendant knew of ways to reduce the risk but knowingly or recklessly declined to act.  *Hale*, 50 F.3d at 1583; *LaMarca*, 995 F.2d at 1537 (holding that deliberate indifference is met where a defendant "knowingly or recklessly declined to take actions that would have improved the conditions" that created an excessive risk of inmate violence).  But if a defendant "attempt[ed] to remedy a constitutionally deficient prison condition, but fail[ed] in that endeavor, [he] cannot be deliberately indifferent unless [he] kn[ew] of, but disregard[ed], an appropriate and sufficient alternative."  *LaMarca*, 995 F.2d at 1536 (footnote omitted).

Moreover, a defendant cannot be deliberately indifferent to an excessive risk

---

[27] The Eleventh Circuit recently clarified that to show deliberate indifference a plaintiff must prove that a defendant (1) actually knew about a risk of serious harm; (2) disregarded that risk; and (3) acted with more than ***gross*** negligence. *Wade v. McDade*, 67 F.4th 1363 (11th Cir. 2023).

of inmate violence unless he "had the capability (authority and means) to provide adequate security and did not do so." *Williams v. Bennett*, 689 F.2d 1370, 1389 (11th Cir. 1982); *LaMarca*, 995 F.2d at 1536 ("[T]o demonstrate an official's deliberate indifference, a plaintiff must prove that the official possessed . . . the means to cure that condition."). That is, "[t]hose whose [] indifference results in liability are those under a duty—possessed of authority and means—to prevent the injury.'" [28] *Williams*, 689 F.2d at 1389. Therefore, in examining whether Barefield plausibly alleged Defendants were deliberately indifferent to the excessive risk of inmate violence at Ventress—so as to subject them to personal monetary liability for the harm Barefield suffered—the analysis must also assess the power, authority, discretion, and means held by each Defendant to take steps to remedy the excessive risk of inmate violence at Ventress. *See id.*; *see also Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986).[29]

In sum, to establish deliberate indifference, Barefield must plausibly allege (1) that each Defendant was subjectively aware of the alleged excessive risk of

---

[28] To be clear, authority and means to remedy the excessive risk of inmate violence bears directly on causation; however, it overlaps with deliberate indifference because an official can rarely manifest a deliberately indifferent state of mind by failing to do something that was not in the official's power to do. *See Rodriguez*, 508 F.3d at 622 ("For purposes of determining whether [defendant] caused the Eighth Amendment violation and [plaintiff's] subsequent injury, the 'critical' question is whether [defendant] was 'in a position to take steps that could have averted the [excessive risk of inmate violence] . . .'" (quoting *Williams,* 689 F.2d at 1384)). Accordingly, the court considers authority and power as to deliberate indifference and causation.

[29] As opposed to an official-capacity suit for injunctive relief where many individuals' knowledge, power, and authority can be considered collectively. *Williams*, 689 F.2d at 1389.

inmate violence, *Hale*, 50 F.3d at 1583, (2) that each Defendant had the authority and power to reduce that risk by taking known measures, *Williams*, 689 F.2d at 1389, and (3) that each Defendant—either knowingly, recklessly, or with more than gross negligence—failed to take such steps, *Hale*, 50 F.3d at 1583; *Wade*, 67 F.4th at 1363 (articulating the more-than-gross-negligence disregard standard). The court will apply this deliberate indifference framework to the excessive-inmate-violence claims brought against Defendants.  Defendants can be roughly broken up into three groups based on their respective authority: the Ventress officers,[30] the Ventress supervisors,[31] and Ivey and the ADOC officials.[32] The court will analyze each group in turn.

### i.    Deliberate Indifference Against Ventress Officers

As an initial matter, Barefield has not plausibly alleged a viable excessive-inmate-violence claim against the Ventress officer Defendants (Glenn, Rumph, Byrd, and Lewis) who by the nature of their position did not possess the authority, discretion, or means to alleviate the specific features at Ventress that allegedly created an excessive risk of inmate violence.  There should be no dispute these officers knew about the alleged excessive risk of inmate violence at Ventress

---

[30] Glenn, Rumph, Byrd, Lewis.

[31] Strickland, Jones, Myers, Gordon, Peters, and Haggins.

[32] Ivey, Dunn, Culliver, Williams, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent.

and the specific features enumerated previously that contributed to the risk. However, they did not allegedly possess the authority, discretion, and means to enact and enforce policies to address those features.  They could not address the understaffing or overcrowding; they could not deploy the suggested measures to rid the facility of the weapons proliferation; they could not change classification policies or institute training programs; and they could not decide to install new cameras or locks.  *See Rodriguez*, 508 F.3d at 622 ("For purposes of determining whether [a defendant] caused the Eighth Amendment violation and [the plaintiff's] subsequent injury, the 'critical' question is whether [a defendant] was 'in a position to take steps that could have averted the [excessive risk of inmate violence] . . . but, through deliberate indifference, failed to do so.' . . . To determine whether [a defendant] caused [the plaintiff's] injury, we look at his 'duties, discretion and means.'" (quoting *Williams*, 689 F.2d at 1384)).

These Defendants lacked the requisite authority, control, and responsibility over the conditions of confinement that created a substantial risk of serious harm from inmate-on-inmate violence necessary to hold them liable in their individual capacities for disregarding the conditions at Ventress with deliberate indifference. Therefore, Barefield's excessive-inmate-violence claims against Ventress officers Glenn, Byrd, Rumph, and Lewis will be dismissed.

ii.   **Deliberate Indifference Against Ventress Supervisors**

Of the Ventress supervisors, Barefield's briefing only addresses Strickland, Jones, and Myers as to the deliberate-indifference prong of his excessive-inmate-violence claims.  (Doc. # 95 at 24–27 ("Plaintiff has alleged that Jones, Strickland, and Myers . . . 'failed to correct the known problems of overcrowding, inmate classification, and contraband that caused inmate-on-inmate abuse,'" among other issues (citing *Dickinson*, 833 F. App'x at 273)).)  Accordingly, to the extent that Barefield brought this claim against Ventress supervisors Gordon, Peters, and Haggins, it has been abandoned and the excessive-inmate-violence claims in Count I against Gordon, Peters, and Haggins will be dismissed.  That leaves Ventress supervisor Defendants Strickland, Jones, and Myers for analysis.

To begin, Barefield plausibly alleges that Strickland and Myers had the authority, means, and power to fix many of the alleged conditions at Ventress that created an excessive risk of inmate violence.  At the time of the rape, Strickland was the warden at Ventress and was responsible for the day-to-day operations of the prison.  Meanwhile, Myers, who worked under Strickland, was responsible "for the safety of all inmates and the supervision of all institutional security activities." (Doc. # 74 at 99.)  Accordingly, the complaint plausibly alleges that Strickland and Myers both had the responsibility and authority to take steps that would effectively

remedy the alleged excessive risk of inmate violence.[33]  Defendants' dispute this by arguing that Strickland and Myers lack sufficient control to establish deliberate indifference because their authority is limited by the ADOC and state-budget constraints (Doc. # 102 at 10), and those points may ultimately be true, however, such a limitation of power is not alleged in the complaint and therefore that argument is improper at this pre-evidence stage.

The result is different for Jones.  While Jones had the same authority as Strickland during her tenure as Ventress's warden, she stepped down from that post six months before Barefield was raped.  (Doc. # 74 at 15–16.)  And while the court recognizes that an official could be culpable for conditions which she did not retain control over at the exact time the injury occurred, the court finds that six months of no responsibility/authority, in the absence of other factual allegations suggesting control, is too tenuous to plausibly establish an official manifested deliberately indifferent disregard to the conditions that allegedly caused a plaintiff's injury.  Accordingly, Jones's motion to dismiss this claim will be granted.  However, as stated, Strickland and Myers nonetheless are alleged to have had sufficient power over the dangerous conditions to plausibly allege deliberate

---

[33] The Ventress Defendants' reply brief indicates that Myers had significantly less control than Strickland. (Doc. # 102 at 10 (referring to Myers as a "lower-level employee," and analyzing Myers differently than Strickland on this basis)).  And this may be true.  However, at this stage, the court must stay within the four corners of the complaint barring an exception, and the complaint plausibly alleges that Myers had authority that is close to or analogous to that of Strickland.

indifference for the excessive-inmate-violence claim against them.

The remaining questions for deliberate indifference then are:  Does Barefield plausibly allege (1) that Strickland and Myers were (subjectively) aware of the excessive risk of inmate violence, and (2) that they disregarded that risk with more than gross negligence?  *Hale*, 50 F.3d at 1583; *McDade*, 67 F.4th at 1363; *see also LaMarca*, 995 F.2d at 1537 (holding that deliberate indifference may be demonstrated by allegations that a defendant, "with knowledge of the infirm conditions, [] knowingly or recklessly declined to take actions that would have improved the conditions.").  On both questions, Barefield has carried his burden at this procedural stage.

"[T]he complaint alleges sufficient facts to show that the risk of inmate-on-inmate violence at [Ventress] was 'obvious.'"  *Q.F. v. Daniel*, 768 F. App'x 935, 946 (11th Cir. 2019) (citing *Farmer*, 511 U.S. at 842-44, 846 n.9).  And Strickland and Myers's "supervisory positions suggest, at least by inference, that [they] were aware" of the allegations pertaining to staffing, overcrowding, weapons proliferation, failures to monitor and supervise, and the widespread history of violence at Ventress.  *Id.* (citing *Farmer*, 511 U.S. at 842)).  Indeed, Barefield's allegations "paint a dark picture of life at [Ventress]; a picture that would be apparent to any knowledgeable observer, and certainly to [] official[s]" like the Ventress supervisors.  *LaMarca*, 995 F.2d at 1536.

71

Courts across this circuit dealing with similar allegations have reached the same conclusion: Longstanding and pervasive violence, extreme understaffing, extreme overcrowding, failures to monitor and control inmates, and uncontrolled weapons proliferation are allegations that plausibly create the inference that the prison's administrators were obviously, subjectively aware of the alleged excessive risk of inmate violence at the prison they oversaw.[34] *See Wilson*, 618 F. Supp. 3d at 1274; *D.S.*, 2022 WL 1785262, at *8; *see also Hale*, 50 F.3d at 1582–83 (finding potential awareness of a substantial risk of serious harm where a defendant was aware that a prison had severe overcrowding problems and the plaintiff presented evidence that "inmate-on-inmate violence occurred regularly when the jail was overcrowded"); *Marsh*, 268 F.3d at 1029 (attributing notice to the jail supervisor of "longstanding and pervasive" conditions); *LaMarca*, 995 F.2d at 1536–37 (attributing notice of jail conditions to an official when such conditions "would be apparent to any knowledgeable observer"); *Q.F.*, 768 F. App'x at 946 ("[T]he defendants' supervisory positions suggest, at least by inference, that the defendants were aware of the staffing, classification, and segregation issues" at the

---

[34] Barring the obviousness inference, Barefield also cites other competent sources of information conferring awareness: ADOC annual reports, ADOC internal statistics and documents, lawsuits, specific instances, the fact DOJ was investigating Ventress, and PREA reports.  All these sources together are capable of establishing subjective awareness in the excessive-inmate-violence context.  *See Marsh,* 268 F.3d at 1029 (finding that state agency inspection reports describing jail conditions gave the Sheriff notice of the risks those conditions posed); *LaMarca,* 995 F.2d at 1536 (finding that "incident reports, internal staff reports, and reports by external investigators" provided notice of an unreasonable risk of inmate violence).

prison) (citing *Farmer*, 511 U.S. at 842 (allowing the plaintiff to establish subjective knowledge of a risk by inference or from circumstantial evidence))).

This inference is common sense.  It would defy credulity for the on-the-ground administrators of a prison not to know (1) how the prison was staffed, (2) how many inmates the prison should hold, (3) what the status of inmate monitoring was in their prison, (4) whether weapons had proliferated throughout their prison, and (5) what the rate of violence was within their prison's walls.  But Defendants ask the court to ignore common sense.  They argue that the Ventress supervisors were unaware of many of these conditions because the 2019 DOJ report did not come out until after Barefield was raped.  (Doc. # 91 at 19.)  This argument misses the point.  Of course, the 2019 DOJ report could not have provided notice to the Defendants in 2018.  But the report can establish facts about Ventress that, if true in 2018, would have been obvious to the people running the prison.

And, if (1) allegations about rampant violence, understaffing, overcrowding, monitoring, supervision, failures to train, and weapons proliferation at Ventress are true, and if (2) the administrators *on the ground* at Ventress were supposedly ignorant of these conditions—as they seem to argue—then (3) a plausible case of deliberate indifference against Strickland and Myers makes itself.  After all, the only explanation for such a lack of awareness to such obvious conditions is willful

blindness, intentional ignorance, wanton disregard, and quintessentially deliberate indifference to their constitutional charge to run the prison in a manner that reasonably protects inmates from institutional violence. *See Goebert v. Lee Cnty.,* 510 F.3d 1312, 1328 (11th Cir. 2007) ("[A] party that willfully blinds itself to a fact . . . can be charged with constructive knowledge of that fact." (quoting *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 902 (11th Cir. 2003)).   The argument to the contrary sounds like this: "We buried our head in the sand; therefore, we cannot be deliberately indifferent because we did not know what was going on above ground, even though above-ground surveillance was our job."   That dog does not hunt.  As the Supreme Court has stated, "[w]hile the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him, he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8.  If the Ventress supervisors mean what they say when they argue that they were ignorant to the systemic, pervasive conditions alleged in the complaint and catalogued in the 2019 DOJ Report, then they were plausibly deliberately indifferent because they intentionally blinded themselves to an obvious risk and took none of the reasonable steps Barefield alleges were available to them, such as adequately staffing the facility, adequately monitoring and supervising inmates,

adequately training staff, controlling the dissemination of contraband weapons, installing cameras, removing makeshift-tents, *et cetera*.

As a secondary argument, the Ventress supervisors assert that Barefield cannot establish deliberate indifference because he has not alleged "the ways in which [they] could have reduced the harm but failed to do so." (Doc. # 91 at 21.) This argument ignores Barefield's factual allegations.  First, as already stated, Barefield lays out *many* ways the Ventress supervisors "could have reduced the harm," (Doc. # 91 at 21), such as by adequately staffing the facility, ensuring adequate inmate supervision, installing cameras, fixing broken door locks, eradicating blind spots and makeshift tents, and adequately lighting the facility, among many others, (Doc. # 95 at 27).  Regardless, Barefield alleges that the Ventress supervisors did not take *any* reasonable measures to address the alleged understaffing, overcrowding, uncontrolled proliferation of contraband weapons, and failures to monitor and supervise inmates.  At this stage, that is sufficient to plausibly establish that the Ventress supervisors were either more than grossly negligent or reckless in their disregard to an excessive risk of inmate violence. *See Dickinson*, 833 F. App'x 268 at 273 (finding failure to train allegations, widespread weaponry allegations, and improper inmate classification systems "sufficient to establish a supervisory officials' deliberate indifference" even in the absence of granular policy proposals); *Marsh*, 268 F.3d at 1034 (holding that an

official's complete inaction in the face of an excessive risk of inmate violence constitutes deliberate indifference); *see also Ashcroft*, 556 U.S. at 678 ("[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Barefield need not *prove* any factual allegation at the motion-to-dismiss stage. As Barefield points out, based on his plausible claim that these Defendants did none of the suggested measures to address the known excessive risk of violence at Ventress, he "is entitled to discovery to 'demonstrate' . . . measures considered or not considered to reduce [the risk of excessive inmate violence] to a constitutionally acceptable level." (Doc. # 95 at 22.) With the benefit of discovery, Strickland and Myers may present evidence that shows that they did respond to the risk of inmate violence with less than gross negligence; however, based on the complaint's factual allegations, it is plausible that they did *not* respond adequately by taking basic steps to prevent the risk of harm—like installing cameras, fixing broken locks, removing makeshift tents, controlling contraband weapon proliferation, ensuring dorm blocks were adequately monitored, ensuring adequate staffing, and ensuring adequate surveillance, among many others alleged in the complaint. (*See* Doc. # 95 at 27). *See also Farmer*, 511 U.S. at 844 (noting that prison officials may avoid Eighth Amendment liability at

summary judgment and trial by showing that "they responded reasonably to the risk, even if the harm ultimately was not averted").

On this record, at this early procedural stage, Barefield has plausibly alleged that Strickland and Myers (1) were subjectively aware of the alleged conditions that created an excessive risk of inmate violence, (2) had the authority and responsibility to remedy the risk, and (3) disregarded that risk with, at least, more than gross negligence.  Accordingly, Barefield has plausibly alleged that Strickland and Myers were deliberately indifferent to the alleged excessive risk of inmate violence at Ventress in 2018.  However, as stated, Barefield's excessive-inmate-violence claims as to Ventress supervisor Defendants Gordon, Peters, Haggins, and Jones will be dismissed.

### iii.    Deliberate Indifference Against ADOC Officials

The ADOC officials present individualized arguments for many of the Defendants in this group regarding the deliberate-indifference prong of Barefield's excessive-inmate-violence claims.  (Doc. # 103 at 6–15.)  These Defendants can be discussed in three groups: (1) Williams; (2) Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent; and (3) Governor Ivey.  Of these, Barefield plausibly alleges deliberate-indifference claims against Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent.  He does not for Williams.  As for Ivey, the court declines to address whether Barefield has plead

deliberate indifference against her; this is because, as explained in Section V.D.2.b, the court concludes that the alleged violation against Governor Ivey was not clearly established.

### a. Williams

Barefield fails to plausibly allege that Defendant Williams acted with deliberate indifference to the excessive risk of inmate violence at Ventress in November of 2018. As the complaint notes, Williams assumed the title of interim Associate Commissioner for Operations after the alleged rape—when Culliver retired from the post at the end of November 2018. (Doc. # 74 at 12.) Further, Williams was only in that role for two months before he was replaced by Charles Daniels in January 2019. (Doc. # 74 at 12.) Moreover, the complaint does not allege Williams's role or responsibility prior to stepping in as an interim associate commissioner. Accordingly, based on the complaint's allegations, Williams did not have the authority, power, or responsibility to address any of the conditions Barefield alleges created an excessive risk of inmate violence at Ventress before Barefield was injured. Lacking such authority, Williams could not have acted with deliberate indifference to the risk of harm. *See Williams*, 689 F.2d at 1389 (reiterating that only "[t]hose whose [] indifference results in liability are those under a duty—possessed of authority and means—to prevent the injury"). Barefield's excessive-inmate-violence claim against Williams will be dismissed.

**b. Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent**

Next up is the remainder of the ADOC officials (barring Governor Ivey).  At the time of the rape, all these Defendants were allegedly high-ranking ADOC officials, with substantial power and responsibility over Ventress's operation. Dunn was the Commissioner of ADOC, Culliver was the Associate Commissioner, Stammper was the Deputy Commissioner, Naglich was the Associate Commissioner of Health Services, Mercado was the Director of the Intelligence and Investigation Division, Abbott was the Director of Facilities Management, Brand was the Association Commissioner of Administrative Services, Hill was the Chief of Staff, and Vincent was the PREA Director.  They are alleged to have failed to take known, basic steps to address the excessive risk of inmate violence at Ventress, despite having the responsibility and authority to eliminate the risk and/or substantially improve prisoner safety.

As with Strickland and Myers, Barefield has plausibly alleged that these ADOC officials were deliberately indifferent to the excessive risk of inmate violence by alleging facts that plausibly show that they were (1) aware of the alleged conditions at Ventress that created an excessive risk of inmate violence, *Hale*, 50 F.3d at 1583, (2) had the responsibility and authority to remedy the risk, *Williams*, 689 F.2d at 1389, and (3) disregarded the risk—either intentionally,

recklessly, or with more than gross negligence.  *Hale*, 50 F.3d at 1583.

First, it is plausible that these Defendants were aware of the understaffing, overcrowding, violence statistics, lack of monitoring and supervision, dysfunctional locks, lack of cameras, *et cetera*, at Ventress that created the excessive risk of inmate violence. *Braggs*, 257 F. Supp. 3d at 1256 ("ADOC has been well aware of the magnitude and impact of overcrowding on every facet of its operations for years."). These macro, systemic deficiencies were plausibly obvious to overarching ADOC officials. As with the on-the-ground supervisors at Ventress, it would defy credulity to determine, as a matter of law, that these Defendants were unaware of the foundational issues at the prison they were responsible for supervising. *See Huffman v. Dunn*, 2021 WL 2533024, at *7 (N.D. Ala. June 21, 2021) (Maze, J.) ("[A]t the Rule 12 stage, the court must assume that Defendants [including Dunn and Culliver] knew about the pre-attack incidents and statistics that [plaintiff] pleads and thus Defendants knew or should have known that '[the prison] was a place where inmate-on-inmate murders were the norm, rather than isolated occurrences.'"); *see also McKee,* 2023 WL 5103102, at *4 (same). In any event, ADOC's own statistics,[35] incident reports, prison reports, disciplinary records, and the 2018 PREA Report also plausibly conferred subjective awareness of the relevant conditions at Ventress to these ADOC

---

[35] *See generally*, Alabama Dep't of Corr., Statistical Reports, http://www.doc.state.al.us/StatReports.

officials.  *See Wilson*, 618 F. Supp. 3d at 1274–75 (finding that the Eleventh Circuit had clearly established that similar documentation is sufficient to plausibly allege subjective awareness of a substantial risk of serious harm from inmate-on-inmate violence); *see D.S.*, 2022 WL 1785262, at *8 (finding Dunn, Culliver, and Vincent plausibly knew about a substantial risk of serious harm from similar documentation alleged here).  Indeed, just two months after Barefield's rape, Dunn testified before the Alabama state legislature, stating, "[T]here is a direct correlation between the shortage of officers in our prisons and the increase in violence."[36]  (Doc. #74 at 6–7.)  Accordingly, Barefield plausibly alleges that these high-ranking ADOC officials were subjectively aware of the excessive risk of inmate violence at Ventress.  A contrary outcome would require the court to erroneously ignore, pre-evidence, logical inferences that plausibly confer subjective awareness.

Second, Barefield plausibly alleges that these ADOC officials had the authority and means to take steps to prevent or eliminate the excessive risk of inmate violence.   Dunn was responsible for ADOC's direction, supervision, and control.   He was allegedly responsible for all personnel, as well as ADOC's compliance with federal and state laws.  (*See* Doc. # 95 at 23.)   Meanwhile,

---

[36]  Because this statement came two months after the rape, it is not a direct admission that Dunn had awareness of the impact of understaffing on prison violence in November 2018. However, given the proximity between the statement and the rape, it creates the plausible inference that Dunn held this same understanding prior to the rape, which discovery may prove.

Culliver was "responsible for ensuring safe daily operations of all prison facilities, including overseeing institutional security," and staffing. (Doc. # 74 at 72–73.)  In short, both Dunn and Culliver allegedly had responsibility over, and the authority to address, the systemic deficiencies and conditions that created the alleged excessive risk of inmate-on-inmate violence—like understaffing, overcrowding, inadequate supervision and monitoring, and anything else that bears on the "safe daily operation" of the prisons they were charged with running. (*See* Doc. # 95 at 23.)  Similarly, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent are all allegedly high-ranking ADOC officials with responsibility and authority over many of the conditions which allegedly created the excessive risk of inmate violence.  While their roles were allegedly more compartmentalized, albeit still wide ranging, than Dunn and Cullivers', Barefield nevertheless plausibly alleges that they had sufficient authority to either prevent the excessive risk of inmate violence or to substantially improve prisoner safety at Ventress.

Third, Barefield alleges that these ADOC supervisors took none of the reasonable steps available to them to address the excessive risk of inmate violence at Ventress.  While Barefield specifically lists many of these Defendants shortcomings, such as failing to install cameras and functioning locks and failing to address overcrowding and understaffing (and therefore the collateral consequences inherent with these issues), this is not the case where Barefield has only alleged

that they took an action where its reasonability can be tested.  This case, at this stage, is premised on *inaction*.  This is a case where Barefield has alleged that Defendants took no action whatsoever, that was within their power, in response to a known, excessive risk of inmate violence.  At this early stage, and without the benefit of discovery where Defendants can say exactly what steps were or were not taken, that is sufficient to allege more than grossly negligent disregard as required to establish deliberate indifference.  *See Dickinson*, 833 F. App'x at 273 (finding failure to train allegations, widespread weaponry allegations, and improper inmate classification systems "sufficient to establish a supervisory official's deliberate indifference" even in the absence of granular, pre-discovery policy proposals in the complaint); *Marsh*, 268 F.3d at 1034 (holding that an official's complete inaction in the face of an excessive risk of inmate violence constitutes deliberate indifference); *see Hollingsworth v. Edgar*, 2006 WL 2009104, at *7 (M.D. Ala. July 18, 2006) (Watkins, J.) (noting in the inmate-suicide context that the liability of officials "is premised on their alleged inaction, their failure to take any precautions," and reiterating that the Eleventh Circuit cases "may not specify exactly what actions" must been taken, but "the cases make perfectly clear that some level of action is required").

Accordingly, like with Strickland and Myers, Barefield has sufficiently alleged every element of deliberate indifference against Dunn, Culliver, Stamper,

Naglich, Abbott, Mercado, Brand, Hill, and Vincent.    Though, the court again emphasizes that this case is at the motion-to-dismiss stage.   Creating a genuine dispute of fact based on evidence as to deliberate indifference is a different ballgame than pleading deliberate indifference.[37]

### c.    Causation

The causation prong for excessive-inmate-violence claims seeking personal liability can be complex for several reasons.[38]

---

[37] The court takes judicial notice of the continuing political saga in Alabama involving a toxic mix of (1) a history of legislative inaction and (2) inherent difficulties in hiring prison staff with the at-present excessively dangerous working conditions.   While ADOC officials are compelled by law to keep, manage, and care for prisoners, they may be constrained from providing constitutionally adequate conditions as a result of the deliberate indifference of a recalcitrant government, not their own individual failings.   Of course, Defendants may still be found liable even when facing "budgetary constraints," if they had within their means to "substantially improve prisoner safety" and knowingly or recklessly disregarded available solutions.   *LaMarca*, 995 F.2d at 1537–39.   But it may turn out to be the State—as a collective— that is ultimately culpable for certain injuries caused by the unconstitutional prison conditions it forces on its citizens.   If so, justice in such a situation is presently foreclosed by an arguably unfounded limiting of Section 1983's used of the word "person." *See* Katherine Mims Crocker, *Reconsidering Section 1983's Nonabrogation of Sovereign Immunity*, 73 FLA. L. REV. 523 (2021) (arguing that "the best reading of Section 1983 may make states suable"); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 94 (1989) (Stevens, J., dissenting) ("The Court's holding that a State is not a person under § 1983 departs from a long line of judicial authority based on exactly that premise.").   In America, private corporations are persons, but States are apparently not, even though the relevant definition of "person" at the time of Section 1983's passage includes "bodies politic" and "bodies politic" includes States.   *Will*, 491 U.S. at 77–79 (Brennan, J., dissenting).   It may be the case that private collectives are fictional persons and public collectives are not, but that would be a sad case in a land where government is purportedly "of the people, by the people, for the people."   A. Lincoln, Gettysburg Address (1863).

[38]  As discussed in Section V.C.2., the excessive-inmate-violence causation inquiry is not limited to the supervisory-causation framework.   But even if it were, the inquiry outlined in this section would be the same.   For example, the supervisory-causation framework lays out tests for a supervisor's knowledge of the need to take action, such as when there is a deficient policy or custom, or "there is a history of widespread abuse putting the supervisor on notice to *take action* but he fails to do so."   *Braddy v. Fla. Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802

First, unlike most deliberate-indifference inmate attack cases that deal with specific risks to specific plaintiffs, these are *systemic* deficiencies cases, meaning that there are often many actors whose deliberate indifference creates, contributes to, and sustains an unconstitutionally violent living environment; it is rarely one actor or condition that causes a generally excessive risk of violence by mere virtue of confinement.[39]   Rather, it is often an aggregation of various factors and conditions that lead to an unconstitutionally lawless and excessively violent environment. *See Williams*, 689 F.2d at 1389 (noting that "the acts and omissions of many individuals may have combined to cause the unconstitutional conditions at [a] prison.").

Second, unlike in an injunctive relief case targeting systemic deficiencies, these claims are for *personal* liability, meaning the culpability and causal role of

_____

(11th Cir. 1998) (emphasis added).  Implicit in this inquiry is an analysis of the capability of a Defendant to "*take action*"—that is, even under the supervisory-causation framework, to be liable for an excessive-inmate-violence claim, the supervisor must be alleged to have within his authority and means the ability to act.  And, as explained in this section, it is clearly established that those who have the authority and means to prevent, eliminate, or substantially remedy the excessive risk of inmate violence may be found to cause the risk and therefore the resulting injuries.  Thus, regardless of the starting point of the causation inquiry for an excessive-inmate-violence claim seeking personal liability, the inquiry converges to require consideration of the responsibility and capability wielded by each Defendant.

[39] However, as already stated, given the horrendously inadequate staffing level alleged at Ventress in 2018, the court finds that Barefield's allegations of understaffing and overcrowding alone are sufficient to plausibly allege a substantial risk of serious harm from inmate-on-inmate violence.  A business that only filled 33% of its necessary staff while serving double its expected customers would shut down.  It is incomprehensible that a prison could provide any—let alone constitutionally adequate—safety when it has less than a third of the staff it needs to supposedly do just that.  The battle is predictably lost before it begins, the victim toll racks up, and the casualties are American citizens who have been denied their basic human and constitutional rights.

*each* Defendant must be scrutinized. *See Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). While the Defendants, viewed "collectively, as the corporate officialdom," may be in "a position to end the constitutional violation," they may not necessarily each be individually liable for the injurious results that come from the collective's failure to do so. *Williams v. Bennett*, 689 F.2d 1370, 1383 (11th Cir. 1982).

And third, these first two points together mean the court is tasked with determining whose individual role in creating, contributing to, or sustaining an unconstitutional system is culpable and causal enough to find that he or she can be personally liable for the foreseeable results that the system produces (that is, the injuries that predictably result from forcing humans to live in an excessively dangerous environment). *See Williams*, 689 F.2d at 1383 (noting that, while the State may rightfully be "castigated [] for its failure to take seriously its responsibility for operating its prisons in conformity with constitutional mandates," the "degree of culpability of each of the *individual* defendants and his causal role in the physical injuries suffered by [the plaintiff] as a result of his exposure to the constant threat of violence," is a "different matter" (emphasis added)).

With that in mind, the first topic is the applicable causation framework as pronounced and applied by the Eleventh Circuit. This framework has areas of ambiguity in the center, but its poles are clear as to who can and cannot be found to

have a sufficient causal role to be held personally liable for injuries resulting from unconstitutionally dangerous conditions of confinement. Then, that framework will be applied to the remaining Defendants in the violation analysis: Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, Vincent, Strickland, and Myers (again, the court declines to address Ivey in the violation analysis). As will be explained, causation is sufficiently plead as to all of these Defendants.

In excessive-inmate-violence claims, two causal links must be established. *Hale*, 50 F.3d at 1584 (citing *LaMarca*, 995 F.2d at 1538). "First, a link between [the prison official's] allegedly deliberately indifferent acts and omissions and the excessive risk of violence; and second, a link between the excessive risk of violence and [his] injur[ies]." *Id.* The Eleventh Circuit has also described these two links as (1) an "individualized causation requirement (proof that a defendant contributed to the unconstitutional prison conditions)," and (2) "the more generalized causation requirement (proof that the unconstitutional prison conditions contributed to [the plaintiff's] injuries.)" *Williams*, 689 F.2d at 1384–85.

To be sure, these are two distinct causal links. But, in practice, the inquiry at this stage is primarily concerned with the individualized causal link, *i.e,* "whether [a defendant's] deliberate indifference caused the alleged constitutionally infirm condition." *LaMarca*, 995 F.2d at 1540. That is because, in the

excessive-inmate-violence context, if there is in fact a known, substantial risk of serious harm from inmate-on-inmate violence, and a plaintiff establishes the first causal link between the "defendant's acts or omissions" and that risk, then the defendant is "precluded from contending that the [excessive risk of inmate violence] was not at least a proximate cause of [the plaintiff's injuries]." *Williams,* 689 F.2d at 1389.  "This is not to say that a plaintiff need not show a causal link between the constitutionally infirm condition and the alleged injuries.  Rather, the finding that a prison condition offends the Eighth Amendment presupposes the distinct likelihood that the harm threatened will result." *LaMarca*, 995 F.2d at 1538; *Bugge*, 430 F. App'x at 760 (holding that the dangerous risk of excessive inmate violence "erupted in a predictable way that lead [*sic*] to [the plaintiff's] death.").  Thus, because a finding that there is an "excessive risk of violence" presupposes "the distinct likelihood that the harm threatened will result," courts cannot declare that there is insufficient evidence to establish the "causal link between the objectively intolerable conditions [] and the plaintiffs' injuries." *Hale*, 50 F.3d at 1584 (quoting *LaMarca*, 995 F.2d at 1538).[40]

---

[40] To illustrate this framework, imagine this reductive hypothetical: Inmates are in a giant water tank. Somehow, a shark gets into that tank and is circling the inmates.  Clearly, in that moment, the inmates are exposed to a substantial risk of serious harm.  If and when the shark attacks, it is clear that the substantial risk of serious harm (the circling shark) is causally related to the resulting injuries. Thus, the second, generalized causal link, the "link between the excessive risk of violence" and the injury is established. *Hale*, 50 F.3d at 1584 (citing *LaMarca*, 995 F.2d at 1538).  The question that remains then is whether there is a causal link "between [the prison official's] allegedly deliberately indifferent acts and omissions and the excessive risk of

Here, Barefield has sufficiently plead this "more generalized causation requirement (proof that the unconstitutional prison conditions contributed to [his] injuries." *Williams,* 689 F.2d at 1384. As stated, the court has found that Barefield has clearly alleged constitutionally intolerable conditions that created an excessive risk-of-inmate violence, *see* Section V.D.1.a; therefore, the court presupposes that there is a causal link between that risk and his rape. *See Hale,* 50 F.3d at 1584 (citing *LaMarca,* 995 F.2d at 1538–39).

And, considering all the dangerous conditions that elevated the risk of harm here, this generalized causal link makes sense. If guards were supervising the prison canteen, they could have stopped F Dorm residents, like Lowe, from being in the canteen at the same time as the C Dorm residents, like Barefield. If guards were supervising the canteen, they could have stopped Lowe from abducting Barefield in plain view. If weapons had not proliferated throughout Ventress,

---

violence;" *i.e.* the circling shark. *Id.* That question, in this hypo, is easy: If a defendant saw the shark, had the means to either get the inmates out of the water or subdue the shark, and that official decided to sit back and watch, then that official would be deliberately indifferent, and that indifference was causally related to the excessive risk of serious harm that predictably injured the inmate. Therefore, both causal links are satisfied. What makes this case more difficult is that the court is not simply dealing with one factor (the shark) that creates the excessive risk of inmate violence—it is dealing with a host of conditions that, together, pose a similar risk the shark posed. And control over those conditions can vary from defendant to defendant—creating the potential for concurrent and combining causes. *See Williams,* 689 F.2d at 1374, 1389 n.18 (noting that, in establishing "each individual defendant proximately caused the unconstitutional conditions in the prison," the causation jury instruction is "crucial because the acts and omissions of many individuals may have combined to cause the unconstitutional conditions at [the prison]."); *see also Farmer,* 511 U.S. at 833 (noting that, in establishing a substantial risk of serious harm, "it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether [an inmate] faces an excessive risk of attack for reasons personal to him or because all [inmates] face such a risk").

Lowe would not have been able to use a knife to force Barefield to walk with him. If the prison yard had been properly monitored, Lowe would not have been able to force Barefield across it by knifepoint.  If the locks worked, Lowe would not have been able to "roam freely" from dorm to dorm, and force Barefield into F Dorm. *Id.*  If a guard was checking the authorization of people who accessed F Dorm, Barefield would not have been allowed into the area where he was raped.  If makeshift tents were not tolerated, Lowe would not have been able to conceal the rape.  If camera surveillance was used, then the guards could have effectively monitored F Dorm.  If there were guard patrols, then they could have stopped the rape or saved Barefield from being held hostage in an overcrowded, open-bay dormitory for over five hours.  If the prison was even close to adequately staffed, Lowe would not have had "free reign" to kidnap an inmate with a knife, force that inmate across the prison yard and through multiple unlocked doors and into an unauthorized area, hide him in an unauthorized, makeshift tent, rape him, and then hold him hostage in plain view for five hours.  *Id.*  If the prison did not hold nearly double its inmate capacity, guards could adequately monitor the facility.  If sexual assault allegations were properly addressed, investigated, and the perpetrators punished, then Lowe may not have felt free to commit such a heinous crime.  If cameras were used, Ventress *could* properly investigate sexual assaults and collect evidence—and the cameras would deter crimes from happening in the first place.

But collectively, according to the complaint, none of these known, bare-minimum steps were taken.[41]  Instead, Ventress was plagued with "lawless prison conditions" *Hale*, 50 F.3d at 1584, and Barefield was "forced to live" in unconstitutional conditions that exposed him daily to an excessive risk of inmate violence, *Williams,* 689 F.2d at 1384.  Accordingly, Barefield plausibly alleges that the kidnapping and knife-point rape, "due to their very nature as acts of violence," flowed "directly from the lawless prison conditions at [Ventress] . . . [These conditions created] the background and climate . . . which preordained homosexual rapes and other inmate assault[s]," like Barefield's. *LaMarca*, 995 F.2d at 1539; *see also Hale*, 50 F.3d at 1584–85 (holding that the existence of an unconstitutionally excessive risk of inmate violence presupposes that the unconstitutional conditions proximately caused the act of violence that injured plaintiff); *Marsh*, 268 F.3d at 1029 ("Conditions, like those in this case, where violent prisoners are allowed free reign of a jail with easy access to weapons without proper supervision by guards could be found to have caused the assaults on Plaintiffs.").

As stated, the court has found that Barefield has plausibly alleged constitutionally intolerable conditions that created an excessive risk-of-inmate

---

[41]  Again, many of these corrective steps may have been taken or at least attempted.  But the case comes before the court under Rule 12.  Defendants, if they choose to, will have a chance to rebut the factual allegations in the complaint at summary judgment.

violence, therefore, Barefield has sufficiently plead the "more generalized causation requirement (proof that the unconstitutional prison conditions contributed to [his] injuries)." *Williams,* 689 F.2d at 1384.

The focus of the inquiry, then, is whether Barefield has alleged, as to each Defendant, the "individualized causation requirement (proof that a defendant contributed to the unconstitutional prison conditions)." *Id*. That is, a causal link "between [the prison official's] allegedly deliberately indifferent acts and omissions and the excessive risk of violence." *Hale*, 50 F.3d at 1584 (citing *LaMarca*, 995 F.2d at 1538). From the court's reading, three guiding causation principals in this context have been clearly established.

First, because a defendant can only have caused an excessive risk of inmate violence by acting (or failing to act) within his authority and means, "resolution of this issue necessarily entails a very individualized approach, taking into account the duties, discretion and means of each defendant." *Williams*, 689 F.2d at 1384; *see also Wade v. United States*, 13 F.4th 1217, 1231 (11th Cir. 2021) (Tjoflat, J., concurring) (noting that the "key difference" for establishing personal liability for deliberate indifference claims is often "*who* is being sued," in terms of the defendant's authority and what that defendant can and cannot do).

Second, it is clear that a defendant who has *no* (or very minimal) power to lessen/mitigate/reduce/etc. the excessive risk of inmate violence cannot be found to

have caused that risk. *Williams*, 689 F.2d at 1384 ("There can be no duty, the breach of which is actionable, to do that which is beyond the power, authority, or means of the charged party."). *See also Bugge*, 430 F. App'x at 760 (reiterating that defendants who have no "responsibility for the conditions" or could not "have taken reasonable steps to lessen the substantial risk of serious harm" cannot cause the infirm condition). This type of defendant is the classic example of the low-ranking guard who has no authority over the systemic conditions of confinement that allegedly created the excessive risk of inmate violence. Though, of course, such a guard still may be liable for a *specific* failure-to-protect claim based on his specific conduct in the context of his knowledge that an excessive risk of inmate violence pervades the institution. *See* Section V.E (discussing Barefield's specific failure-to-protect claims); *see also Wilson*, 618 F. Supp. 3d at 1283 (finding guards potentially liable for a failure-to-protect claim where the guards were aware of a generally excessive risk of inmate violence from appalling conditions and then the guards "left [the plaintiff's] door unlocked to expose him to that known violence").[42]

---

[42] "For example, it would be unfair to penalize with personal monetary liability an individual Board of Corrections member whose vigorous efforts to hire sufficient prison guards, or to assign available guards so as adequately to staff the dormitories, were overruled by the contrary views of a majority of the Board. On the other hand, it would be highly relevant to the establishing of personal liability to introduce evidence that an individual defendant, having jurisdiction over an adequate number of guards and over [the injured plaintiff's] dormitory at the time of the stabbing announced: 'I'm not going to station a guard in that dorm. Those prisoners deserve what they can do to one another.'" *Williams*, 689 F.2d at 1383–85 (noting that, in a

Third, if a defendants' deliberate indifference is the but-for cause of an excessive risk of violence's existence/persistence, then the causal link between the defendant and the infirm condition is clearly satisfied. *See LaMarca*, 995 F.2d at 1538 ("Section 1983 thus focuses our inquiry on whether an official's acts or omissions were the cause—not merely a contributing factor—of the constitutionally infirm condition."); *Hale*, 50 F.3d at 1584 (finding causation as to a sheriff where, "without the [sheriff's] failure to take meaningful action, . . . the infirm condition—the excessive risk of violence—would not have existed."). This is a defendant who has the authority, alone, to effectively eliminate the risk, but, through deliberate indifference, does not. *See Williams*, 689 F.2d at 1389 ("To prove actionable conduct . . . [the plaintiff] must demonstrate that a particular defendant had the capability (authority and means) to provide [constitutionally] adequate security and did not do so."); *Hale*, 50 F.3d at 1584 (finding individualized causation where "the excessive risk of violence flowed from an atmosphere of deliberate indifference reflected in [*the specific defendant's* failure[s]"); *LaMarca*, 995 F.2d at 1539 (finding individualized causation where there was evidence showing that the defendant "could have brought [the prison]

---

prison beset by a constitutionally intolerable risk of inmate violence, if a defendant—who may lack the power to remedy the overarching conditions—specifically does something with deliberate indifference, such as "[c]onfining medium and maximum security risk prisoners in a dormitory without the presence of a guard," that causes the injury, then that defendant may be liable for the "violent injury" that resulted from his specific act given his awareness of the generally excessive risk of violence).

within constitutional norms," but did not through deliberate indifference).

Moreover, a defendant can be found to have caused an excessive risk of inmate

violence if he "had the means substantially to improve prisoner safety" but,

through deliberate indifference, did not substantially improve safety. *LaMarca*,

995 F.2d at 1539. The lion's share of viable excessive-inmate-violence claims has

been typically brought against such capable defendants: sheriffs, wardens, and

overarching prison-system officials. *See Dickinson,* 833 F. App'x at 273 (finding a

sheriff and warden potentially liable); *Bugge*, 430 F. App'x at 760 (finding a prison

warden potentially liable); *Hale,* 50 F.3d at 1584 (finding a sheriff potentially

liable); *Marsh,* 268 F.3d at 1030 (same); *LaMarca*, 995 F.2d at 1539 (finding that

a superintendent of a prison could be held personally liable for excessively

dangerous conditions of confinement); *see also Wilson*, 618 F. Supp. 3d at 1283

(finding Defendant Dunn, an ADOC associate commissioner, and wardens

potentially liable for an excessive risk of inmate violence where they knew of the

risk and either "failed to create policy or failed to enforce and follow their policies

to remedy the conditions"); *Ogletree*, 2021 WL 4477630, at *51 (denying

summary judgment to jail administrator and sheriff); *but see D.S.*, 2022 WL

1785262, at *9 (finding many ADOC officials, including Defendants Dunn,

Culliver, and Vincent potentially liable, but not discussing their responsibility).

Accordingly, a distillation of these principles clearly provides that, in the

excessive-inmate-violence context, (1) each Defendant's authority must be evaluated individually for personal liability to attach, *Williams*, 689 F.2d at 1384; (2) a defendant cannot have caused an excessive risk of inmate violence from conditions of confinement if he is powerless to reduce/lessen/mitigate, *etc.*, that risk, *id.*; and (3) a defendant can be found causally linked to an excessive risk of inmate violence by failing to effectively remedy/eliminate/prevent the risk through deliberate indifference, or by having the power to substantially improve prisoner safety but failing to do so with deliberate indifference, *Hale*, 50 F.3d at 1584 (finding individualized causation where "the excessive risk of violence flowed from an atmosphere of deliberate indifference reflected in [*the specific defendant's*] failure[s]."); *LaMarca*, 995 F.2d at 1539 (finding individualized proximate causation where a defendant "was in a position to take steps that could have averted [the excessive risk of inmate violence], but through deliberate indifference, he failed to do so." (quoting *Williams*, 689 F.2d at 1384 (internal quotations and brackets omitted))).  While the inquiry must always be individual and case specific, guards have typically fallen into the "no power to reduce/lessen/mitigate systemic deficiencies" category, and wardens and commissioners have typically fallen into the "power to prevent/avert/eliminate the excessive risk or substantially improve safety" category. [43]

---

[43] Notably, this clearly established framework leaves an unclear middle zone: Defendants

The court will now apply this individualized causal link framework to two groups of Defendants: (1) Strickland and Myers, and (2) Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent.  For the following reasons, on this complaint, Barefield plausibly alleges causation against both groups.

### i.    Causation Against Strickland and Myers

Here, against Strickland and Myers, Barefield plausibly alleges the individualized causal link: a causal link "between [the prison official's] allegedly deliberately indifferent acts and omissions and the excessive risk of violence." *Hale*, 50 F.3d at 1584 (citing *LaMarca*, 995 F.2d at 1538).  Barefield's complaint plausibly alleges that, but-for each of these Defendants' own deliberate indifference, the excessive risk of inmate violence would not have existed.  As determined previously, the complaint sufficiently portrays these Defendants responsibilities and authority over inmate safety and security at the time of Barefield's attack.     Indeed, given their roles as prison principals, it is

---

who have some power to reduce/lessen/mitigate the overall danger, but, even if they exercised all their power, they could *not* have *substantially* improved prison safety or could not "have brought [the prison] within constitutional norms" by preventing/remedying the excessive risk of inmate violence.  *LaMarca*, 995 F.2d at 1539.  On one hand, the Eleventh Circuit has articulated the individualized-causal link as requiring "proof that a defendant *contributed* to the unconstitutional prison conditions." *Williams*, 689 F.2d at 1385.  The use of the word "contributed" indicates that a defendant may be liable for the excessive risk of inmate violence if they had any power to reduce/lessen/mitigate the dangerous conditions but did not do so with deliberate indifference. But then again, the Eleventh Circuit has stated that "Section 1983 [] focuses [the] inquiry on whether an official's acts or omissions were the cause—not merely a contributing factor—of the constitutionally infirm condition."  *Id.*; *Williams*, 689 F.2d at 1384.  Because of the tension between these precedents, the court has only laid out the framework that has been clearly established.

"unsurprising that [they] would have the means to improve systematic deficiencies in protecting the safety of prisoners." *Rodriguez*, 508 F.3d at 625 (Cox, J., dissenting).   Strickland and Myers were responsible for running Ventress, including ensuring the safety of each inmate, supervising inmates to protect them from sexual assault, ensuring compliance with PREA, and ensuring that the facility was maintained to provide adequate inmate safety.

In light of this alleged systemic authority over safety, Barefield plausibly alleges that the excessive risk of inmate violence "flowed" naturally and directly from the alleged inaction of Strickland and Myers to avail themselves of known measures to restrain and restrict inmate movement throughout Ventress, limit the proliferation of weapons and makeshift tents, [44] improve staffing, reduce overcrowding, install cameras, fix broken locks, implement and enforce adequate inmate monitoring policies and procedures, and adequately receive and investigate reports of assaults, among others.   *Hale*, 50 F.3d at 1584.   Barefield plausibly alleges that adopting such measures—which were allegedly within their power— would have prevented the risk of excessive inmate violence.   Accordingly, these Defendants' own deliberate indifference plausibly caused the excessive risk of inmate violence and therefore individualized causation is satisfied as to them.

---

[44] It is indicative of a total disintegration of adequate monitoring and supervision if makeshift tents are routinely allowed in high-risk, overcrowded dorms for any substantial period of time, let alone for hours and days on end, as alleged.

And, as noted, because an excessive risk of inmate violence presupposes that the risk caused the violent injury, these Defendants are precluded from arguing that proximate cause between the excessive risk and Barefield's injury is inadequately plead.

In summary, Barefield plausibly alleges that (1) Strickland and Myers's individual deliberate indifference caused the unconstitutionally excessive risk of inmate violence, and (2) that that excessive risk was causally linked to Barefield's injuries.  Satisfying both causal links for each Defendant, Barefield plausibly alleges causation as to Strickland and Myers for his excessive-inmate-violence claims against them.  *See Wilson*, 618 F. Supp. 3d at 1273–79 (finding a causal connection on similar allegations to similarly-situated defendants); *D.S.*, 2022 WL 1785262, at *8 (same).

### ii.  Causation Against Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent

The result is the same for the remainder of the ADOC officials: Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent.

Dunn was the ADOC's Commissioner and held general authority over the prison system at large, including staffing and compliance with federal and state law; Culliver was responsible for ensuring the safe daily operation of ADOC's prisons, including Ventress, and overseeing institutional security, staffing,

Correctional Emergency Response Teams, and training.  (Doc. # 74 at 12.)  Dunn and Culliver plausibly had the authority and means to prevent the alleged excessive risk of inmate violence.  That is, but for their alleged inaction the excessive risk of inmate violence would not have persisted.

From the court's reading of the complaint, however, unlike Culliver and Dunn, the remainder of the ADOC officials are not alleged to have had as all-encompassing responsibility, making it less clear as to whether they had sufficient authority and means to avert, prevent, or remedy the excessive risk of inmate violence at Ventress, so as to establish individual causation.  *LaMarca*, 995 F.2d at 1539 (finding individualized proximate causation where a defendant "was in a position to take steps that could have averted" the excessive risk of inmate violence).  *See also Williams v. Bennett*, 689 F.2d 1370, 1384 (11th Cir. 1982) ("[T]hose whose callous indifference results in liability are those under a duty— possessed of authority and means—to prevent the injury.").  But it is not implausible, based on the pre-discovery factual allegations and considering the systemic power each of these ADOC officials allegedly had over ADOC operations, that these Defendants could have prevented the alleged excessive risk of inmate violence at Ventress.  Moreover, and alternatively, Barefield sufficiently alleges individualized causation against these ADOC Defendants because he plausibly alleges that they had the authority and means, by themselves, to

*substantially* reduce the degree of unconstitutional dangerousness at Ventress (that is, substantially improve prisoner safety), but, through deliberately indifferent disregard, did not do so. *LaMarca*, 995 F.2d at 1539.

For example, Stamper was "responsible for helping with departmental projects . . . such as construction of new prisons and renovation of existing facilities." (Doc. # 74 at 13.) Defendant Abbott was "responsible for maintenance operations within ADOC's correctional institutions." *Id.* Stamper and Abbott could have "corrected major security failures" such as the lack of cameras, faulty locks, poor lighting, and other related conditions at Ventress. (Doc. # 95 at 18.) Meanwhile, Naglich "was responsible for the administration of medical and mental health services to inmates throughout ADOC's correctional institutions." (Doc. # 74 at 13.) Hill is alleged to have been responsible for coordinating all staff activities and overseeing the day-to-day management of ADOC operations. (Doc. # 74 at 14.) Brand was responsible for the training, development, and education of ADOC's workforce. (Doc. # 74 at 14.) Brand and Hill allegedly failed to correct major security failures and understaffing issues; they failed to properly train and supervise prison officers to properly monitor inmates and ensure adequate classification and segregation of inmate populations. (Doc. # 95 at 19.) Arnaldo Mercado was ADOC's Director of I&I and was responsible for the supervision of all I&I investigations at the time of the rape. (Doc. # 74 at 13.) Vincent was and is

the Director of ADOC's PREA Division.  (Doc. # 74 at 14.)   She is responsible for "coordinating and developing procedures to identify, monitor, and track sexual abuse, rape and sexual harassment in ADOC facilities" and for ensuring ADOC compliance with the PREA.  (Doc. # 74 at 14.)   At this early stage, all of this plausibly indicates that each of these Defendants could have either prevented the excessive risk of inmate violence or substantially improved prisoner safety but did not with deliberate indifference so as to establish individualized causation.

Barefield provides sufficient factual detail establishing the individualized causal link between Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent's individual deliberate indifference (when considered in the context of their alleged authority and alleged inaction), and the systemically excessive risk of inmate violence.   That is, the court finds that the complaint sufficiently alleges that "the excessive risk of violence flowed from an atmosphere of deliberate indifference reflected in" these Defendants' failures considering the authority they are alleged to have wielded.  *Hale*, 50 F.3d at 1584.  Having plead that, the generalized-causal link between the risk and the injury follows.  *Hale*, 50 F.3d at 1584.   Accordingly, Barefield states viable excessive-inmate-violence claims against Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent. *See Wilson*, 618 F. Supp. 3d at 1273–79 (finding a causal connection on similar allegations to similarly-situated defendants); *D.S.*, 2022 WL 1785262, at

*8 (same).

## 2.    *Clearly Established Law*[45]

Two groups remain after the violation analysis: (1) Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, Vincent, Strickland, and Myers (against whom Barefield has plausibly alleged excessive-inmate-violence claims); and (2) Governor Ivey (against whom the court declined to decide whether Barefield plausibly alleged a violation).  The balance of the qualified immunity inquiry asks whether the alleged violations constituted violations of a clearly established right. *Crocker,* 995 F.3d at 1240.  For the following reasons, Barefield sufficiently alleges that all remaining Defendants (other than Governor Ivey) violated a clearly established right.  Barefield does not allege the same for Ivey, so she is entitled to qualified immunity as to the excessive-inmate-violence claim brought against her.

### a.    **Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, Vincent, Strickland, and Myers**

As discussed, Barefield has alleged a plausible Eighth Amendment violation against Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, Vincent, Strickland, and Myers.  The rest of the qualified immunity analysis asks whether Barefield has shown that the right they plausibly violated was clearly established at

---

[45] As a reminder, the court determined that Barefield failed plausibly to allege a constitutional violation of the right to be reasonably protected from an environment beset by an excessive risk of inmate violence against Defendants Williams, Jones, Gordon, Peters, Haggins, Lewis, Glenn, Rumph, and Byrd.  Accordingly, the court will not discuss whether the law was clearly established as to these Defendants.

the time of the unconstitutional conduct.  *Crocker*, 995 F.3d at 1240.  To do so, Barefield must point to either (1) binding "case law with indistinguishable facts," (2) "a broad statement of principle within the Constitution, statute, or [binding] case law" that applies with obvious clarity to the conduct at question, or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."  *Id*.

The court finds that the relevant legal principles were clearly established at the time of the alleged violations, both as a matter of binding, materially indistinguishable case law and obvious application of general Eighth Amendment principles.  And other courts in the Eleventh Circuit when dealing with materially similar claims, legal principles, and facts, have reached the same conclusion.  *See Wilson*, 618 F. Supp. 3d at 1283 (relying on case law and general principles of obvious application to find a clearly established violation where similarly situated defendants allegedly "stripped [an inmate] of his safety and 'let the state of nature takes its course.'" (quoting *Farmer*, 511 U.S. at 833)); *see also McKee,* 2023 WL 5103102, at *3; *D.S.*, 2022 WL 1785262, at *8.

Barefield alleges that these Defendants were aware of conditions that created an excessive risk of inmate-on-inmate violence at Ventress, were responsible for these conditions, and were deliberately indifferent to the violence that could, and did, naturally result from these conditions by taking no action to prevent the risk

despite the authority to do so and the availability of basic measures. Those allegations, supported with sufficient factual detail to render them plausible, constitute a clearly established violation of the Eighth Amendment right to not be exposed to an environment beset by an excessive risk of inmate violence. *See Q.F.*, 768 F. App'x at 947 ("[W]e held that, *in 2010*, it was clearly established that the Eighth Amendment protected inmates from prison officials' deliberate indifference to a known risk of inmate-on-inmate violence." (citing *Bowen*, 826 F.3d at 1325) (emphasis added)). As stated, an excessive-inmate-violence claim has three elements: "(1) a substantial risk of serious harm [from inmate-on-inmate violence]; (2) the defendants' deliberate indifference to that risk; *and* (3) causation." *Hale*, 50 F.3d at 1582. Eleventh Circuit case law confirms that Barefield's allegations, if proven true by evidence, clearly satisfies each of these elements so as to put all reasonable officials on notice that their conduct, if it was in-fact what Barefield alleges it was, constituted a violation of his Eighth Amendment rights.

First, binding, factually indistinguishable Eleventh Circuit case law clearly established in November 2018 that the conditions alleged in the complaint posed a substantial risk of serious harm from inmate-on-inmate violence. *See Marsh,* 268 F.3d at 1029; *Hale,* 50 F.3d at 1583; *LaMarca,* 995 F.2d at 1536-37; *Williams,* 547

F.2d at 1211.[46]  Like in the binding cases finding a substantial risk of serious harm

from inmate-on-inmate violence, Barefield has alleged extreme understaffing,

overcrowding, and a widespread history of violence, among many other features—

most of which are a known collateral consequence of understaffing and

overcrowding, like abject failures to control the proliferation of weapons, segregate

inmates, and supervise inmates.    *Williams*, 547 F.2d at 1211 (holding that

unconstitutionally excessive inmate violence was a "deplorable condition" that is

"due to overcrowding and to lack of security" and that "[t]he prison staff included

too few guards to protect the inmates from one another through either supervision

or through confiscation of weapons"); *see also Wilson*, 618 F. Supp. 3d at 1282

("In *Dickinson v. Cochran*, the Circuit Court stated, '[Defendants] had fair warning

under *Hale* and *Marsh* that their alleged failure to correct the overcrowding, inmate

classification, and contraband weapons, which resulted in inmate-on-inmate abuse

at the jail, violated a clearly established right.'"); *Bugge*, 430 F. App'x at 760 n.8

(finding that Eleventh Circuit caselaw prior to 2011 "clearly established[ed]" that

---

[46] For this determination, the court does not rely on unpublished cases or cases published
after November 2018, like *Dickinson*, 833 F. App'x 268; *Bugge*, 430 F. App'x 753; and
*Marbury*, 936 F.3d 1227.  Those cases are "incapable of clearly establishing law." *Trotter v.
Shull*, 720 F. App'x 542, 545 (11th Cir. 2017).  But the court need not rely on those cases to
determine that it was clearly established that the alleged conditions constituted an excessive risk
of inmate violence.  This is so because many cases had already clearly established the specific
legal principles relevant here.  *See Marsh*, 268 F.3d at 1029; *Hale*, 50 F.3d at 1583; *LaMarca*,
995 F.2d at 1536–37; *Williams*, 547 F.2d at 1211.  Moreover, *Dickinson*, *Bugge*, and *Marbury* do
show the Eleventh Circuit's recognition that clearly established law existed as of 2017 under
*Hale*, *Marsh*, *Williams*, and *LaMarca*, and that those cases "provide[d] clearly established law as
to similar conduct by prison officials."  *Wilson,* 2022 WL 3007599, at *7 n.5, *17–18.

evidence of "widespread possession of weapons by inmates" and a widespread history of "unchecked" violence—even without considering understaffing and overcrowding—was "sufficient to create a jury question" as to a substantial risk of serious harm from inmate-on-inmate violence); *D.S. v. Dunn*, 2022 WL 1785262, \*11–12 (denying ADOC and prison officials' request for qualified immunity as to similar claims because of *Hale* and *Marsh*, as well as *Dickinson*'s pronunciation that those cases clearly established law prior to 2018).

Even in the absence of this binding, materially-indistinguishable case law, an obvious application of general Eighth Amendment principles establishes that the conditions alleged in the complaint, if true, created a substantial risk of serious harm from inmate-on-inmate violence that all reasonable officials would recognize. Generally, an "excessive risk of inmate-on-inmate violence at a [prison] creates a substantial risk of serious harm." *Purcell*, 400 F.3d at 1320–22. Here, the complaint alleges that while only a third of staffing positions were filled, the inmate population was nearly double what it should have been, and a former ADOC-warden stated that that the level of understaffing puts inmates in "extreme danger." (Doc. # 74 at 57.) If true, the allegations of rampantly widespread violence, extreme overcrowding, and horrifically inadequate staffing obviously created a substantial risk of serious harm that all reasonable officials would

recognize, even before considering the litany of other recognized conditions denominated in the complaint.

Therefore, based on materially similar cases and the obvious application of general Eighth Amendment principles, it was clearly established in November 2018 that a prison's living conditions pose a substantial and excessive risk of serious harm from inmate-on-inmate violence where that prison has *less than a third* of staff coupled with *nearly double* the inmate population capacity; a widespread history of rampant inmate violence that is over ten times the national average; many of the specific features collateral to understaffing, like abject failures to control weapon proliferation and total failures to supervise/monitor inmates in overcrowded open-bay dormitories for hours on end; and where the prison largely lacks cameras, functioning locks, and adequate lighting. In short, both as a matter of binding caselaw and indisputable obviousness, no reasonable official could doubt that the totality of the conditions alleged in the complaint, if true, created an excessive risk of inmate-on-inmate violence. *Marsh*, 268 F.3d at 1028–30 (denying qualified immunity as to conditions that no reasonable official could conclude were more dangerous or materially different than those alleged here).

Second, in regard to deliberate indifference, "at the time of the assaults in this case, it was clearly established in this Circuit that it is an unreasonable

response for an official to do nothing when confronted with prison conditions—like the conditions alleged in this case—that pose a risk of serious physical harm to inmates." *Marsh*, 268 F.3d at 1034 (citing *LaMarca*, 995 F.2d at 1537–38).  That is, it is clearly established that taking no action against a known, substantial risk of serious harm from inmate-on-inmate violence constitutes more than gross negligence and deliberate indifference.  *Id.*  It has also long been clearly established that subjective notice of the risk may be inferred by obvious conditions. *Farmer,* 511 U.S. at 842–43.  Here, Barefield alleges conditions that were plausibly obvious to all ADOC Defendants (*e.g.*, rampant violence, overcrowding, understaffing, unrestricted inmate movement, contraband weapons proliferation, absence of cameras, broken locks, weapons proliferation, and abject failures to monitor and supervise) and other conditions that were at least obvious to Strickland and Myers (*e.g.*, tolerance for makeshift tents in contravention of ADOC policy).  These allegations are sufficient to plausibly create the inference that each of these Defendants were aware of the alleged substantial risk of serious harm from inmate-on-inmate violence posed at Ventress.  Subjective knowledge is, after all, a factfinding exercise and a factfinder may very well determine that these conditions were not actually known to the Defendants; but at the motion-to-dismiss stage, the court cannot declare, based solely on the complaint's allegations, that Barefield fails to plausibly allege that they were aware of the alleged excessive risk

of inmate violence in 2018.

And, again, it is clearly established that doing *nothing* "when confronted with [excessively violent] prison conditions" constitutes deliberate indifference. *Marsh*, 268 F.3d at 1034. *See also Marbury*, 936 F.3d at 1234. As with subjective knowledge, the court recognizes that these Defendants very well may have not failed to respond to the conditions alleged (or they may have responded reasonably or merely negligently); but, the allegations assert that each of these Defendants took none of the known, available measures within their authority to remedy the risk of inmate violence at Ventress in 2018, including failures to staff, train, reduce overcrowding, monitor, supervise, surveil, segregate, repair locks, install cameras, restrict movement, and more. Complete inaction, as Barefield plausibly alleges, is a clearly established manifestation of deliberate indifference in this context.

Finally, as to causation, applicable Eleventh Circuit authority clearly established that causation is satisfied by sufficiently pleading two causal links: (1) a link between a defendant's deliberate indifference and the excessive risk of inmate violence, and (2) a link between the excessive risk of violence and the plaintiff's injury. *See Hale,* 50 F.3d at 1584 (citing *LaMarca*, 995 F.2d at 1538). Here, the second causal link is satisfied because the existence of an excessive risk of inmate violence presupposes "the distinct likelihood that the harm threatened will result." *Id.* Therefore, because the court has found that the allegations, if true,

clearly reflect an excessive risk of inmate violence at Ventress during the relevant time period, the Defendants are "precluded from contending that [the risk] was not at least a proximate cause of" Barefield's injuries. *Williams,* 689 F.2d at 1389. It is presumed plausible that violent assaults and rape, like Barefield was forced to experience, are the predictable result of a lawless environment that is beset by an excessive risk of inmate-on-inmate violence.

Similarly, it was clearly established in November 2018 that the individualized causal link—that is, the link between an individual's deliberate indifference and the excessive risk of inmate violence—is satisfied by plausible allegations that, but for a defendant's deliberate indifference, the excessive risk would not have existed or persisted. *Hale*, 50 F.3d at 1584 (finding causation as to a sheriff where, "without the [sheriff's] failure to take meaningful action, . . . the infirm condition—the excessive risk of violence—would not have existed."). Put differently, individualized causation is clearly satisfied where a Defendant could have eliminated, prevented, or averted the excessive risk of inmate violence, but, through deliberate indifference, he did not do so. *See LaMarca*, 995 F.2d at 1539. Here, Barefield plausibly alleges that, without these Defendants' individual deliberate indifference, Ventress would not have been plagued by an excessive risk of inmate violence. That is, Barefield plausibly alleges that each of these Defendants had the authority and means to effectively prevent or eliminate the

excessive risk of inmate violence but, with deliberate indifference, they did not. That is sufficient to allege causation in this context. *Hale*, 50 F.3d at 1584 (finding personal-liability causation where the "excessive risk of violence flowed" from the defendant's deliberately indifferent failings). Accordingly, clearly established law dictates that Barefield has sufficiently alleged causation against these Defendants.

In sum, it is beyond debate that all reasonable prison officials, who had the power to make conditions of confinement constitutional or to substantially improve prisoner safety, were on notice that taking *no action* when knowingly faced with an indisputably excessive risk of inmate-on-inmate violence from conditions of confinement constitutes a violation of the Eighth Amendment. And that is what Barefield has alleged with sufficient factual detail to render plausible. If those plausible allegations are true, the relevant legal principles clearly establish a constitutional violation. Therefore, these Defendants are not presently entitled to qualified immunity, and their motions to dismiss Barefield's excessive-inmate-violence claims are due to be denied. Barefield's excessive-inmate-violence claims will proceed against Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, Vincent, Strickland, and Myers.[47] Defendants may, of course, assert

---

[47] Defendants pose two similar types of arguments to attempt to distinguish the clearly established law (that is, *legal* arguments, not *factual* arguments about the plausibility of Barefield's allegations). *See English v. City of Gainesville,* 2023 WL 4782733, at *3 (11th Cir. July 27, 2023) (explaining the difference between questions of fact and law in the qualified immunity context). They argue (1) that the precedential cases deal with on-site personnel, like wardens and sheriffs, as opposed to off-site administrators, like Dunn and Culliver, and (2) that

qualified immunity in later proceedings, if they so choose.

### b.    Governor Ivey

Finally, Barefield alleges that the Governor of Alabama, Kay Ivey, was deliberately indifferent to the alleged excessive risk of inmate violence at Ventress in 2018.  To support this allegation Barefield alleges that "Governor Ivey was and is responsible for overseeing ADOC and is responsible for implementing policies and procedures to protect inmates such as Plaintiff."  (Doc. # 95 at 24.)  Further, according to Barefield, "Governor Ivey failed to correct major security failures, overcrowding, and understaffing at Ventress that directly caused Plaintiff's injuries."  (Doc. # 95 at 24.)

---

the precedential cases deal with county systems where sheriffs bear ultimate authority, as opposed to a state system where wardens are overseen by the state office. (Doc. # 102 at 9–11.) Both distinctions are meritless under existing law.  First, there is no law suggesting that there is an analytical-legal distinction to be made based on whether the defendant is a state or county official, or on the basis that the official is either on-site or off-site.  The *legal* analysis properly looks at authority, knowledge, and response.  An official may have sufficient authority and knowledge, and respond with deliberate indifference, so as to be liable, regardless of whether they are in a jail or a prison system or work on-site or work off-site.  Simply put, physical location of the defendant and whether that defendant is in a state or county system is not a stand in for control/authority, knowledge, or response in the excessive-inmate-violence context.  And there is absolutely no precedent suggesting that the analysis changes on those superficial bases or that those are facts that would render a prior case materially distinguishable.  No reasonable official can read the body of binding law and conclude that physical location or state prison system, as opposed to county jail, would alter the applicable principles of law on these claims. *See Wilson*, 618 F. Supp. 3d at 1282 (addressing similar arguments).  What matters, according to binding precedent, is whether a defendant—regardless of their physical location or body politic—had the capability and responsibility to prevent a known excessive risk of inmate violence and did not do so with deliberate indifference.  Because of the plausible allegations, Barefield is entitled to discovery of facts on this issue. *See McKee,* 2023 WL 5103102, at *6; *Wilson*, 618 F. Supp. 3d at 1269; *D.S.*, 2022 WL 1785262, at *8.

For the sake of argument, the court assumes that these allegations plausibly allege that the Governor was deliberately indifferent.  But such a conclusion was not clearly established in the law in November 2018, and therefore Governor Ivey is entitled to qualified immunity.

Barefield cites no case that finds a governor of any state plausibly liable in her individual capacity for an Eighth Amendment excessive-inmate-violence claim.  But Defendants cite several cases, albeit in other contexts, that puts the question in doubt.  *See Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003) (a governor's "shared authority over [a] Department is simply too attenuated to establish that [she] is 'responsible for'" that department's actions or inactions, without more); *Osterback v. Scott*, 782 F. App'x 856, 859 (11th Cir. 2019) ("[E]ven partial responsibility for administering a challenged statute, is insufficient to make the governor a proper party [for injunctive relief]," let alone for personal liability).  To be clear, Ivey is not protected simply by fiat of her status as Governor; rather, the unclear legal question is whether Ivey can be deliberately indifferent wherein, in context of the broad and *sui generis* role of Governor, she delegated to and shared responsibility with the ADOC.  Accordingly, it was not clearly established in 2018 that, on these allegations and without more allegations of control over Ventress, Governor Ivey was deliberately indifferent to the risk of

violence at Ventress.  Therefore, Governor Ivey is entitled to qualified immunity. *See Crocker*, 995 F.3d at 1240.

### 3.    *Summary of Excessive-Inmate-Violence Analysis*

Based on the foregoing, Barefield's excessive-inmate-violence claims against ADOC officials Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, and Vincent proceed.  Similarly, Barefield's excessive-inmate-violence claims against Ventress supervisors Strickland and Myers proceed.  In contrast, Barefield's excessive-inmate-violence claims against ADOC official Williams and Ventress supervisors Jones, Gordon, Peters, and Haggins will be dismissed for failure to plead deliberate indifference.  Likewise, his claims against the Ventress officers—Glenn, Rumph, Byrd, and Lewis—will be dismissed for failure to plead deliberate indifference.  Finally, his excessive-inmate-violence claim against Ivey will be dismissed because she is not alleged to have violated clearly established law.

The court emphasizes that this analysis has taken Barefield's allegations as true and construed them in his favor, as is required at this stage.  But "[t]his case may look very different as it moves beyond the pleadings and the record is developed more fully."  *Bowen*, 826 F.3d at 1325; *see Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1289 (11th Cir. 2000) (explaining that the "defendants [are] not precluded from asserting the qualified immunity defense

throughout the proceedings as the facts develop[]"). Nevertheless, at this stage and on the pleading alone, many of the Defendants, as discussed, are not entitled to the protections of qualified immunity.

The analysis and summary end there. But the court finds it necessary to address several of the Defendants' overarching themes pertaining to this cause of action. Defendants argue that Barefield's excessive-inmate-violence claim, or generalized failure-to-protect claim, (1) is "novel," (Doc. # 102 at 3); (2) seeks to hold Defendants personally liable for the "allegedly criminal actions of another inmate," (Doc. # 103 at 2); (3) is a "global negligence claim" that seeks to hold Defendants "individually liable for *partially* contributing to alleged systemic deficiencies in the State's prison system," (Doc. # 102 at 3); and (4) creates "a massive disincentive for individuals to seek careers within the ADOC." (Doc. # 103 at 2). None of these points is correct.

First, Barefield's excessive-inmate-violence claim is not "novel." The Eleventh Circuit has long recognized this cause of action. While the semantical framework of these claims has varied over time, the theory has not. *See* Section V.C.1. This theory has overcome motions to dismiss and summary judgment. It has gone to trial. Liability has been sustained on appeal. The "novelty" Defendants attempt to inject into this case is based on the fact that some of the Defendants were not physically at the unconstitutionally dangerous prison.

But nothing in the Eleventh Circuit's precedent, nor basic logic, would suggest that a Defendants' physical location stands in for knowledge, responsibility, authority, and means over systemic conditions—which are the relevant considerations for deliberate indifference and causation in this context.

Second, contrary to the Defendants' contorted framing, Barefield does *not* seek to hold Defendants personally liable for the "allegedly criminal actions of another inmate." (Doc. # 103 at 2.) Barefield seeks to hold Defendants personally liable for their individualized deliberate indifference to unconstitutionally dangerous and horrendously inadequate prison conditions.

Third, Defendants' assert that Barefield seeks to hold Defendants "individually liable for *partially* contributing to alleged systemic deficiencies in the State's prison system." (Doc. # 102 at 3 (emphasis in original).) But as the court's analysis reflects, no Defendants are plausibly liable for just *"partially"* contributing to the dangerous conditions of confinement. Such a partial-contribution causation rule is not clearly established. Rather, what is clearly established is that Defendants can be liable if either (1) they had the power to eliminate the excessive risk of violence but did not do so with deliberate indifference, or (2) they had the power to *substantially* reduce dangerousness but with deliberate indifference did not do so. *See* Section V.D.1.c. That clearly established framework is emblematic of foundational combined and concurrent

117

causation principles.

Finally, Defendants assert that allowing this claim to proceed creates "a massive disincentive for individuals to seek careers within the ADOC." (Doc. # 103 at 2). Not so. First, as already explained, the constitutional right at stake has long been clearly established. To the extent that such a right disincentivizes public-sector employment, it did so years ago. This opinion forges no new ground as to potential liability for state actors. Second, contrary to the Defendants' suggestion, constitutional rights do not yield to policy arguments that amount to: "If the Constitution is enforced, state employees will not like it." Third, Defendants' inaccurate implication that allowing the claims to proceed at this early stage would open a "flood gate of litigation," is wrong and irrelevant. As stated, the gate has long been open. Moreover, unconstitutional conduct is not given a rubber stamp of approval simply because there is a lot of it. Finally, in advancing their thematic policy point, Defendants seem to forget (1) the standard at the motion-to-dismiss stage and (2) the high bar that is the deliberate indifference standard. Pleading deliberate indifference is one thing, proving it is another. Make no mistake, Defendants cannot be held personally liable for mere negligence, only their own *deliberate* indifference.

Again, as outlined throughout this section, Dunn, Culliver, Stamper, Naglich, Abbott, Mercado, Brand, Hill, Vincent, Strickland, and Myers are not

entitled to qualified immunity at this stage as to Barefield's excessive-inmate-violence claims against them. The remainder of the Defendants are entitled to qualified immunity and the excessive-inmate-violence claims against them will be dismissed.

E.    **Failure to Protect from Specific Risk Posed By Lowe**

In addition to his generalized excessive-inmate-violence claims, Barefield also alleges in Count I (A-W) individualized, or specific, failure-to-protect claims. An individualized failure-to-protect claims requires plausible allegations of three elements: "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Goodman v. Kimbrough,* 718 F.3d 1325, 1331 (11th Cir. 2013) (quoting *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003)).

Barefield alleges that Lowe specifically posed a risk of harm to Barefield, that Defendants were deliberately indifferent to this risk, and that Defendants failed to protect Barefield from Lowe.[48] (Doc. # 95 at 20.)  Barefield asserts two separate, specific failure-to-protect theories: (1) the ADOC Defendants were deliberately indifferent to the risk posed by Lowe by transferring Lowe from St. Clair to Ventress, and (2) the Ventress Defendants were deliberately indifferent to

---

[48]    Barefield brings this claim against Ventress Defendants and ADOC Defendants, including Culliver, Williams, Mercado, Vincent, Strickland, Myers, Gordon, Peters, Haggins, and Lewis.  (Doc. # 95 at 28.)

the risk posed by Lowe by in various ways.  All Defendants argue that Barefield's claim should be dismissed because he has failed to plausibly allege that any of them were deliberately indifferent to any specific threat Lowe posed to Barefield or inmates like Barefield.   (Doc. # 91 at 14.)  The analysis will first address the ADOC Defendants then the Ventress Defendants.

### 1.    *ADOC Defendants*

Barefield argues that ADOC Defendants were deliberately indifferent to the substantial risk of serious harm Lowe posed to inmates at Ventress, including Barefield, when the ADOC Defendants transferred Lowe from St. Clair, a prison for Alabama's most violent inmates, to Ventress, a prison plagued by allegedly unconstitutional dangerous conditions of confinement.   (Doc. # 95 at 28.) Barefield does not allege that the ADOC Defendants were responsible for Lowe's placement once in Ventress.  Barefield cites no cases, and the court has found none, where sanctioning an inmate transfer from one prison to another prison (which is alleged to have segregation cells), without more, can constitute deliberate indifference to a substantial risk of serious harm. *But see Cox v. Nobles,* 15 F.4th 1350, 1360 (11th Cir. 2021) (explaining that an inmate's *cell* placement may rise to deliberate indifference). Accordingly, the ADOC Defendants are entitled to qualified immunity as to Barefield's specific failure-to-protect claims against them.

**2.** *Ventress Defendants*

As an initial matter, Barefield's briefing only addresses Ventress Defendants Strickland, Myers, Gordon, Peters, Haggins, and Lewis. (Doc. # 95 at 28.) It does not address Glenn, Rumph, Byrd, or Jones. As a result, to the extent that this claim was brought against Glenn, Rumph, Byrd, or Jones, it has been abandoned and will be dismissed. The Ventress Defendants do not argue the first element, substantial risk of serious harm. Rather, they argue that Barefield fails to allege (1) deliberate indifference to the risk posed by Lowe and (2) that that deliberate indifference caused Barefield's injuries. (Doc. # 91 at 14–16.)

Barefield alleges Ventress Defendants Strickland, Myers, Gordon, Peters, Haggins, and Lewis had subjective knowledge of the risk posed by Lowe based on the following: (1) Lowe was serving a 25-year prison sentence for murder; (2) Lowe had been transferred from St. Clair, a prison that houses Alabama's most-violent inmates; (3) Lowe had an extensive history of violence at his previous prison, St. Clair, which included murdering an inmate by stabbing five years before the rape; (4) Lowe assaulted another inmate at Ventress just two weeks before he attacked Barefield; (5) Lowe was known to be in a gang; (6) Barefield was known and classified as a vulnerable inmate under the PREA; and (7) all of which, in context, was heightened by the Ventress Defendants' knowledge of a generally excessive risk of violence throughout Ventress. Moreover, Barefield argues that

the Ventress Defendants were deliberately indifferent to the risk posed by Lowe by failing to supervise Lowe, failing to restrict his access to vulnerable inmates in other dorms, failing to ensure he did not have access to weapons, failing to provide supervision or surveillance at the canteen and between the canteen and entrance to the F Dorm, failing to remove the makeshift tent in Lowe's dorm, failing to ensure the F Dorm was locked, failing to check color-coded wristbands, and failing to patrol the overcrowded F Dorm for over five hours.

Assuming, (1) that Lowe posed a substantial risk of harm to inmates like Barefield and (2) that Defendants actually knew that Lowe posed a risk of harm to inmates like Barefield were they ever to come into contact, then (3) Barefield's individualized failure-to-protect claims nevertheless fail against the Ventress Defendants because he does not plausibly allege *how* they acted with more than gross negligence in response to this knowledge (that is, with more than gross negligence that is specific to Lowe and Barefield, *not* to the conditions of confinement generally). This is because Barefield never complained about Lowe or mentioned that he felt unsafe around Lowe prior to the rape. Indeed, Lowe had never threatened Barefield before the morning of the rape. Barefield also does not allege that any of the Defendants were aware of whether Lowe and Barefield had even crossed paths before the rape, let alone that Defendants—other than having knowledge of Ventress's overarching danger—knew that Lowe and Barefield

"would encounter each other in an unsupervised setting." *Cox*, 15 F.4th at 1361. Moreover, Barefield does not allege that any of the Defendants specifically observed Lowe abducting Barefield prior to the assault or observed the assault itself.

For the named Defendants, Barefield provides no allegations of deliberately indifferent failings that are not failings that apply to *all* inmates at Ventress. That is, the deliberate indifference allegations here overlap largely with the allegations in Barefield's generalized risk of excessive-inmate-violence claims. For example, Barefield alleges that Defendants were deliberately indifferent through failures to supervise, to control weapons proliferation, to fix faulty locks, to segregate inmates, and to patrol dorms. However, these are all generalized failures of the prison that are captured in Barefield's excessive-inmate-violence claims. *See* Section V.D.

To the extent that these shortcomings are exasperated by the Defendants' specific knowledge of Lowe's dangerousness—it is unclear, other than by remedying the systemic failings at Ventress—what Barefield contends are the Ventress Defendants specific failings *as to Lowe and Barefield*. Perhaps Lowe should have been—based on the Ventress Defendants' knowledge of Lowe's violent history and their knowledge of generally lawless conditions at Ventress—placed in an isolation cell prior to the rape. Indeed, that may have been a prudent

course, especially given that Lowe assaulted an inmate at Ventress just two weeks before raping Barefield.  Or, perhaps, Barefield should have been isolated himself or transferred to a facility that was not plagued by unconstitutionally dangerous conditions of confinement given his vulnerable status.  But to the extent that Barefield's specific failure-to-protect claims lie on the Ventress Defendants' failures to segregate Lowe or Barefield based solely on their classifications and history, and in context of the generally dangerous prison conditions, he cites no cases clearly establishing that such a failure can constitute more than gross negligence under the alleged circumstances.  *Cf. Cox*, 15 F.4th at 1361. Accordingly, Barefield does not plausibly allege how any of the Ventress Defendants responded with more than gross negligence to the *specific* risk posed by Lowe to Barefield.  Barefield does, however, reallege how the Ventress Defendants responded with more than gross negligence to the generally lawless and excessively dangerous conditions of confinement at Ventress (such as by generally allowing dorms to go unmonitored for whole days on end).

Of course, the analysis would be different had Barefield alleged that any of the named Defendants personally observed Lowe abducting Barefield or observed the makeshift tent in F Dorm or were personally responsible for monitoring the relevant areas on the day of the rape.  *See Williams*, 689 F.2d at 1383–85 (noting that an intentional decision to not station a guard in a dorm may give rise to Eighth

124

Amendment personal liability).  But none of the named Defendants were alleged to have been in such a position.  Indeed, the only named Defendant that encountered Barefield on the day of the rape was Haggins—but Haggins is only alleged to have encountered Barefield in the yard *after* the rape.  Moreover, none of the named Defendants were alleged to have been personally responsible for monitoring any relevant area on the day of the rape.

However, there is one final point.  While the named Ventress Defendants in this action are not alleged to have had any knowledge of any specific contact between Barefield and Lowe prior to the rape, the operative complaint does identify several *unnamed* guards and officers that either saw them (such as the officer who should have been checking wristbands at F Dorm) or were supposed to be patrolling, monitoring, and supervising certain areas but were not (such as the officer responsible for removing makeshift tents in F Dorm).  These officers are presumably included in the complaint as the Unknown Defendants, or they may in fact be one of the named Defendants, but Barefield does not know exactly who these officers are absent discovery on officers' "physical location[s]", who was (or who was supposed to be) monitoring the canteen, the yard, the F Dorm door, the F Dorm cubicle, *etc*.; and their subjective knowledge of Lowe and Barefield's characteristics—facts that may be exclusively within the knowledge of the Defendants which would be quintessential "issues for development in discovery."

*Hollingsworth v. Edgar*, 2006 WL 2009104, at *7 (M.D. Ala. July 18, 2006) (Watkins, J.).

In light of this opacity, Barefield argues that, "[a]t minimum, [he] has alleged facts in his Amended Complaint supporting his claims for Defendants' failure to protect that permit him to pursue those claims, including to further develop the facts [] through discovery." (Doc. # 95 at 28 n.8). Because he has failed to plausibly allege any of the named Defendants acted with more than gross negligence to the specific risk posed by Lowe, he is not entitled to such discovery. However, because he has plausibly alleged deliberate indifference in response to a general risk of harm at Ventress, (*see* Section V.D), he is entitled to discovery on those viable excessive-inmate-violence claims and that discovery will necessarily include factual development on such relevant issues as who was, or who was supposed to be, monitoring what areas and when; what did those people observe and know and do; and who was responsible for assigning and overseeing monitoring on the day of the rape, among other relevant inquiries. To the extent that such discovery reveals information that, at this point, has only been in the Defendants "knowledge and control," and that previously unattainable information gives rise to a specific failure-to-protect action, Barefield can seek leave to file an amended complaint adding those claims. *Hollingsworth*, 2006 WL 2009104, at *7.

126

For now, the specific failure-to-protect claims against all named Ventress Defendants will be dismissed without prejudice.

## F.   **Eighth Amendment Deliberate Indifference to a Serious Medical Need**[49]

In Count II (A–L), Barefield brings Eighth Amendment deliberate indifference to serious-medical-needs claims.  (Doc. # 74 at 117–42.)  He alleges that Ventress Defendants Strickland, Lewis, Gordon, Peters, Haggins, and Glenn acted with deliberate indifference to his medical needs when they failed to timely provide him with any medical treatment after they learned that he was violently raped.  Further, Barefield seeks to hold several ADOC officials liable in their supervisory capacities for the alleged deliberate indifference of their subordinates.  Specifically, Barefield alleges that the ADOC officials were aware that the Ventress Defendants routinely failed to provide medical treatment to victims of sexual abuse and did nothing to address this wrongful conduct—such as by providing additional training.

For the following reasons, Barefield plausibly alleges that the Ventress Defendants—other than Defendant Glenn—were deliberately indifferent to Barefield's serious medical needs in violation of the Eighth Amendment.

---

[49] Barefield's complaint refers to the claims in Count II as "deprivation of health care" claims (Doc. # 74 at 117); however, in the parties' briefing, all sides more accurately refer to Count II as containing claims for "deliberate indifference to serious medical needs" per the Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  Accordingly, the court will refer to the Count II claims as such.

However, Barefield fails to allege that the ADOC officials are liable in their supervisory capacities for that misconduct. Because Defendants have asserted their entitlement to qualified immunity, the court will analyze whether the Ventress Defendants violated Barefield's constitutional rights, whether that violation was clearly established at the time, and, finally, whether the ADOC officials can be held liable in their supervisory capacities for the alleged unconstitutional conduct of their subordinates.

### 1.   *Constitutional Violation*

Barefield alleges that the Ventress Defendants "acted with deliberate indifference to [his] serious medical needs" in the hours and days following the rape. (Doc. # 95 at 34.) Specifically, Barefield alleges that Defendants Strickland, Lewis, Gordon, Peters, and Haggins were informed of the rape within hours of its occurrence and yet they did nothing for days—no investigation, no medical treatment, no medical referral, no rape kit, no infection testing, no visit to Barefield, nothing. Barefield told Glenn about the rape two days after it happened; she also did nothing. The parties agree that to survive a motion to dismiss, Barefield must plausibly allege: (1) that he had an objectively serious medical need, (2) that the official acted with deliberate indifference to that serious medical need, and (3) that he has suffered an injury caused by the officer's wrongful conduct. *See Patel v. Lanier Cty.*, 969 F.3d 1173, 1188 (11th Cir. 2020); *Brown v.*

*Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004).  As to the second element, an official is deliberately indifferent to a plaintiff's serious medical need when he (1) has subjective knowledge of a risk of serious harm; (2) disregards that risk; and (3) acts with more than gross negligence.  *Patel*, 969 F.3d at 1188; *see also Wade v. McDade*, 67 F.4th 1363 (11th Cir. 2023) (confirming that the standard for an Eighth Amendment deliberate-indifference claim is "more than *gross* negligence," not more than *mere* negligence).

The first element is not at issue.  Defendants do not dispute that Barefield had objectively serious medical needs in the hours and days after he was raped. (Doc. # 91 at 20–23; Doc. # 89 at 16.)  Nor could they.  "Rape is clearly a severe injury."  *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).  The immediate aftermath of rape presents serious medical needs "so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and . . . that, if left unattended, [it] poses a substantial risk of serious harm."  *Patel*, 969 F.3d at 1188. Some of these serious medical needs include devastating physical and mental trauma, as well as sexually transmitted diseases and infections, the last of which poses an especially serious risk in the prison context.  As Congress explicitly recognized in passing the PREA: "Infection rates for . . . sexually transmitted diseases, tuberculosis, and hepatitis B and C are . . . far greater for prisoners than for the American population as a whole. . . Prison rape undermines the public

health by contributing to the spread of these diseases, often giving a potential death sentence to its victims."  34 U.S.C. § 30301.   Indeed, ADOC's own regulations recognize the serious medical needs rape triggers:

> Victims of sexual abuse at the facility shall be referred immediately to Medical. Victims shall receive timely, unimpeded access to emergency medical treatment and crisis intervention services.   The [Institutional Prison Rape Elimination Act Compliance Manager] shall also refer an inmate victim immediately to an ADOC mental health professional for further treatment and counseling. . . . If no qualified medical or mental health practitioners are on duty at the time a report of recent abuse is made, security staff first responders shall take preliminary steps to protect the victim and *shall immediately notify the appropriate medical and mental health practitioners.*

ADOC Admin. Reg. No. 454, *Inmate Sexual Abuse and Harassment (Prison Rape Elimination Act)*,   Jan.   4,   2016   (available   at http://www.doc.state.al.usdocs/AdminRegs/AR454.pdf)   (hereinafter, "AR 454") (emphasis added).

The third element, causation, is not at issue either.  And, as to the second element, the objective prong of deliberate indifference—whether Defendants disregarded a known medical need by more than gross negligence—is also not at issue.  But some of the Ventress Defendants assert that they were not subjectively aware of Barefield's serious medical needs after the rape so as to establish deliberate indifference.

However, the parties agree that dismissal is inappropriate for at least one

Defendant: Haggins. As Defendants put it, Barefield alleges that "Haggins was the first person Plaintiff informed of the rape[] and asserts that Sergeant Haggins failed to take Plaintiff to the Infirmary, instead informing him that the prison yard was closed and ordering him to return to his assigned dorm." (Doc. # 91 at 25.) This allegation, Defendants concede, provides a plausible claim against Haggins for deliberate indifference to a serious medical need. (Doc. # 91 at 25.) This concession is likely because of the clearly established (and obviously applicable) principle that "[t]he knowledge of the need for medical care and [the] intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." *Patel*, 969 F.3d at 1190.

Nonetheless, the parties disagree about whether Barefield has plausibly alleged a claim against the remaining Ventress Defendants—Strickland, Gordon, Lewis, Peters, and Glenn. Each of these Defendants raise a similar argument: They did not plausibly have subjective awareness of Barefield's serious medical needs because he reported the rape to them but did not specifically request medical attention. This argument is correct as to Glenn, but it is not as to Strickland, Gordon, Peters, and Lewis.

First, subjective awareness is inherently a factfinding determination, typically reserved for the jury, which can be shown in the usual manner by establishing facts via circumstantial evidence and inference. *Patel*, 969 F.3d at

1190 ("A jury doesn't need direct evidence of [a defendant's] state of mind but, rather, may infer the necessary subjective facts from circumstantial evidence—including inferences from the very fact that the risk was obvious." (internal quotation omitted); *Farmer*, 511 U.S. at 843 (holding that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").    Second, at this stage, Barefield need only show that it is plausible, based on his allegations, that Defendants were subjectively aware of his serious medical needs.

With that in mind, Barefield's allegations raise a plausible inference that Strickland, Gordon, Peters, and Lewis had subjective awareness of Barefield's serious medical needs in the hours following the rape.  Barefield alleges that each of these Defendants was put on notice of the rape, mere hours after it occurred, from an online report filed by Barefield's friend at Barefield's request.  (Doc. # 74 at 26.)  Upon receiving this report, Strickland, Gordon, Peters, and Lewis allegedly took no action for days.  (Doc. # 74 at 26.)  They did not refer him to medical and they did not even investigate whether Barefield had received any treatment from anyone else.  (Doc. # 74 at ¶ 70); *see Farmer*, 511 U.S. at 843 n.8 (holding that defendants cannot "escape liability [on the awareness prong] if the evidence showed that [they] merely refused to verify underlying facts . . . or declined to confirm inferences of risk that [they] strongly suspected to exist.").

Based on these alleged facts, at least two plausible inferences could be made. First, hours after the rape, these Defendants received a rape report and subjectively believed that they did not have to take any action, because they thought someone else was handling it. Second, hours after the rape, these Defendants received a rape report and they subjectively believed they were the first responders to the rape and, as first responders, it was obvious to them that the rape victim needed medical attention (at minimum, a medical referral), or that it was obvious that they should at least investigate further and contact Barefield—which they did not. Defendants advocate for the former scenario, and Barefield advocates for the latter. But both scenarios are plausible. Defendants' subjective awareness turns on whether they believed themselves to be first responders to the rape or not—a fact question that the court cannot usurp at this stage based on these plausible allegations.[50]

Accordingly, Strickland, Lewis, Gordon, and Peters's motions to dismiss this claim are due to be denied because Barefield's factual allegations plausibly allege that they were subjectively aware of Barefield's serious needs for medical

---

[50] As already discussed, Defendants concede that Haggins's failure to do anything as a first responder to the rape plausibly created a claim for deliberate indifference to a serious medical need. (Doc. # 74 at 91.) The same logic applies here. The question for this specific analysis is whether Lewis, Gordon, Strickland, and Peters subjectively believed themselves to be first responders to the rape when they received the report hours after the fact. And a plausible answer to that question is, "Yes, they did subjectively believe that they were first responders to Barefield's report." Haggins had not reported the rape to any of these Defendants, so, based on the allegations, they had no reason to think they were *not* the first responders to a report that came within hours of the rape itself.

treatment (*any* treatment whatsoever) in the wake of a violent rape, but, despite this knowledge, they intentionally took no action whatsoever.

The outcome is different for Glenn. Barefield alleges he told Glenn about the rape two days after it happened, when Glenn asked Barefield why Lowe was harassing him from the segregation cell. Like with the other reports, Barefield reported the rape to Glenn but did not request medical attention. Barefield argues that Glenn subjectively understood herself to be the first responder to Barefield's rape report because of the "circumstances" and "context" of the report. But the circumstances undermine Barefield's position. Notably, the alleged rapist had just been put in a segregation cell. Glenn had little reason to think she was a first responder because (1) she received the report days after the rape; (2) Barefield did not inform her that his other reports were ignored or that he presently needed medical attention; and (3) the alleged rapist had recently been "punished" (albeit with an allegedly retaliatory cell placement), creating the inference that the report had been addressed by other officials, negating the need for medical attention. Further, Barefield did not proactively report the rape to Glenn. Rather, Barefield was being harassed by Lowe, which prompted Glenn to ask why. Once asked, Barefield explained what happened.

Accordingly, Barefield fails to plausibly allege that Glenn was subjectively aware of Barefield's serious medical needs because Barefield did not ask for

medical attention, because he did not report the rape to Glenn for several days, and because Glenn was aware that his assailant had already been identified when Barefield spoke with her. However, as stated, Barefield plausibly alleges Gordon, Lewis, Peters, and Strickland acted with deliberate indifference to his serious medical needs.

### 2.    *Clearly Established Law*

The remaining Defendants—Gordon, Lewis, Peters, and Strickland—all invoke qualified immunity as to Barefield's deliberate indifference to a serious-medical-need claims. Based on the factual allegations, they are not entitled to it. First, as discussed, there is a plausible Eighth Amendment violation. Second, that plausible violation, if true, was a violation of Barefield's clearly established rights.

It is clearly established that knowing first responders in the immediate aftermath of a violent rape are subjectively aware that the rape victim needs some form of treatment,[51] even if the rape victim does not explicitly request treatment.

---

[51] "To be clear, 'some medical attention' doesn't necessarily demand curative care. Rather, medical intervention exists along a spectrum. At one end is ignoring medical needs entirely, which our decisions have rightly and repeatedly condemned: 'Choosing to deliberately disregard' an inmate's complaints of pain 'without any investigation or inquiry,'" we have held, constitutes deliberate indifference." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1272 (11th Cir. 2020) (citing *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019) (quoting *Goebert*, 510 F.3d at 1328)).

The need is obvious.[52]  *Taylor*, 920 F.3d at 733 (recognizing that subjective awareness of a need for medical attention can be inferred when "even a lay person would easily recognize the ne[ed] for a doctor's attention"); *see also Carnell v. Grimm*, 872 F. Supp. 746, 755 (D. Haw. 1994), *aff'd in part, appeal dismissed in part*, 74 F.3d 977 (9th Cir. 1996) ("Victims of rape experience immediate and serious physical and psychological trauma," and therefore require some minimum form of urgent treatment, such as delivery to a medical provider or a rudimentary field evaluation to determine the scope of needs); *see also LaMarca*, 995 F.2d at 1544 (upholding a finding that the denial of post-rape psychological counseling constitutes "deliberate indifference to a serious medical need").    In addition, the complete failure to provide *any* minimum form of treatment for days on end in such a situation constitutes deliberate indifference.  *Patel*, 969 F.3d at 1190 (noting that a 1985 case put all prison officials "on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution.").   "The knowledge of the need for medical care and [the] intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference."  *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985).  Both aspects of

---

[52] This obviousness is not lost on the ADOC either, which requires that "[v]ictims of sexual abuse at the facility shall be referred immediately to Medical . . . If no qualified medical or mental health practitioners are on duty at the time a report of recent abuse is made, security staff first responders shall take preliminary steps to protect the victim and shall immediately notify the appropriate medical and mental health practitioners." AR 454

this long-established articulation—knowledge and intentional refusal to provide any treatment whatsoever—are on full display in Barefield's complaint.

Defendants dispute whether the allegations sufficiently establish first responder awareness, but Defendants do not dispute that such a scenario, if proven, would violate clearly established law.  (Doc. # 91 at 25 (conceding that a rape victim's first-responder's alleged failure to provide any medical treatment constitutes a well-pled claim for deliberate indifference that "must be resolved at summary judgment").)  And, as discussed, Barefield's allegations do plausibly create the inference that the remaining Defendants—Gordon, Peters, Lewis, and Strickland—found themselves in a scenario where they subjectively believed themselves to be a first responder within hours of a violent rape and yet did absolutely nothing for days.

Accordingly, at this stage, Gordon, Peters, Lewis, and Strickland are not entitled to qualified immunity as to Barefield's deliberate indifference to serious medical need claim.  Afterall, "[t]his is not a case in which a [prison official] provided inadequate aid, the reasonableness of which can be fairly disputed. Here, at least on the facts as we must take them, [the defendants] provided no timely aid—[they were] confronted with a serious medical need and did *nothing*."  *Patel*, 969 F.3d at 1190 (relying on legal principles established before 2018 to deny qualified immunity).

### 3.    *Supervisory Liability as to ADOC Officials*

Barefield also attempts to hold Ivey, Dunn, Hill, Culliver, Naglich, and Vincent liable in their supervisory capacities for his serious-medical-need claim. (Doc. # 74 at 129–143.)  Barefield alleges these ADOC officials were "aware of and [deliberately] indifferent to the *routine* refusal to provide or delay medical care for prisoners, like [Barefield], who were victims of sexual assault at Ventress." (Doc. # 95 at 43.)  Specifically, Barefield alleges that the ADOC officials failed to train and supervise the Ventress Defendants, which resulted in the Ventress Defendants' failure to treat Barefield in the hours and days following the rape.[53]

The parties agree that, to impose supervisory liability for a deliberate indifference to serious-medical-needs claim, Barefield must plausibly allege: (1) that, in failing to adequately train and supervise subordinates, the defendant was deliberately indifferent to an inmate's serious health care needs; (2) that a reasonable person in the supervisor's position would know that his or her failure to

---

[53] To the extent Barefield alleges the ADOC officials were deliberately indifferent to his serious medical needs for failing to adequately staff Ventress, such a proposition is irrelevant to *this* specific serious-medical-needs claim because the alleged failure to staff is causally unrelated to this serious-medical-needs claim.  As discussed above, the deliberate indifference to serious-medical-needs claim against the Ventress Defendants in this case does not stem from a lack of staffing; rather, Barefield was able to report the rape to *many* Ventress officials.  That is, Barefield does not allege he was injured because of understaffing, but because of staff that blatantly ignored his repeated reports.  *Cf. Anderson v. City of Atlanta*, 778 F.2d 678, 686 (11th Cir. 1985) (finding supervisory liability on a claim of deliberate indifference to pre-trial detainee's serious medical needs where supervisor had received repeated complaints of inadequate staffing and failed to take action *and* where the "injury or deprivation" was "*legally caused by the lack of adequate staffing*," resulting in the unavailability of medical personnel." (emphasis added)).

train and supervise reflected deliberate indifference; and (3) that his or her conduct was causally related to the constitutional infringement by his subordinates. *Greason v. Kemp*, 891 F.3d 829, 836–37 (11th Cir. 1990) (holding that supervisory policymakers "can be liable for deficient training" of subordinates if they were "deliberately indifferent to infringements of constitutional rights that are caused by lack of training and supervision").

Under this analysis, Barefield's supervisory liability arguments fail. At the outset, the ADOC has promulgated a regulation for how to respond to reports of sexual abuse. That regulation provides that, when there is such a report, "[v]ictims of sexual abuse at the facility shall be referred immediately to Medical." AR 454. Accordingly, Barefield is alleging that the ADOC supervisors should be liable for their Ventress subordinates' willful disobedience of ADOC policy. And they could be liable *if* Barefield plausibly alleged that the ADOC Defendants knew that their subordinates were declining to provide any medical care to sexual assault victims. *See Greason*, 891 F.3d at 878 n.18. That is, ADOC officials could be liable for their subordinates' disobedience if there is "a history of abuse by subordinates [that] has put the supervisor on notice of the need for improved supervision and training, and his failure to take corrective action sets the stage for the inmate's injury." *Id.*

Barefield fails to sufficiently detail in his factual allegations the ADOC

officials' awareness of this alleged history of refusing to provide medical care. While he does argue that the ADOC officials were "aware of and indifferent to the *routine* refusal to provide [] medical care" for sexual abuse victims (Doc. # 95 at 43), Barefield does not support this with sufficient factual detail to survive the plausibility standard. For example, Barefield argues that the ADOC officials were aware of a history of indifferent refusals to provide medical care to rape victims because Gordon, Lewis, Peters, Strickland, and Glenn allegedly did nothing in response to Barefield's report of a violent rape. But those deliberate indifference allegations themselves could not have provided notice to the ADOC officials before they arose in this action. *See Greason*, 891 F.3d at 878 n.18 (requiring notice of a *history* of abuse that existed prior to the injuries asserted in the pending action). Additionally, Barefield alleges that a different case, *Braggs v. Dunn*, put the ADOC officials on notice that the Ventress Defendants were failing to provide sexual assault victims with health care upon report. 257 F. Supp. 3d 1171 (M.D. Ala. 2017). But Barefield's reliance on *Braggs* is misplaced. *Braggs* provides notice to the ADOC officials of overcrowding, understaffing, and systematically inadequate mental-health care within the Alabama prison system. It does not provide notice that these specific Ventress officials were deliberately defying ADOC regulations and constitutional mandates requiring them to provide rape victims with medical attention. *See generally* (Doc. # 74.). Put differently, notice

of understaffing and systemically inadequate mental-health care does not necessarily mean that supervisors had notice that these Ventress subordinates were outright ignoring initial reports of rape. Aside from these allegations, Barefield does not allege any other facts that would have given notice to the ADOC officials that their Ventress subordinates blatantly ignored initial reports of rape in violation of ADOC policy.

In short, Barefield lacks sufficient factual allegations to plausibly establish that the ADOC officials were aware, or had notice, that there was a history of their Ventress subordinates failing to provide sexual abuse victims with medical care when those victims directly reported sexual assaults to the Ventress officials. Based on Barefield's allegations, the ADOC officials may have had notice of systematically inadequate medical treatment throughout ADOC facilities, and even at Ventress. But they did not have notice, as required for supervisory liability to attach to this specific claim, that there was a widespread history of Ventress officials blatantly failing to provide sexual abuse victims with medical attention when an inmate directly reported a rape.

Accordingly, Barefield has failed to plausibly allege that the ADOC officials are liable in their supervisory capacities for their subordinates' alleged deliberate indifference to Barefield's serious medical needs. The ADOC Defendants— Vincent, Naglich, Culliver, Hill, Dunn, and Ivey—are therefore entitled to

qualified immunity as to Barefield's Eighth Amendment claims for deliberate indifference to serious medical needs and the claims brought in Count II against them are due to be dismissed. However, as discussed, Barefield's serious-medical-needs claims will proceed against Gordon, Peters, Lewis, and Strickland.

## G.    <u>State-Law Claims</u>

Barefield also brings two Alabama law tort claims against several of the Ventress Defendants: intentional infliction of emotional distress (*i.e.*, outrage) and civil conspiracy.[54] As to the outrage claims, Barefield alleges that Strickland, Haggins, Glenn, and Lewis independently committed torts of outrage during their alleged actions related to their response, investigation, and treatment of Barefield's reports of rape.  (Doc. # 74 at 143–47.)  As to the conspiracy claim, Barefield alleges that Ventress Defendants Byrd, Glenn, Gordon, Haggins, Lewis, Myers, Peters, Rumph, and Strickland engaged in a conspiracy to unlawfully suppress Barefield's, and others, reports of rape at Ventress.  (Doc. # 74 at 147.)[55]  In response to both torts, the Defendants raise the same arguments: (1) state-agent immunity bars the claim, and (2) Barefield fails to plausibly allege the elements of the claim.  Neither argument is persuasive at this stage, and the Ventress

---

[54] Notably, Barefield does not bring either of his state-law claims against the ADOC officials.

[55] Jones is the only Ventress Defendant not named in this claim.  (*See* Doc. # 74 at 147.)

Defendants' motions to dismiss will be denied.

### 1.    *State-Agent Immunity*

As a threshold matter, Defendants assert that they are entitled to state-agent immunity.  At this juncture, they are not.  State-agent immunity attaches when (1) a defendant engages in immunized conduct and (2) no exception to immunity applies.  *Ex Parte Cranman*, 792 So. 2d 392 (Ala. 2000) (plurality).  Here, the court need not discuss whether Defendants engaged in immunized conduct because, even if they did, Barefield's complaint alleges facts that demonstrate conduct that falls into recognized exceptions to state-agent immunity.  *Wilson v. Dunn,* 618 F. Supp. 3d 1253, 1286 (N.D. Ala. 2022) (finding an applicable exception without analyzing whether the conduct was immunized in the first place).

Under Alabama law, state agents are not entitled to state-agent immunity:

> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; *or* (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Ex parte Cranman*, 792 So. 2d at 405 (emphasis added).  State-agent immunity does not apply "unless the inapplicability of all the [] exceptions is clear from the face of the complaint."  *Odom v. Helms*, 314 So. 3d 220, 229 n.3 (Ala. 2020)

(citation omitted).

Here, Barefield has plausibly alleged conduct beyond Defendants' authority. *See Ex parte Cranman*, 792 So. 2d at 405. Under this exception, a prisoner may defeat state-agent immunity by sufficiently alleging that prison officials knowingly acted in violation of prison policy. *See Ala. Dept. of Corr. v. Thompson*, 855 So. 2d 1016, 1021 (Ala. 2003) ("[Defendant] willfully violated a written regulation . . . . Therefore [Defendant] acted willfully or beyond [his] authority."); *Robinson v. Montgomery Cty. Bd. of Educ.*, 2021 WL 3200988, at *14 (M.D. Ala. July 28, 2021) (Watkins, J.) (recognizing that state-agent immunity does not apply where officials fail to "discharge duties pursuant to detailed rules or regulations"). Barefield alleges that each of these Defendants knowingly violated ADOC and/or PREA rules in various and numerous ways that relate to both his outrage and civil conspiracy claims.

Additionally, based on the nature of the allegations, it is plausible that Defendants' actions were "malicious" and "willful" for the same reason that it is plausible that their actions constituted deliberate indifference to Barefield's serious medical needs—at least as it relates to Haggins, Lewis, Strickland, Gordon, and Peters. *See D.S.*, 2022 WL 1785262, at *12. As for Glenn, Barefield alleges she threatened to ignore his future reports of rape while laughing at him—even though she was responsible for receiving rape reports and protecting Barefield. (Doc. # 74

at 30.)  That is plausibly malicious conduct on its face.  Accordingly, at this stage, Defendants are excepted from the application of state-agent immunity.

### 2.    *Intentional Infliction of Emotional Distress (*i.e., *Outrage)*

Turning to the merits, to state an outrage claim, Barefield must plausibly allege four elements:

> (1) the defendant must have intended to inflict emotional distress, or should have known that his or her acts would result in emotional distress; (2) the act must be extreme and outrageous; (3) the act must have caused plaintiff's distress; and (4) plaintiff's emotional distress must have been so severe that no reasonable person could be expected to endure it.

*K.M. v. Ala Dep't Youth Servs.*, 360 F. Supp 2d 1253, 1259 (M.D. Ala. 2005). This cause of action is reserved for conduct that is "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. *Jenkins v. U.S. Fid. & Guar. Co.*, 698 So. 2d 765, 768 (Ala. 1997).  Barefield brings outrage claims against four Ventress Defendants: Strickland, Haggins, Glenn, and Lewis. (Doc. # 74 at 143–46.)

These Defendants argue that Barefield's allegations "do not depict any act that was extreme or outrageous."  (Doc. # 91 at 31.)  The court disagrees. Barefield plausibly alleges that Haggins, Strickland, and Lewis—his custodians— blatantly ignored his reports of a kidnapping and a knifepoint rape.  Not only that, Barefield alleges that these Defendants, in retaliation against Barefield for

reporting the rape, moved the rapist to a cell near Barefield, which forced Barefield to frequently see the rapist and endure the rapists' threats and taunts.  Finally, Barefield alleges that Glenn, whose job it was to protect Barefield, received a confidential rape report from Barefield and used that information to harass and threaten Barefield in front of other inmates, stating, while laughing, "the next time those black boys sexually assault or sexually harass you, don't come running my way or ask me for help."  (Doc. # 74 at 30.)

All of this, if true, is plausibly extreme, outrageous, atrocious, and utterly intolerable in a civilized society.  *See Avendano v. Shaw*, 2022 WL 3572663, at *4 (Ala. Aug. 19, 2022) (reiterating that while the tort is extremely limited, "an outrage claim can proceed past the motion-to-dismiss stage if the complaint alleges conduct so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." (internal quotations omitted)).  While the tort of outrage does not recognize mere threats, petty oppression, or other trivialities, *see American Rd. Serv. Co. v. Inmon*, 394 So. 2d 361, 364-65 (Ala. 1980), the court finds that Barefield's allegations clear those hurdles because he allegedly suffered extreme emotional and physical damage from Strickland, Lewis, and Haggins's decisions to blatantly ignore his rape report, such as by contracting Hepatitis C.  And because Glenn was not merely threatening or insulting him—she knew he was a rape victim, she publicly announced that

146

confidential information, and she threatened that she would not protect him from future rapes,[56] which he relied on her to do. Glenn's statement was not just an abhorrent threat and emotionally abusive to a known rape victim. *See Continental Casualty Insurance Co. v. McDonald*, 567 So. 2d 1208, 1219 (Ala. 1990) ("The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity."). Glenn's public statement also gave notice to violent inmates that Barefield was a rape victim and that he would not be protected from future rape, thus putting him in even more danger than that which already allegedly pervaded the prison. *Id.* at 1216 ("The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position . . . which gives him actual or apparent authority over the other, or power to affect his interests.").

The court cannot declare that such extreme allegations are insufficient as a matter of law to allege a claim for intentional infliction of emotional distress.[57] If

---

[56] As Justice Blackmun long ago noted, "[t]he horrors experienced by many young inmates . . . border on the unimaginable. Prison rape not only threatens the lives of those who fall prey to their aggressors, but is potentially devastating to the human spirit. Shame, depression, and a shattering loss of self-esteem accompany the perpetual terror the victim thereafter must endure. Unable to fend for himself without the protection of prison officials, the victim finds himself at the mercy of larger, stronger, and ruthless inmates." *Farmer v. Brennan*, 511 U.S. 825, 853 (1994) (Blackmun, J., concurring) (citations omitted).

[57] As stated, outrage is an "extremely" circumscribed tort in Alabama. *Wilson v. Univ. of Ala. Health Servs. Found., P.C.*, 266 So. 3d 674, 676–77 (Ala. 2017*).* "It is so limited that [the

147

discovery breathes truth to these allegations, a jury is fit to determine whether the conduct is "utterly intolerable in a civilized society." *Wilson v. Univ. of Alabama Health Servs. Found., P.C.*, 266 So. 3d 674, 676–77 (Ala. 2017). After all, a jury, not a lone judge, is the legal manifestation of that "civilized society." Accordingly, Defendants' motions to dismiss Barefield's outrage claims are due to be denied. *See Swain v. AIG Claims, Inc.*, 295 So. 3d 1072, 1084 (Ala. Civ. App. 2019) (denying a motion to dismiss because, when "viewing all the allegations of the complaint most strongly in [plaintiff's] favor, [the court] cannot say that there is no possibility that he might prevail on his claim alleging intentional infliction of emotional distress.").

### 3. *Civil Conspiracy Against Ventress Defendants*

In Count IV, Barefield brings a civil conspiracy claim against all Ventress Defendants other than Jones. (Doc. # 74 at 147.) He alleges that they unlawfully conspired to suppress, obstruct, underreport, and ignore Barefield's reports of

---

Alabama Supreme Court] has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement; and (3) egregious sexual harassment." *Id.* However, this list is not exhaustive. The Alabama Supreme Court has been clear that a viable outrage claim may proceed in other circumstances. *Id.* The baseline determination is whether the conduct complained of "is so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized society." *Id.*; *see also Avendano v. Shaw*, 2022 WL 3572663, at *4 (Ala. Aug. 19, 2022). Applying this test, it is apparent to the court that a custodian intentionally ignoring a rape report from someone in their custody constitutes conduct that a reasonable juror could determine is "atrocious and utterly intolerable in a civilized society." *Id.* Similarly, a custodian and guardians' *public* threat (in the presence of violent criminals) to ignore future threats of rape is likewise plausibly outrageous. The court is bound to apply Alabama's law as it has been articulated.

sexual assault at Ventress.   The alleged goal was to label the sexual assault allegation as "unsubstantiated," which would negate the need for more work from the Ventress Defendants, such as a further investigation and a referral of the allegation to the district attorney for criminal prosecution.  (Doc. # 74 at 147–48.)  Moreover, suppressing rape reports generally would manufacture better statistics at Ventress, and in turn, make the Defendants look better.   Defendants raise two arguments in response.   First, they invoke the "intracorporate conspiracy doctrine" to argue that Ventress employees cannot be in a conspiracy together.  (Doc. # 91 at 35–37.)   Second, they say that Barefield fails to plausibly allege that Defendants acted in concert to suppress and obstruct Barefield's sexual assault report.  (Doc. # 91 at 35–37.)   Both arguments fail at this stage and Barefield's civil conspiracy claim will proceed.

Under Alabama law, a plaintiff proves a civil conspiracy claim by showing "a concerted action by two or more people that achieved an unlawful purpose or a lawful end by unlawful means."  *Luck v. Primus Auto Fin. Servs., Inc.*, 763 So. 2d 243, 247 (Ala. 2000) (citing *McLemore v. Ford Motor Co.*, 628 So. 2d 548 (Ala. 1993)).  The intracorporate conspiracy doctrine provides that "a corporation cannot conspire with its employees, and [that] its employees, when acting in the scope of their employment, cannot conspire among themselves."  *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1035 (11th Cir. 2000) (en banc).  The rationale

behind this rule is simple.   A conspiracy requires at least two actors, and a corporation, either acting as a single entity or collectively through its agents, is one actor and therefore cannot conspire with itself.   And because an employee is an agent of the corporation, all acts of the employee made in the line and scope of his employment are considered the actions of the corporation.   An employee acts within the scope of employment when "performing a function that, but for the alleged [wrongdoing], was within the ambit of [his] scope of authority . . . *and* [is] in furtherance of the employer's business."  *See Grider v. City of Auburn*, 618 F.3d 1240, 1261 n.30 (11th Cir. 2010) (emphasis added).

While the "doctrine applies to public entities," like the ADOC, *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001),[58] it is nonetheless inapplicable here because Barefield alleges a conspiracy that was not "in furtherance of the employer's business," *Grider*, 618 F.3d at 1261 n.30.  That is, Barefield alleges the Ventress Defendants conspired to obstruct and suppress reports of sexual assaults to avoid bad statistics and additional work, to punish inmates for reporting sexual assaults in the first place, and to criminally obstruct reports of sexual abuse.  Barefield alleges that this conspiracy was directly against overarching ADOC policy, which requires, in part, that officials, upon learning of an allegation of a PREA-related incident, preserve evidence, take the alleged

---

[58]   Ironically, State entities are considered fictional persons under the intracorporate conspiracy doctrine, but they are not under Section 1983.  *See supra* n. 37.

victim to the medical unit for an evaluation, secure the crime scene, notify investigators, draft an incident report as soon as possible, and request that the victim not bathe or wash, among other things.  (Doc. # 74 at 26–27.)

If a corporation's goal is to do X, and a handful of its agents conspire to unlawfully do the opposite of X, then those individuals are not acting in furtherance of the corporation.  They are acting against it.  By defying X, they are acting outside of the corporation's authorization.  And because they are acting outside of the corporation's prerogative, they cannot be said to be conspiring as a singular entity (the corporation) and cannot be shielded under the intracorporate conspiracy doctrine.  Of course, individual defendants could be protected by the doctrine if it turns out that the corporation itself, in this case the ADOC—despite a nominal policy or regulation to the contrary—in fact authorized its agents to do the opposite of X.  But an employee cannot take actions that are simultaneously "in furtherance" of the overarching entity and completely against its prerogatives.  If the actions are not in furtherance of the corporation, then they are not the corporation's actions, as would be necessary to confer 'single entity' status to the collective actions of the individual employees.

Because Barefield alleges a conspiracy that is based on conduct that is in direct contravention of ADOC's written policies and regulations, Barefield has plausibly alleged that Defendants conspired to act contrary to ADOC's "business."

Based on the allegations in the complaint, it is only plausible that the intracorporate conspiracy doctrine does not apply.[59]

Aside from the intracorporate conspiracy doctrine, Defendants argue that Barefield has failed to state the concerted action element of a civil conspiracy claim. Under Alabama law, a civil conspiracy claim requires "a concerted action by two or more people that achieved an unlawful purpose or a lawful end by unlawful means." *Luck*, 763 So. 2d at 247 (citing *McLemore*, 628 So. 2d at 548). Defendants argue: "There is nothing to indicate any 'concerted action' undertaken by all [Defendants] together to achieve a particular result of 'suppress[ing] reports of sexual assault at Ventress.'" (Doc. # 102 at 19.) Rather, according to Defendants, Barefield has alleged that "different Defendants named in this count took different actions . . . depending on the information they received."

---

[59] Alternatively, the intracorporate conspiracy doctrine does not apply because Barefield brings allegations that involve the obstruction of a complaint of sexual abuse—which constitutes criminal activity in Alabama. Ala. Code § 13A-10-2 (criminalizing conduct used to "obstruct governmental operations . . . by means of intimidation, physical force or interference by any other independently unlawful act"). And, as the Eleventh Circuit has recognized, criminal activity perpetrated to impinge civil laws is conduct that is exempted from the intracorporate conspiracy doctrine. *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1040 (11th Cir. 2000). This is so because, "the corporate entity fiction was designed to expand corporate liability by holding the corporation liable for the acts of its agents. The intracorporate conspiracy doctrine shielding corporate employees and the corporation itself from unlawful conspiracy claims was a product of this fiction. However, the fiction was never intended nor used to shield conspiratorial conduct that was criminal in nature," regardless of whether the action at bar is based in civil or criminal law. *Id.* at 1040–41. Defendants argue that Barefield cannot rely on this exception because he did not specifically cite Ala. Code. § 13A-10-2 in his complaint; however, Barefield's complaint does substantively allege facts that plausibly fall into this criminal category. Therefore, the absence of references to a specific criminal code section does not change the nature of Barefield's pleadings. And his reliance on the criminal activity exception to the intracorporate conspiracy doctrine flows naturally from the complaint's allegations and is permissible.

(Doc. # 102 at 19.)

In response, Barefield argues that the totality of the actions taken by each of the Defendants provides a plausible "basis for inferring a tacit agreement among Defendants to underreport sexual assaults." (Doc. # 95 at 50.) The court agrees with Barefield. At this early stage, Barefield has plausibly alleged, through factual allegations that create circumstantial inferences, that Defendants acted in concert to suppress Barefield's sexual assault claim. *See Eidson v. Olin Corp.,* 527 So. 2d 1283, 1285 (Ala. 1988) ("In order to prove a conspiracy, a plaintiff may present circumstantial evidence."). Barefield alleges that each Defendant took an action, against ADOC policy, that would function to suppress and obstruct his rape report and his ability to report sexual abuse. (Doc. # 74 at ¶ 566–570 (ignoring multiple reports, failing to provide medical treatment, failing to record rape reports, failing to investigate non-compliance with the PREA, *etc.*).)

Further, Barefield alleges that Strickland—the ultimate authority at Ventress—blamed Barefield for burdening him with the rape report and even demanded that Barefield explain what his "intentions" were in reporting the crime. (Doc. # 74 at ¶ 544.) Meanwhile, Gordon, Lewis, Peters, Strickland, and Glenn allegedly retaliated against Barefield by moving Barefield's assailant to a neighboring cell close enough to allow Lowe to harass and threaten Barefield for reporting the rape. (Doc. # 74 at 148.) And Gordon, Myers, Byrd, and Rumph all

allegedly worked together to "deny [Barefield] timely access to Defendant Gordon, the Ventress Institutional PREA Compliance Manager," by repeatedly refusing to give Barefield access to an audience with Gordon.   (Doc. # 74 at 147–48.) Moreover, from 2016 to 2018, somehow not one Ventress correctional officer observed or intervened to stop a *single* sexual assault. (Doc. # 74 at 49.)   Finally, Barefield alleges that 96% of sexual assault allegations in 2018 were ultimately found to be "unsubstantiated," a troubling number that a reasonable jury could use to plausibly infer, in conjunction with other evidence, that the Ventress Defendants conspired to suppress, ignore, and decline to investigate sexual assault reports, like Barefield's.  (Doc. # 74 at 53.)

In short, the allegations in the complaint, in their totality, plausibly create the inference that the Ventress Defendants took concerted action to obstruct Barefield's sexual abuse report and to suppress his ability to report sexual abuse. Accordingly, the Ventress Defendants' motion to dismiss Barefield's civil-conspiracy claim brought in Count IV will be denied.

## H.   <u>Fictitious Defendants</u>

Finally, Barefield seeks to proceed against many fictitious defendants.  For each, Barefield provides general information about the unknown defendants, such as their job title and position.  But "[a]s a general matter, fictitious-party pleading is not permitted in federal court" unless "the plaintiff's description of the defendant

is so specific as to be 'at the very worst, surplusage.'" *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010). Furthermore, a plaintiff relying upon this rule needs to provide a "description . . . sufficiently clear to allow service of process on the [fictitious party]." *Dean v. Barber*, 951 F.2d 1210, 1215–16 (11th Cir. 1992) (citations omitted).

Here, Barefield has not provided sufficient information to permit service upon the alleged fictitious defendants. Accordingly, all unknown Defendants will be dismissed without prejudice at this time. *See Moulds v. Bullard*, 345 F. App'x 387, 390 (11th Cir. 2009) (affirming dismissal of fictitious parties where plaintiff "gave general descriptions of . . . such as by indicating the duty stations to which they were assigned, but [providing] nothing in the record [that] suggest[ed] those officers' identities and [failing to] timely request any discovery that would have allowed him to learn their names and serve process on them."). However, Barefield may seek to add the unknown, fictitious defendants via an amended complaint once he has obtained more information, either through discovery or otherwise. *See McKee,* 2023 WL 5103102, at *9 n.2 (dismissing unknown defendants and directing the plaintiff to "expeditiously proceed in determining the names of those correctional officers who were present at the time of the assault," and add them to the lawsuit).

One final point regarding the statute of limitations. While recognizing that

this will be a battle for another day, if at all, the court's experience with dismissals *without prejudice* that are potentially outside of the applicable statute of limitations counsels in favor of addressing some statute-related issues to provide clarity and transparency.

All constitutional claims brought pursuant to 42 U.S.C. § 1983 are considered tort actions that are subject to the statute of limitations governing personal injury actions in the state where the Section 1983 claim is filed. *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008); *see also Wallace v. Kato*, 549 U.S. 384, 394 (2007) (holding that state law also determines statutory tolling rules in Section 1983 actions). In Alabama, the governing statute of limitations is two years. *McNair*, 515 F.3d at 1173; *see also* Ala. Code § 6-2-38(1). However, the running of the statute is dictated by federal law, which provides in Section 1983 cases that "the statute [of limitations] does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Calhoun v. Alabama Alcoholic Beverage Control Board,* 705 F.2d 422, 425 (11th Cir.1983) (quoting *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 930 (5th Cir. 1975)). Thus, a Section 1983 action will generally not accrue until the plaintiff "can identify the person who inflicted the injury." *Baker v. Sanford*, 484 F. App'x 291, 293 (11th Cir. 2012) (citing *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir. 2003).

For these unknown defendants it may be case the case that Barefield not only should not have been aware, but in fact *could not* have been aware of who plausibly violated his rights—especially in the Eighth Amendment failure-to-protect context—because of the opaque nature of the Alabama prison system. "No plaintiff could be expected to allege facts of which only the defendants have knowledge and control." *Hollingsworth v. Edgar*, 2006 WL 2009104, at *7 (M.D. Ala. July 18, 2006) (Watkins, J.). Accordingly, it may be the case that the statute never began to run against certain unknown defendants if Barefield was in-fact unable to access certain information from the ADOC—such as what official was checking wristbands at the F Dorm entrance or who was guarding the canteen, or who was in the cubicle, or who decided that F Dorm should not be monitored for hours on end, *etc*.

Nonetheless, after a limitations period has run, the action is generally barred, regardless of the merits of the plaintiff's claims. *Arce v. Garcia*, 434 F.3d 1254, 1261 (11th Cir. 2006). But, under the doctrine of equitable tolling, the statute of limitations is paused "when a litigant has pursued his rights diligently, but some extraordinary circumstance prevents him from bringing a timely action." *Fedance v. Harris*, 1 F.4th 1278, 1284 (11th Cir. 2021) (quotation marks omitted). While a dismissal without prejudice "does not automatically toll the statute of limitations," courts, "acting in their equitable capacity, will toll statutes of limitations" if equity

so demands.  However, the burden is on the plaintiff to show that equitable tolling is warranted.  *Ross v. Buckeye Cellulose Corp.*, 980 F.2d 648, 661 (11th Cir. 1993).

When considering equitable tolling, the "interests of justice are most often aligned with the plaintiff," when "[he] has no reasonable way of discovering the wrong perpetrated against [him] . . . or when [he] timely files a technically defective pleading and in all other respects acts with the proper diligence . . . which . . . statutes of limitation were intended to insure." *Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993) (quotations and citations omitted).  The interests of justice side with the defendant when "plaintiff does not file [his] action in a timely fashion despite knowing or being in a position reasonably to know that the limitations period is running . . . and, of course, when [he] fails to act with due diligence." *Id.*

Here, while the burden will be on Barefield in any hypothetical equitable tolling scenario, it is clear to the court at present that (1) given the opaque nature of prison systems, Barefield may have "no reasonable way of discovering" necessary facts that may complete a viable cause of action; and (2) generally speaking, he has thus far acted with the utmost diligence in pursuing his claims.  *Id.*  In many respects, Barefield is tasked with looking through a glass darkly at this stage.  It would be inherently inequitable to later bar his claims when he acquires a clear

view of the case during discovery simply because, pre-discovery, necessary information was withheld from his view by Defendants.

In summary, the Unknown Fictitious Defendants will be dismissed. However, Barefield may seek leave to file an amended complaint once he has obtained more information through discovery or otherwise. If he does so, the statute of limitation may pose obstacles; however, those obstacles are not necessarily insurmountable.

## VI.  CONCLUSION

Accordingly, it is ORDERED as follows:

(1)  The ADOC Defendants' motion to dismiss (Doc. # 88) is GRANTED in part and DENIED in part.

(2)  The Ventress Defendants' motion to dismiss (Doc. # 90) is GRANTED in part and DENIED in part.

(3)  All counts (Count I-L; Count II-L) against Defendant Kay Ivey are DISMISSED.

(4)  The deliberate indifference to excessive inmate-on-inmate violence claims brought in Count I against Defendants Williams (Count I-C), Jones (Count I-N), Gordon (Count I-Q), Peters (Count I-R), Haggins (Count I-S), Glenn (Count I-T), Rumph (Count I-U), Byrd (Count I-V), and Lewis (Count I-W) are

DISMISSED.

(5)     The deliberate indifference to excessive inmate-on-inmate violence claims brought in Count I shall proceed against Defendants Dunn (Count I-A), Culliver (Count I-B), Stamper (Count I-D), Naglich (Count I-E), Abbott (Count I-G), Mercado (Count I-H), Brand (Count I-I), Hill (Count I-J), Vincent (Count I-K), Strickland (Count I-M), and Myers (Count I-P).

(6)     The individualized failure-to-protect claims brought in Count I (A-W) are DISMISSED.

(7)     The deliberate indifference to serious-medical-needs claims brought in Count II against Defendants Glenn (Count II-B), Vincent (Count II-G), Naglich (Count II-H), Culliver (Count II-I), Hill (Count II-J), and Dunn (Count II-K) are DISMISSED.

(8)     The deliberate indifference to serious-medical-needs claims brought in Count II shall proceed against Defendants Haggins (Count II-A), Strickland (Count II-C), Lewis (Count II-D), Gordon (Count II-E), and Peters (Count II-F).

(9)     The intentional infliction of emotional distress (*i.e.*, outrage) state-law claims in Count III shall proceed against Defendants Strickland (Count III-A), Haggins (Count III-B), Glenn

(Count III-C), and Lewis (Count III-D).

(10)    The civil conspiracy state-law claim brought in Count IV shall proceed against Defendants Byrd, Glenn, Gordon, Haggins, Lewis, Myers, Peters, Rumph, and Strickland.

(11)    All fictitious parties are DISMISSED.

This case is not closed.

DONE this 22nd day of August, 2023.

_____
/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE
